1  SEYFARTH SHAW LLP
   Aaron R. Lubeley (SBN 199837)
2  alubeley@seyfarth.com
   Simon L. Yang (SBN 260286)
3  syang@seyfarth.com
   Meagan Sue O'Dell (SBN 280086)
4  modell@seyfarth.com
   601 South Figueroa Street, Suite 3300
5  Los Angeles, California 90017-5793
   Telephone:  (213) 270-9600
6  Facsimile:  (213) 270-9601

7  Attorneys for Defendant
   AIRPORT TERMINAL SERVICES, INC.
8

9                UNITED STATES DISTRICT COURT
10              CENTRAL DISTRICT OF CALIFORNIA
11

12 JAYME TIPTON,                           Case No.  2:18-cv-9503 AB (JEMx)
13            Plaintiff,                    *Assigned to Hon. Andre Birotte Jr.*
14     v.                                   **APPENDIX OF EVIDENCE IN
                                            SUPPORT OF AIRPORT
15 AIRPORT TERMINAL SERVICES, INC.,         TERMINAL SERVICES, INC.'S
   and DOES 1 through 100, inclusive,       MOTION FOR SUMMARY
16                                          JUDGMENT OR IN THE
17            Defendants.                   ALTERNATIVE, PARTIAL
                                            SUMMARY JUDGMENT**
18
                                           [Filed concurrently with Separate
19                                         Statement of Undisputed Material Facts,
                                           Declaration of Meagan O'Dell,
20                                         Memorandum in Support of Motion,
                                           Notice of Motion, Request for Judicial
21                                         Notice, [Proposed] Judgment, and
                                           [Proposed] Order]
22
                                           Date:          February 7, 2020
23                                         Time:          10:00 a.m.
                                           Courtroom:     7B
24
25                                         Complaint Filed:     October 4, 2018
26
27
28

                                                          APPENDIX OF EVIDENCE

1 | **TABLE OF CONTENTS**

2 | **DECLARATION OF MEAGAN SUE O'DELL**

3 | Exhibit 1 – Relevant Excerpts from the Deposition of Plaintiff Jayme Tipton,

4 | Volume 1

5 | Tipton Deposition Exhibit No. 5

6 | Tipton Deposition Exhibit No. 9

7 | Tipton Deposition Exhibit No. 12

8 | Tipton Deposition Exhibit No. 13

9 | Tipton Deposition Exhibit No. 14

10 | Tipton Deposition Exhibit No. 15

11 | Exhibit 2 – Relevant Excerpts from the Deposition of Plaintiff Jayme Tipton,

12 | Volume 2

13 | Exhibit 3 – Relevant Excerpts from the Deposition of Jeff Luetkenhaus as the

14 | Person Most Knowledgeable regarding Policies and Procedures

15 | Exhibit 4 – Relevant Excerpts from the Deposition of Shonta Henderson as the

16 | Person Most Knowledgeable regarding Termination

17 | Henderson PMK Deposition Exhibit No. 2

18 | Exhibit 5 – Relevant Excerpts from the Deposition of Shonta Henderson as an

19 | Individual

20 | Henderson Deposition Exhibit No. 8

21 | Henderson Deposition Exhibit No. 9

22 | Exhibit 6  – Relevant Excerpts from the Deposition of Damien Neri

23 | Exhibit 7 – Relevant Excerpts from the Deposition of Moses Guillen

24 | Exhibit 8 – Relevant Excerpts from the Deposition of Deon Brown

25 | Exhibit 9 – December 10, 2019 Meet and Confer Correspondence to Plaintiff's

26 | counsel regarding anticipated Motion for Summary Judgment or Summary Adjudication

27 |

28 |

1    Exhibit 10– Meet and Confer e-mail exchange with Plaintiff's counsel regarding

2    anticipated Motion for Summary Judgment or Summary Adjudication.

3

4    DATED: January 3, 2020                    Respectfully submitted,

5                                              SEYFARTH SHAW LLP

6

7                                              By: _____ */s/ Meagan S. O'Dell*

8                                                   Aaron R. Lubeley
                                                    Simon L. Yang
9                                                   Meagan Sue O'Dell
                                                    Attorneys for Defendant
10                                                  AIRPORT TERMINAL SERVICES,
                                                    INC.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

APPENDIX OF EVIDENCE

# DECLARATION

SEYFARTH SHAW LLP
Aaron R. Lubeley (SBN 199837)
alubeley@seyfarth.com
Simon L. Yang (SBN 260286)
syang@seyfarth.com
Meagan Sue O'Dell (SBN 280086)
modell@seyfarth.com
601 South Figueroa Street, Suite 3300
Los Angeles, California 90017-5793
Telephone:  (213) 270-9600
Facsimile:    (213) 270-9601

Attorneys for Defendant
AIRPORT TERMINAL SERVICES, INC.

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JAYME TIPTON,<br><br>Plaintiff,<br><br>v.<br><br>AIRPORT TERMINAL SERVICES, INC., and DOES 1 through 100, inclusive,<br><br>Defendants. | Case No.  2:18-cv-9503 AB (JEMx)<br><br>*Assigned to Hon. Andre Birotte Jr.*<br><br>**DECLARATION OF MEAGAN SUE O'DELL IN SUPPORT OF AIRPORT TERMINAL SERVICES, INC.'S MOTION FOR SUMMARY JUDGMENT OR IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT**<br><br>[Filed concurrently with Separate Statement of Undisputed Material Facts, Appendix of Evidence, Memorandum in Support of Motion, Notice of Motion, Request for Judicial Notice, [Proposed] Judgment, and [Proposed] Order]<br><br>Date:          February 7, 2020<br>Time:          10:00 a.m.<br>Courtroom:    7B<br><br>Complaint Filed:      October 4, 2018 |

# DECLARATION OF MEAGAN SUE O'DELL

I, Meagan Sue O'Dell, declare as follows:

1.     I have personal knowledge of the facts set forth in this declaration and could and would testify to them competently under oath if called as a witness to do so.

2.     I am an attorney at law, duly licensed to practice before this Court and before all courts in the State of California. I am an attorney in the law firm of Seyfarth Shaw LLP, attorneys of record for Defendant Airport Terminal Services, Inc. in connection with the above-captioned matter. The following is based upon my own personal knowledge, and if called upon to testify, I could and would competently testify thereto.

3.     On October 23, 2019, Aaron Lubeley of Seyfarth Shaw LLP took Plaintiff Jayme Tipton's deposition. I have reviewed the transcript of this deposition. Copied as **Exhibit 1** in the Appendix of Evidence of which this declaration is a part are relevant excerpts from Volume 1 of Ms. Tipton's deposition transcript.

4.     At Ms. Tipton's deposition, she authenticated various documents. They are copied in the Appendix of Evidence of which this declaration is a part as Tipton Deposition Exhibits Nos. 5, 9, 12, 13, 14, and 15, redacted to comply with the Local Rules.

5.     On December 2, 2019, Aaron Lubeley of Seyfarth Shaw LLP completed the deposition of Plaintiff Jayme Tipton. I have reviewed the transcript of this deposition. Copied as **Exhibit 2** in the Appendix of Evidence of which this declaration is a part are relevant excerpts from Volume 2 of Ms. Tipton's deposition transcript.

6.     On October 29, 2019, Plaintiff took the deposition of Jeffrey Luetkenhaus as the Person Most Knowledgeable regarding Policies and Procedures. I have reviewed the transcript of this deposition. Copied as **Exhibit 3** in the Appendix of Evidence of which this declaration is a part are relevant excerpts from Mr. Luetkenhaus's deposition transcript.

7.      On November 22, 2019, Plaintiff took the deposition of Shonta Henderson as the Person Most Knowledgeable regarding Plaintiff's Termination. I have reviewed the transcript of this deposition. Copied as **Exhibit 4** in the Appendix of Evidence of which this declaration is a part are relevant excerpts from Ms. Henderson's deposition transcript.

8.      At Ms. Henderson's deposition, she authenticated various documents. They are copied in the Appendix of Evidence of which this declaration is a part as Henderson PMK Deposition Exhibit No. 2.

9.      On November 22, 2019, Plaintiff took the deposition of Shonta Henderson as an individual. I have reviewed the transcript of this deposition. Copied as **Exhibit 5** in the Appendix of Evidence of which this declaration is a part are relevant excerpts from Ms. Henderson's deposition transcript.

10.     At Ms. Henderson's deposition, she authenticated various documents. They are copied in the Appendix of Evidence of which this declaration is a part as Henderson Deposition Exhibits Nos. 8 and 9, redacted to comply with the Local Rules.

11.     On November 25, 2019, Plaintiff took Damien Neri's deposition. I have reviewed the transcript of this deposition. Copied as **Exhibit 6** in the Appendix of Evidence of which this declaration is a part are relevant excerpts from Mr. Neri's deposition transcript.

12.     On November 25, 2019, Plaintiff took Moses Guillen's deposition. I have reviewed the transcript of this deposition. Copied as **Exhibit 7** in the Appendix of Evidence of which this declaration is a part are relevant excerpts from Mr. Guillen's deposition transcript.

13.     On December 18, 2019, I took Deon Brown's deposition. I have reviewed the transcript of this deposition. Copied as **Exhibit 8** in the Appendix of Evidence of which this declaration is a part are relevant excerpts from Mr. Brown's deposition transcript.

DECLARATION OF MEAGAN SUE O'DELL

14.     On December 10, 2019, I sent meet and confer correspondence to Plaintiff's counsel via mail and e-mail that outlined ATS's intent to file a Motion for Summary Judgment or Summary Adjudication, as well as a Rule 11 Motion for Sanctions. A true and correct copy of this communication is copied as **Exhibit 9** in the Appendix of Evidence of which this declaration is a part.

15.     On December 17, 2019, I conferred with Plaintiff's counsel via phone to discuss in greater detail ATS's intended Motion for Summary Judgment or Summary Adjudication, as well as its Rule 11 Motion for Sanctions.

16.     On December 18, 2019, Plaintiff's counsel informed me that Plaintiff was willing to dismiss, with prejudice, her claims for wrongful termination and retaliation if ATS would refrain from filing their anticipated motions.

17.     On December 19, 2019, I provided Plaintiff's counsel with two cases that further supported ATS's intent to seek summary judgment of all of Plaintiff's claims.

18.     On December 20, 2019, I sent e-mail correspondence to Plaintiff's counsel to continue meet and confer discussions in light of the supportive case law I provided. On December 30, 2019, Plaintiff's counsel responded by contending that each of Plaintiff's claims had merit, and only offering to dismiss her claim for retaliation in an effort to forego motion practice. A true and correct copy of my e-mail communications with Plaintiff's counsel are copied as **Exhibit 10** in the Appendix of Evidence of which this declaration is a part.

3

19.    During the early stages of this case, Aaron Lubeley and I spoke to Plaintiff's counsel via phone and advised that ATS was willing to reinstate Plaintiff. Plaintiff's counsel advised that Plaintiff was not interested in returning to work at ATS, and declined the offer.

I declare under penalty of perjury under the laws of the State of California and the United States of America that the foregoing is true and correct.

Executed on this 3rd day of January, 2020, at Los Angeles, California.

*/s/ Meagan Sue O'Dell*
Meagan Sue O'Dell

4

# EXHIBIT 1

Jayme Tipton (v.I)    Jayme Tipton vs. Airport Terminal Services, Inc.    1147705

1              UNITED STATES DISTRICT COURT

2              CENTRAL DISTRICT OF CALIFORNIA

3

4

5    JAYME TIPTON,                    )
                                      )
6              Plaintiff,             )
                                      )
7    vs.                              )  Case No.
                                      )  2:18-cv-09503
8    AIRPORT TERMINAL SERVICES, INC., )  AB-JEM
     et al.,                          )
9                                     )
               Defendants.            )
10                                    )
     _____)
11

12

13

14              VOLUME I

15    VIDEOTAPED DEPOSITION OF JAYME TIPTON

16         Los Angeles, California

17       Wednesday, October 23, 2019

18

19

20   Reported by:

21   Norma L. Gaddison, CSR No. 4214,
     Certified Realtime Professional
22

23

24

25



10/23/2019
Jayme Tipton (v.I)                    Jayme Tipton vs. Airport Terminal Services, Inc.                    1147705

1              UNITED STATES DISTRICT COURT

2              CENTRAL DISTRICT OF CALIFORNIA

3

4

5    JAYME TIPTON,                         )
                                           )
6              Plaintiff,                  )
                                           )
7    vs.                                   )  Case No.
                                           )  2:18-cv-09503
8    AIRPORT TERMINAL SERVICES, INC.,  )  AB-JEM
     et al.,                               )
9                                          )
               Defendants.                 )
10                                         )
     _____ )

11

12

13

14              Videotaped deposition of JAYME TIPTON,

15    Volume One, taken on behalf of Defendants, at 601 S.

16    Figueroa Street, Suite 3300, Los Angeles, California,

17    beginning at 10:18 A.M. and ending at 3:46 P.M., on

18    October 23, 2019, before NORMA L. GADDISON, Certified

19    Shorthand Reporter No. 4214.

20

21

22

23

24

25

Kusar® Keeping Your Word Is Our Business℠

```
 1    APPEARANCES:

 2    For Plaintiff:

 3              SHEGERIAN & ASSOCIATES
               BY:  AARON GBEWONYO, Esq.
 4              225 Santa Monica Boulevard, Suite 700
               Santa Monica, California 90401
 5              (310) 860-0770
               agbewonyo@shergerianlaw.com
 6


 7    For Defendants:

 8              SEYFARTH SHAW
 9              BY:  AARON LUBELEY, Esq.
               601 S. Figueroa Street, Suite 3300
10              Los Angeles, California 90017
               (213) 270-9600
11              alubeley@seyfarth.com

12

13    Also Present:

14              SPENCER BENVENISTE, Videographer
               CAROLINA NUNEZ
15

16

17

18

19

20

21

22

23

24

25
```

Case 2:18-cv-09503-AB-JEM    Document 52    Filed 01/03/20    Page 14 of 258    Page ID
#:1337
Jayme Tipton (v.I)                    Jayme Tipton vs. Airport Terminal Services, Inc.                    1147705

```
 1                        I N D E X

 2    WITNESS                         EXAMINATION

 3    JAYME TIPTON

 4                                    PAGE

 5            BY MR. LUBELEY          7

 6

 7                        EXHIBITS

 8    NUMBER       DESCRIPTION                    PAGE

 9    Exhibit 1    Amended Notice of Deposition    17
                   of Plaintiff Jayme Tipton
10
      Exhibit 2    Plaintiff Jayme Tipton's        17
11                 Responses to Defendant Airport
                   Terminal Services, Inc.'s
12                 Requests for Production of
                   Documents (Set One)
13
      Exhibit 3    Defendant's Interrogatories     18
14                 Propounded to Plaintiff (Set
                   One)
15
      Exhibit 4    Plaintiff Jayme Tipton's        19
16                 Responses to Defendant Airport
                   Terminal Services, Inc.'s
17                 Interrogatories (Set One)

18    Exhibit 5    Written Warning Notice - U.S.,   22
                   4/8/2017
19
      Exhibit 6    Medical record, under           37
20                 separate cover (Confidential)

21    Exhibit 7    May 9, 2017 Separation of       49
                   Employment letter, signed
22
      Exhibit 8    May 9, 2017 Separation of       49
23                 Employment letter, unsigned

24    Exhibit 9    Tarzana Treatment Center        74
                   Certificate to Return to
25                 Work/School, return 4/20/17
```



Jayme Tipton (v.I)                    Jayme Tipton vs. Airport Terminal Services, Inc.                    1147705

```
 1    INDEX (CONTINUED):

 2                            EXHIBITS

 3    NUMBER          DESCRIPTION                      PAGE

 4    Exhibit 10      4/12/2017 Lancaster Imaging       75
                      x-ray results
 5
      Exhibit 11      Referral Request No. 67227211     83
 6
      Exhibit 12      Tarzana Treatment Center          89
 7                    Certificate to Return to
                      Work/School, return 5/1/17
 8
      Exhibit 13      Tarzana Treatment Center          97
 9                    Certificate to Return to
                      Work/School, return 5/15/17
10
      Exhibit 14      ATS Employee Handbook            121
11
      Exhibit 15      Employee Services Policy and     122
12                    Procedures Acknowledgment

13    Exhibit 16      Voluntary Self-Identification    131
                      of Disability
14
      Exhibit 17      Form W-4 (2016) Jayme Tipton     150
15
      Exhibit 18      October 30, 2017 Notice of       164
16                    Complainant or Complainant's
                      Attorney Right to Sue
17
      Exhibit 19      Plaintiff Jayme Tipton's         169
18                    Second Amended Complaint for
                      Damages
19

20

21

22

23

24

25
```

**Kusar** *Keeping Your Word Is Our Business* SM

| | |
|---|---|
| 10:19 | 1 | witness. |

10:19  1  witness.

10:19  2      MR. LUBELEY:  Aaron Lubeley of the law firm of

10:19  3  Seyfarth Shaw representing defendant Airport Terminal

10:19  4  Services, Inc., as well as -- Airport Terminal

10:19  5  Services, Inc.

10:19  6      MR. GBEWONYO:  Aaron Gbewonyo on behalf of the

10:19  7  plaintiff Jayme Tipton of the law firm of Shegerian &

      8  Associates.

      9

      10              JAYME TIPTON

      11  having been first duly sworn, was examined and

      12  testified as follows:

10:19  13

10:19  14      THE REPORTER:  State your experience, please.

10:19  15      MS. NUNEZ:  Good morning, Carolina Nunez, and

10:20  16  I'm a senior fellow at Seyfarth Shaw here assisting

10:20  17  attorney Aaron Lubeley.

10:20  18          Thank you.

      19

10:20  20              EXAMINATION

10:20  21  BY MR. LUBELEY:

10:20  22      Q.    Can you state your full name for the

10:20  23  record?

10:20  24      A.    Jayme Danielle Tipton.

10:20  25      Q.    And have you used any other names?

Kusar® Keeping Your Word Is Our Business℠

Jayme Tipton (v.I)                Jayme Tipton vs. Airport Terminal Services, Inc.                1147705

| | | |
|---|---|---|
| 10:38 | 1 | A.       Line 13. |
| 10:38 | 2 | Q.       Line 13, okay. |
| 10:38 | 3 | What's the issue with that -- it says, |
| 10:38 | 4 | "Responding party sustained a work-related injury |
| 10:38 | 5 | that she informed her supervisor Damian Neri of." |
| 10:38 | 6 | A.       Yes.   It says two -- |
| 10:38 | 7 | Q.       Go ahead. |
| 10:38 | 8 | A.       "Two days after responding party |
| 10:38 | 9 | informed Neri of her injury," and it says -- on line |
| 10:38 | 10 | 15, "Neri suddenly issued responding party a final |
| 10:38 | 11 | written notice." |
| 10:38 | 12 | Q.       Yes. |
| 10:38 | 13 | A.       That happened before. |
| 10:38 | 14 | Q.       Okay.   The written notice was issued |
| 10:38 | 15 | before -- |
| 10:38 | 16 | A.       I got injured. |
| 10:38 | 17 | Q.       Before you got injured? |
| 10:38 | 18 | A.       Yes. |
| 10:38 | 19 | Q.       Okay.   And what was the written notice |
| 10:39 | 20 | that was issued before you got injured? |
| 10:39 | 21 | A.       The written notice was because my lead |
| 10:39 | 22 | at the time, she told my manager that I wasn't |
| 10:39 | 23 | listening to her, or I wasn't -- like she was giving |
| 10:39 | 24 | me direction to do, and I wouldn't comply with what |
| 10:39 | 25 | she said, which wasn't true. |

21

**Kusar** ˟ *Keeping Your Word Is Our Business* ˢᴹ

Jayme Tipton (v.I)                Jayme Tipton vs. Airport Terminal Services, Inc.                1147705

| 10:52 | 1 | A. | No.  I actually -- no, I did not. |
| 10:52 | 2 | Q. | And why not? |
| 10:52 | 3 | A. | I just didn't. |
| 10:52 | 4 | Q. | Okay.  That's okay. |

10:52  5          Other than what you've indicated, is

10:52  6  everything else in this accurate --

10:52  7       A.    Yes.

10:52  8       Q.    -- as listed?  Yes.  Okay.

10:52  9          And do you have any sense that -- you

10:52  10  said you didn't think the crew chief liked you and

10:52  11  you explained why.

10:52  12       A.    Yes.

10:52  13       Q.    Do you have any feelings as to whether

10:52  14  Damian or Edgar liked you?

10:52  15       A.    No.  They both liked me at that time.

10:52  16       Q.    Okay.

10:52  17       A.    I was a really good worker.

10:52  18       Q.    That's good.

10:52  19          And do you have any reason to believe

10:53  20  that they had any issues with you during your

10:53  21  employment?

10:53  22       A.    No.

10:53  23       Q.    Do you have any reason to believe that

10:53  24  they would want to harm your employment in any way?

10:53  25       A.    No.

32

Kusar® Keeping Your Word Is Our Business℠

Case 2:18-cv-09503-AB-JEM    Document 52    Filed 01/03/20    Page 19 of 258    Page ID #:1342

Jayme Tipton (v.I)                Jayme Tipton vs. Airport Terminal Services, Inc.                1147705

| 10:53 | 1 | MR. GBEWONYO: Objection. Calls for |
| 10:53 | 2 | speculation. |
| | 3 | BY MR. LUBELEY: |
| 10:53 | 4 | Q.    Did you find them to be supportive of |
| 10:53 | 5 | you? |
| 10:53 | 6 | A.    Yes. |
| 10:53 | 7 | Q.    Any reason to believe that they are |
| 10:53 | 8 | dishonest people? |
| 10:53 | 9 | MR. GBEWONYO: Objection. Calls for |
| 10:53 | 10 | speculation. Vague. |
| 10:53 | 11 | MR. LUBELEY: You can answer. |
| 10:53 | 12 | THE WITNESS: No. |
| 10:53 | 13 | MR. LUBELEY: Okay. |
| 10:53 | 14 | Q.    They didn't do anything -- they haven't |
| 10:53 | 15 | exhibited anything that would make you believe that |
| 10:53 | 16 | they were not honest and straightforward in their |
| 10:53 | 17 | interactions with you? |
| 10:53 | 18 | A.    No. |
| 10:53 | 19 | MR. GBEWONYO: Objection, compound. |
| 10:53 | 20 | MR. LUBELEY: All right. |
| 10:53 | 21 | Q.    You mentioned that after -- all right. |
| 10:53 | 22 | Let's continue to go through on the interrogatory |
| 10:54 | 23 | real quick. |
| 10:54 | 24 | Is there anything else in here that was |
| 10:54 | 25 | not accurate or -- before we get to that. Would you |

Kusar® Keeping Your Word Is Our Business℠

Case 2:18-cv-09503-AB-JEM    Document 52    Filed 01/03/20    Page 20 of 258    Page ID #:1343

Jayme Tipton (v.I)    Jayme Tipton vs. Airport Terminal Services, Inc.    1147705

| 11:00 | 1 | MR. LUBELEY:   Okay. |
|---|---|---|
| 11:00 | 2 | Q.     Due to an injury, you were able -- |
| 11:00 | 3 | unable to perform your job at Airport Terminal |
| 11:00 | 4 | Services; correct? |
| 11:00 | 5 | A.     Yes. |
| 11:00 | 6 | Q.     Okay.   And you had been seeking |
| 11:00 | 7 | treatment for that injury; correct? |
| 11:00 | 8 | A.     Yes. |
| 11:00 | 9 | Q.     So that you would be able to eventually |
| 11:00 | 10 | be well enough to perform your job; is that correct? |
| 11:00 | 11 | A.     Can you -- can you repeat that, please? |
| 11:01 | 12 | Q.     Okay.   Sure. |
| 11:01 | 13 | A.     Sorry. |
| 11:01 | 14 | Q.     What I'm getting at is:   You were |
| 11:01 | 15 | injured and unable to perform your job -- |
| 11:01 | 16 | A.     Yes. |
| 11:01 | 17 | Q.     -- right? |
| 11:01 | 18 | And why did your injury prevent you |
| 11:01 | 19 | from being able to perform your job? |
| 11:01 | 20 | A.     Because I hurt -- I injured my |
| 11:01 | 21 | shoulder. |
| 11:01 | 22 | Q.     Okay.   And what is it about your job |
| 11:01 | 23 | that required you to -- strike that. |
| 11:01 | 24 | And why would a shoulder injury prevent |
| 11:01 | 25 | you from being able to perform your job? |


Kusar®  Keeping Your Word Is Our Business℠

Jayme Tipton (v.I)          Jayme Tipton vs. Airport Terminal Services, Inc.          1147705

| 11:01 | 1 | A. Well, they have a heavy vacuum that we |
| 11:01 | 2 | have to use to vacuum the aircrafts, carrying bags of |
| 11:01 | 3 | blankets up on the aircrafts and that will be kind of |
| 11:01 | 4 | difficult. |
| 11:01 | 5 | Q. Okay. Your job was that of a groomer? |
| 11:01 | 6 | A. Yes. |
| 11:01 | 7 | Q. And what does that job entail? |
| 11:02 | 8 | A. You will -- you go on the aircraft, you |
| 11:02 | 9 | pick up trash, you clean the bathrooms. |
| 11:02 | 10 | They had a first class section where we |
| 11:02 | 11 | had to do more of a detailed cleaning as far as |
| 11:02 | 12 | wiping down everything. They have the big bags of |
| 11:02 | 13 | blankets that we have to put on the seats and that's |
| 11:02 | 14 | about it. |
| 11:02 | 15 | Q. Then the vacuum? |
| 11:02 | 16 | A. The vacuum. |
| 11:02 | 17 | Q. Any other things that you need to carry |
| 11:02 | 18 | to perform your job? |
| 11:02 | 19 | A. We have bags of supplies for the |
| 11:02 | 20 | bathroom that we will bring with us. |
| 11:02 | 21 | Q. Okay. And what are you doing for your |
| 11:02 | 22 | job when you're not cleaning the plane, or is that |
| 11:02 | 23 | the entirety of your job? |
| 11:02 | 24 | A. Yes. |
| 11:02 | 25 | Q. So the injury that you suffered to your |

Kusar  Keeping Your Word Is Our Business℠

| 11:03 | 1 | shoulder prevented you from being able to perform |
| 11:03 | 2 | your job? |
| 11:03 | 3 | A.    Yes. |
| 11:03 | 4 | Q.    Okay.  And so back to my other |
| 11:03 | 5 | question. |
| 11:03 | 6 | You had seen a doctor that told you |
| 11:03 | 7 | that you were unable to perform your job until your |
| 11:03 | 8 | shoulder healed; correct? |
| 11:03 | 9 | A.    Yes. |
| 11:03 | 10 | MR. GBEWONYO:  Can we go off the record for a |
| 11:03 | 11 | second? |
| 11:03 | 12 | MR. LUBELEY:  Just give me -- |
| 11:03 | 13 | MR. GBEWONYO:  We've been going for about an |
| 11:03 | 14 | hour. |
| 11:03 | 15 | MR. LUBELEY:  Just let me continue this, and |
| 11:03 | 16 | we can take a break. |
| 11:03 | 17 | MR. GBEWONYO:  Okay. |
|  | 18 | BY MR. LUBELEY: |
| 11:03 | 19 | Q.    And then at some point in time, a |
| 11:03 | 20 | doctor released you to being able to go back and |
| 11:03 | 21 | perform your job, correct, or being able to work? |
| 11:03 | 22 | A.    What do you mean -- can you explain |
| 11:03 | 23 | that, please? |
| 11:03 | 24 | Q.    Sure.  The doctor's note that we just |
| 11:03 | 25 | looked at here -- |

**Kusar** *Keeping Your Word Is Our Business℠*

Case 2:18-cv-09503-AB-JEM    Document 52    Filed 01/03/20    Page 23 of 258    Page ID #:1346

Jayme Tipton (v.I)          Jayme Tipton vs. Airport Terminal Services, Inc.          1147705

| 11:03 | 1 | A. | Yes. |

11:03   2      Q.      -- it says that you were to remain off

11:03   3   of work --

11:03   4      A.      Yes.

11:03   5      Q.      -- for a period of time.

11:03   6      A.      Yes.

11:03   7      Q.      What work do you think the doctor was

11:03   8   referring to here?

11:03   9      A.      Well, he didn't want me to further

11:04   10  injure my shoulder so he didn't want me to -- to do

11:04   11  anything.  Yeah.

11:04   12     Q.      It makes sense.  I mean a doctor wants

11:04   13  you to heal and be better, right?

11:04   14     A.      Yes.

11:04   15     Q.      So -- so there's a point in time where

11:04   16  you injured your shoulder?

11:04   17     A.      Yes.

11:04   18     Q.      And you were unable to work?

11:04   19     A.      Yes.

11:04   20     Q.      And that continued until there was a

11:04   21  point in time where you were healed and able to work,

11:04   22  correct?

11:04   23     A.      Yes.

11:04   24     MR. GBEWONYO:  Objection, vague as to

11:04   25  "healed."

Kusar® Keeping Your Word Is Our Business℠

Jayme Tipton (v.I)                Jayme Tipton vs. Airport Terminal Services, Inc.                1147705

| 11:05 | 1 | A. | Yes. |

11:05   1     A.     Yes.

11:05   2     Q.     And when did you work?

11:05   3     A.     I was working for ABM Aviation.  I got

11:05   4  hired -- I can't recall my hire date.

11:05   5     Q.     Do you know how many months ago?

11:05   6     A.     I just went blank.

11:05   7     Q.     That's okay.

11:05   8     A.     Sorry.

11:05   9     Q.     Let's do this.  What year?  Was it this

11:05   10 year?

11:05   11    A.     No.  It was -- it was -- I remember

11:06   12 now.

11:06   13    Q.     Okay.

11:06   14    A.     It was November 28th, 2018.

11:06   15    Q.     Okay.  So -- and before -- and what's

11:06   16 the position for ABM Aviation?

11:06   17    A.     Cabin cleaner.

11:06   18    Q.     Similar position?

11:06   19    A.     Yes.

11:06   20    Q.     And between -- and prior to getting the

11:06   21 job at ABM Aviation, did you perform any work?

11:06   22    A.     No.

11:06   23    Q.     And by at least November 28th, 2018,

11:06   24 you were cleared to be able to perform work as --

11:06   25    A.     Yes.

44

Jayme Tipton (v.I)            Jayme Tipton vs. Airport Terminal Services, Inc.           1147705

| 11:06 | 1 | Q.      -- as a cabin cleaner? |
| 11:06 | 2 | A.      Yes. |
| 11:06 | 3 | Q.      Okay. How long before you got that job |
| 11:06 | 4 | were you cleared by the doctor to perform work? |
| 11:06 | 5 | A.      I don't recall. I don't know. |
| 11:06 | 6 | Q.      Sometime before that? |
| 11:06 | 7 | A.      Yes. |
| 11:07 | 8 | Q.      Okay. When did you first start looking |
| 11:07 | 9 | for a new job? |
| 11:07 | 10 | A.      Maybe around June 2018. |
| 11:07 | 11 | Q.      And in around June 2018, were you |
| 11:07 | 12 | cleared by then to be able to perform work because -- |
| 11:07 | 13 | you know, in other words, was your injury healed |
| 11:07 | 14 | enough to allow you to be able to perform work? |
| 11:07 | 15 | A.      Yes. |
| 11:07 | 16 | Q.      Okay. How many months before you |
| 11:07 | 17 | started looking for a job was it that you were |
| 11:07 | 18 | cleared by the doctor to be able to work? |
| 11:08 | 19 | A.      I'm not sure, but I just want to say |
| 11:08 | 20 | I've always been putting in applications because I |
| 11:08 | 21 | get a notification through this website of jobs that |
| 11:08 | 22 | are hiring. So I've always been putting in |
| 11:08 | 23 | applications. |
| 11:08 | 24 | Q.      And what's this website? |
| 11:08 | 25 | A.      Indeed. |

45

 Keeping Your Word Is Our Business ℠

| 11:08 | 1 | Q. I know it. |
|---|---|---|
| 11:08 | 2 | And do you have any records of these |
| 11:08 | 3 | applications that you've put in? |
| 11:08 | 4 | A. I'm not sure. It's like -- it's an |
| 11:08 | 5 | app, and it shows that the -- the applications that |
| 11:08 | 6 | you put in, but I believe it erase after a certain |
| 11:08 | 7 | amount of time. |
| 11:08 | 8 | Q. Okay. |
| 11:08 | 9 | A. Because I was trying to look -- look |
| 11:08 | 10 | for it, but every time a cabin cleaning position |
| 11:08 | 11 | opens for an airlines, I'm always putting in |
| 11:08 | 12 | applications because that's my line of work. |
| 11:08 | 13 | Q. Okay. And when did you first put an |
| 11:09 | 14 | application in through Indeed after your employment |
| 11:09 | 15 | with ATS ended? |
| 11:09 | 16 | A. I want to say it was like June of 2018. |
| 11:09 | 17 | Like when I said -- it was around there. |
| 11:09 | 18 | Q. Okay. So around June 2018 is when you |
| 11:09 | 19 | believed you were well enough to begin looking for |
| 11:09 | 20 | similar work? |
| 11:09 | 21 | A. Yes. |
| 11:09 | 22 | Q. Was there other work that you were able |
| 11:09 | 23 | to perform that didn't involve kind of the physical |
| 11:09 | 24 | requirements of being a plane groomer? |
| 11:09 | 25 | A. I'm sorry. Say that again. |

46



Case 2:18-cv-09503-AB-JEM    Document 52    Filed 01/03/20    Page 27 of 258    Page ID #:1350

Jayme Tipton (v.I)          Jayme Tipton vs. Airport Terminal Services, Inc.          1147705

| 11:13 | 1 | A.    Yes. |

11:13  1    A.    Yes.

11:13  2    Q.    I'd like to have these marked as

11:13  3    exhibits 6 and 7.

11:13  4    THE REPORTER:  I think seven and eight.

11:13  5    MR. LUBELEY:  Okay.

       6    (Deposition Exhibits 7-8 were marked for

       7     identification by the reporter and are

       8     attached herewith.)

       9    BY MR. LUBELEY:

11:14  10    Q.    This was not the first notice you

11:14  11    received that your employment was terminated, was it?

11:14  12    A.    Yes.  This is the first letter.

11:14  13    Q.    Did you have any discussions with

11:14  14    anyone prior to this about your employment?

11:14  15    A.    No.

11:14  16    Q.    Okay.  Do you recall being told that

11:14  17    once you were cleared to return to work that you

11:14  18    could reapply to an open position?

11:14  19    A.    No.

11:14  20    Q.    Are you aware that in your -- in the

11:14  21    company's separation paperwork that you were eligible

11:14  22    for rehire?

11:14  23    A.    No.

11:14  24    Q.    Okay.  Did you ever ask to be rehired

11:14  25    or reapply to Airport Terminal Services?

Kusar  Keeping Your Word Is Our Business℠

Jayme Tipton (v.I)                Jayme Tipton vs. Airport Terminal Services, Inc.                    1147705

| | | |
|---|---|---|
| 11:14 | 1 | A.        No. |
| 11:14 | 2 | Q.        Why not? |
| 11:14 | 3 | A.        I haven't talked to ATS. |
| 11:14 | 4 | Q.        But why when you were able to go back |
| 11:15 | 5 | to work did you not attempt to apply again to the |
| 11:15 | 6 | company? |
| 11:15 | 7 | A.        I just -- not sure. |
| 11:15 | 8 | Q.        Did you not want to go back to work |
| 11:15 | 9 | there? |
| 11:15 | 10 | A.        I did want to go back there, but I was |
| 11:15 | 11 | just like hurt by the way that they treated me when I |
| 11:15 | 12 | talked to Shonta that day that she told me that I |
| 11:15 | 13 | need to resign. |
| 11:15 | 14 | Q.        Tell me when that day was.  What day |
| 11:15 | 15 | are you referring to? |
| 11:15 | 16 | A.        I want to say it was the date of this |
| 11:15 | 17 | letter May 9, but it probably was May 8th, the day |
| 11:15 | 18 | before. |
| 11:16 | 19 | Q.        And what do you remember about that |
| 11:16 | 20 | conversation? |
| 11:16 | 21 | A.        Shonta called me and said that I need |
| 11:16 | 22 | to resign because they -- because she needs to fill |
| 11:16 | 23 | my spot on the crew. |
| 11:16 | 24 | Q.        What does that -- what did that mean to |
| 11:16 | 25 | you? |



| 11:16 | 1 | A. That meant that she wanted to let me go |
|---|---|---|

11:16   1   A.    That meant that she wanted to let me go

11:16   2   because she wanted to fill my -- my position on the

11:16   3   crew.

11:16   4   Q.    You said she needed to fill your spot

11:16   5   on the crew.  Do you know why she needed to fill your

11:16   6   spot on the crew?

11:16   7   A.    I have no idea.  I'm sorry.

11:16   8   Q.    Were you ever short staffed when you

11:16   9   were working at Airport Terminal Services?

11:16   10   A.    I wouldn't say that we were short

11:16   11   staffed.  They was -- they were -- we had enough

11:17   12   people on the crew to pursue the cleaning on the

11:17   13   airplane.  We had enough people.

11:17   14   Q.    But if someone's gone, that would

11:17   15   impact how many people you had; right?

11:17   16   A.    No.

11:17   17   Q.    Why not?

11:17   18   A.    Because we had enough people to do what

11:17   19   we have to do.  They always had an extra person there

11:17   20   just in case somebody didn't come to work.

11:17   21   Q.    And while you were out, did you know

11:17   22   how many employees were there and what the

11:17   23   availability of crew members were at that time?

11:17   24   A.    No.

11:17   25   MR. GBEWONYO:  Objection, compound.  Calls for

**Kusar**® *Keeping Your Word Is Our Business* SM

Case 2:18-cv-09503-AB-JEM   Document 52   Filed 01/03/20   Page 30 of 258   Page ID #:1353

Jayme Tipton (v.I)          Jayme Tipton vs. Airport Terminal Services, Inc.                    1147705

| | | |
|---|---|---|
| 11:39 | 1 | Q.      For the reasons you testified to? |
| 11:39 | 2 | A.      Yes. |
| 11:39 | 3 | Q.      Okay.  And did you -- why did you |
| 11:39 | 4 | decide not to voluntarily resign and then reapply for |
| 11:39 | 5 | a position? |
| 11:39 | 6 | A.      Because I wanted to keep my job. |
| 11:40 | 7 | Q.      Okay.  Did you mention that to Shonta? |
| 11:40 | 8 | A.      Yes. |
| 11:40 | 9 | Q.      And do you recall her telling you that |
| 11:40 | 10 | you could reapply once you were cleared to return to |
| 11:40 | 11 | work? |
| 11:40 | 12 | MR. GBEWONYO:  Objection.  Asked and answered. |
| 11:40 | 13 | THE WITNESS:  I don't recall. |
| 11:40 | 14 | MR. LUBELEY:  Okay. |
| 11:40 | 15 | Q.      Do you have any reason to disagree with |
| 11:40 | 16 | her account that she did mention that to you? |
| 11:40 | 17 | MR. GBEWONYO:  Objection, argumentative. |
| 11:40 | 18 | MR. LUBELEY:  You can answer. |
| 11:40 | 19 | THE WITNESS:  Can you repeat that, please? |
| | 20 | BY MR. LUBELEY: |
| 11:40 | 21 | Q.      Do you have any reason to disagree with |
| 11:40 | 22 | her account that she did mention that to you in the |
| 11:40 | 23 | call? |
| 11:40 | 24 | A.      No. |
| 11:40 | 25 | Q.      Your counsel said you had a question |



| 11:41 | 1 | BY MR. LUBELEY: |
|---|---|---|

11:41  1   BY MR. LUBELEY:

11:41  2        Q.    What's that?

11:41  3        A.    That's okay.

11:41  4        Q.    Was there a question?  Something about

11:41  5   the date?

11:41  6        A.    I just noticed that it said the date of

11:41  7   injury was in March.

11:41  8        Q.    Okay.  Is that --

11:42  9        A.    But this is the doctor's note.

11:42  10       Q.    Yeah.  I'm not sure what -- that

11:42  11  appears to be the doctor's note, yes.

11:42  12             Did you tell someone that you had been

11:42  13  injured in March?

11:42  14       A.    No.  I'm trying to -- it's okay.

11:42  15       Q.    When -- what was the date that you

11:42  16  injured yourself?  Do you recall?

11:42  17       A.    No, I do not recall.

11:42  18       Q.    Okay.  And do you think it was in March

11:42  19  or it may have been a different time?

11:42  20       A.    I believe it was in April.

11:42  21       Q.    Okay.  Because you'd seen the doctor in

11:42  22  April 11?

11:42  23       A.    Between March and April.  So --

11:42  24       Q.    Okay.  Do you recall when you filed a

11:42  25  workers' comp claim?

Jayme Tipton (v.I)          Jayme Tipton vs. Airport Terminal Services, Inc.          1147705

| | | |
|---|---|---|
| 11:42 | 1 | MR. GBEWONYO: Objection. Asked and answered. |
| 11:42 | 2 | If you recall, you can answer. |
| 11:43 | 3 | THE WITNESS: I do not recall the date. |
| 11:43 | 4 | MR. LUBELEY: Okay. |
| 11:43 | 5 | Q.   Do you recall the claim was filed after |
| 11:43 | 6 | your employment from the company had been separated? |
| 11:43 | 7 | A.   It was after I got this letter. |
| 11:43 | 8 | Q.   But you had not filed the claim before |
| 11:43 | 9 | that? |
| 11:43 | 10 | A.   No. |
| 11:43 | 11 | Q.   Why not? |
| 11:43 | 12 | A.   I just didn't. Once I got this letter, |
| 11:43 | 13 | I just -- |
| 11:43 | 14 | Q.   That's when you said let me talk to a |
| 11:43 | 15 | lawyer? |
| 11:43 | 16 | A.   Yes. Yes. |
| 11:43 | 17 | Q.   Okay. And the lawyer advised you to |
| 11:43 | 18 | file a workers' comp claim? |
| 11:43 | 19 | A.   Yes. |
| 11:43 | 20 | Q.   Okay. And before that time, you hadn't |
| 11:43 | 21 | discussed with anyone at the company about a workers' |
| 11:43 | 22 | comp claim or workers' comp injury? |
| 11:43 | 23 | A.   No. |
| 11:43 | 24 | Q.   Isn't it true that you had had |
| 11:43 | 25 | discussions with people about -- strike that. |

**Kusar**®  Keeping Your Word Is Our Business℠

Case 2:18-cv-09503-AB-JEM    Document 52    Filed 01/03/20    Page 33 of 258    Page ID #:1356

Jayme Tipton (v.I)                Jayme Tipton vs. Airport Terminal Services, Inc.                1147705

| | | |
|---|---|---|
| 11:43 | 1 | Isn't it true that you have suffered |
| 11:44 | 2 | shoulder pain over the years prior to working at |
| 11:44 | 3 | Airport Terminal Services? |
| 11:44 | 4 | A.    Yes. |
| 11:44 | 5 | Q.    Okay.  And isn't it true that you have |
| 11:44 | 6 | -- was there any point -- let me ask you this. |
| 11:44 | 7 | Was there any point in time that you |
| 11:44 | 8 | had told anyone at Airport Terminal Services that you |
| 11:44 | 9 | had shoulder pain and that you had experienced like a |
| 11:44 | 10 | history of shoulder pain? |
| 11:44 | 11 | A.    No. |
| 11:44 | 12 | Q.    It wasn't until after your termination |
| 11:44 | 13 | that you mentioned that you -- well, strike that. |
| 11:44 | 14 | There was -- you had been on a leave, |
| 11:44 | 15 | though, due to shoulder pain that started in April; |
| 11:44 | 16 | correct? |
| 11:44 | 17 | A.    With -- through Airport Terminal |
| 11:44 | 18 | Services? |
| 11:44 | 19 | Q.    Yes. |
| 11:44 | 20 | A.    Yes. |
| 11:44 | 21 | Q.    Okay.  And what was the cause of the |
| 11:44 | 22 | shoulder pain that caused you to go on leave? |
| 11:44 | 23 | A.    I was vacuuming, and I was vacuuming |
| 11:44 | 24 | under the seat and it was a piece of paper under the |
| 11:45 | 25 | seat and I went to reach for it and I heard a pop in |

Jayme Tipton (v.I)                Jayme Tipton vs. Airport Terminal Services, Inc.                    1147705

| 11:45 | 1 | my shoulder. |
| 11:45 | 2 | Q. Would this be a reinjury then to an |
| 11:45 | 3 | injury that you had in that shoulder? |
| 11:45 | 4 | A. I had shoulder pain a couple years |
| 11:45 | 5 | before. I had a shoulder pain, but it wasn't as |
| 11:45 | 6 | severe as it was with -- with this injury. |
| 11:45 | 7 | Q. Okay. Do you recall what day that was? |
| 11:45 | 8 | A. Of the prior? |
| 11:45 | 9 | Q. No. When you were cleaning the plane, |
| 11:45 | 10 | what day? |
| 11:45 | 11 | A. Oh, I do not recall the exact day. |
| 11:45 | 12 | Q. Do you recall the airline that you were |
| 11:45 | 13 | working on? |
| 11:45 | 14 | A. Oh, Jet Blue Airlines. |
| 11:45 | 15 | Q. It was Jet Blue? |
| 11:45 | 16 | A. Yes. |
| 11:45 | 17 | Q. Would this have been in April? |
| 11:45 | 18 | A. I believe it was in April. |
| 11:45 | 19 | Q. And why do you believe it was in April? |
| 11:45 | 20 | A. It was -- it was between -- it was the |
| 11:45 | 21 | end of March, April. I can't remember the exact day |
| 11:46 | 22 | that it happened. |
| 11:46 | 23 | Q. Okay. And then the -- who was working |
| 11:46 | 24 | with you that day? |
| 11:46 | 25 | A. I cannot remember. It was so long ago. |



**Kusar** Keeping Your Word Is Our Business ℠

Jayme Tipton (v.I)          Jayme Tipton vs. Airport Terminal Services, Inc.          1147705

| 11:50 | 1 | that date.  Okay.  So April 8th is a Saturday, and |
| 11:50 | 2 | April 11th was a Tuesday.  So you had your write-up |
| 11:50 | 3 | on Saturday. |
| 11:50 | 4 | Do you remember if the injury occurred |
| 11:50 | 5 | on that Sunday or the next Monday? |
| 11:50 | 6 | A.    I'm sorry.  Say that again. |
| 11:50 | 7 | Q.    Okay.  It looks like in 2017 April 8th |
| 11:51 | 8 | was a Saturday, the day you had the write-up. |
| 11:51 | 9 | A.    The write-up, yes. |
| 11:51 | 10 | Q.    And then you said you had an injury |
| 11:51 | 11 | that occurred sometime after that but before April 11 |
| 11:51 | 12 | when you saw the doctor? |
| 11:51 | 13 | A.    Yes. |
| 11:51 | 14 | Q.    Do you -- |
| 11:51 | 15 | A.    I didn't see -- I'm sorry.  I didn't |
| 11:51 | 16 | see the doctor on April 11.  That's when the doctor |
| 11:51 | 17 | took me off work, April 11. |
| 11:51 | 18 | Q.    Okay.  Do you recall when you saw the |
| 11:51 | 19 | doctor? |
| 11:51 | 20 | A.    No. |
| 11:51 | 21 | MR. GBEWONYO:  Objection, vague as to time. |
|  | 22 | BY MR. LUBELEY: |
| 11:51 | 23 | Q.    Had you seen the doctor before April |
| 11:51 | 24 | 11? |
| 11:51 | 25 | A.    Yes. |

**Kusar** Keeping Your Word Is Our Business℠

Jayme Tipton (v.I)          Jayme Tipton vs. Airport Terminal Services, Inc.                    1147705

| 11:51 | 1 | Q.       Okay.  Do you know what the -- |
| 11:51 | 2 | A.       I need to see a calendar. |
| 11:51 | 3 | Q.       You can pull it up, or I can show -- |
| 11:51 | 4 | let the record reflect that I am showing a calendar |
| 11:52 | 5 | for 2017 off of an iPhone calendar app. |
| 11:52 | 6 | MR. GBEWONYO:  Make sure it's 2017.  Okay. |
| 11:52 | 7 | MR. LUBELEY:  Yeah, counsel, you can look at |
| 11:52 | 8 | it.  Just don't respond to any text messages she |
| 11:52 | 9 | might receive. |
| 11:52 | 10 | MR. GBEWONYO:  April 8 is a Saturday and the |
| 11:52 | 11 | 11th appear to be a Tuesday. |
| 11:52 | 12 | THE WITNESS:  Yeah, it was the day before. |
| 11:52 | 13 | MR. GBEWONYO:  April 10. |
| 11:52 | 14 | THE WITNESS:  Uh-huh. |
| 11:53 | 15 | BY MR. LUBELEY: |
| 11:53 | 16 | Q.       So there is a -- in that time period, |
| 11:53 | 17 | did you see -- so you get injured working on the |
| 11:53 | 18 | plane, but it had to be either -- it would have been |
| 11:53 | 19 | either the 9th or 10th, which are workdays for you; |
| 11:53 | 20 | correct? |
| 11:53 | 21 | A.       Yes. |
| 11:53 | 22 | Q.       Okay.  Do you remember whether it was |
| 11:53 | 23 | the 9th or 10th of April? |
| 11:53 | 24 | A.       I do not recall. |
| 11:53 | 25 | Q.       Did you return to work -- do we have |

68

**Kusar** Keeping Your Word Is Our Business℠

| 11:54 | 1 | this, you injure at work at the end of your shift? |
| 11:54 | 2 | A.    Yes. |
| 11:54 | 3 | Q.    The next day after that injury, did you |
| 11:54 | 4 | come back to work? |
| 11:55 | 5 | A.    Yes. |
| 11:55 | 6 | Q.    Okay.  And did you actually work that |
| 11:55 | 7 | day? |
| 11:55 | 8 | A.    Yes. |
| 11:55 | 9 | Q.    Okay.  Even though you were injured? |
| 11:55 | 10 | A.    Yes. |
| 11:55 | 11 | Q.    And why did you do that? |
| 11:55 | 12 | A.    Because I had to complete my shift. |
| 11:55 | 13 | Q.    Well, I'm saying that you have -- your |
| 11:55 | 14 | shift ends at 3:30? |
| 11:55 | 15 | A.    Yes. |
| 11:55 | 16 | Q.    Okay.  You got injured -- your |
| 11:55 | 17 | testimony is you got injured around 3:00? |
| 11:55 | 18 | A.    Yes. |
| 11:55 | 19 | Q.    Okay.  Then you told your supervisor |
| 11:55 | 20 | that you injured your shoulder? |
| 11:55 | 21 | A.    Yes. |
| 11:55 | 22 | Q.    The next day, do you recall that being |
| 11:55 | 23 | a workday or a day that you had off? |
| 11:55 | 24 | A.    The next day after I injured my |
| 11:55 | 25 | shoulder. |

70



Kusar   Keeping Your Word Is Our Business℠

Jayme Tipton (v.1)   Jayme Tipton vs. Airport Terminal Services, Inc.   1147705

| | | |
|---|---|---|
| 12:02 | 1 | A. Can I see a calendar, please? |
| 12:02 | 2 | Q. Sure. |
| 12:02 | 3 | MR. GBEWONYO:  Do you have another copy of |
| 12:02 | 4 | exhibit 10 as well? |
| 12:02 | 5 | MR. LUBELEY:  Oh, did I not -- |
| 12:02 | 6 | MR. GBEWONYO:  Yeah, I just got nine. |
| 12:02 | 7 | MR. LUBELEY:  Here you go. |
| 12:02 | 8 | MR. GBEWONYO:  Thank you. |
| 12:02 | 9 | MR. LUBELEY:  I wrote 10 on there. |
| 12:02 | 10 | THE WITNESS:  So I believe the injury happened |
| 12:02 | 11 | on the 9th. |
| 12:02 | 12 | MR. LUBELEY:  Okay. |
| 12:02 | 13 | Q. So the day after the write-up? |
| 12:02 | 14 | A. Yes. |
| 12:02 | 15 | Q. Okay.  All right.  Thank you. |
| 12:02 | 16 | And what did you do with this doctor's |
| 12:03 | 17 | note when you received this, the exhibit 8 -- or 9. |
| 12:03 | 18 | Sorry. |
| 12:03 | 19 | MR. GBEWONYO:  This would be the first |
| 12:03 | 20 | doctor's note, April 11. |
| 12:03 | 21 | THE WITNESS:  When I was supposed to return |
| 12:03 | 22 | back to work on Thursday, that Thursday, I brought |
| 12:03 | 23 | this doctor's note in with me and I had gave it to my |
| 12:03 | 24 | crew chief. |
| | 25 | BY MR. LUBELEY: |

**Kusar**® *Keeping Your Word Is Our Business*℠

| | | |
|---|---|---|
| 12:03 | 1 | Q.      And which -- what was the name of the |
| 12:03 | 2 | person you gave this to? |
| 12:03 | 3 | A.      Ora. |
| 12:03 | 4 | Q.      Ora.  That's on or about that Thursday, |
| 12:04 | 5 | like April 13. |
| 12:04 | 6 |         What did you -- what time did you give |
| 12:04 | 7 | it to Ora? |
| 12:04 | 8 | A.      It was -- right before my shift was |
| 12:04 | 9 | about to start. |
| 12:04 | 10 | Q.      Okay.  Did you call anyone to tell them |
| 12:04 | 11 | that you weren't able to work?  Like did you call in |
| 12:04 | 12 | to let anyone know, hey, can you schedule -- you know |
| 12:04 | 13 | I'm not going to be able to work today? |
| 12:04 | 14 | A.      No. |
| 12:04 | 15 | Q.      You showed up at the start of your |
| 12:04 | 16 | shift with just the note? |
| 12:04 | 17 | A.      Yes. |
| 12:04 | 18 | Q.      Okay.  Why didn't you call ahead of |
| 12:04 | 19 | time? |
| 12:04 | 20 | A.      Not sure. |
| 12:04 | 21 | Q.      Okay.  But you weren't going to be able |
| 12:04 | 22 | to perform your work that day, right? |
| 12:04 | 23 | A.      No.  But I asked to be on light duty. |
| 12:04 | 24 | Q.      Oh, when you brought the note you asked |
| 12:04 | 25 | to be on light duty? |



| 12:04 | 1 | A.      Yes. |
|---|---|---|
| 12:04 | 2 | Q.      Now, I didn't see -- it doesn't say |
| 12:04 | 3 | anything in the note about light duty? |
| 12:05 | 4 | A.      No. |
| 12:05 | 5 | Q.      Did the doctor recommend that you could |
| 12:05 | 6 | do light duty? |
| 12:05 | 7 | A.      No. |
| 12:05 | 8 | Q.      Okay.  Why did you ask for light duty? |
| 12:05 | 9 | A.      Because I wanted to be there for my |
| 12:05 | 10 | shift.  I needed -- you know, I didn't want to miss |
| 12:05 | 11 | days. |
| 12:05 | 12 | Q.      You wanted to get paid? |
| 12:05 | 13 | A.      Yeah.  Yes. |
| 12:05 | 14 | Q.      I understand that. |
| 12:05 | 15 |         So you brought the note to Ora, and at |
| 12:05 | 16 | the beginning of your shift, so around 7:00 A.M.? |
| 12:05 | 17 | A.      Yes. |
| 12:05 | 18 | Q.      And you described what you do as a |
| 12:05 | 19 | groomer for the plane on the plane? |
| 12:05 | 20 | A.      Yes. |
| 12:05 | 21 | Q.      And it involves lifting.  What were you |
| 12:05 | 22 | thinking about in terms of light duty? |
| 12:05 | 23 | A.      Light duty, I could pick up trash with |
| 12:05 | 24 | my other arm.  Because what -- what happens on a |
| 12:05 | 25 | shift is two people are doing the same job.  So it's |

| 12:06 | 1 | two people in first class.  There's two people |
| 12:06 | 2 | vacuuming.  Two people picking up trash and two |
| 12:06 | 3 | people doing the bathrooms. |
| 12:06 | 4 | Q.    Okay. |
| 12:06 | 5 | A.    So they could have me picking up trash. |
| 12:06 | 6 | I could have done something light like that, or |
| 12:06 | 7 | sometimes if there's no planes coming in, they have |
| 12:06 | 8 | us cleaning up the break room all the time because |
| 12:06 | 9 | we're cleaners.  So I could have cleaned the break |
| 12:06 | 10 | room.  I could have -- anything light, light duty |
| 12:06 | 11 | like that. |
| 12:06 | 12 | Q.    But do you recall Ora saying they |
| 12:06 | 13 | needed a note from a doctor about what your |
| 12:06 | 14 | restrictions were -- |
| 12:06 | 15 | A.    No. |
| 12:06 | 16 | Q.    -- for light duty? |
| 12:06 | 17 | A.    No. |
| 12:06 | 18 | Q.    There's nothing in the note that you |
| 12:06 | 19 | provided that said you could perform light duty. |
| 12:07 | 20 | A.    No. |
| 12:07 | 21 | Q.    The note only said that you couldn't |
| 12:07 | 22 | perform work. |
| 12:07 | 23 | A.    Yes. |
| 12:07 | 24 | Q.    Okay.  Are you aware of the policies of |
| 12:07 | 25 | Airport Terminal Services as it relates to employees |

**Kusar** Keeping Your Word Is Our Business ℠

Jayme Tipton (v.I)       Jayme Tipton vs. Airport Terminal Services, Inc.       1147705

| 12:07 | 1 | working while injured? |
| 12:07 | 2 | A.    No. |
| 12:07 | 3 | MR. GBEWONYO:  Calls for speculation. |
| 12:07 | 4 | MR. LUBELEY:  Okay. |
| 12:07 | 5 | Q.    We can go over those in just a little |
| 12:07 | 6 | bit, but what did Ora tell you about your request? |
| 12:07 | 7 | A.    Ora said that she will have to ask the |
| 12:07 | 8 | supervisor, which is Damian, and she called Damian |
| 12:07 | 9 | right there in front of me. |
| 12:07 | 10 | Q.    And what did she say? |
| 12:07 | 11 | A.    And she told Damian that I asked if I |
| 12:07 | 12 | can be on light duty and Damian said no. |
| 12:07 | 13 | Q.    Did Damian say that there was no light |
| 12:07 | 14 | duty available? |
| 12:07 | 15 | A.    Yes. |
| 12:07 | 16 | Q.    Was there any discussion about the |
| 12:07 | 17 | doctor's note you brought in? |
| 12:08 | 18 | A.    Before -- before I asked for light |
| 12:08 | 19 | duty, yes.  Ora told Damian that I brought in a |
| 12:08 | 20 | doctor's note, and he told Ora to make a copy of it. |
| 12:08 | 21 | Q.    Okay.  Do you recall them discussing |
| 12:08 | 22 | that the note did not refer to light duty? |
| 12:08 | 23 | A.    No. |
| 12:08 | 24 | Q.    And what do you recall happening after |
| 12:08 | 25 | that? |

**Kusar**® *Keeping Your Word Is Our Business* ℠

Jayme Tipton (v.I)                    Jayme Tipton vs. Airport Terminal Services, Inc.                    1147705

| | | |
|---|---|---|
| 12:08 | 1 | A.    After that, once he said that there was |
| 12:08 | 2 | no light duty available, I went home. |
| 12:08 | 3 | Q.    What did they tell you at the time? |
| 12:08 | 4 | What did Ora tell you? |
| 12:08 | 5 | A.    As far as? |
| 12:08 | 6 | Q.    Did she tell you to go home? |
| 12:08 | 7 | A.    Yes. |
| 12:08 | 8 | Q.    Okay.  And when did she tell you you |
| 12:08 | 9 | could come back? |
| 12:08 | 10 | A.    She didn't tell me when to come back. |
| 12:08 | 11 | My doctor's note said that I can return to work on |
| 12:08 | 12 | the 20th. |
| 12:08 | 13 | Q.    Okay.  So you planned to come back on |
| 12:08 | 14 | the 20th? |
| 12:08 | 15 | A.    Yes. |
| 12:09 | 16 | Q.    Did you talk to your doctor at all |
| 12:09 | 17 | about whether your doctor would allow you to perform |
| 12:09 | 18 | light duty? |
| 12:09 | 19 | A.    No. |
| 12:09 | 20 | Q.    And why not? |
| 12:09 | 21 | A.    Well, once they denied my light duty |
| 12:09 | 22 | request, I just -- I didn't think anymore of it.  I |
| 12:09 | 23 | just said okay.  And I was focused on my arm at that |
| 12:09 | 24 | time with my doctor. |
| 12:09 | 25 | Q.    Okay.  You were undergoing continuing |

82

**Kusar** *Keeping Your Word Is Our Business℠*

Jayme Tipton (v.l)          Jayme Tipton vs. Airport Terminal Services, Inc.                    1147705

| 12:10 | 1 | A. | I see it. |

12:10    1          A.       I see it.

12:10    2          Q.       Is that what you told the doctor?

12:10    3          A.       No.

12:10    4          Q.       You didn't tell the doctor that?

12:10    5          A.       No.

12:10    6          Q.       What did you tell the doctor?

12:10    7          A.       I told the doctor exactly what happened

12:10    8    at -- at my job, but I guess he looked at -- because

12:11    9    I came in before a while ago.  So --

12:11    10         Q.       You think -- that's what you're

12:11    11   speculating?

12:11    12         A.       Yes.

12:11    13         Q.       Okay.  Did you talk to the doctor at

12:11    14   all about whether he would permit you to engage in

12:11    15   light duty?

12:11    16         A.       No.

12:11    17         Q.       Why not?

12:11    18         A.       Because after my job denied the light

12:11    19   duty, I -- I was focused on my arm with my doctor in

12:11    20   how to -- and what we needed to do.

12:11    21         Q.       Okay.  Did your doctor ever or did you

12:11    22   ever provide any note from a doctor -- well, let me

12:11    23   back up.

12:11    24                  You understand that when you provide a

12:11    25   note that says you're unable to perform any work an

**Kusar**® *Keeping Your Word Is Our Business*℠

| | | |
|---|---|---|
| 12:11 | 1 | employer must respect that. |
| 12:11 | 2 | Do you have any understanding about |
| 12:11 | 3 | that? |
| 12:11 | 4 | MR. GBEWONYO:  Objection, calls for a legal |
| 12:11 | 5 | conclusion.  You can testify if you understand. |
| | 6 | BY MR. LUBELEY: |
| 12:12 | 7 | Q.    Do you understand that? |
| 12:12 | 8 | A.    Yes. |
| 12:12 | 9 | Q.    Okay.  And obviously there are certain |
| 12:12 | 10 | protections for your employment if -- that may exist |
| 12:12 | 11 | when you have an injury.  Do you understand that? |
| 12:12 | 12 | A.    Say that again, please. |
| 12:12 | 13 | Q.    Strike.  I withdraw that question. |
| 12:12 | 14 | You understand that when you provide an |
| 12:12 | 15 | employer with a doctor's note that says you're unable |
| 12:12 | 16 | to perform work that they are to follow that doctor's |
| 12:12 | 17 | note unless a doctor says you're released to return |
| 12:12 | 18 | to work? |
| 12:12 | 19 | MR. GBEWONYO:  Objection, calls for |
| 12:12 | 20 | speculation.  If you know what the employer believes, |
| 12:12 | 21 | you can answer. |
| 12:12 | 22 | MR. LUBELEY:  I was asking for your |
| 12:12 | 23 | understanding. |
| 12:12 | 24 | THE WITNESS:  Yes. |
| 12:12 | 25 | BY MR. LUBELEY: |



Kusar® Keeping Your Word Is Our Business℠

| 12:12 | 1 | Q. You understand that to be the case? |
|---|---|---|
| 12:12 | 2 | A. Yes. |

12:12   3   Q. Okay. If you want to have modified or

12:12   4   light duty, you need to ask your doctor to say, you

12:12   5   know, she can perform work but it must be modified

12:12   6   and describe how.

12:12   7   Do you understand that?

12:12   8   A. Yes.

12:12   9   Q. Okay. Did you ever request a modified

12:13   10   or light duty recommendation from your doctor so that

12:13   11   you could provide it to your employer?

12:13   12   A. No.

12:13   13   Q. And why not?

12:13   14   A. Because once my employer denied light

12:13   15   -- when I asked for it, once my employer denied it, I

12:13   16   didn't think anymore of it. When I was going to my

12:13   17   doctor's appointment after that, I just was focused

12:13   18   on how to get my arm better so I can go back to work.

12:13   19   Q. Okay. Looking back, do you wish you

12:13   20   would have asked your doctor to provide you light

12:13   21   duty?

12:13   22   MR. GBEWONYO: Objection, calls for

12:13   23   speculation.

12:13   24   MR. LUBELEY: You can answer.

12:13   25   THE WITNESS: I'm not sure.

Kusar® Keeping Your Word Is Our Business℠

| | | |
|---|---|---|
| 12:13 | 1 | MR. LUBELEY:  Okay. |
| 12:13 | 2 | Q.    So what happened on the 20th?  Did you |
| 12:13 | 3 | come back to work? |
| 12:13 | 4 | A.    No, I did not. |
| 12:13 | 5 | Q.    And why not? |
| 12:13 | 6 | A.    Because my doctor took me off again. |
| 12:13 | 7 | Q.    And why? |
| 12:13 | 8 | A.    Because my arm was still -- I was still |
| 12:13 | 9 | going care -- I was still doing -- going through |
| 12:14 | 10 | waiting on -- waiting or the MRI approval and stuff |
| 12:14 | 11 | like that with my doctor. |
| 12:14 | 12 | Q.    Okay.  And when did -- when did you |
| 12:14 | 13 | first understand you were not going able to return to |
| 12:14 | 14 | work? |
| 12:14 | 15 | A.    On the 19th. |
| 12:14 | 16 | Q.    On the 20th? |
| 12:14 | 17 | A.    I'm sorry. |
| 12:14 | 18 | MR. GBEWONYO:  Make sure you wait until he's |
| 12:14 | 19 | finished with the question, okay? |
| 12:14 | 20 | THE WITNESS:  I'm sorry. |
| 12:14 | 21 | BY MR. LUBELEY: |
| 12:14 | 22 | Q.    And how is this that you came to |
| 12:14 | 23 | understand this?  Did you have a doctor's appointment |
| 12:14 | 24 | on the 19th? |
| 12:14 | 25 | A.    Yes. |

87

Kusar® *Keeping Your Word Is Our Business*℠

Jayme Tipton (v.I)　　　　Jayme Tipton vs. Airport Terminal Services, Inc.　　　　1147705

| 12:14 | 1 | Q.　　And what did your doctor say during |
| 12:14 | 2 | that appointment if you recall? |
| 12:14 | 3 | A.　　That he's going to extend my -- my -- |
| 12:14 | 4 | the doctor leave. |
| 12:14 | 5 | Q.　　The leave off of work? |
| 12:14 | 6 | A.　　Yes. |
| 12:14 | 7 | Q.　　Now, did you have any discussions with |
| 12:14 | 8 | your doctor at this time saying -- asking him whether |
| 12:15 | 9 | or not you could perform light duty? |
| 12:15 | 10 | MR. GBEWONYO:　Objection.　Asked and answered. |
| 12:15 | 11 | MR. LUBELEY:　At this time during your April |
| 12:15 | 12 | 19th meeting with the doctor. |
| 12:15 | 13 | THE WITNESS:　No. |
|  | 14 | BY MR. LUBELEY: |
| 12:15 | 15 | Q.　　And why not? |
| 12:15 | 16 | A.　　Just wasn't on my mind at that time. |
| 12:15 | 17 | Q.　　Okay.　Did your doctor ask you if you |
| 12:15 | 18 | needed a note for work at that time in your April 19 |
| 12:15 | 19 | meeting with the doctor? |
| 12:15 | 20 | A.　　He didn't ask me.　I told -- we talked |
| 12:15 | 21 | and I said if he's extending it, then I'm going to |
| 12:15 | 22 | need paperwork -- |
| 12:15 | 23 | Q.　　Okay. |
| 12:15 | 24 | A.　　-- to give to my employer. |
| 12:15 | 25 | Q.　　Okay.　And did he give you that |

88

**Kusar** *Keeping Your Word Is Our Business* SM

| | | |
|---|---|---|
| 12:15 | 1 | paperwork that day? |
| 12:15 | 2 | A.        April 19. |
| 12:15 | 3 | Q.        Yes. |
| 12:15 | 4 | A.        Yes. |
| 12:15 | 5 | MR. LUBELEY:  Okay.  I'd like to have marked |
| 12:15 | 6 | exhibit 12. |
| 12:16 | 7 | (Deposition Exhibit 12 was marked for |
| | 8 | identification by the reporter and is |
| 12:16 | 9 | attached herewith.) |
| 12:16 | 10 | BY MR. LUBELEY: |
| 12:16 | 11 | Q.        This a document from Tarzana Treatment |
| 12:16 | 12 | Centers.  It appears to be a certificate to return to |
| 12:16 | 13 | work.  It said that -- well, Jayme Tipton -- it has |
| 12:16 | 14 | your name and a stamp there -- will be able to return |
| 12:16 | 15 | to work on -- it says May 1st, 2017.  It's signed by |
| 12:16 | 16 | the doctor. |
| 12:16 | 17 | Do you recognize this note? |
| 12:16 | 18 | A.        Yes. |
| 12:16 | 19 | Q.        All right.  Is this the note that you |
| 12:16 | 20 | believe you received on April 19? |
| 12:16 | 21 | A.        Yes. |
| 12:16 | 22 | Q.        Okay.  And what did you do with this -- |
| 12:16 | 23 | once you received this note, what did you do? |
| 12:16 | 24 | A.        I sent it with my -- at that time, it |
| 12:16 | 25 | was my fiance to the job, and he gave it to the |

89

**Kusar** *Keeping Your Word Is Our Business*℠

| 12:16 | 1 | manager. |
|---|---|---|
| 12:16 | 2 | Q.  How do you know he gave it to the |
| 12:16 | 3 | manager? |
| 12:16 | 4 | A.  Because I asked him. |
| 12:17 | 5 | Q.  Did he tell you he gave it to the |
| 12:17 | 6 | manager? |
| 12:17 | 7 | A.  Yes. |
| 12:17 | 8 | Q.  Okay.  Did you reach out to call anyone |
| 12:17 | 9 | at work, your manager or anyone about being out for |
| 12:17 | 10 | -- having your time out extended? |
| 12:17 | 11 | A.  No. |
| 12:17 | 12 | Q.  Why not? |
| 12:17 | 13 | A.  I just didn't. |
| 12:17 | 14 | Q.  Okay.  I mean -- |
| 12:17 | 15 | A.  I was -- I just didn't. |
| 12:17 | 16 | Q.  You didn't call anyone? |
| 12:17 | 17 | A.  No. |
| 12:17 | 18 | Q.  Okay.  When -- what was your -- what |
| 12:17 | 19 | was your fiance's work schedule during that time? |
| 12:17 | 20 | MR. GBEWONYO:  Objection, calls for |
| 12:17 | 21 | speculation.  If you know. |
| 12:17 | 22 | THE WITNESS:  Can't remember the exact time |
| 12:17 | 23 | that he started.  Between 6:00 and 6:30 A.M. |
| 12:17 | 24 | BY MR. LUBELEY: |
| 12:17 | 25 | Q.  What days of the week did he work? |

Kusar® Keeping Your Word Is Our Business℠

Jayme Tipton (v.l)          Jayme Tipton vs. Airport Terminal Services, Inc.          1147705

| 12:17 | 1 | A. | The same days. |

12:17      1        A.      The same days.

12:18      2        Q.      What's his full name?

12:18      3        A.      Deon Brown.

12:18      4        Q.      And who did -- who did you ask him to

12:18      5    give the note to?

12:18      6        A.      Edgar.

12:18      7        Q.      Edgar.  And did Deon tell you he'd

12:18      8    given the note to Edgar?

12:18      9        A.      Yes.

12:18      10       Q.      Did he tell you -- was there anything

12:18      11   said or any more information that he gave you?

12:18      12       A.      No.  They just said thank you.

12:18      13       Q.      Did you hear from anyone at HR or

12:18      14   anything about the extension?

12:18      15       A.      No.

12:18      16       Q.      Did you come back to work on May 1st?

12:18      17       A.      No.

12:18      18       Q.      And why not?

12:18      19       A.      Because my leave got extended.

12:19      20       Q.      Tell me what happened with that.

12:19      21       A.      Well, I went back to the doctor, and we

12:19      22   were still waiting on some -- some -- what is it

12:19      23   called -- the approval from my health care to approve

12:19      24   some more tests that I needed.

12:19      25       Q.      Do you recall what these tests were?


Kusar® Keeping Your Word Is Our Business℠

Case 2:18-cv-09503-AB-JEM    Document 52    Filed 01/03/20    Page 52 of 258    Page ID #:1375

10/23/2019
Jayme Tipton (v.1)                Jayme Tipton vs. Airport Terminal Services, Inc.                1147705

| 12:19 | 1 | A. | No. |
| 12:19 | 2 | Q. | Did you ever have additional tests? |
| 12:19 | 3 | A. | I didn't. |
| 12:19 | 4 | Q. | You didn't? |
| 12:19 | 5 | A. | I didn't. |
| 12:19 | 6 | Q. | Why not? |

12:19    7        A.    Because something happened with my
12:19    8    medical at that time.

12:19    9        Q.    And what's that?

12:19    10        A.    It -- I was -- it was -- it was -- it
12:19    11    got disconnected, terminated.

12:19    12        Q.    Okay.

12:19    13        A.    And I was trying to re -- trying to get
12:20    14    my health -- my medical back.

12:20    15        Q.    Okay.  Were you offered -- so when your
12:20    16    employment was separated, is that when your medical
12:20    17    ended?

12:20    18        A.    No.

12:20    19        Q.    It was before that?

12:20    20        A.    Yes.

12:20    21        Q.    And why did your medical end before
12:20    22    your separation?

12:20    23        MR. GBEWONYO:  Objection.  Calls for
12:20    24    speculation.

12:20    25        MR. LUBELEY:  If you know.  I mean I don't



Kusar  Keeping Your Word Is Our Business℠

| 12:20 | 1 | want you to guess. |
| 12:20 | 2 | THE WITNESS:  I have no idea.  I have no idea. |
| 12:20 | 3 | BY MR. LUBELEY: |
| 12:20 | 4 | Q.    What's your understanding of what |
| 12:20 | 5 | happened? |
| 12:20 | 6 | A.    It's -- |
| 12:20 | 7 | MR. GBEWONYO:  Asked and answered.  If you |
| 12:20 | 8 | know.  Yeah, if you know.  I'll tell you when not to |
| 12:20 | 9 | -- |
| 12:20 | 10 | THE WITNESS:  I -- still to this day, I do not |
| 12:20 | 11 | know exactly what happened, but I was -- I was on the |
| 12:20 | 12 | County -- |
| 12:20 | 13 | MR. LUBELEY:  Okay. |
| 12:20 | 14 | THE WITNESS:  -- with my medical, and a lot of |
| 12:20 | 15 | paperwork and stuff that was going on, and it got |
| 12:20 | 16 | disconnected and I had to get it back on. |
| 12:20 | 17 | MR. LUBELEY:  Okay. |
| 12:20 | 18 | Q.    So you weren't -- you weren't receiving |
| 12:20 | 19 | medical health insurance through your work? |
| 12:21 | 20 | A.    No. |
| 12:21 | 21 | Q.    Okay.  So you never took the medical |
| 12:21 | 22 | insurance from work? |
| 12:21 | 23 | A.    No. |
| 12:21 | 24 | Q.    Even from the day you were hired until |
| 12:21 | 25 | you left, you didn't have medical benefits? |



Kusar  Keeping Your Word Is Our Business℠

Case 2:18-cv-09503-AB-JEM    Document 52    Filed 01/03/20    Page 54 of 258    Page ID #:1377

Jayme Tipton (v.I)          Jayme Tipton vs. Airport Terminal Services, Inc.                    1147705

| | | |
|---|---|---|
| 12:21 | 1 | A.      No. |
| 12:21 | 2 | Q.      Okay.  And why not? |
| 12:21 | 3 | A.      I don't believe that they -- that they |
| 12:21 | 4 | have it.  If they did, you have to be on the job for |
| 12:21 | 5 | a year. |
| 12:21 | 6 | Q.      Okay.  That's your understanding?  But |
| 12:21 | 7 | you already had medical before you started? |
| 12:21 | 8 | A.      Yes. |
| 12:21 | 9 | Q.      Okay.  And had you gone through like |
| 12:21 | 10 | California Care, one of those -- you know, what they |
| 12:21 | 11 | call the Obamacare public health system? |
| 12:21 | 12 | A.      Yes.  I went -- I had L.A. Care. |
| 12:21 | 13 | Q.      Okay.  You had L.A. Care.  Excellent. |
| 12:21 | 14 | And how long had you had L.A. Care |
| 12:21 | 15 | before you began working at ATS? |
| 12:21 | 16 | A.      Years. |
| 12:21 | 17 | Q.      You'd had it while you had been at your |
| 12:21 | 18 | prior job? |
| 12:21 | 19 | A.      Yes. |
| 12:21 | 20 | Q.      Where did you work before you worked at |
| 12:21 | 21 | ATS? |
| 12:21 | 22 | A.      Menzies Aviation. |
| 12:21 | 23 | Q.      Menzies Aviation, okay.  Doing the same |
| 12:22 | 24 | job? |
| 12:22 | 25 | A.      Yes. |

94



| | | |
|---|---|---|
| 12:26 | 1 | break to use the rest room. |
| 12:26 | 2 | MR. LUBELEY:  Yeah.  Let me just get through |
| 12:26 | 3 | the doctor notes and then we can.  We've been going I |
| 12:26 | 4 | think about, what, 30 minutes since -- |
| 12:26 | 5 | MR. GBEWONYO:  That's it.  Wow. |
| 12:26 | 6 | MR. LUBELEY:  If we can power through till |
| 12:26 | 7 | 1:00, we can do a lunch break if that makes sense. |
| 12:26 | 8 | MR. GBEWONYO:  Okay.  All right. |
| | 9 | BY MR. LUBELEY: |
| 12:26 | 10 | Q.     Do you recognize this document that |
| 12:26 | 11 | we've had marked as exhibit 13? |
| 12:26 | 12 | A.     Yes. |
| 12:26 | 13 | Q.     And what do you recognize this as? |
| 12:26 | 14 | A.     This is my -- my doctor's note for my |
| 12:26 | 15 | employer. |
| 12:26 | 16 | Q.     Okay.  This is a note from Tarzana |
| 12:26 | 17 | Treatment Centers.  It appears to provide a return to |
| 12:26 | 18 | work date of May 15, 2017.  Is that correct? |
| 12:26 | 19 | A.     Yes. |
| 12:26 | 20 | Q.     But you don't recall when the doctor |
| 12:26 | 21 | gave you this note? |
| 12:26 | 22 | A.     I do not. |
| 12:26 | 23 | Q.     Okay.  What I'd like to understand is |
| 12:26 | 24 | -- so did your doctor know that you were having the |
| 12:26 | 25 | health insurance issues at this time? |

Kusar  Keeping Your Word Is Our Business℠

Jayme Tipton (v.I)                Jayme Tipton vs. Airport Terminal Services, Inc.                        1147705

| 12:28 | 1 | work; correct? |
| 12:28 | 2 | A.    Yes. |
| 12:28 | 3 | Q.    And he gave you that note? |
| 12:28 | 4 | A.    Yes. |
| 12:28 | 5 | Q.    But you were still waiting to have an |
| 12:28 | 6 | MRI approved? |
| 12:28 | 7 | A.    Yes. |
| 12:28 | 8 | Q.    And you needed to have that done before |
| 12:28 | 9 | you could return to work? |
| 12:28 | 10 | A.    Yes. |
| 12:28 | 11 | Q.    You still needed treatment on your |
| 12:28 | 12 | shoulder.  Your shoulder wasn't better, right? |
| 12:28 | 13 | A.    Yes. |
| 12:28 | 14 | Q.    Okay.  Did you eventually get that MRI? |
| 12:28 | 15 | A.    No. |
| 12:28 | 16 | Q.    You never got the MRI? |
| 12:28 | 17 | A.    No. |
| 12:28 | 18 | Q.    Then how did you continue your |
| 12:28 | 19 | treatment on your shoulder? |
| 12:28 | 20 | A.    What happened was when they terminated |
| 12:28 | 21 | me, May 9th -- |
| 12:28 | 22 | Q.    Yes. |
| 12:28 | 23 | A.    -- that I got the letter.  After that, |
| 12:28 | 24 | I had went to the workers' comp to go see a lawyer |
| 12:28 | 25 | and they provided me with their doctor and I was |

Kusar  Keeping Your Word Is Our Business℠

Jayme Tipton (v.I)                Jayme Tipton vs. Airport Terminal Services, Inc.                1147705

| | | |
|---|---|---|
| 12:29 | 1 | A. I never did. |
| 12:29 | 2 | Q. Okay. So when the doctor -- when the |
| 12:29 | 3 | doctor -- did the doctor choose the return to work |
| 12:30 | 4 | date? |
| 12:30 | 5 | A. Yes. |
| 12:30 | 6 | Q. Okay. Do you know what that was based |
| 12:30 | 7 | on? |
| 12:30 | 8 | A. No. |
| 12:30 | 9 | Q. But you weren't able to return to work |
| 12:30 | 10 | on the 15th? |
| 12:30 | 11 | A. No. |
| 12:30 | 12 | Q. Based on the injury? |
| 12:30 | 13 | A. Yes. |
| 12:30 | 14 | Q. Okay. Did you discuss -- when you had |
| 12:30 | 15 | your discussion with Shonta prior to your termination |
| 12:30 | 16 | or about your termination or discussion you testified |
| 12:30 | 17 | to, did you have -- did you discuss with her when you |
| 12:30 | 18 | might be able to return to work? |
| 12:30 | 19 | A. No. |
| 12:30 | 20 | Q. Okay. And why not? |
| 12:30 | 21 | A. She didn't ask me, but I was -- but I |
| 12:30 | 22 | told her that I was seeing a doctor for my injury. I |
| 12:30 | 23 | didn't know when I can return to work, but I told her |
| 12:30 | 24 | I wanted to return to work. |
| 12:30 | 25 | Q. Of course. And I understand that. I |

102

Jayme Tipton (v.1)                Jayme Tipton vs. Airport Terminal Services, Inc.                1147705

| 12:30 | 1 | mean you wanted to return to work.  You wanted to be |
| 12:30 | 2 | better and healthy, right? |
| 12:31 | 3 | A.    Yes. |
| 12:31 | 4 | Q.    Okay.  But you recall telling her that |
| 12:31 | 5 | you didn't know when you would be able to return to |
| 12:31 | 6 | work? |
| 12:31 | 7 | MR. GBEWONYO:  Objection, misstates witness |
| 12:31 | 8 | testimony. |
| 12:31 | 9 | MR. LUBELEY:  That's what I'm asking.  I just |
| 12:31 | 10 | wanted to be clear. |
| 12:31 | 11 | THE WITNESS:  No.  I didn't tell her when.  I |
| 12:31 | 12 | was going off of my doctor's notes, which my doctor |
| 12:31 | 13 | said I return to work on the 15th and that's what I |
| 12:31 | 14 | was referring to, but I didn't know if my doctor was |
| 12:31 | 15 | going to extend it. |
| 12:31 | 16 | I didn't know what -- what would |
| 12:31 | 17 | happen.  So I can't see the future, but I know that I |
| 12:31 | 18 | wanted to come back to work.  I did not want to lose |
| 12:31 | 19 | my job. |
| 12:31 | 20 | MR. LUBELEY:  No, I understand. |
| 12:31 | 21 | Q.    But your doctor -- because of the |
| 12:31 | 22 | health insurance issue, you knew that you weren't |
| 12:31 | 23 | going to be able to get the treatment you needed to |
| 12:31 | 24 | be able to return to work until sometime after May 15 |
| 12:31 | 25 | and you testified it took actually a couple months |

103

Jayme Tipton (v.I)                    Jayme Tipton vs. Airport Terminal Services, Inc.                    1147705

| | | |
|---|---|---|
| 12:31 | 1 | before you were able to get the further treatment; |
| 12:31 | 2 | correct? |
| 12:31 | 3 | A.      Yes. |
| 12:31 | 4 | MR. GBEWONYO:  Objection, compound. |
| 12:32 | 5 | MR. LUBELEY:  Okay. |
| 12:32 | 6 | Q.      And so when you talked to Shonta, did |
| 12:32 | 7 | you kind of talk through this?  Let her know, hey, I |
| 12:32 | 8 | want to return to work, but I don't know when I'm |
| 12:32 | 9 | going to be able to, you know, be cleared by my |
| 12:32 | 10 | doctor? |
| 12:32 | 11 | Did you kind of explain to her what was |
| 12:32 | 12 | going on? |
| 12:32 | 13 | MR. GBEWONYO:  Objection.  Asked and answered. |
| 12:32 | 14 | MR. LUBELEY:  You can answer. |
| 12:32 | 15 | MR. GBEWONYO:  Yeah, you can answer. |
| 12:32 | 16 | MR. LUBELEY:  He just has to say that so that |
| 12:32 | 17 | later down the road -- it's a lawyer thing. |
| 12:32 | 18 | THE WITNESS:  Okay.  I did explain to her that |
| 12:32 | 19 | I wanted to come back to work and -- but I was under |
| 12:32 | 20 | a doctor's care.  So I didn't know what was going to |
| 12:32 | 21 | happen.  I did explain that, and she said that, well, |
| 12:32 | 22 | you need to resign. |
| | 23 | BY MR. LUBELEY: |
| 12:32 | 24 | Q.      She had said that you need to resign |
| 12:32 | 25 | until you were cleared, right? |

**Kusar**® *Keeping Your Word Is Our Business*℠

Jayme Tipton (v.I)                    Jayme Tipton vs. Airport Terminal Services, Inc.                    1147705

| 12:37 | 1 | You're referring to this note? |
| 12:37 | 2 | THE WITNESS:  Can you repeat -- |
| 12:37 | 3 | MR. LUBELEY:  The May -- the note that had the |
| 12:37 | 4 | May 15 return date. |
| 12:37 | 5 | MR. GBEWONYO:  Okay. |
| 12:37 | 6 | THE WITNESS:  Can you repeat the question, |
| 12:37 | 7 | please? |
| 12:37 | 8 | MR. LUBELEY:  Sure. |
| 12:37 | 9 | Q.     There's -- I'm just trying to clarify |
| 12:37 | 10 | because I have a note myself -- |
| 12:37 | 11 | A.     Yes. |
| 12:37 | 12 | Q.     -- that comes from someone named Moses. |
| 12:37 | 13 | Now Moses was a manager who replaced Edgar.  Is that |
| 12:37 | 14 | your understanding? |
| 12:37 | 15 | A.     Yes. |
| 12:37 | 16 | Q.     And how do you know this? |
| 12:37 | 17 | A.     Moses called me. |
| 12:37 | 18 | Q.     And when did Moses call you? |
| 12:37 | 19 | A.     I do not recall the exact date, but it |
| 12:37 | 20 | was before Shonta called me. |
| 12:37 | 21 | Q.     Okay.  So sometime in May before the |
| 12:37 | 22 | call with Shonta that occurred on May 8th, I believe, |
| 12:38 | 23 | right?  The day before the May 9th letter? |
| 12:38 | 24 | A.     Yes. |
| 12:38 | 25 | Q.     Okay.  Talk to me about the call from |

109

**Kusar**® *Keeping Your Word Is Our Business*℠

Jayme Tipton (v.I)          Jayme Tipton vs. Airport Terminal Services, Inc.          1147705

| | | |
|---|---|---|
| 12:38 | 1 | Moses. |
| 12:38 | 2 | A.    Moses called me to introduce his self |
| 12:38 | 3 | as the new manager, and he asked what's going on. |
| 12:38 | 4 | Why -- you know why was I off.  Even though he got |
| 12:38 | 5 | the doctor's note, he was trying to clarify. |
| 12:38 | 6 | Q.    How do you know that he got the |
| 12:38 | 7 | doctor's note? |
| 12:38 | 8 | A.    Well, he told me that he seen all the |
| 12:38 | 9 | doctor notes. |
| 12:38 | 10 | Q.    Okay. |
| 12:38 | 11 | A.    Yeah. |
| 12:38 | 12 | Q.    Do you know when this call occurred? |
| 12:38 | 13 | A.    I do not remember, but it was between |
| 12:38 | 14 | May 1st and May 8th. |
| 12:39 | 15 | Q.    And did your -- back to -- so back to |
| 12:39 | 16 | the -- you now recall that he had reached out, when |
| 12:39 | 17 | Moses reached out to you to introduce himself, what |
| 12:39 | 18 | do you recall about that interaction?  So you said |
| 12:39 | 19 | that he asked you -- well, strike that. |
| 12:39 | 20 | What do you recall occurring in that |
| 12:39 | 21 | conversation? |
| 12:39 | 22 | MR. GBEWONYO:  Objection, calls for a |
| 12:39 | 23 | narrative.  If you can recall, go ahead. |
| 12:39 | 24 | THE WITNESS:  I do not recall word for word. |
| 12:39 | 25 | MR. LUBELEY:  That's fine. |

**Kusar**® *Keeping Your Word Is Our Business* ℠

| 12:39 | 1 | THE WITNESS: But he was just introducing him |
| 12:39 | 2 | self as the new manager. Asked me about the doctor's |
| 12:40 | 3 | notes, like that he got it, and do I know when I will |
| 12:40 | 4 | be able to return to work and that was basically it. |
| 12:40 | 5 | BY MR. LUBELEY: |
| 12:40 | 6 | Q. And what did you say to him? |
| 12:40 | 7 | A. Well, it was -- I told him it was going |
| 12:40 | 8 | to be the 15th. |
| 12:40 | 9 | Q. But did you think at that time you were |
| 12:40 | 10 | actually going to be able to return to work on the |
| 12:40 | 11 | 15th? |
| 12:40 | 12 | MR. GBEWONYO: Objection, calls for |
| 12:40 | 13 | speculation. |
| 12:40 | 14 | BY MR. LUBELEY: |
| 12:40 | 15 | Q. Or did you tell him I have a note that |
| 12:40 | 16 | says -- |
| 12:40 | 17 | A. Yes, I have a note that says the 15th. |
| 12:40 | 18 | My doctor has taken me off until the 15th. |
| 12:40 | 19 | Q. What did you -- but what -- did you |
| 12:40 | 20 | tell him, but I don't know whether I can actually |
| 12:40 | 21 | come back then or not? |
| 12:40 | 22 | A. No. |
| 12:40 | 23 | Q. Do you recall? |
| 12:40 | 24 | (The parties are speaking over one another.) |
| 12:41 | 25 | MR. LUBELEY: That's what happens when I talk |

111

Case 2:18-cv-09503-AB-JEM    Document 52    Filed 01/03/20    Page 63 of 258    Page ID #:1386

Jayme Tipton (v.I)                Jayme Tipton vs. Airport Terminal Services, Inc.                        1147705

| 12:41 | 1 | over you.  See I have to follow the rules, too. |
| 12:41 | 2 | Q.    Might you have told him your situation |
| 12:41 | 3 | that -- you know, because I can imagine it probably |
| 12:41 | 4 | would have been pretty stressful -- you don't know |
| 12:41 | 5 | what's going on, when you're going to be released? |
| 12:41 | 6 | Might have you explained to him what was going on at |
| 12:41 | 7 | that time? |
| 12:41 | 8 | MR. GBEWONYO:  Objection.  Asked and answered. |
| 12:41 | 9 | You can answer. |
| 12:41 | 10 | THE WITNESS:  I just explained to him that my |
| 12:41 | 11 | doctor just took me off until the 15th. |
| 12:41 | 12 | MR. LUBELEY:  Okay. |
| 12:41 | 13 | THE WITNESS:  And that's when I was expected |
| 12:41 | 14 | by the doctor's note to come back to work. |
| | 15 | BY MR. LUBELEY: |
| 12:41 | 16 | Q.    Now -- but you didn't explain to him |
| 12:41 | 17 | the other stuff that you've already testified to that |
| 12:41 | 18 | was going on, like, you know, you were waiting for |
| 12:41 | 19 | approval for tests, that you weren't cleared yet to |
| 12:41 | 20 | come back to work? |
| 12:41 | 21 | A.    No. |
| 12:41 | 22 | Q.    Okay.  And why not? |
| 12:42 | 23 | A.    Didn't think I had to explain that to |
| 12:42 | 24 | my manager.  That was between me and my doctor. |
| 12:42 | 25 | Q.    But your manager is trying to plan the |



Kusar  Keeping Your Word Is Our Business℠

Jayme Tipton (v.I)          Jayme Tipton vs. Airport Terminal Services, Inc.                    1147705

| 12:50 | 1 | A.       Before I received the letter. |
|-------|---|----------------------------------------|
| 12:50 | 2 | Q.       And did she tell you in that |
| 12:50 | 3 | conversation that you were terminated? |
| 12:50 | 4 | A.       She told me that if I do not resign |
| 12:50 | 5 | that she will -- she will terminate me. |
| 12:50 | 6 | Q.       Okay.   But she didn't tell you in that |
| 12:50 | 7 | conversation that you were terminated? |
| 12:50 | 8 | A.       No.   She just said that I will be |
| 12:50 | 9 | terminated. |
| 12:50 | 10 | Q.       Okay.  From that date, did you have any |
| 12:50 | 11 | other conversations with anyone at Airport Terminal |
| 12:50 | 12 | Services -- |
| 12:50 | 13 | A.       No. |
| 12:50 | 14 | Q.       -- regarding your job? |
| 12:50 | 15 | And you never tried to reapply once you |
| 12:50 | 16 | were released to come back to work; correct? |
| 12:50 | 17 | A.       No. |
| 12:50 | 18 | Q.       All right.  When you were hired, do you |
| 12:51 | 19 | recall receiving and reviewing an employee handbook? |
| 12:51 | 20 | A.       I do not recall. |
| 12:51 | 21 | MR. LUBELEY:  I'd like to have a document |
| 12:51 | 22 | entitled "Airport Terminal Services Employee |
| 12:51 | 23 | Handbook."  It's Bates numbered ATS 000055 through |
| 12:51 | 24 | ATS 000072. |
| 12:51 | 25 | THE REPORTER:  14. |

120

**Kusar**° *Keeping Your Word Is Our Business* ℠

Jayme Tipton (v.I)       Jayme Tipton vs. Airport Terminal Services, Inc.        1147705

| 12:57 | 1 | Q. And did you see it electronically or |
|---|---|---|
| 12:57 | 2 | did you see it in a hard copy? |
| 12:58 | 3 | A. I do not recall. |
| 12:58 | 4 | MR. LUBELEY: I'd like to have mark as the |
| 12:58 | 5 | next exhibit in order a document Bates numbered |
| 12:58 | 6 | ATS 000010. |
|  | 7 | (Deposition Exhibit 15 was marked for |
|  | 8 | identification by the reporter and is |
| 12:58 | 9 | attached herewith.) |
| 12:58 | 10 | MR. GBEWONYO: Do you have an extra copy? |
| 12:58 | 11 | BY MR. LUBELEY: |
| 12:58 | 12 | Q. Is that your digital signature? |
| 12:58 | 13 | MR. GBEWONYO: Thank you. |
| 12:58 | 14 | THE WITNESS: Yes. |
| 12:58 | 15 | MR. LUBELEY: Okay. |
| 12:58 | 16 | Q. And it's dated October 16, 2016? |
| 12:58 | 17 | A. Yes. |
| 12:58 | 18 | Q. And you recall reviewing these policies |
| 12:58 | 19 | at that time? |
| 12:59 | 20 | A. Yes. |
| 12:59 | 21 | Q. Including the employee handbook? |
| 12:59 | 22 | A. Yes. |
| 12:59 | 23 | Q. Okay. I'd like you to turn to page 7 |
| 12:59 | 24 | of the handbook, which is -- I'll give you the Bates |
| 12:59 | 25 | number. Bates number 000062. |

Kusar® Keeping Your Word Is Our Business℠

Jayme Tipton (v.I)                Jayme Tipton vs. Airport Terminal Services, Inc.                1147705

| 01:07 | 1 | Q.    Did you ever provide a fitness for duty |
| 01:07 | 2 | certification from your health care provider that you |
| 01:07 | 3 | were now fully cleared to return to work? |
| 01:07 | 4 | MR. GBEWONYO:  Objection.  Asked and answered. |
| 01:07 | 5 | Vague as to fitness for duty application. |
| 01:07 | 6 | THE WITNESS:  Can you repeat that, please? |
| 01:07 | 7 | MR. LUBELEY:  Yes. |
| 01:07 | 8 | Q.    Did you ever return -- did you ever |
| 01:07 | 9 | provide like a fitness for duty, like I am now -- |
| 01:07 | 10 | here's the doctor has said I am now fully able to |
| 01:07 | 11 | perform my job? |
| 01:07 | 12 | A.    No. |
| 01:07 | 13 | Q.    Did you have any vacation or paid sick |
| 01:07 | 14 | time available to you during this time? |
| 01:07 | 15 | A.    I'm not sure. |
| 01:08 | 16 | Q.    If you look at the policy, look on page |
| 01:08 | 17 | 9 there.  If you look at the second to the last |
| 01:08 | 18 | paragraph at the bottom of the page, it talks about |
| 01:08 | 19 | what to do when you're returning to work. |
| 01:08 | 20 | Did you do any of that? |
| 01:08 | 21 | A.    Repeat the question, please. |
| 01:08 | 22 | Q.    Did you do any of those -- those things |
| 01:08 | 23 | specified there before attempting to return to work? |
| 01:08 | 24 | MR. GBEWONYO:  Objection, compound. |
| 01:08 | 25 | THE WITNESS:  Are you talking about the "call |

128

Kusar® Keeping Your Word Is Our Business℠

| | | |
|---|---|---|
| 01:11 | 1 | on a non-FMLA leave because you're not eligible, that |
| 01:11 | 2 | ATS cannot guarantee your position would be available |
| 01:11 | 3 | once any extension has ended on your leave? |
| 01:11 | 4 | MR. GBEWONYO: Objection. Calls for |
| 01:11 | 5 | speculation, incomplete hypothetical. |
| | 6 | BY MR. LUBELEY: |
| 01:11 | 7 | Q. Do you see where it says that in the |
| 01:11 | 8 | policy? |
| 01:11 | 9 | A. Yes. |
| 01:11 | 10 | Q. Do you have any reason to believe that |
| 01:11 | 11 | wasn't the policy of the company? |
| 01:11 | 12 | MR. GBEWONYO: Objection. The document speaks |
| 01:11 | 13 | for itself. |
| 01:11 | 14 | THE WITNESS: No. |
| 01:11 | 15 | MR. LUBELEY: Okay. |
| 01:11 | 16 | Q. Then it indicates, "ATS will make every |
| 01:11 | 17 | effort to reinstate an employee when possible or |
| 01:11 | 18 | practical to do so." |
| 01:11 | 19 | Do you see that? |
| 01:11 | 20 | A. Yes. |
| 01:11 | 21 | Q. Okay. But you never reached out to |
| 01:11 | 22 | Airport Terminal Services to let them know that |
| 01:11 | 23 | you -- you know, that you were cleared to work and |
| 01:12 | 24 | attempt to reapply once your employment had been |
| 01:12 | 25 | separated; correct? |

| | | | |
|---|---|---|---|
| 01:12 | 1 | A. | Yes. |
| 01:12 | 2 | Q. | Yes, that you had never reached out? |
| 01:12 | 3 | A. | Yes. |

01:12   4      Q.     Okay.  And you were on unpaid leave --

01:12   5   did you receive any COBRA notifications from employee

01:12   6   services?

01:12   7      A.     I do not recall.

01:12   8      Q.     Okay.  All right.  At the time you were

01:12   9   hired by ATS, do you recall receiving a "Disability

01:12   10  Disclosure Form"?

01:12   11     A.     Repeat that, please.

01:12   12     Q.     At the time you were hired by Airport

01:12   13  Terminal Services, do you recall receiving a form

01:13   14  called a "Disability Disclosure Form"?

01:13   15     A.     I do not recall.

01:13   16          (Deposition Exhibit 16 was marked for

01:13   17           identification by the reporter and is

01:13   18           attached herewith.)

01:13   19     MR. LUBELEY:  I'd like to have marked as the

01:13   20  next exhibit 16.

01:13   21     Q.     Do you recognize this document?

01:13   22     A.     Yes.

01:13   23     Q.     And do you recall filling out this

01:13   24  document?

01:13   25     A.     Yes.

Kusar® Keeping Your Word Is Our Business ℠

Jayme Tipton (v.I)                Jayme Tipton vs. Airport Terminal Services, Inc.                1147705

| | | |
|---|---|---|
| 02:12 | 1 | Q.    And when did you start working for ABM |
| 02:12 | 2 | Aviation? |
| 02:12 | 3 | A.    November 28, 2018. |
| 02:12 | 4 | Q.    And what position did you work at ABM |
| 02:12 | 5 | Aviation? |
| 02:12 | 6 | A.    Cabin cleaner. |
| 02:12 | 7 | Q.    And how long did you hold that |
| 02:12 | 8 | position? |
| 02:12 | 9 | A.    Till August 2014, 2019. |
| 02:13 | 10 | Q.    And what happened? |
| 02:13 | 11 | MR. GBEWONYO:  Objection, vague. |
| | 12 | BY MR. LUBELEY: |
| 02:13 | 13 | Q.    Why do you no longer work at ABM |
| 02:13 | 14 | Aviation? |
| 02:13 | 15 | A.    I had to resign because of child care |
| 02:13 | 16 | with my children. |
| 02:13 | 17 | Q.    What happened with that? |
| 02:13 | 18 | A.    It was hard.  Because ABM Aviation is |
| 02:13 | 19 | graveyard shift, from 9:30 P.M. to 6:00 A.M., and it |
| 02:13 | 20 | was hard finding child care to -- child care that I |
| 02:13 | 21 | was comfortable with to care for my children. |
| 02:13 | 22 | Q.    Okay.  And is your husband currently |
| 02:13 | 23 | working? |
| 02:13 | 24 | A.    Yes. |
| 02:13 | 25 | Q.    Okay.  And where does he work? |

139

Jayme Tipton (v.I)                Jayme Tipton vs. Airport Terminal Services, Inc.                1147705

| | | |
|---|---|---|
| 02:20 | 1 | that time stopped her and said, hey, are you guys |
| 02:20 | 2 | hiring for -- for Airport Terminal Services, and she |
| 02:20 | 3 | said, yeah, just go on and put your résumé.  Go on |
| 02:20 | 4 | and apply and put your résumé and then that's how I |
| 02:20 | 5 | got ATS. |
| 02:20 | 6 | Q.    And who hired you at ATS? |
| 02:20 | 7 | MR. GBEWONYO:  Objection.  Calls for |
| 02:20 | 8 | speculation. |
| 02:20 | 9 | THE WITNESS:  I can't recall her name. |
| | 10 | BY MR. LUBELEY: |
| 02:20 | 11 | Q.    Do you remember who you interviewed |
| 02:20 | 12 | with? |
| 02:20 | 13 | A.    Shonta. |
| 02:20 | 14 | Q.    Okay.  You interviewed with Shonta. |
| 02:20 | 15 | Shonta hired you in the position.  She's also the one |
| 02:20 | 16 | who notified you about being fired? |
| 02:20 | 17 | A.    Yes. |
| 02:20 | 18 | MR. GBEWONYO:  Objection, compound. |
| | 19 | BY MR. LUBELEY: |
| 02:21 | 20 | Q.    Did you quit at -- did you quit |
| 02:21 | 21 | Menzies? |
| 02:21 | 22 | A.    I put in my two week notice Menzies, |
| 02:21 | 23 | yes. |
| 02:21 | 24 | Q.    Why did you want to leave Menzies so |
| 02:21 | 25 | quickly after you started? |

**Kusar** *Keeping Your Word Is Our Business* ℠

Jayme Tipton (v.I)          Jayme Tipton vs. Airport Terminal Services, Inc.                    1147705

| 02:52 | 1 | Q.      Anyone at Airport Terminal Services? |
| 02:52 | 2 | MR. GBEWONYO:  Objection, vague. |
| 02:52 | 3 | MR. LUBELEY:  Especially any of the three, any |
| 02:52 | 4 | of the individuals listed, Edgar, Melissa. |
| 02:52 | 5 | MR. GBEWONYO:  Compound. |
| 02:52 | 6 | THE WITNESS:  I'm sorry.  What was the |
| 02:52 | 7 | question? |
| 02:52 | 8 | BY MR. LUBELEY: |
| 02:52 | 9 | Q.      Do you recall them asking you any |
| 02:52 | 10 | non-job related personal -- non-job related questions |
| 02:52 | 11 | at any time you were on leave I assume? |
| 02:53 | 12 | A.      No. |
| 02:53 | 13 | Q.      Did you ever engage anyone in |
| 02:53 | 14 | attempting to -- strike that. |
| 02:53 | 15 | Did you ever -- you testified about you |
| 02:53 | 16 | asking for light duty on the first day you came in |
| 02:53 | 17 | with the arm sling; correct? |
| 02:53 | 18 | A.      Yes. |
| 02:53 | 19 | Q.      You spoke with Ora, and other than |
| 02:53 | 20 | that, you didn't have any discussions with anyone |
| 02:53 | 21 | about light duty, including your doctor; is that |
| 02:53 | 22 | correct? |
| 02:53 | 23 | A.      Yes. |
| 02:53 | 24 | MR. GBEWONYO:  Objection.  Asked and answered. |
| 02:53 | 25 | MR. LUBELEY:  Okay. |

166

**Kusar**® *Keeping Your Word Is Our Business℠*

Jayme Tipton (v.I)                 Jayme Tipton vs. Airport Terminal Services, Inc.                 1147705

| | | |
|---|---|---|
| 02:53 | 1 | Q.     And you never reached out to HR about |
| 02:53 | 2 | seeing if there was alternative jobs you could |
| 02:54 | 3 | perform or other duties you could do? |
| 02:54 | 4 | MR. GBEWONYO:  Objection.  Asked and answered, |
| 02:54 | 5 | vague as to time. |
| 02:54 | 6 | THE WITNESS:  No. |
| 02:54 | 7 | MR. LUBELEY:  No. |
| 02:54 | 8 | Q.     The other thing on the charge, it |
| 02:54 | 9 | mentions that you reside in Santa Monica.  Was that |
| 02:54 | 10 | correct at all?  Did you ever live in Santa Monica? |
| 02:54 | 11 | A.     No. |
| 02:54 | 12 | Q.     Okay.  Do you know why it says that you |
| 02:54 | 13 | live in Santa Monica on this complaint? |
| 02:54 | 14 | MR. GBEWONYO:  Objection, lacks foundation. |
| 02:54 | 15 | THE WITNESS:  I don't know why it says that. |
| 02:54 | 16 | MR. LUBELEY:  That's okay. |
| 02:54 | 17 | Q.     Sometimes, you know, it's like the |
| 02:54 | 18 | other form that we looked at.  You know, sometimes |
| 02:54 | 19 | the lawyers might put something on that could be a |
| 02:55 | 20 | mistake, but I just wanted to understand from you why |
| 02:55 | 21 | -- I was going to ask you when did you move |
| 02:55 | 22 | because -- based on your prior testimony. |
| 02:55 | 23 | Did anyone ever harass you on any basis |
| 02:55 | 24 | when you were at Airport Terminal Services? |
| 02:55 | 25 | MR. GBEWONYO:  Objection, relevance. |

167



Kusar® Keeping Your Word Is Our Business℠

Jayme Tipton (v.I)                Jayme Tipton vs. Airport Terminal Services, Inc.                1147705

| 03:04 | 1 | not lift heavy things. |
| 03:04 | 2 | Q.    Okay.  So -- but had you -- and we |
| 03:04 | 3 | talked about how you had not been released from your |
| 03:04 | 4 | doctor to perform -- |
| 03:04 | 5 | A.    Yes. |
| 03:04 | 6 | Q.    -- any duties? |
| 03:04 | 7 | A.    But I was -- I'm sorry. |
| 03:04 | 8 | Q.    Okay. |
| 03:04 | 9 | A.    But I was able to -- I feel that I was |
| 03:04 | 10 | able to do other things as far as picking up trash. |
| 03:05 | 11 | Anything that was light duty.  I just could not carry |
| 03:05 | 12 | heavy things up the stairs into the aircraft. |
| 03:05 | 13 | Q.    Okay.  But you never got a doctor that |
| 03:05 | 14 | said you could do light duty? |
| 03:05 | 15 | A.    No. |
| 03:05 | 16 | Q.    Or tell the employer.  Okay. |
| 03:05 | 17 |      Were you able to still care for your |
| 03:05 | 18 | kids? |
| 03:05 | 19 | A.    I could care for my children, yes.  I |
| 03:05 | 20 | just could not pick up my daughter which was around |
| 03:05 | 21 | two and a half at that time.  I could not pick her |
| 03:05 | 22 | up. |
| 03:05 | 23 | Q.    Could you cook? |
| 03:05 | 24 | A.    It was -- it was difficult to cook, but |
| 03:05 | 25 | I can cook with my left arm. |

175

**Kusar**® *Keeping Your Word Is Our Business*℠

Jayme Tipton (v.I)                Jayme Tipton vs. Airport Terminal Services, Inc.                    1147705

| | | |
|---|---|---|
| 03:05 | 1 | Q.      Could you clean? |
| 03:05 | 2 | A.      It was difficult, but I could do it.  I |
| 03:05 | 3 | just could not move or lift my right arm. |
| 03:05 | 4 | Q.      Could you drive? |
| 03:05 | 5 | A.      It was difficult. |
| 03:06 | 6 | Q.      But could you drive? |
| 03:06 | 7 | A.      Yes. |
| 03:06 | 8 | Q.      Were you aware that in the complaint, |
| 03:06 | 9 | and I refer you to paragraph 6 on page 2, over to |
| 03:06 | 10 | paragraph -- over to page 3, it said that due to your |
| 03:06 | 11 | work injury, you suffered severe pain that prevented |
| 03:06 | 12 | you from being able to care for young children, cook, |
| 03:06 | 13 | clean, drive and caused her to experience sleep |
| 03:06 | 14 | deprivation. |
| 03:06 | 15 | MR. GBEWONYO:  Objection, compound.  Again, |
| 03:06 | 16 | the complaint is not verified. |
| 03:06 | 17 | THE WITNESS:  Meaning I cannot do things with |
| 03:06 | 18 | my right arm. |
| 03:06 | 19 | MR. LUBELEY:  Okay. |
| 03:06 | 20 | Q.      But it doesn't say that there.  It says |
| 03:06 | 21 | you couldn't do those things at all, but that's not |
| 03:06 | 22 | accurate, right? |
| 03:06 | 23 | MR. GBEWONYO:  Objection, argumentative.  You |
| 03:06 | 24 | can answer if you understand the question. |
| 03:06 | 25 | THE WITNESS:  Repeat it, please. |

176

**Kusar**® *Keeping Your Word Is Our Business*℠

Jayme Tipton (v.I)                  Jayme Tipton vs. Airport Terminal Services, Inc.                  1147705

| 03:09 | 1 | Were you diagnosed with a tear in your |
| 03:09 | 2 | rotator cuff? |
| 03:09 | 3 | A.    I was not diagnosed with that, but it |
| 03:09 | 4 | was topic -- |
| 03:09 | 5 | Q.    That's -- |
| 03:09 | 6 | A.    -- between my physician.  They were |
| 03:09 | 7 | trying to see. |
| 03:09 | 8 | Q.    That's what you were waiting for the |
| 03:10 | 9 | MRI for, right? |
| 03:10 | 10 | A.    Correct. |
| 03:10 | 11 | Q.    Okay.  Had you previously torn your |
| 03:10 | 12 | rotator cuff back in 2015 when you first saw a doctor |
| 03:10 | 13 | about an injury to your shoulder? |
| 03:10 | 14 | A.    No. |
| 03:10 | 15 | Q.    How did you originally injure your |
| 03:10 | 16 | shoulder? |
| 03:10 | 17 | A.    I don't recall, but I just know it was |
| 03:10 | 18 | just sore. |
| 03:10 | 19 | Q.    Did you play sports? |
| 03:10 | 20 | A.    And I went to the doctor.  I do. |
| 03:10 | 21 | Q.    Was it like a sports related injury |
| 03:10 | 22 | maybe? |
| 03:10 | 23 | MR. GBEWONYO:  Objection, asked and answered. |
| 03:10 | 24 | MR. LUBELEY:  You can answer. |
| 03:10 | 25 | THE WITNESS:  I don't know. |

179



Jayme Tipton (v.I)              Jayme Tipton vs. Airport Terminal Services, Inc.                    1147705

| | | |
|---|---|---|
| 03:13 | 1 | any point to see if there was a way in which you |
| 03:13 | 2 | could return to work? |
| 03:13 | 3 | MR. GBEWONYO:  Objection.  Asked and answered. |
| 03:14 | 4 | You can answer. |
| 03:14 | 5 | THE WITNESS:  No. |
| 03:14 | 6 | BY MR. LUBELEY: |
| 03:14 | 7 | Q.    Did you ever attempt to call Moses to |
| 03:14 | 8 | see if there was a way that you could return to work? |
| 03:14 | 9 | MR. GBEWONYO:  Objection, asked and answered. |
| 03:14 | 10 | Vague as to time. |
| 03:14 | 11 | MR. LUBELEY:  From the time you went out on |
| 03:14 | 12 | leave until separation of your employment. |
| 03:14 | 13 | THE WITNESS:  No.  Didn't think -- |
| 03:14 | 14 | MR. LUBELEY:  You keep going. |
| 03:14 | 15 | THE WITNESS:  That's okay. |
| 03:14 | 16 | BY MR. LUBELEY: |
| 03:14 | 17 | Q.    Did you ever return the security badge? |
| 03:14 | 18 | A.    Yes. |
| 03:14 | 19 | Q.    And why was that important to do? |
| 03:14 | 20 | MR. GBEWONYO:  Objection.  Calls for |
| 03:14 | 21 | speculation. |
| 03:14 | 22 | MR. LUBELEY:  If you know. |
| 03:14 | 23 | THE WITNESS:  Because I believe it's federal |
| 03:14 | 24 | property. |
| | 25 | BY MR. LUBELEY: |

182

**Kusar** *Keeping Your Word Is Our Business℠*

Jayme Tipton (v.I)      Jayme Tipton vs. Airport Terminal Services, Inc.      1147705

| | | |
|---|---|---|
| 03:31 | 1 | BY MR. LUBELEY: |
| 03:31 | 2 | Q.    In your employment with ATS, you would |
| 03:31 | 3 | get certain attendance points if you missed, right? |
| 03:31 | 4 | A.    Yes. |
| 03:32 | 5 | Q.    Do you recall how many attendance |
| 03:32 | 6 | points you had received by April of 2017? |
| 03:32 | 7 | A.    No. |
| 03:32 | 8 | Q.    Okay.  Other than Edgar and Moses, did |
| 03:32 | 9 | you have any other supervisors when you were at ATS? |
| 03:32 | 10 | A.    I'm not sure. |
| 03:33 | 11 | Q.    Did you ever complain about any of the |
| 03:33 | 12 | conduct you've alleged in your complaint prior to |
| 03:33 | 13 | your termination? |
| 03:33 | 14 | MR. GBEWONYO:  Objection, vague. |
| 03:34 | 15 | THE WITNESS:  Can you explain, please? |
| 03:34 | 16 | MR. LUBELEY:  Yeah. |
| 03:34 | 17 | Q.    I mean was there any -- other than the |
| 03:34 | 18 | complaint you told me that you discussed with Damian |
| 03:34 | 19 | about issues with Melissa and not feeling like the |
| 03:34 | 20 | work distribution that was fair, was there any other |
| 03:34 | 21 | complaints you made to anyone about any -- about |
| 03:34 | 22 | anything that occurred when you were working at ATS? |
| 03:34 | 23 | MR. GBEWONYO:  Vague, unintelligible. |
| 03:34 | 24 | THE WITNESS:  Not that I recall. |
| 03:34 | 25 | BY MR. LUBELEY: |

197

**Kusar**  Keeping Your Word Is Our Business℠

Jayme Tipton (v.l)          Jayme Tipton vs. Airport Terminal Services, Inc.          1147705

| | | |
|---|---|---|
| 03:34 | 1 | Q.    Did anyone take any actions against you |
| 03:34 | 2 | while you were employed at ATS that you believed |
| 03:34 | 3 | harmed you emotionally? |
| 03:34 | 4 | A.    I believe Shonta when I spoke to her, |
| 03:35 | 5 | the way that she was communicating with me when she |
| 03:35 | 6 | was term -- telling me to resign or she'll terminate |
| 03:35 | 7 | me. |
| 03:35 | 8 | Q.    What was her tone in that conversation? |
| 03:35 | 9 | A.    Firm. |
| 03:35 | 10 | Q.    Okay.  When she called you, what did |
| 03:35 | 11 | she first say? |
| 03:35 | 12 | A.    She introduced herself as Shonta |
| 03:35 | 13 | Henderson from HR, and word for word, I can't |
| 03:35 | 14 | remember exactly. |
| 03:35 | 15 | Q.    Shonta is the one who interviewed and |
| 03:35 | 16 | hired you; correct? |
| 03:35 | 17 | A.    Yes. |
| 03:35 | 18 | Q.    And did you have a good working |
| 03:35 | 19 | relationship with Shonta? |
| 03:35 | 20 | A.    I didn't work with Shonta. |
| 03:35 | 21 | Q.    But did you feel that you could reach |
| 03:35 | 22 | out to Shonta if you needed to? |
| 03:36 | 23 | A.    You could never get in contact with |
| 03:36 | 24 | Shonta. |
| 03:36 | 25 | Q.    What do you mean? |

198


Kusar® Keeping Your Word Is Our Business℠

Jayme Tipton (v.I)                      Jayme Tipton vs. Airport Terminal Services, Inc.                      1147705

| | | |
|---|---|---|
| 03:39 | 1 | not like they couldn't perform their work because I |
| 03:39 | 2 | was gone.  They could perform their work. |
| 03:39 | 3 | Q.      And what do you base that on?  Is that |
| 03:39 | 4 | your -- are you speculating or do you have -- did you |
| 03:39 | 5 | have access to information on schedules and their |
| 03:39 | 6 | hiring needs at that time? |
| 03:39 | 7 | A.      I just know from me working there how |
| 03:39 | 8 | many people is there.  Now I'm not sure who came |
| 03:39 | 9 | certain days, who was off, I don't know, but as far |
| 03:39 | 10 | as terminating me because I was -- I couldn't perform |
| 03:39 | 11 | the job at that time, they didn't need to replace me |
| 03:39 | 12 | is what I'm saying, and they didn't -- I believe that |
| 03:39 | 13 | they didn't start hiring or they didn't hire people |
| 03:39 | 14 | till like four months later. |
| 03:39 | 15 | Q.      Were you aware that during this time |
| 03:39 | 16 | they actually were actively looking to hire people? |
| 03:39 | 17 | A.      No. |
| 03:40 | 18 | Q.      Did you -- you weren't looking for |
| 03:40 | 19 | positions at other companies at this time, right? |
| 03:40 | 20 | A.      Oh, no. |
| 03:40 | 21 | Q.      Okay.  But they did hire -- did they |
| 03:40 | 22 | hire your friend from Menzies as well? |
| 03:40 | 23 | A.      Later, yes.  After me. |
| 03:40 | 24 | Q.      So you knew they had been hiring just a |
| 03:40 | 25 | few months before you went out on leave, right? |

**Kusar** *Keeping Your Word Is Our Business*<sup>SM</sup>

Jayme Tipton (v.I)                  Jayme Tipton vs. Airport Terminal Services, Inc.                  1147705

| 03:41 | 1 | Q.      Isn't it difficult for them to meet the |
| 03:41 | 2 | customer needs if employees aren't coming to work? |
| 03:41 | 3 | A.      Yes. |
| 03:41 | 4 | MR. GBEWONYO:  Same objection. |
| 03:41 | 5 | MR. LUBELEY:  And I think we can end for |
| 03:42 | 6 | today.  What time is it? |
| 03:42 | 7 | MR. GBEWONYO:  3:41. |
| 03:42 | 8 | MR. LUBELEY:  Okay.  Does that work okay for |
| 03:42 | 9 | you? |
| 03:42 | 10 | MR. GBEWONYO:  That's fine with me. |
| 03:42 | 11 | THE WITNESS:  Yes. |
| 03:42 | 12 | MR. LUBELEY:  Okay.  All right.  Why don't we |
| 03:42 | 13 | -- we're going to end this session of the -- this |
| 03:42 | 14 | session of the deposition.  Her deposition will |
| 03:42 | 15 | remain open, but we can have the court reporter |
| 03:42 | 16 | prepare the transcript for review, and then we'll |
| 03:42 | 17 | continue -- we'll continue on a short time frame. |
| 03:42 | 18 | MR. GBEWONYO:  We'll meet and confer. |
| 03:42 | 19 | MR. LUBELEY:  We'll meet and confer.  We |
| 03:42 | 20 | should probably talk anyway based on some of the |
| 03:42 | 21 | other housekeeping matters -- |
| 03:42 | 22 | MR. GBEWONYO:  Okay. |
| 03:42 | 23 | MR. LUBELEY:  -- housekeeping stuff. |
| 03:42 | 24 | And then what do we want to do on the |
| 03:42 | 25 | stipulation?  Do it by Code. |

**Kusar** *Keeping Your Word Is Our Business* SM

Case 2:18-cv-09503-AB-JEM    Document 52    Filed 01/03/20    Page 81 of 258    Page ID
#:1404
Jayme Tipton (v.I)                    Jayme Tipton vs. Airport Terminal Services, Inc.                    1147705

1          DECLARATION

2              OF

3        PENALTY OF PERJURY

4

5        I declare under penalty of perjury, under the

6    laws of the State of California, that I have read the

7    foregoing transcript, I have made any corrections,

8    additions or deletions that I was desirous of making

9    in order to render the within transcript true and

10   correct, and

11       IN WITNESS WHEREOF, I have hereunto subscribed

12   my name this _____ day of _____, 20____, at

13   _____, California.

14

15

16

17       _____

18       JAYME TIPTON

19

20

21

22

23

24

25

Kusar  Keeping Your Word Is Our Business SM

```
 1                  CERTIFICATION OF COURT REPORTER

 2                         FEDERAL JURAT

 3

 4          I, the undersigned, a Certified
     Shorthand Reporter of the State of California do
 5   hereby certify:

 6          That the foregoing proceedings were
     taken before me at the time and place herein set
 7   forth; that any witnesses in the foregoing
     proceedings, prior to testifying, were placed under
 8   oath; that a verbatim record of the proceedings was
     made by me using machine shorthand which was
 9   thereafter transcribed under my direction; further,
     that the foregoing is an accurate transcription
10   thereof.

11

12          That before completion of the
     deposition, a review of the transcript [X] was
13   [ ] was not requested.

14          I further certify that I am neither
     financially interested in the action nor a relative
15   or employee of any attorney of any of the parties.

16

17          IN WITNESS WHEREOF, I have this date
     subscribed my name.

18

19          Dated: October 30, 2019

20

21

22                    Norma L. Gaddison

23

24                    _____
                      NORMA L. GADDISON, CSR
25                    Certificate No. 4214
```

Kusar  *Keeping Your Word Is Our Business*℠



# Written Warning Notice – U.S.



EXHIBIT
5
Tipton
10 23-19

Employee: Jayme Tipton

Position: Grooming Agent

Station: LAX 87

Date of notice: 4/8/2017

*The purpose of this written warning is to bring to your attention ongoing deficiencies in your conduct and/or performance. The intent is to define for you the importance of the situation so that you may take prompt corrective action. This written warning will be placed in your personnel file.*

## A. Nature of violation (check appropriate box)

☐ Safety    ☐ Violation of policy and/or work rules    ☐ Substandard Work    ☒ Misconduct

☒ Other (explain): <u>Insubordination towards Crew Chief and poor interaction with Crew Chief</u>

## B. Statement of the problem (include a separate sheet if necessary):

Jayme on 4/1/2017 I addressed your behavior toward your Crew Chief. I explained to you that ignoring or contradicting a direct order (such as leaving early without authorization), poor interaction with your Crew Chief (such as not maintaining a harmonious working relationship with your CC) can result in a Final Written Warning.

## C. Statement of expectations and/or company policy on this subject (include a separate sheet if necessary):

Jayme on 4/1/2017 I explained to you that my expectations were that you needed to complete your full schedule and you were only allowed to leave early if an emergency will come up. You've failed to reach my expectation and continued to demonstrate insubordination towards your Crew Chief.

## D. Action taken:    ☐ Written Warning    ☒ Final Warning

## E. Prior warning/s on this subject (leave blank if N/A):   Date : _____    Date : _____

## F. Will this notice be accompanied with a suspension?   ☒ No   ☐ Yes, Start: _____   End: _____

## G. Summary of corrective action to be taken, dates for improvement and plans for follow up (include a separate sheet if necessary):

Jayme, as part of the corrective action you will be placed on a Final Warning. I expect you improve your attendance and misconduct immediately. Failure to meet my expectation can result in your suspension including termination.

## H. Employee's comments and commitment:

☒ I do wish to submit written comments (please indicate below, include a separate sheet if necessary)

☐ I do not wish to submit written comments

_____

_____

_____

## I. Consequences of failure to improve performance or corrective behavior:

*Failure to follow the above standards or any additional violation to company policy and/or established procedure may result in further disciplinary action up to and including termination of your employment with Airport Terminal Services.*

Employee's signature: _____    Date: 4/8/2017

Supervisor's signature: _____    Print Name: Damian Neri

Manager's signature: _____    Print Name: Edgar Trujillo

Cc: Employee            Cc: Employee's personnel file            Cc: Employee Services (Final Warnings <u>only</u>)

**BOARD OFFICERS**

Scott Taylor
President
Chief Executive Officer

Albert M. Senella
Secretary / Treasurer
Chief Operating Officer

Bobbi Sloan, Ph.D
Vice President



## TARZANA TREATMENT CENTERS
Integrated Behavioral Healthcare

18646 Oxnard Street, Tarzana, CA 91356  •  (818) 996-1051  •  (818) 345-3778 fax  •  www.tarzanatc.org

Reply Address:

## Certificate To Return To Work/School

TIPTON, JAYME - 201475
~~████████████~~ - Palmdale 93550
DOB: ~~████~~   Age: 30   Gender: Female
Home: ~~██████████~~ Cell: ~~██████~~
L.A. Care Medi-Cal LAMC Capitated

Name_____

has been under my care from ___4/11/17___ to ___4/19/17___

and will be able to return to work/school on ___4/20/17___

Limitations/Remarks:_____ ℗ shoulder pain _____

_____ referred to Orthopedic _____

Dr. _____   Phone _____   4/11/17

TARZANA TREATMENT CENTER
Address 907 W. LANCASTER BLVD.   Date_____
LANCASTER, CA 93534
(661) 723-4829

TARZANA TREATMENT CENTER
907 W. LANCASTER BLVD.
LANCASTER, CA 93534
(661) 723-4829

EXHIBIT
9
Tipton
10-25-19

INCORPORATED IN 1972
TARZANA  •  RESEDA  •  NORTHRIDGE  •  LONG BEACH  •  LANCASTER
DETOXIFICATION • RESIDENTIAL • WOMEN'S SERVICES • COMMUNITY EDUCATION • FAMILY MEDICAL CARE • MENTAL HEALTH
OUTPATIENT • YOUTH SERVICES • SOBER LIVING • HIV/AIDS SERVICES • AFTER CARE • FAMILY SERVICES • DOMESTIC VIOLENCE

JT000088

**BOARD OFFICERS**

Scott Taylor
President
Chief Executive Officer

Albert M. Senella
Secretary / Treasurer
Chief Operating Officer

Bobbi Sloan, Ph.D
Vice President



## TARZANA TREATMENT CENTERS
### Integrated Behavioral Healthcare

18646 Oxnard Street, Tarzana, CA 91356  •  (818) 996-1051  •  (818) 345-3778 fax  •  www.tarzanatc.org

Reply Address:

## Certificate To Return To Work/School

TIPTON, JAYME - 201475

████████████ - Palmdale 93550
DOB: ██████   Age: 29   Gender: Female
Home: ████████ Cell: ████████
L.A. Care Medi-Cal LAMC

Nai_____   _____

has been under my care from_____ to ___5/1/17

and will be able to return to work/school on ___5/1/17

Limitations/Remarks:_____ (R) shoulder

_____

_____

_____

Dr._____   Phone_____
       TARZANA TREATMENT CENTER
Address 907 W. LANCASTER BLVD.    Date_____
       LANCASTER, CA 93534
       (661) 723-4829

TARZANA TREATMENT CENTER
907 W. LANCASTER BLVD.
LANCASTER, CA 93534
(661) 723-4829



EXHIBIT
12
Tipton
10-23-19

INCORPORATED IN 1972

TARZANA  •  RESEDA  •  NORTHRIDGE  •  LONG BEACH  •  LANCASTER

DETOXIFICATION • RESIDENTIAL • PREVENTION • WOMEN'S SERVICES • COMMUNITY EDUCATION • FAMILY MEDICAL CARE • MENTAL HEALTH
OUTPATIENT • YOUTH SERVICES • SOBER LIVING • HIV/AIDS SERVICES • AFTER CARE • FAMILY SERVICES • DOMESTIC VIOLENCE

JTY000069



**BOARD OFFICERS**

Scott Taylor
President
Chief Executive Officer

Albert M. Senella
Secretary / Treasurer
Chief Operating Officer

Bobbi Sloan, Ph.D
Vice President



# TARZANA TREATMENT CENTERS
Integrated Behavioral Healthcare

18646 Oxnard Street, Tarzana, CA 91356 • (818) 996-1051 • (818) 345-3778 fax • www.tarzanatc.org

Reply Address:

.......... P...... T..... W... k/School

TIPTON, JAYME - 201475
38955 ~~~~~~~~~~ Ave - Palmdale 93550
DOB: ███████  Age: 30  Gender: Female
Home: ███████████  Cell: ████████████
L.A. Care Medi-Cal LAMC Capitated

Name_____

has been under my care from_____ to_____

and will be able to return to work/school on  5/15/17

Limitations/Remarks: ℞ shoulder for

_____

_____

Dr._____ or Phone_____ MD

Address TARZANA TREATMENT CENTER      Date_____
        907 W. LANCASTER BLVD.
        LANCASTER, CA 93534
        (661) 723-4829

TARZANA TREATMENT CENTER
907 W. LANCASTER BLVD.
LANCASTER, CA 93534
(661) 723-4829



EXHIBIT
13
Tipton
10-23-18

INCORPORATED IN 1972

TARZANA • RESEDA • NORTHRIDGE • LONG BEACH • LANCASTER

DETOXIFICATION • RESIDENTIAL • PREVENTION • WOMEN'S SERVICES • COMMUNITY EDUCATION • FAMILY MEDICAL CARE • MENTAL HEALTH
OUTPATIENT • YOUTH SERVICES • SOBER LIVING • HIV/AIDS SERVICES • AFTER CARE • FAMILY SERVICES • DOMESTIC VIOLENCE

TTC000079

13



# EMPLOYEE HANDBOOK

Airport Terminal Services, Inc
Headquarters: 111 Westport Plaza Dr
Suite 400
St Louis, MO 63146
(314) 739-1900
http://www.atsstl.com



EXHIBIT
*14*
*Tipton*
*10-23-19*

Created January 15, 2008

Revised January 1, 2016

pg. 0

ATS 000055

ATS Handbook: Table of contents (alphabetical order)

Airport Identification Badges........................... 4
Attendance ................................................. 7
Bulletin Boards........................................... 15
Change of Personal Information............................ 12
Complaint and Suggestion Procedures.................... 12
Dismissal .................................................. 16
Driving Company Vehicles/Equipment.................... 12
Driving Personal Vehicles on Company Business ..... 13
Employment-At-Will ...................................... 3
Employment Eligibility .................................. 3
Equal Employment Policy ............................... 3
Family Medical Leave..................................... 9
Funeral Leave ............................................ 11
General Disclaimer........................................2
Hazardous Chemicals and Waste............................ 5
History..................................................... 2
Leave of Absence ......................................... 8
Lunch and Rest Periods................................. 6
Medical Non-FMLA Leave ................................ 10
Military Family Leave Entitlements........................10
Military Leave ............................................ 11
Mission Statement ....................................... 2
Outside Employment and Conflict of Interest.......... 14
Overtime/Additional Hours .............................. 7
Pay ........................................................ 7
Personal Leave ........................................... 11
Pilferage .................................................. 4
Professional Appearance ................................. 5
Promotions, Demotions and Transfers.................... 14
Resignation ............................................... 16
Safety and Safety Equipment ............................ 4
Security Background Check .............................. 3
Sick Time ................................................. 8
Smoking .................................................. 13
Solicitation and Distribution ............................ 15
Temporary Duty Assignments (TDY)......................... 14
Timekeeping .............................................. 6
Tools....................................................... 15
Violation of Work Rules .................................. 16
Welcome .................................................. 2
Work Schedule............................................. 6
Worker's Compensation ................................... 8

Created January 15, 2008                    Revised January 1, 2016

ATS 000056

**Mission Statement**

*We, the employees of ATS, will provide the highest quality service in the safest environment to the airlines, airports and the customers they serve.*

**GENERAL DISCLAIMER**

The contents of this handbook have been presented as a matter of information only.  Airport Terminal Services (ATS) believes wholeheartedly in the policies and procedures described herein.  However, because circumstances and operational needs can change, it reserves the right to modify, revoke, deviate, suspend, terminate or change any or all of such policies or procedures, in whole or in part, at any time with or without notice.  Additionally, while considerable effort has been made to provide clear and accurate information, the contents of this handbook should not be considered to be exhaustive.  Neither this handbook nor any other policy, rule, procedure, practice, or form is intended or should be construed as any sort of contract, express or implied, or as creating any contractual rights.

If you have questions concerning these guidelines, please consult with your Manager, HRG/A, or an Employee Services Manager at (314) 739-1900.

ATS operates in a number of different states, and the laws of all states vary to some degree. In the event that any provision of this handbook is contradictory to state or local law, ATS will follow the applicable state law, if required.

**WELCOME**

On behalf of Airport Terminal Services, welcome to the ATS family.  We hope that your employment with ATS will be a mutually rewarding experience.

We must keep in mind that our efforts are for the purpose of rendering the best possible quality service in the safest way to each of our customers.  This is the purpose of our existence, and our efforts should be directed accordingly.

Remember, each and every one of us, in our own way, represents ATS to our customers and the patrons of each airport.  You should be proud and happy to be part of the finest team of any ground handling company.

Again, welcome to our family.

**HISTORY**

Airport Terminal Services was formed in 1975 as a subsidiary of Midcoast Aviation.  Midcoast Aviation, and its subsidiary, were purchased by Ozark Airlines, who was in turn purchased by Trans World Airlines in 1986.  In September of 1994, ATS was sold by TWA to Mr. Richard B. Hawes, a local investor and an eighth generation St. Louisan.  Since 1986, ATS has expanded to major airports across the United States.  In 2000, ATS expanded into Canada.

Throughout the ever-changing airline industry, Airport Terminal Services meets the challenges of a diverse customer base and their corresponding requirements by creating and nurturing long term partnerships.

Created January 15, 2008                                            Revised January 1, 2016

ATS 000057

**EQUAL EMPLOYMENT POLICY**

Airport Terminal Services is an Equal Opportunity Employer and as such does not discriminate against or deprive an individual of equal employment opportunities on the basis of race, color, religion, sex (including pregnancy), age (40 or older), national origin, citizenship status, disability, genetic information, veteran status, or any other legally protected status in accordance with applicable local, state and federal law. No one will be retaliated against by ATS in any manner for exercising their rights under this policy.

Any employee who feels they have been the target of or a witness to any form of unlawful discrimination should immediately file a written or verbal complaint with the General Manager, Human Resources Generalist, Employee Hotline (877.702.0190), or Employee Relations Manager or above at corporate office (314.739.1900). All complaints are promptly investigated. Cooperation is required with investigations. Information obtained during investigations is confidential and only disclosed to those who have a need for the information.

If ATS determines that unlawful discrimination has occurred, corrective action will be taken. Appropriate action will also be taken to deter any future discrimination. ATS will not retaliate against you for filing a complaint and will not knowingly permit retaliation by management, employees or your co-workers.

**EMPLOYMENT-AT-WILL**

Employees covered by this handbook are employees-at-will. This means that either you or ATS can terminate your employment at any time. No representative of ATS, other than an Officer of the Company, has the authority to enter into any agreement modifying your status as an employee-at-will, and any such agreement must be in writing and signed by an Officer of the Company. No one has the authority to make any verbal statements of any kind, at any time, which are inconsistent with the foregoing and binding upon ATS. If you have any questions concerning policies or procedures, contact your manager or Employee Services Manager or above at corporate office.

**EMPLOYMENT ELIGIBILITY**

Employees must continue to meet certain minimum eligibility requirements in order to maintain employment with ATS. Where applicable, these include, but are not limited to: Being approved by the Airport Badging Office to obtain, and continue to keep, an Authorized Airport Identification Badge, obtaining and keeping a U.S. Customs' badge, being authorized to have access to U.S. Postal mail, having a valid driver's license with a good driving history as defined by ATS in those positions that have such requirement, being able to pass required training in designated time allowed or up to the standards of ATS and/or customer, being able to perform the essential functions of the position with or without reasonable accommodations, continued eligibility and documentation to work in the United States and remaining conviction-free of any FAA disqualifying crimes or other crimes that are relevant to our workplace. It is the employee's responsibility to notify their station manager within 24 hours of any of circumstances that may alter one's employment eligibility.

Employees must be a minimum of 18 years of age.

**SECURITY BACKGROUND CHECK**

Due to the nature of our positions, employees may be required to go through various background checks. These may include, but not limited to; an FBI Criminal History Records Check (CHRC), U.S. Customs background and criminal check, fingerprint check coordinated by the United States Postal Service. ATS will also run its own criminal background check. There may be some instances where employees will be required to obtain or clarify information based off of these

Created January 15, 2008                                                    Revised January 1, 2016

ATS 000058

background checks. Failure to fully and promptly cooperate and disclose all necessary information with the completion of this background investigation may result in refusal to employ or termination of employment. Convictions found may be grounds for dismissal or for refusal to hire.

## AIRPORT IDENTIFICATION BADGES

Once your security background clearance has been completed, an Airport Identification (I.D.) Badge will be issued by the Airport Authority. This badge must be displayed in strict compliance with FAA regulations at all times (i.e. prominently on the outer most garment above the waist) when in the Security Identification Display Area (SIDA). Lost or stolen badges must be reported immediately to your immediate supervisor, and the cost of replacement is the responsibility of the employee. Each employee is responsible for authorized or unauthorized use of his/her I.D. badge. These badges are the property of the airport and must be turned in at the time of resignation or separation from the company.

## SAFETY AND SAFETY EQUIPMENT

It is the policy of ATS to provide and maintain safe and healthful working conditions, follow operating practices that will safeguard all employees and result in safe working conditions and efficient operation. This includes compliance with EPA and OSHA standards and adherence to all other applicable laws and procedures.

New employees will receive a primary safety orientation to provide a basis for future safety attitude development and are informed of airport operations handling and general shop rules and practices. Safe practices and procedures are reviewed to show how accidents are prevented. Individual responsibility for job safety is emphasized. It is the employee's responsibility not to perform any task or function until they are trained and signed off on by the safety officer. Employees who violate ATS' safety policies or perform their work in an unsafe manner are subject to disciplinary action up to and including termination of employment.

Department safety meetings are held regularly and employees are paid for the time they attend. These meetings are to communicate operational issues that are key to us providing a safe working environment for our employees and the equipment with which we work. All employees are expected to attend these safety meetings.

ATS provides, at no cost, personal protection equipment required by state or federal mandate, to all employees whose jobs necessitate such protection. Safety devices must be used as directed. Check with your station manager to see if such equipment is applicable to your area. First-Aid cabinets and eye wash stations are in several locations. Locate the closest one to your work area and use these facilities if needed. Report any injury to your supervisor as soon as possible, even if it seems minor at the time. The cooperation of all employees in eliminating hazards and developing safe working habits is a primary ingredient in a successful safety program. If you see an unsafe condition or work practice, report this to a supervisor or your station manager immediately. Safety concerns, hazards, and other factors (weather, equipment, procedures, facilities) can be reported via the ATS Connection Intranet by using the "Safety Concern Reporting" tool. Employees may leave their name, phone and email if they want to be contacted.

## PILFERAGE

Given the nature of our business, our customers and the traveling public place a great deal of trust in our company and our employees. It is everyone's responsibility to ensure pilferage does not occur. Employees who witness pilferage must contact their station manager immediately so it may be investigated. If, for any reason, the employee does not feel comfortable contacting the station

Created January 15, 2008                                     Revised January 1, 2016

ATS 000059

manager, the employee may also contact the corporate office or use the toll free hotline number (877.702.0190).  ATS will cooperate with the authorities to ensure those found pilfering are prosecuted to the fullest extent of the law.

In addition, ATS also has a established reward program to anyone who provides information that leads to the involuntary separation of an ATS employee, who, in the scope of his/her duties, it is determined the employee was pilfering.

As such, ATS reserves the right to search property, lockers, desks, vehicles or clothing of our employees.  When these situations may arise, it is not something we take lightly, but it is a step we must take to ensure any pilferage stops.  We will make every effort we can to have our work environment one where employees are not working next to someone who is breaking the law.

## HAZARDOUS CHEMICAL AND WASTE

ATS abides by all State, Local and Federal regulations regarding the storage, use, disposal and transportation of hazardous materials.  All employees exposed to hazardous material will be appropriately trained and informed in accordance with governmental regulations. Employees will be expected to follow established procedures for the safe storage, use and disposal of hazardous material and will use protective equipment and clothing at all times.  Employees are also expected to become familiar with the hazardous nature of materials they come in contact with and should request assistance from their immediate supervisor for this familiarization.

## PROFESSIONAL APPEARANCE

Due to the nature of our business, where our public image directly affects our business relationship with our customer, we have established general guidelines on personal appearance for all employees, listed on the Uniform policy.  Where applicable, ATS employees may be required to follow our customers' dress code or more specific guidelines.

ATS reserves the right to determine what is appropriate dress and grooming, not only for appearance, but also for those situations which are defined by safety practices and/or customer requirements.

ATS furnishes uniforms to employees whose jobs require uniform attire.  Employees will be expected to wear clean, fully pressed uniforms and to keep the shirt tail tucked into the trousers, shorts or skirt at all times.  Uniforms must be worn during all working hours.  Employees will receive any specific uniform requirements applicable to their position when they are hired.  You will also be required to sign a Garment Liability form that identifies all uniforms issued to you.

If a uniform becomes torn or damaged, or cannot be properly cleaned, please report it to your supervisor so that a replacement can be ordered.

Employees contribute money (non refundable) to the cost of uniforms through payroll deductions (as allowable by law).

For certain positions however, a uniform security deposit will be deducted from your initial paychecks to cover a complete set of uniforms. This security deposit will be returned to you when you return all uniforms upon departure from the company. The cost of unreturned uniforms, or uniforms returned past the specified time frame, will be deducted from this deposit amount.

All employees not issued uniforms are expected to dress in appropriate business attire, maintaining neat and clean grooming habits and appearance at all times.  Your supervisor will explain attire for your particular work area at the time of your orientation.

Employees' hair should be of a natural color, clean, combed and neatly trimmed.  Untidy or extreme hair arrangements are considered unsuitable (extreme hair colors may include pink, purple, blue, etc).  Sideburns should be well trimmed and neat. Should any employee wish to wear a mustache

Created January 15, 2008                                    Revised January 1, 2016

ATS 000060

or beard, he may do so provided our customer contract permits such appearance, and if permitted, the mustache or beard must be kept trim and neat in appearance. Other male employees will be expected to be clean-shaven at all times. Any jewelry worn should be simple and not excessive.

Employees are expected at all times to practice acceptable standards of personal hygiene.

## TIMEKEEPING

Hourly employees are required to badge/clock-in and out unless other arrangements have been authorized by the station manager in advance. Each employee shall personally record his/her starting time, quitting time, and any other required time keeping. Employees shall not begin working prior to scheduled starting time without the prior approval of their station manager. Employees should not badge/clock-in earlier than 5 minutes before their scheduled starting time. Unless authorized to do so, employees are to begin working at their scheduled start time, not before.

One swipe card will be provided at no charge to hourly employees. Lost or stolen swipe cards must be reported immediately to your immediate supervisor, and the cost of replacement is the responsibility of the employee.

Clocking in or out for another employee or falsifying one's own or another's time is prohibited and will result in disciplinary action up to and including termination. All employees are expected to be clocked in and ready to work at their work stations in order to be considered "on time".

Failing to clock-in and/or out, clocking in more than 5 minutes ahead of the start time, or working unauthorized hours may result in disciplinary action up to and including termination.

## LUNCH AND REST PERIODS

A full-time employee's work day will vary from station to station and department to department. Normally, it will be either 8½ or 10½ hours with a half an hour lunch or 9 or 11 hours with an hour lunch. Rest periods will vary depending on station/departmental needs. Lunch and rest periods should be approved by one's supervisor or manager to ensure safety and/or customer service is not compromised.

## WORK SCHEDULE

Your work schedule will be explained at the time of employment. ATS operates 24 hours a day, seven days a week. Given the nature of our business, it is very likely that employees work schedules and responsibilities will change over time. It is critical that employees have the flexibility to alter their work schedule if needed. This includes, but is not limited to, rotating or changing days off, shifts or assigned work areas. In addition, employees may have to change their full-time or part-time status depending on the new work schedule, such change may affect eligibility for company benefits. Employees may be required to work additional hours dependent upon station/departmental needs. This includes staying past one's normal quitting time, coming in early, or working different days. Fulltime is defined as a regular schedule of forty (40) hours per week.

An employee working when the clocks are set back or forward an hour will be paid for the actual hours worked. For example, for an eight (8) hours shift, the employee will receive seven (7) hours of pay if the clocks are moved forward and nine (9) hours of pay if the clocks are moved backward.

The workweek begins at 12:01 a.m. (0001) Monday morning and ends Sunday at 12:00 a.m. (2400). The established workday for any employee will be the start of the employee's regularly scheduled shift and ends 24 hours later.

In addition, employees may have to change their full- or part-time status depending on the new work schedule. Employees may be required to work additional hours dependent upon

Created January 15, 2008                                              Revised January 1, 2016

pg. 6

ATS 000061

station/departmental needs. This includes staying past one's normal quitting time, coming in early, or working different days.

An employee working when the clocks are set back or forward an hour will be paid for the actual hours worked. For example, for an eight (8) hours shift, the employee will receive seven (7) hours of pay if the clocks are moved forward and nine (9) hours of pay if the clocks are moved backward.

## OVERTIME / ADDITIONAL HOURS

Because of the customer oriented nature of our business, all employees may be required to work overtime or additional hours and must be available when it is necessary. Although every effort will be made to schedule this in advance and consider the availability of the individual, an employee may be required to work overtime without prior notice, depending on the demands of the work schedule. Overtime for hourly employees is paid in compliance with all applicable State and Federal Laws.

Any overtime or additional hours must be authorized in advance by one's supervisor. Overtime pay is calculated based on the hours worked by an employee. Vacation, Sick, Holiday, Funeral pay, Jury Duty pay, Three (3) Hour Minimum or any other pay provided for hours not actually worked does not count towards hours worked in calculation of overtime. Working unauthorized overtime may result in disciplinary action up to and including termination.

## ATTENDANCE

It is essential for the success of ATS and for the security of everyone's job that ATS meet its work schedules on time. In order to accomplish this objective, regular and prompt attendance at work is required of all employees. Excessive absenteeism and lateness is expensive, disruptive and places an unfair burden on other employees. Many areas are schedule sensitive, and absence or tardiness directly influences ATS' ability to meet the customers' needs and may result in a loss of business. Therefore, prompt attendance is a priority.

If an employee is going to be late or absent for any reason, he/she must personally notify either the Station Manager or designated member of management no later than three (3) hours in advance of starting time. Depending on station needs, a station may have a requirement for greater than three (3) hours notice. It is the employee's responsibility to ensure that proper notification is given. Asking another employee, friend or relative to give this notification is not considered proper, except under emergency conditions. Failure to report an absence from work is unexcused and is grounds for disciplinary action. Failure to call or report in for two (2) consecutive scheduled days will result in the assumption that the employee has voluntarily quit and the separation will be processed by ATS effective the first day of the absence. One no-call/no-show within the first sixty (60) days of employment will result in termination.

If it is necessary to be absent for an extended period, employees are expected to keep in constant contact with their supervisor.

## PAY

Any employee who works a short shift lasting less than three (3) hours, will receive a minimum of three (3) hours pay. For example, if you are scheduled to work one (1) hour, you will receive three (3) hours of pay. The three (3) hour minimum does not apply if you are sent home for disciplinary reasons, attend training classes, meetings, clock in late, or go home from work due to illness or other special circumstance. Hourly employees are paid weekly. Corporate hourly employees are paid every

Created January 15, 2008                                              Revised January 1, 2016

ATS 000062

two (2) weeks. Salaried, exempt employees are paid on the 15th and last day of the month. If a payday falls on a weekend or holiday, paychecks will normally be issued on the last work day prior to the normal pay date.

An employee's immediate supervisor or station manager should be consulted to resolve questions concerning paychecks. Any errors in pay should be reported to the supervisor as soon as possible. Whether an error causes underpayment or overpayment, employees are expected to advise their supervisor to ensure the error is corrected as promptly as possible.

If it becomes necessary for an employee to contact Payroll, the supervisor or station manager may request the employee discuss the matter in the supervisor's or station manager's presence.

## SICK TIME

Sick time is for the protection of a full-time employee who is unable to attend work for short-term illnesses unless otherwise authorized by state law. Use of sick time for other than a personal confining illness may result in disciplinary action up to and including termination.

Accumulated sick time may be used after six (6) months of continuous employment. An employee can accumulate a maximum of ten (10) sick days. Sick days are not paid out upon separation from the company.

## WORKER'S COMPENSATION

Worker's Compensation Insurance is carried for all of our employees. In order to insure coverage under Worker's Compensation, it is necessary to follow some basic rules. All on-the-job injuries or illnesses must be reported to the employee's station manager immediately or no later than the end of shift, even if the injury or illness seems small at the time and may not appear to require medical attention. Failure to notify your station manager of an injury immediately or no later than the end of your shift may impact your benefits. If the injury requires treatment, your station manager may instruct you where to go for treatment.

Each employee is required to supply a copy of the doctor's notes following the initial and follow-up visits. Failure to do so, or failure to follow doctor's orders may result in disciplinary action, up to and including termination. ATS strongly believes in a restricted duty program to aid the employee in his/her recovery and to return to work as quickly as possible. If the injury results in restricted duty, the employee must obtain a doctor's release before being able to return to full duty. Employees who do not return to work after being released to restricted duty are subject to ATS Attendance Policy and related disciplinary action.

If an employee loses time from work (lost-time injury), the employee is required to contact his/her station manager regularly to update ATS on his/her status. The frequency of these contacts will vary based on how long it is estimated the employee will be out from work, but in no case should be less than monthly.

## LEAVE OF ABSENCE (LOA)

ATS offers a Leave of Absence policy to help meet the needs of the employee while at the same time ensuring high quality service to our customers and minimal interruption to the work flow. Employees will not normally be granted a Leave of Absence with less than three (3) months of service. Employees requesting a Leave of Absence must give thirty (30) days notice to their manager in writing. If the leave is not foreseeable, notice must be given as soon as possible and practical. In the event an employee is unable to obtain necessary forms and physician certification prior to the start of a leave, forms will be sent to the employee and must be returned to Employee Services within fifteen (15) days of the start of the leave.

Created January 15, 2008                                      Revised January 1, 2016

ATS 000063

Employees may not be employed elsewhere while on a Leave of Absence without indicating so and obtaining written approval from the employee's manager and the Vice President of Employee Services.

Employees may take a Leave of Absence for the following reasons as outlined below: Family Medical Leave, Medical non-FMLA, personal and military. In addition, employees may be placed on an Administrative Leave.

Some states may have other types of leaves of absence or different requirements. Where this is the case, ATS will comply with such requirements.

**Family and Medical Leave (FMLA)**

Employees at sites that are covered by the Family Medical Leave Act (location with at least 50 employees employed by ATS within 75 miles) must meet the following eligibility guidelines for a Family Medical Leave of Absence. The employees must: 1) have been employed with ATS for at least twelve (12) months; and, 2) have worked for ATS at least 1,250 hours during the previous 12-month period.

An employee may take a Family Medical Leave for the birth of a child or the placement of a child with the employee for adoption or foster care. For adoption or foster care, the child must be under 18 years of age or 18 years of age or older but incapable of self-care because of a mental or physical disability. Appropriate medical or legal documentation must accompany the request. Leave for birth or placement must take place within twelve (12) months of the birth or placement.

An employee may take a Family Medical Leave for a serious health condition of the employee (including pregnancy or worker's compensation) or an immediate family member. This means an illness, injury, impairment or a physical or mental condition that involves inpatient care or continuing treatments by a health care provider. Immediate family members include the employee's child, spouse or parent.

The Family Medical Leave of Absence may be up to a total of twelve (12) weeks (full-time employee week defined as 40 hours, part-time defined as average hours worked per week) in duration within a 12-month period. If medically necessary, leave may be taken on an intermittent basis.

Employees must provide 30 days advance notice of the need to take FMLA leave when the need is foreseeable. When 30 days notice is not possible, the employee must provide notice as soon as practicable and generally must comply with an employer's normal call-in procedures.

Employees must provide sufficient information for the employer to determine if the leave may qualify for FMLA protection and the anticipated timing and duration of the leave.

Sufficient information may include that the employee is unable to perform job functions, the family member is unable to perform daily activities, the need for hospitalization or continuing treatment by a health care provider, or circumstances supporting the need for military family leave. Employees also must inform the employer if the requested leave is for a reason for which FMLA leave was previously taken or certified. Employees also may be required to provide a certification and periodic recertification supporting the need for leave.

An employee on a Family Medical Leave who returns within the 12-week period will be returned to the same or similar position.

An employee returning from a Leave of Absence must contact his/her supervisor immediately upon the employee's release to return to work from his/her physician. Prior to returning to work from a Leave for the employee's health reasons, the employee must present a fitness-for-duty certification from a qualified health care provider to their manager for final approval to return to work.

An employee must use his/her benefit time (i.e. vacation, floating holiday) during a leave. For

medical leaves, the employee must use sick time first and then any other remaining benefit time. If all benefit time has been exhausted, the remaining leave will be unpaid. Unless allowed by state law, sick time may only be used for the personal confining illness of the employee.

If an employee does not return from a leave of absence, or get an approved extended leave of absence (see Extended Leave of Absence section below), he/she may be terminated.

During a Family Medical Leave, if an employee has insurance, his or her medical and/or dental coverage will continue during the leave as long as the employee paying only the employee portion of the premium.

The FMLA does not replace or supplant any state or local laws that offer **greater** employee protections than the FMLA.

ATS complies with all requirements, prohibitions, and other provisions of the state and local laws applicable in areas where it operates or does business. If a state law entitles an employee to more generous benefits than FMLA does, the employee receives the more generous benefits.

*If you have any questions about FMLA, please contact your Station Manager, HRG or Director of Employee Services at (314) 739-1900.*

### Military Family Leave Entitlements

Eligible employees whose spouse, son, daughter or parent is on covered active duty or call to covered active duty status may use their 12-week leave entitlement to address certain qualifying exigencies. Qualifying exigencies may include attending certain military events, arranging for alternative childcare, addressing certain financial and legal arrangements, attending certain counseling sessions, and attending post-deployment reintegration briefings.

FMLA also includes a special leave entitlement that permits eligible employees to take up to 26 weeks of leave to care for a covered servicemember during a single 12-month period. A covered servicemember is:

(1) a current member of the Armed Forces, including a member of the National Guard or Reserves, who is undergoing medical treatment, recuperation or therapy, is otherwise in outpatient status, or is otherwise on the temporary disability retired list, for a serious injury or illness*; or

(2) (2) a veteran who was discharged or released under conditions other than dishonorable at any time during the five-year period prior to the first date the eligible employee takes FMLA leave to care for the covered veteran, and who is undergoing medical treatment, recuperation, or therapy for a serious injury or illness.*

### Medical Non-FMLA Leave

Requests for medical leaves by employees who are not eligible for the Family Medical Leave will be considered a Medical Non-FMLA leave.

Request for extension to a Family Medical Leave over the twelve week time limit will be considered a Medical Non-FMLA leave and may be granted based upon employee and departmental needs. Employees who remain on an unpaid medical non-FMLA leave will be placed on COBRA and will receive information from Employee Services.

For non-FMLA leaves, ATS cannot guarantee that a position for the employee will be available once an extension has ended. ATS will make an effort to reinstate an employee when possible and practical to do so.

Created January 15, 2008                                              Revised January 1, 2016

ATS 000065

**Personal Leave**

An employee may request a Personal Leave of Absence for a period of up to three (3) months. The employee must use available benefit time during this leave. If all benefit time has been exhausted, the remaining leave will be unpaid. Personal leaves of absence are for personal reasons and may also be used for family reasons in cases where employees do not meet the eligibility for the Family Medical Leave Act. Personal leaves will be approved based upon the employee's situation and the needs of ATS. Full-time employees going on a Personal Leave will stop accruing vacation time.

Employees may be placed on COBRA during an unpaid period of their Personal Leave of Absence and will receive information from Employee Services.

ATS cannot guarantee that a position for the employee will be available once a personal leave has ended. ATS will make an effort to reinstate an employee when possible and practical to do so.

**Military Leave**

Eligibility for Military Leaves of Absence will be as required by both federal and state law.

An employee may request a Military Leave of Absence. The employee should give ATS at least two (2) weeks notice of such active duty periods, and furnish ATS with a copy of official orders relating to such active activity. This leave would be in force until the military obligation is fulfilled. Reinstatement of the employee will be made in accordance with applicable federal and state law. Employees must reapply for re-employment within ninety (90) days of discharge from military service or hospitalization for service-related illnesses or injury continuing after service discharge for a period of not more than one (1) year.

A full-time employee who is a member of the military reserve unit and is called to temporary active duty, including annual training, or for a state or national emergency will be reimbursed the difference between a normal work week's wages at straight time and reservist pay, up to a maximum of two weeks per year, if the reservist pay is less than the employee's normal wages. In order to receive this pay, the military pay voucher must be submitted to the employee's supervisor upon return from active duty.

**Funeral Leave**

All full-time employees may be granted up to three (3) days paid leave to attend the funeral of an immediate family member. Immediate family member is defined as parent or step-parent, spouse, child or step-child, minor child if legal guardian, sister or brother or step-sister or step-brother. An employee may be granted funeral pay for their scheduled hours, not to exceed eight hours per day for up to three scheduled days. The final funeral paid day may not be later than one day following the funeral.

If an employee is scheduled to work on the day of the funeral for a father-in-law, mother-in-law, grandmother, grandfather or grandchild, the employee will be paid for their scheduled hours not to exceed eight hours for that day.

The days granted for funeral leave are not deducted from eligible vacation or personal holidays.

**CHANGE OF PERSONAL INFORMATION**

Any change of name, address, telephone number or beneficiary information should be reported immediately to the Employee Services Department.

**COMPLAINT AND SUGGESTION PROCEDURE**

It is the policy of ATS to insure that all employees are free to discuss their problems and

Created January 15, 2008                                    Revised January 1, 2016

ATS 000066

suggestions with management.

If you have a complaint or suggestion concerning your job or any other matter which affects you at work, you should take the matter up with your immediate supervisor.

If the complaint or suggestion is taken to the immediate supervisor and cannot be handled or settled by your supervisor, or if you feel, for whatever reason that you cannot address your complaint or suggestion with your immediate supervisor, it should then be taken to their manager who will attempt to work out a satisfactory solution. If the matter cannot be settled at this point, you should arrange to discuss your issue with their manager. If a satisfactory solution is not arranged, the employee should continue with the chain of command up to the President of the company.

If the problem is of such a nature that you would like to discuss it with the Vice President of Employee Services, you should feel free to do so at any stage of this procedure. The Vice President of Employee Services will listen to the problem, counsel with you, and if necessary, refer you to anyone who can best take action on the matter involved.

ATS hopes that this procedure will provide a free and open means for understanding and cooperation among all employees at all levels of the organization.

In addition, ATS maintains an "open door" policy in order to make it possible for employees to express serious concerns directly to any member of management up to and including the President. Concerns may be expressed directly to the President at informal meetings conducted occasionally with members of the various stations.

ATS has a formal Suggestion Program whereby employees may earn cash rewards for suggestions which have a positive impact for ATS.

ATS also maintains a toll-free number (877.702.0190) and website http://www.atsstl.com/contact.asp that is checked by the Employee Services department. Any employee may call or email, anonymously or otherwise, to notify the corporate office of any issues that he/she feels is important to communicate and, for whatever reason, does not feel comfortable reporting at the local station level. Employees are encouraged to provide their name and number so that the employee may be contacted to gather further information, clarify issues, etc., however, this is not required.

These calls and emails will be kept as confidential as possible, however, because many times a follow-up investigation is needed, absolute confidentiality cannot be guaranteed. ATS will do its utmost to maintain confidentiality. No one will be retaliated against for making a call to the hotline. Making calls for malicious purposes or giving information that is blatantly false in order to harass another individual or individuals will result in disciplinary action up to and including termination.

## DRIVING COMPANY VEHICLES/ EQUIPMENT

Only properly trained, authorized, and individuals with a valid driver's license may drive ATS vehicles or equipment or any vehicle operated in the course of employment.

Employees should keep in mind that in the eyes of the public, they are representatives of ATS and must observe safe and courteous operating procedures at all times. For safety and insurance reasons, it is imperative that any employee who drives a company vehicle or equipment maintains a safe and acceptable personal driving record and immediately inform his/her supervisor of any license suspension or revocation. Any employee operating an ATS vehicle or equipment with a suspended, or invalid or no driver's license may be disciplined up to and including termination.

Initial Moving Violation Reports (MVR) will be required of all employees being hired in positions that include driving. Anyone whose record is considered marginal by ATS or its insurance company or whose license is suspended or revoked will not be eligible to drive and may be terminated from employment. ATS reserves the right to obtain an MVR for individuals, on an ongoing basis, to

Created January 15, 2008                                          Revised January 1, 2016

ATS 000067

ensure employees driving records are current and have maintained a good driving record.

**DRIVING PERSONAL VEHICLES ON COMPANY BUSINESS**

During the performance of their duties, employees may be requested to drive their personal vehicle on ATS business. Company insurance policies cannot provide corporate coverage for vehicles that are also used for non-work purposes. Therefore, when this occurs, employees are not covered by ATS' automotive insurance for physical damage or liability. In the event of an accident, the employee's personal insurance will be considered the primary coverage and the employee will be responsible for any deductibles and any other loss not covered by their personal insurance.

Employees who use their personal vehicles for company business should be aware that ATS does not provide insurance coverage for physical damage to these vehicles during such use and only provides liability coverage in excess of $300,000. This means that if an employee's personal vehicle is damaged while it is being used for company business, the repair of the vehicle will be at the employee's expense (or through reimbursement from his/her personal insurance coverage). In addition, if the employee is liable for physical damage or personal injury to the property of others, he/she will be personally responsible for such liability up to the limit of $300,000 (this may be covered by the employee's automobile liability coverage if they have coverage of $300,000 or more).

Employees using their personal vehicle for company business are encouraged to review their insurance coverage, particularly with respect to liability coverage, and where possible, obtain liability coverage with limits of $300,000 or more. Physical damage coverage (collision coverage) should also be given serious consideration.

Employees are encouraged to check their personal vehicle's insurance coverage to insure adequate insurance coverage exists.

Employees may be reimbursed for mileage driven on company business in accordance with current ATS policy. Your station manager will explain what reimbursement documentation is needed and must approve such reimbursement requests.

**SMOKING**

Because of the number of flammable items used in many locations, smoking is allowed only in designated areas. This policy must be strictly enforced. Smoking by anyone, whether employee, customer, or visitor, is prohibited within 50 feet of any fuel vehicle or aircraft and everywhere in the hangars or on the ramps. It is each person's responsibility to see that smoking in unauthorized areas does not occur.

In consideration of others and in respect for a healthful environment, ATS has adopted a smoke free policy which includes all company vehicles. Violations may result in disciplinary action up to and including termination of employment.

**OUTSIDE EMPLOYMENT AND CONFLICT OF INTEREST**

Employees will not be permitted to engage in activities during or after normal working hours that would be in competition with ATS or would in any way affect the Company's profitability, or the employee's usefulness and efficiency. This would include performing work for an existing or potential customer that could or would normally be performed by ATS. It is the responsibility of the employee to report any requests of this nature by a customer to his/her supervisor or other management.

Normally, manager positions and above are not allowed to engage in employment outside of ATS and in no circumstances by a customer or competitor. Such employment would result in a direct conflict of interest with ATS. Manager positions and above will be required to sign a Conflict of Interest form.

The following will provide helpful guides in more obvious areas of activities to be avoided.

Created January 15, 2008                                     Revised January 1, 2016

ATS 000068

These examples are not meant to be all inclusive, but rather are areas where conflicts of interest may arise.

Use of Company Information - Information not of public record obtained from Company sources shall not be used for personal gain, nor disclosed to others, except for Company purposes.

Interest in Suppliers - No Employee or related party should have any interest, direct or indirect, in any supplier of the Company. If this situation arises, the employee needs to disclose the potential conflict of interest in writing and explain the relationship and give to the Employee's supervisor.

Employment - Due to the high demands of managing in our service environment, the Employee may not normally engage in other employment. In a rare circumstance, other employment may be approved by your supervisor, as long as such employment does not create a conflict of interest and does not impact the Employee's duties and responsibilities to the Company. Any other employment must be disclosed by the Employee, in writing, to the Employee's supervisor.

Gifts - No Employee may receive a gift from a supplier that could potentially cause a conflict of interest. For these purposes, one-time or occasional gifts valued under $100 need not be disclosed. Gifts exceeding $100, or gifts that are on-going, must be disclosed to the Employee's supervisor.

For any potential conflicts of interest as described above, the Executive Committee of the Company will determine if there is a conflict of interest and what appropriate action must be taken to ensure this potential conflict of interest is not to the detriment of the Company.

## TEMPORARY DUTY ASSIGNMENTS (TDY)

When one station is busy and another slow, or during a station start-up, ATS needs may make it necessary to assign an employee to another department or location. Employees will report to work and clock in at that location as if that were their regular assignment. In order to continue to provide continuity and good service, employee cooperation in these events is appreciated.

Employees may be required to sign Travel/TDY guidelines before traveling to the new assignment.

## PROMOTIONS, DEMOTIONS AND TRANSFERS

Employees are selected because of their skills, abilities and suitability for particular jobs and the business needs of ATS. However, should other openings become available for which they would also be qualified, employees may request a transfer. ATS encourages employees to seek advancement within the organization.

Selection criteria may include experience, formal education, location, performance reviews, attendance, discipline records, seniority, ability to perform the duties of the new position and prior related training. ATS reserves the right to consider outside candidates as it deems necessary.

Notices of corporate office opportunities and other positions with a title of manager, will normally be posted throughout the company.

An employee will not normally be considered eligible if he/she has been employed for less than six (6) months in a position (twelve (12) months for those in management positions) or if their performance is unsatisfactory in the position he/she is presently employed.

In situations where an employee's performance is not meeting standards, or where company situations require it, an employee may be demoted into a different position. Employees who are demoted may receive a corresponding reduction in pay to reflect the new position.

## SOLICITATION AND DISTRIBUTION

ATS believes that employees should be provided with an environment free from unwarranted

Created January 15, 2008                                         Revised January 1, 2016

ATS 000069

distractions and interruptions. ATS also believes in ensuring a highly productive work environment. In order to prevent possible distractions in our operations, and to avoid interference with work and inconvenience to any employees, we have established the following guidelines concerning solicitation and distribution on ATS premises:

Solicitation or distribution by non-employees is not allowed.

A)   Employees may not solicit other employees or distribute documents or literature which are not work related during working time.

B)   Tip solicitation is strictly prohibited.

## BULLETIN BOARDS

Bulletin boards have been placed in various departments for company memos, employee information, training and safety messages, and department correspondence. Please consult these bulletin boards on a regular basis for information or updates.

These boards are not to be used in connection with solicitation for meetings or charities, clubs, group organizations, or for the sale of commercial products.

## TOOLS

Mechanics are required to provide their personal hand tools. Your station manager can advise you on the necessity to bring your own tools. If you work in such an area, a current tool inventory must be maintained in your personnel file and a copy must also be on file at the corporate office so ATS can verify any losses. If any additional tools are purchased from the original inventory, it is the responsibility of the employee to ensure the inventory list is updated both at the station and the corporate office. Theft of tools must be reported immediately to your supervisor, and a police report is required.

The employee should prepare a statement explaining when the loss was discovered and the circumstances surrounding the loss. Employees must also prepare a list of all tools missing and their original or replacement value. Employees should give the statement and the list to their station manager, who will forward them to Employee Services after investigation to determine the validity of the claim. Reimbursement for stolen tools is entirely at the discretion of ATS.

If a personal tool used for repairing ATS equipment breaks and is not covered by the tool manufacture warranty, ATS at its discretion may pay for a replacement or repair of the tool. This will be handled on a case by case basis.

## RESIGNATION

Any employee who resigns should give proper resignation notice to their immediate supervisor. Proper notice is defined as two (2) weeks for hourly employees, and four (4) weeks for manager positions and above. Vacation time cannot normally be used once a notice of resignation is given. Failure to give the proper notice may result in the employee being ineligible for re-hire. Floating holidays and sick time are not paid out upon separation of employment.

On the last day of work, employees must return identification credentials, keys, uniforms (PAX only) and any other ATS property to their supervisor.

Failure to call in or report for work for two (2) consecutive scheduled days is considered a voluntary resignation.

## DISMISSAL

ATS expects its employees to act at all times in the best interests of ATS. Any employee who

Created January 15, 2008                                                    Revised January 1, 2016

ATS 000070

violates the company's rules, regulations, policies and/or procedures may be subject to disciplinary action up to and including termination. ATS may impose disciplinary action procedures in those instances where management decides it is appropriate, and/or bypass discipline policies as each situation warrants. ATS reserves the right to determine what discipline will be imposed in each situation. If any employee is terminated due to what may be illegal activity (e.g. pilferage, assault, battery), ATS will cooperate fully with the authorities to determine if any criminal activity took place.

The following list of standards is not exhaustive, but simply illustrates the type of conduct that may lead to discipline and/or discharge. Conduct not specifically listed may also, at the company's discretion, result in discipline and/or discharge.

## VIOLATIONS OF WORK RULES

The following actions are causes for discipline, up to and including termination:

1. Disorderly conduct, abuse or ill treatment of a customer or fellow co-worker.
2. Unauthorized disclosure or use of confidential information.
3. Absence without notification to a supervisor or manager.
4. Failure to report regularly for work or failure to report regularly on time for work.
5. Use of sick time for other than a personal confining illness (unless specifically allowed by state law).
6. Dishonesty, theft, fraud, or assisting or protecting others in attempting such actions.
7. Any attempt to falsify time worked, badging in or out for another employee, or requesting another employee to badge in or out for you.
8. Fighting, horseplay, or any violent or unprofessional behavior on the job.
9. Using profane, abusive or threatening language toward, or in the presence of, other employees or customers.
10. Insubordination or non-compliance with requests from management.
11. Neglect of duty or failure to perform duties. Use of poor judgment during the course of duty.
12. Failure to promptly return from a leave of absence when released to do so.
13. Destruction of company, customer and/or co-worker's property or destruction of such property through neglect. Wasting or misusing company and/or customer property and/or products.
14. Failure to report an accident or injury while on duty.
15. Improper, unauthorized or illegal possession, sale, distribution, manufacture, or use of prescriptive or controlled substance drugs, or possession, sale, distribution, or use of alcoholic beverage while on duty.
16. Reporting to work under the influence of controlled substance drugs and/or alcohol.
17. Having possession while on duty of any weapon including firearms or knives or the use of any tool or object in a threatening, intimidating or injurious manner.
18. Sleeping on the job or otherwise neglecting work, carelessness, unsatisfactory work or repeated mistakes.
19. Refusal to leave company premises upon the request of an authorized representative of the company.
20. Permitting minor children to remain on company premises during working hours.
21. Failure to follow established company procedures and/or policies.
22. Failure to comply with safety rules and practices including creating or contributing to unsafe or unsanitary conditions.
23. Working in competition with the company or in any situations that may create a conflict of interest without approval from.

Created January 15, 2008                                          Revised January 1, 2016

ATS 000071

24.    Conviction of a crime while employed by the company.  Violating the law during the course of duty and/or bringing discredit to the company.

25.    Misrepresentation in obtaining employment (includes, but is not limited to, providing false information, omission or misrepresentation in an application for employment or in any written or verbal communication).

26.    Misrepresentation in obtaining employee benefits or privileges or misuse of employee benefits or privileges including the utilization of computers or other medium for personal use.

27.    Refusal to cooperate in an investigation, including refusal to submit to a search of property, lockers, desks, vehicles or clothing, or refusal to cooperate with any investigative or diagnostic test (including but not limited to drug and/or alcohol tests).

28.    Falsification of any company record.

29.    Disregard for quality services and customer service including making disparaging remarks about ATS, a customer, or a passenger.

30.    Inability to retain a SIDA badge.

Created January 15, 2008                                   Revised January 1, 2016

ATS 000072



Airport Terminal Services
111 Westport Plaza Drive, Suite 400
Saint Louis, Missouri 63146
314.739.1900
www.ATSSTL.com

## EMPLOYEE SERVICES POLICY AND PROCEDURES ACKNOWLEDGMENT

I hereby acknowledge that I have read and agree to abide by the ATS Policies and Procedures listed below. I understand that I will be held responsible for complying with all rules and policies contained therein.

I also understand that, over time, policies and procedures may change and may not necessarily be reflected on this acknowledgement page. I recognize I am responsible for complying with any new rules and policies whether communicated verbally or in writing.

<u>Name of the documents received and acknowledged</u>

- ✓ Aircraft Damage Reporting Policy
- ✓ Attendance Policy
- ✓ ATS Training Policy
- ✓ Benefit Programs and Benefits Eligibility Information
- ✓ Conflict of Interest Policy
- ✓ Drug and Alcohol Testing Policy
- ✓ Employment Handbook
- ✓ FMLA Rights and Responsibilities
- ✓ Harassment and Sexual Harassment Policy
- ✓ Occupational Injury Policy
- ✓ Portable Electronic Devices Policy
- ✓ Proprietary, Privacy and Personal Information Policy
- ✓ Safety and Security Policy Statement
- ✓ Security Escort Policy
- ✓ Time Keeping, Work Schedules and Overtime Policy
- ✓ Uniform Policy



EXHIBIT
15
Tipton
10-23-19

I further understand that the procedure for reporting harassment as described in the policy. If there is behavior that I am unclear as to whether or not it is appropriate in the workplace, I understand that it is my responsibility to seek out clarification from my Manager, Human Resources Generalist, Supervisor, and/or a member of management in Employee Services. I also understand that I can contact the corporate hotline number to report harassment.

 Digitally Signed By: Jayme D Tipton on 10/16/2016      Digitally Signed By: Jayme D Tipt

Signature of Employee                                          Date

  

# EXHIBIT
# 2

Case 2:18-cv-09503-AB-JEM    Document 52    Filed 01/03/20    Page 107 of 258   Page ID #:1430

12/2/2019
Jayme Tipton (v.II)                Jayme Tipton vs. Airport Terminal Services, Inc.                1149998

1                    UNITED STATES DISTRICT COURT

2                    CENTRAL DISTRICT OF CALIFORNIA

3

4

5     JAYME TIPTON,                    )
                                       )
6             Plaintiff,               )
                                       )
7     vs.                              ) Case No.
                                       ) 2:18-cv-09503
8     AIRPORT TERMINAL SERVICES, INC., ) AB-JEM
      et al.,                          )
9                                      )
              Defendants.              )
10                                     )
      _____)

11

12

13

14                    VOLUME II

15         VIDEOTAPED DEPOSITION OF JAYME TIPTON

16              Los Angeles, California

17              Monday, December 2, 2019

18

19

20     Reported by:

21     Norma L. Gaddison, CSR No. 4214,
       Certified Realtime Professional

22

23

24

25

Kusar ® Keeping Your Word Is Our Business℠

```
 1                        UNITED STATES DISTRICT COURT

 2                       CENTRAL DISTRICT OF CALIFORNIA

 3

 4

 5    JAYME TIPTON,                     )
                                        )
 6              Plaintiff,              )
                                        )
 7    vs.                               )  Case No.
                                        )  2:18-cv-09503
 8    AIRPORT TERMINAL SERVICES, INC., )  AB-JEM
      et al.,                           )
 9                                      )
                Defendants.             )
10                                      )
      _____)

11

12

13

14              Videotaped deposition of JAYME TIPTON,

15    Volume Two, taken on behalf of Defendants, at 601 S.

16    Figueroa Street, Suite 3300, Los Angeles, California,

17    beginning at 10:11 A.M. and ending at 1:46 P.M., on

18    December 2, 2019, before NORMA L. GADDISON, Certified

19    Shorthand Reporter No. 4214.

20

21

22

23

24

25
```

Kusar® Keeping Your Word Is Our Business ℠

```
 1   APPEARANCES:

 2   For Plaintiff:

 3            SHEGERIAN & ASSOCIATES
              BY:  AARON GBEWONYO, Esq.
 4            225 Santa Monica Boulevard, Suite 700
              Santa Monica, California 90401
 5            (310) 860-0770
              agbewonyo@shergerianlaw.com
 6


 7   For Defendants:

 8            SEYFARTH SHAW
 9            BY:  AARON LUBELEY, Esq.
              601 S. Figueroa Street, Suite 3300
10            Los Angeles, California 90017
              (213) 270-9600
11            alubeley@seyfarth.com

12

13   Also Present:

14            TOM McCARTHY, Videographer

15

16

17

18

19

20

21

22

23

24

25
```

Kusar  Keeping Your Word Is Our Business℠

```
 1                          I N D E X

 2    WITNESS                         EXAMINATION

 3    JAYME TIPTON

 4                                         PAGE

 5                BY MR. LUBELEY      213, 339
                  BY MR. GBEWONYO         314
 6

 7

 8

 9
                          EXHIBITS
10
      NUMBER        DESCRIPTION                PAGE
11
      Exhibit 20    Second Amended Notice of   214
12                    Deposition

13    Exhibit 21    May 9, 2017 letter from Shonta  217
                    to Jayme Tipton re
14                  Separation of Employment

15    Exhibit 22    Collection of text messages and  278
                    emails
16

17

18

19          APPENDED DOCUMENT, UNMARKED, REFERRED TO

20              Workers Compensation Request
                for Authorization, DWC Form RFA
21

22

23

24

25
```

Kusar  *Keeping Your Word Is Our Business* ℠

| 10:34 | 1 | spine. |
|---|---|---|
| 10:34 | 2 | Do you recall any of that? |
| 10:34 | 3 | MR. GBEWONYO:  Objection, compound.  The |
| 10:34 | 4 | document speaks for itself. |
| 10:34 | 5 | THE WITNESS:  Where -- where was this at? |
|  | 6 | BY MR. LUBELEY: |
| 10:34 | 7 | Q.    I guess my question is just:  Did you |
| 10:34 | 8 | receive any of the treatment, any of this treatment? |
| 10:34 | 9 | A.    Yes. |
| 10:34 | 10 | Q.    Okay.  And do you recall having certain |
| 10:34 | 11 | medications prescribed to you? |
| 10:34 | 12 | MR. GBEWONYO:  Objection, vague as to time, |
| 10:34 | 13 | vague as to "medications." |
| 10:34 | 14 | THE WITNESS:  Yes. |
| 10:34 | 15 | MR. LUBELEY:  Okay. |
| 10:34 | 16 | Q.    And do you recall the doctor that you |
| 10:35 | 17 | -- that you saw recommending that you remain off |
| 10:35 | 18 | work? |
| 10:35 | 19 | MR. GBEWONYO:  Objection, vague as to time. |
| 10:35 | 20 | The document speaks for itself. |
| 10:35 | 21 | THE WITNESS:  Can you repeat that, please? |
| 10:35 | 22 | BY MR. LUBELEY: |
| 10:35 | 23 | Q.    Do you recall that doctor requiring |
| 10:35 | 24 | that you remain off work? |
| 10:35 | 25 | A.    Yes. |

231



12/2/2019
Jayme Tipton (v.II)          Jayme Tipton vs. Airport Terminal Services, Inc.          1149998

```
10:36    1   saw the doctor, but from my workers' comp case, my --

10:36    2   they set me up with -- with the doctor right away.

10:37    3        Q.     Okay.

10:37    4        A.     I contacted this workers' comp place

10:37    5   right after I talked to Shonta.

10:37    6        Q.     Okay.

10:37    7        A.     So all of this was all back to back.

10:37    8        Q.     Do you see in that it says that you're

10:37    9   not to perform work?

10:37   10        MR. GBEWONYO:  Objection.  The document speaks

10:37   11   for itself.  Which page are you referring to?

10:37   12        MR. LUBELEY:  That last page she's looking at.

10:37   13   It should be a box checked.

10:37   14        Q.     Do you see that?

10:37   15        A.     Yes.

10:37   16        MR. GBEWONYO:  Objection, misstates the

10:37   17   document.  I believe the document says "remain off

10:37   18   work until."

10:37   19        MR. LUBELEY:  Okay.

10:37   20        Q.     Do you see where it says you had to

10:37   21   remain off work?

10:37   22        A.     Yes.

10:37   23        Q.     Why did you have to remain off work

10:37   24   during that time?

10:37   25        MR. GBEWONYO:  Objection, calls for
```

233

**Kusar**® Keeping Your Word Is Our Business℠

| 10:37 | 1 | speculation. |
| 10:37 | 2 | THE WITNESS:   Because I was still going |
| 10:37 | 3 | through treatment, medical treatment. |
| 10:37 | 4 | MR. LUBELEY:   Okay. |
| 10:37 | 5 | Q.    So you weren't able to perform work |
| 10:37 | 6 | during that time? |
| 10:37 | 7 | A.    During this time, yes. |
| 10:37 | 8 | Q.    Okay.  And was there any point in time |
| 10:38 | 9 | prior to or from the date -- from May 15 until this |
| 10:38 | 10 | date that a doctor had permitted you to perform work? |
| 10:38 | 11 | MR. GBEWONYO:   Objection.  Vague as to "this |
| 10:38 | 12 | date." |
| 10:38 | 13 | MR. LUBELEY:   I'm sorry.  The date on that |
| 10:38 | 14 | document where the doctor signed it under penalty of |
| 10:38 | 15 | perjury which appears to be August 10, 2017. |
| 10:38 | 16 | THE WITNESS:   Please repeat your question. |
| 10:38 | 17 | MR. LUBELEY:   Yes. |
| 10:38 | 18 | Q.    At any point in time from May 9 until |
| 10:38 | 19 | this date the doctor signed this letter, had any |
| 10:38 | 20 | doctor permitted you to perform work? |
| 10:38 | 21 | A.    No. |
| 10:38 | 22 | Q.    And why not? |
| 10:38 | 23 | MR. GBEWONYO:   Objection.  Calls for expert |
| 10:38 | 24 | testimony. |
| 10:38 | 25 | THE WITNESS:   I answer? |

234



| | | |
|---|---|---|
| 10:38 | 1 | MR. GBEWONYO:  Yeah, you can answer. |
| 10:39 | 2 | THE WITNESS:  I was -- was -- I forgot my |
| 10:39 | 3 | train of thought, I'm sorry. |
| 10:39 | 4 | MR. LUBELEY:  Okay. |
| 10:39 | 5 | Q.    So there was no doctor from May 9 to |
| 10:39 | 6 | this date that permitted you to return back to work; |
| | 7 | correct? |
| 10:39 | 8 | A.    No. |
| 10:39 | 9 | Q.    Because of your injury; correct? |
| 10:39 | 10 | A.    Yes. |
| 10:39 | 11 | Q.    And that prevented you from being able |
| 10:39 | 12 | to perform work? |
| 10:39 | 13 | A.    Yes. |
| 10:39 | 14 | MR. GBEWONYO:  Objection.  Misstates witness |
| 10:39 | 15 | testimony, calls for expert testimony. |
| | 16 | BY MR. LUBELEY: |
| 10:39 | 17 | Q.    And at the time that you had your |
| 10:39 | 18 | conversation with Shonta, you had not been released |
| 10:39 | 19 | to return back to work because you were still |
| 10:39 | 20 | undergoing treatment; correct? |
| 10:39 | 21 | A.    Yes. |
| 10:39 | 22 | MR. GBEWONYO:  Objection.  Asked and answered. |
| 10:39 | 23 | MR. LUBELEY:  Okay. |
| 10:39 | 24 | Q.    And when you had your discussion with |
| 10:39 | 25 | Shonta that you had testified to previously and she |

235

| | | |
|---|---|---|
| 10:39 | 1 | mentioned the need to resign, did she tell you why |
| 10:39 | 2 | she needed you to resign? |
| 10:39 | 3 | A.    Because she needs to fill my spot. |
| 10:39 | 4 | Q.    Okay.  And you don't recall any |
| 10:39 | 5 | discussion with her about receiving too many points |
| 10:39 | 6 | for absences that weren't authorized? |
| 10:40 | 7 | MR. GBEWONYO:  Objection.  Asked and answered. |
| 10:40 | 8 | THE WITNESS:  No. |
| 10:40 | 9 | MR. LUBELEY:  Okay. |
| 10:40 | 10 | Q.    And during the conversation, Shonta -- |
| 10:40 | 11 | strike that. |
| 10:40 | 12 | Shonta testified recently in this case. |
| 10:40 | 13 | Did you review her deposition testimony at all? |
| 10:40 | 14 | MR. GBEWONYO:  Objection.  Asked and answered. |
| 10:40 | 15 | THE WITNESS:  No. |
| | 16 | BY MR. LUBELEY: |
| 10:40 | 17 | Q.    Shonta recalled the conversation that |
| 10:40 | 18 | you had as well.  Shonta recalled that during the |
| 10:40 | 19 | conversation she had mentioned to you the need to |
| 10:40 | 20 | resign to avoid being terminated for possible |
| 10:40 | 21 | attendance violations because you had not been |
| 10:40 | 22 | working long enough to have a protected leave. |
| 10:40 | 23 | Do you recall any of that? |
| 10:40 | 24 | A.    No. |
| 10:40 | 25 | MR. GBEWONYO:  Objection.  Asked and answered. |

236

12/2/2019
Jayme Tipton (v.II)                Jayme Tipton vs. Airport Terminal Services, Inc.                1149998

```
           1  BY MR. LUBELEY:
10:40      2      Q.    And she had recalled during that
10:40      3  conversation that when she told you the situation
10:40      4  that you had simply responded "okay."
10:40      5      A.    No.
10:40      6      Q.    Okay.  So did you ever tell her just in
10:41      7  response to her setting out what might happen, the
10:41      8  need to possibly resign or you could be fired and
10:41      9  then you simply responded "okay"?
10:41     10      MR. GBEWONYO:    Objection.  Vague as to what
10:41     11  could require -- or what could happen.  You can
10:41     12  answer.
10:41     13      THE WITNESS:    I was not saying okay or
10:41     14  agreeing to her me resigning.  I was not saying okay
10:41     15  to that.  I was having a conversation with her and
10:41     16  most likely I said "okay" but it wasn't towards I'm
10:41     17  going to resign.  I told her in definite I do not
10:41     18  want to resign.
          19  BY MR. LUBELEY:
10:41     20      Q.    And do you have an understanding that
10:41     21  she actually processed your separation as a
10:41     22  resignation?
10:41     23      A.    You told me at the last deposition,
10:41     24  yes.
10:41     25      Q.    Okay.  But you weren't aware of that
```

**Kusar**® Keeping Your Word Is Our Business℠

10:41   1    previously?

10:41   2         A.      No.

10:41   3         Q.      And you were aware that you were

10:41   4    eligible to be rehired?

10:42   5         MR. GBEWONYO:   Objection.  Misstates witness

10:42   6    testimony only to the extent she was informed during

10:42   7    her deposition.

        8    BY MR. LUBELEY:

10:42   9         Q.      Is that correct?

10:42   10        A.      You told me that during the last

10:42   11   deposition.

10:42   12        Q.      But you had no independent recollection

10:42   13   of that other than that?

10:42   14        A.      No.

10:42   15        Q.      And at any point in time from this

10:42   16   conversation -- from before the conversation with

10:42   17   Shonta until your employment resignation had been

10:42   18   processed, did you inform anyone at ATS that you had

10:42   19   been permitted by a doctor to perform work, that

10:42   20   you'd been released to perform work at the company?

10:42   21        A.      No.  I've never said that.

10:42   22        Q.      Okay.  And did you ever provide any

10:42   23   kind of doctor's notes that allowed you to perform

10:42   24   modified duty at all?

10:42   25        A.      No.

| | | |
|---|---|---|
| 10:42 | 1 | MR. GBEWONYO: Objection. Asked and answered. |
| 10:43 | 2 | BY MR. LUBELEY: |
| 10:43 | 3 | Q. After your resignation from ATS when |
| 10:43 | 4 | you were undergoing treatment through the workers' |
| 10:43 | 5 | comp system, at any point in time, did the workers' |
| 10:43 | 6 | comp doctor allow to you perform modified duty? |
| 10:43 | 7 | A. No. |
| 10:43 | 8 | Q. Okay. Do you understand what modified |
| 10:43 | 9 | duty is? |
| 10:43 | 10 | A. Yes. Like light duty. |
| 10:43 | 11 | Q. Yes. |
| 10:43 | 12 | A. Yes. He never said that, but I've |
| 10:43 | 13 | never -- we never had that conversation. I never |
| 10:43 | 14 | asked because I wasn't working at that time. |
| 10:43 | 15 | Q. Okay. But you were undergoing |
| 10:43 | 16 | treatment on your shoulder at that time? |
| 10:43 | 17 | A. Yes. |
| 10:43 | 18 | Q. All right. Were you able to drive |
| 10:43 | 19 | while you were undergoing your shoulder treatment? |
| 10:43 | 20 | A. No. |
| 10:43 | 21 | Q. So that would have made it difficult to |
| 10:43 | 22 | get to work -- |
| 10:43 | 23 | A. Yes. |
| 10:43 | 24 | Q. -- if you couldn't drive. |
| 10:43 | 25 | Were you aware that ATS had a contract |

| | | |
|---|---|---|
| 10:54 | 1 | Line 11. |
| 10:54 | 2 | "QUESTION:  And around June 2018, were |
| 10:54 | 3 | you cleared by then to be able to perform work?  In |
| 10:54 | 4 | other words, was your injury healed enough to allow |
| 10:54 | 5 | you to perform work? |
| 10:54 | 6 | "ANSWER:  Yes." |
| 10:54 | 7 | Q.    Do you recall that testimony? |
| 10:54 | 8 | A.    Yes. |
| 10:55 | 9 | Q.    When was it that you were first |
| 10:55 | 10 | released to return to work? |
| 10:55 | 11 | MR. GBEWONYO:  Objection.  Asked and answered. |
| 10:55 | 12 | MR. LUBELEY:  To the best of your |
| 10:55 | 13 | recollection. |
| 10:55 | 14 | THE WITNESS:  Released -- |
| 10:55 | 15 | MR. GBEWONYO:  Vague as to "released." |
| 10:55 | 16 | THE WITNESS:  I'm not sure. |
| | 17 | BY MR. LUBELEY: |
| 10:55 | 18 | Q.    Was it in or around June 2018 when you |
| 10:55 | 19 | first began looking for work? |
| 10:55 | 20 | A.    That's where -- that's what I believe, |
| 10:55 | 21 | yes. |
| 10:55 | 22 | Q.    So around June 2018 is when a doctor |
| 10:55 | 23 | said that you were finally healed enough to be able |
| 10:55 | 24 | to perform work? |
| 10:55 | 25 | MR. GBEWONYO:  Objection, misstates witness |



Kusar   Keeping Your Word Is Our Business℠

| 10:55 | 1 | testimony.  Vague as to "healed."  Calls for |
| 10:55 | 2 | speculation. |
| 10:55 | 3 | THE WITNESS:  A doctor, no, but I felt better |
| 10:55 | 4 | to work.  So I started looking for work because I |
| 10:55 | 5 | needed income to take care of my kids. |
| 10:55 | 6 | BY MR. LUBELEY: |
| 10:55 | 7 | Q.    And so prior to June 2018, you weren't |
| 10:55 | 8 | physically able to return to work for ATS; is that |
| 10:55 | 9 | correct? |
| 10:55 | 10 | MR. GBEWONYO:  Objection, misstates witness |
| 10:55 | 11 | testimony, unintelligible. |
| 10:56 | 12 | THE WITNESS:  You said I wasn't -- say that -- |
| 10:56 | 13 | MR. LUBELEY:  Physically able to perform work |
| 10:56 | 14 | for ATS. |
| 10:56 | 15 | MR. GBEWONYO:  Vague as to "physically able." |
| 10:56 | 16 | MR. LUBELEY:  Due to your injury. |
| 10:56 | 17 | THE WITNESS:  I was I felt better to work.  A |
| 10:56 | 18 | doctor did not release me, no, but I felt better and |
| 10:56 | 19 | I needed to get back to work. |
|  | 20 | BY MR. LUBELEY: |
| 10:56 | 21 | Q.    But prior to that point, so from June |
| 10:56 | 22 | 2018 all the way back to May 9, you weren't able to |
| 10:56 | 23 | perform work for ATS due to your injury; correct? |
| 10:56 | 24 | A.    Yes. |
| 10:56 | 25 | Q.    Were you aware that Airport Terminal |

249

12/2/2019
Jayme Tipton (v.II)                Jayme Tipton vs. Airport Terminal Services, Inc.                1149998

| | | |
|---|---|---|
| 10:56 | 1 | Services was hiring people in June of 2018 -- |
| 10:56 | 2 | MR. GBEWONYO:  Objection.  Asked and answered. |
| 10:56 | 3 | BY MR. LUBELEY: |
| 10:56 | 4 | Q.    -- to be groomers? |
| 10:56 | 5 | A.    I seen online. |
| 10:56 | 6 | Q.    You saw online that they were hiring? |
| 10:57 | 7 | A.    Yes. |
| 10:57 | 8 | Q.    And did you -- did you consider |
| 10:57 | 9 | applying for that position? |
| 10:57 | 10 | MR. GBEWONYO:  Objection.  Asked and answered. |
| 10:57 | 11 | THE WITNESS:  I thought about it. |
| | 12 | BY MR. LUBELEY: |
| 10:57 | 13 | Q.    And what did you think about it? |
| 10:57 | 14 | A.    When? |
| 10:57 | 15 | Q.    No.  What were your thoughts about it? |
| 10:57 | 16 | A.    Oh.  I seen that they were hiring, but |
| 10:57 | 17 | I decided not to apply with them.  I was applying for |
| 10:57 | 18 | other jobs. |
| 10:57 | 19 | Q.    And you decided not to apply with them |
| 10:57 | 20 | because you were upset with the company still? |
| 10:57 | 21 | A.    Yes.  Not so much as upset.  Hurt. |
| 10:57 | 22 | Q.    And you understand now that they -- |
| 10:58 | 23 | strike that. |
| 10:58 | 24 | You understand now that because you had |
| 10:58 | 25 | not worked for the company long enough, you did not |

250


Kusar ® Keeping Your Word Is Our Business℠

| | | |
|---|---|---|
| 10:59 | 1 | not working right now. |
| 10:59 | 2 | Q.    You're employed right now.  Who are you |
| 10:59 | 3 | employed with? |
| 10:59 | 4 | A.    With Dollar Tree. |
| 10:59 | 5 | Q.    What's your position with Dollar Tree? |
| 10:59 | 6 | A.    Cashier, stock. |
| 10:59 | 7 | Q.    And where is the Dollar Tree? |
| 10:59 | 8 | A.    In Lancaster, California. |
| 11:00 | 9 | Q.    And when did you become employed at |
| 11:00 | 10 | Dollar Tree? |
| 11:00 | 11 | A.    The beginning of November. |
| 11:00 | 12 | Q.    And what's your rate of pay? |
| 11:00 | 13 | A.    14 -- I think it's $14.45. |
| 11:00 | 14 | Q.    You say you're employed but not |
| 11:00 | 15 | working.  What do you mean? |
| 11:01 | 16 | A.    The store is not open yet.  We're -- |
| 11:01 | 17 | they're waiting to fix some things, but I was one of |
| 11:01 | 18 | the first group hired.  So I'm just waiting for the |
| 11:01 | 19 | call to start working so we can get the store up and |
| 11:01 | 20 | running. |
| 11:01 | 21 | Q.    Okay.  And are you aware that ATS has |
| 11:01 | 22 | positions available? |
| 11:01 | 23 | A.    I get alerts online -- |
| 11:01 | 24 | Q.    Okay. |
| 11:01 | 25 | A.    -- on Indeed. |

252

| 11:01 | 1 | Q.    Are you interested in applying for any |
| 11:01 | 2 | of those positions? |
| 11:01 | 3 | A.    I'm not interested in going back to the |
| 11:01 | 4 | airport at this point. |
| 11:01 | 5 | MR. LUBELEY:  Why don't we take a quick break |
| 11:01 | 6 | and I can get the transcript for you. |
| 11:01 | 7 | MR. GBEWONYO:  Okay.  Great. |
| 11:01 | 8 | THE VIDEOGRAPHER:  The time is 11:01 A.M., and |
| 11:01 | 9 | we are off the record. |
| 11:01 | 10 | (Short break.) |
| 11:15 | 11 | THE VIDEOGRAPHER:  The time is 11:16 A.M., and |
| 11:16 | 12 | we're back on the record. |
|  | 13 | BY MR. LUBELEY: |
| 11:16 | 14 | Q.    Ms. Tipton, do you recall having a |
| 11:16 | 15 | conversation with a supervisor named Moses? |
| 11:16 | 16 | A.    Yes. |
| 11:16 | 17 | Q.    Do you recall testifying to that |
| 11:16 | 18 | conversation?  He reached out to speak with you -- |
| 11:16 | 19 | A.    Yes. |
| 11:16 | 20 | Q.    -- while you were out on leave? |
| 11:16 | 21 | A.    Yes. |
| 11:16 | 22 | Q.    Have you told me everything you can |
| 11:16 | 23 | recall about that conversation? |
| 11:16 | 24 | A.    He called me to introduce his self as a |
| 11:16 | 25 | new manager and that's all I really remember. |

| | | |
|---|---|---|
| 11:17 | 1 | Q.    Did you ever -- while you were employed |
| 11:17 | 2 | at ATS, following your injury to your shoulder when |
| 11:17 | 3 | you were on leave, did you ever talk to your regular |
| 11:17 | 4 | doctor to see if he would allow you to return to work |
| 11:17 | 5 | with modified duties? |
| 11:17 | 6 | MR. GBEWONYO:   Objection.   Asked and answered. |
| 11:17 | 7 | THE WITNESS:   No. |
| 11:17 | 8 | BY MR. LUBELEY: |
| 11:17 | 9 | Q.    And why not? |
| 11:17 | 10 | A.    Well, because when I asked for modified |
| 11:17 | 11 | duty, they told me, no, there is no modified duty. |
| 11:17 | 12 | Q.    Now when you say you asked, are you |
| 11:17 | 13 | referring to the conversation you had with Ora? |
| 11:17 | 14 | A.    Yes. |
| 11:17 | 15 | Q.    Okay.   Now, during that time when you |
| 11:18 | 16 | went to see Ora, you provided Ora with a doctor's |
| 11:18 | 17 | note that we discussed during your last deposition |
| 11:18 | 18 | session; correct? |
| 11:18 | 19 | A.    Yes. |
| 11:18 | 20 | Q.    And on that doctor's note, it said you |
| 11:18 | 21 | were unable to perform any work; is that correct?   Do |
| 11:18 | 22 | you recall that? |
| 11:18 | 23 | A.    No. |
| 11:18 | 24 | Q.    Let me pull up -- I'd like to show you |
| 11:19 | 25 | exhibit 9 from your first session of deposition. |

| | | |
|---|---|---|
| 11:22 | 1 | Q.     You don't recall Ora telling you that |
| 11:22 | 2 | due to company policy, they can't have you work when |
| 11:22 | 3 | you have a work restriction from the doctor? |
| 11:22 | 4 | A.     She said something like that. |
| 11:22 | 5 | Q.     Does that make sense to you? |
| 11:22 | 6 | A.     No.  Because if I -- if they would have |
| 11:22 | 7 | said I needed a doctor's note to be on light duty, |
| 11:22 | 8 | then I would have been able -- I would have asked my |
| 11:22 | 9 | doctor or talked to my doctor about that so I can be |
| 11:22 | 10 | on light duty. |
| 11:23 | 11 | Q.     But you never discussed this with |
| 11:23 | 12 | anyone in HR? |
| 11:23 | 13 | A.     No, I did not.  They just -- basically |
| 11:23 | 14 | Ora just flat out said there is -- well, Damian said |
| 11:23 | 15 | there is no light duty or Ora, one of them said there |
| 11:23 | 16 | is no light duty. |
| 11:23 | 17 | Q.     Because your position required certain |
| 11:23 | 18 | physical work; correct? |
| 11:23 | 19 | A.     Yes.  That I would have been able to -- |
| 11:23 | 20 | to do with help. |
| 11:23 | 21 | Q.     And what kind of help?  What kind of |
| 11:23 | 22 | help would your doctor have permitted you to receive? |
| 11:23 | 23 | A.     Not from my doctor.  From my crew. |
| 11:23 | 24 | Q.     Okay.  What kind of help could have |
| 11:23 | 25 | permitted you to perform your work? |

| | | |
|---|---|---|
| 12:21 | 1 | wasn't authorized to do her job, and I said, yes, I |
| 12:21 | 2 | was.  I talked to Melissa. |
| 12:21 | 3 | And then they was -- they said, no. |
| 12:21 | 4 | Melissa told me this and Melissa told me that and I |
| 12:21 | 5 | was like well that's not what she told me, and so it |
| 12:21 | 6 | was -- it was a big commotion, and so I text Melissa |
| 12:21 | 7 | and this is the text message.  Because she wasn't |
| 12:21 | 8 | answering her phone, I text her and this is what she |
| 12:21 | 9 | said. |
| 12:21 | 10 | Q.    Qiana, did she ever return to work from |
| 12:21 | 11 | her maternity leave before you -- before you left |
| 12:22 | 12 | ATS? |
| 12:22 | 13 | A.    Yes. |
| 12:22 | 14 | Q.    She returned to her position? |
| 12:22 | 15 | A.    Yes.  I believe so. |
| 12:22 | 16 | Q.    Cabin cleaner? |
| 12:22 | 17 | A.    Yes, she always did the same position. |
| 12:22 | 18 | Q.    She didn't get fired? |
| 12:22 | 19 | A.    No.  She's actually -- I believe she's |
| 12:22 | 20 | still working there. |
| 12:22 | 21 | Q.    Were you aware of anyone getting fired |
| 12:22 | 22 | after leaving a leave? |
| 12:22 | 23 | A.    No. |
| 12:22 | 24 | Q.    After coming back from a leave? |
| 12:22 | 25 | A.    No. |

12/2/2019
Jayme Tipton (v.II)    Jayme Tipton vs. Airport Terminal Services, Inc.    1149998

| | | |
|---|---|---|
| 12:32 | 1 | were aware that existed at ATS at LAX? |
| 12:32 | 2 | A.    No. |
| 12:32 | 3 | Q.    Other than your shoulder injury, did |
| 12:32 | 4 | you have any other physical injuries that you |
| 12:32 | 5 | suffered while you were at ATS? |
| 12:32 | 6 | A.    Do I have any other injuries? |
| 12:32 | 7 | Q.    Did you hurt your knee, your foot? |
| 12:32 | 8 | A.    Yes.  I hurt my foot. |
| 12:33 | 9 | Q.    And how did you hurt your foot? |
| 12:33 | 10 | A.    On the jet bridge door. |
| 12:33 | 11 | Q.    What happened? |
| 12:33 | 12 | A.    I -- the door is really heavy, and it |
| 12:33 | 13 | closes right behind you.  So I was going in and then |
| 12:33 | 14 | the door slammed on my foot.  Like I was walking and |
| 12:33 | 15 | it just slammed.  I thought somebody else was |
| 12:33 | 16 | probably behind me catching the door, I believe, but |
| 12:33 | 17 | the door slammed on my foot and it cut my foot. |
| 12:33 | 18 | Q.    And when did that happen? |
| 12:33 | 19 | A.    I do not recall the exact date that it |
| 12:33 | 20 | happened. |
| 12:33 | 21 | Q.    Was that before -- that was before your |
| 12:33 | 22 | injury to your shoulder? |
| 12:33 | 23 | A.    Yes. |
| 12:33 | 24 | Q.    Okay.  Did you report that to anyone? |
| 12:33 | 25 | A.    Yes.  I did. |

Kusar  *Keeping Your Word Is Our Business* SM

| | | |
|---|---|---|
| 01:04 | 1 | Q.    After you were informed by Shonta that |
| 01:05 | 2 | you had to resign or that you were going to be |
| 01:05 | 3 | terminated, how did you feel? |
| 01:05 | 4 | A.    I was upset.  I was -- I was hurt.  I |
| 01:05 | 5 | was depressed.  I was -- you know, depression.  I |
| 01:05 | 6 | couldn't function.  I couldn't be with my kids.  I |
| 01:05 | 7 | don't know.  I couldn't eat.  It was hard for me to |
| 01:05 | 8 | sleep.  I just -- I was under depression because I |
| 01:05 | 9 | just got terminated from my job, the job that I |
| 01:05 | 10 | really liked, the main job that I really liked.  I |
| 01:05 | 11 | was being terminated. |
| 01:05 | 12 | Q.    And what was the reason for which that |
| 01:05 | 13 | you believe that you were terminated? |
| 01:05 | 14 | MR. LUBELEY:  Objection.  Asked and answered. |
| 01:05 | 15 | THE WITNESS:  Why did I believe I was being |
| 01:05 | 16 | terminated? |
| 01:05 | 17 | MR. GBEWONYO:  Or that was communicated to you |
| 01:05 | 18 | by Shonta. |
| 01:06 | 19 | THE WITNESS:  Because they need to replace me. |
| 01:06 | 20 | They need to put someone in my spot. |
| | 21 | BY MR. GBEWONYO: |
| 01:06 | 22 | Q.    And while you worked for ATS, are you |
| 01:06 | 23 | aware of whether there were other groomer positions |
| 01:06 | 24 | that were vacant at that time on the Jet Blue |
| 01:06 | 25 | airlines? |

327



12/2/2019
Jayme Tipton (v.II)                Jayme Tipton vs. Airport Terminal Services, Inc.                1149998

| 01:23 | 1 | being on light duty, then that's fine, but I could |
| 01:23 | 2 | clean with my left hand.  I could vacuum.  I can do |
| 01:23 | 3 | everything.  That's what I'm saying. |
| 01:23 | 4 | Q.    Okay.  So you believed, it's your |
| 01:23 | 5 | belief -- |
| 01:23 | 6 | A.    I believe. |
| 01:23 | 7 | Q.    -- that you could perform your job |
| 01:23 | 8 | without any time off, without any need to rest to let |
| 01:23 | 9 | your shoulder to recover? |
| 01:23 | 10 | MR. GBEWONYO:  Objection, misstates witness |
| 01:23 | 11 | testimony. |
| 01:23 | 12 | THE WITNESS:  Asked and answered. |
| 01:23 | 13 | MR. LUBELEY:  I'm asking what you believe. |
| 01:23 | 14 | THE WITNESS:  I believe that I could have been |
| 01:23 | 15 | working. |
| | 16 | BY MR. LUBELEY: |
| 01:23 | 17 | Q.    Without any accommodation whatsoever; |
| 01:23 | 18 | correct? |
| 01:23 | 19 | A.    With my left hand. |
| 01:23 | 20 | Q.    You could do your full job with your |
| 01:23 | 21 | left hand? |
| 01:23 | 22 | A.    Yes.  I could have, yes. |
| 01:23 | 23 | Q.    Then why did you tell your employer -- |
| 01:23 | 24 | why did you provide a doctor's note telling your |
| 01:23 | 25 | employer that you couldn't do work? |

Kusar® Keeping Your Word Is Our Business℠

12/2/2019
Jayme Tipton (v.II)          Jayme Tipton vs. Airport Terminal Services, Inc.          1149998

| | | |
|---|---|---|
| 01:34 | 1 | MR. LUBELEY:  I guess we'll see what the |
| 01:34 | 2 | doctor says in his deposition. |
| 01:34 | 3 | Q.    If the doctor told you you could not |
| 01:34 | 4 | work, perform any duties, would you have still |
| 01:34 | 5 | performed duties if the company allowed you to? |
| 01:34 | 6 | A.    Not without proper paperwork. |
| 01:34 | 7 | Q.    Okay.  Do you see in that policy I was |
| 01:35 | 8 | reading from there it said if an injury results in |
| 01:35 | 9 | restricted duty, the employee must obtain a doctor's |
| 01:35 | 10 | release before being returned to full duty. |
| 01:35 | 11 | Do you see that? |
| 01:35 | 12 | A.    Yes. |
| 01:35 | 13 | Q.    Did you ever receive that release? |
| 01:35 | 14 | A.    Release, no, because I got terminated. |
| 01:35 | 15 | Q.    Did you ever receive a release at all |
| 01:35 | 16 | -- when did you finally receive a release to return |
| 01:35 | 17 | to full duty? |
| 01:35 | 18 | A.    I never received a release. |
| 01:35 | 19 | Q.    So your workers' comp never said that |
| 01:35 | 20 | you could return to full duty? |
| 01:35 | 21 | A.    No.  My workers' comp doctor died. |
| 01:35 | 22 | Q.    When did your workers' comp doctor die? |
| 01:35 | 23 | A.    September 7. |
| 01:35 | 24 | Q.    But there was -- we did look at a |
| 01:35 | 25 | medical note that had a return to work date or a |

356



| 01:35 | 1 | release for you to return to work; correct? |
| 01:35 | 2 | A.     From the specialist doctor? |
| 01:35 | 3 | Q.     Yes. |
| 01:35 | 4 | A.     No.  It said a follow-up -- until |
| 01:35 | 5 | follow-up appointment, I believe. |
| 01:35 | 6 | Q.     Are you medically cleared to perform |
| 01:36 | 7 | work now? |
| 01:36 | 8 | A.     I am -- I never got a doctor's note -- |
| 01:36 | 9 | a doctor's clear note. |
| 01:36 | 10 | Q.     So you don't know if you're medically |
| 01:36 | 11 | cleared to perform work now? |
| 01:36 | 12 | A.     No. |
| 01:36 | 13 | Q.     Did you expect your supervisors to not |
| 01:36 | 14 | believe your doctor's note? |
| 01:36 | 15 | A.     Why would I -- |
| 01:36 | 16 | Q.     I'm asking.  You gave your supervisor a |
| 01:36 | 17 | note that said you couldn't work? |
| 01:36 | 18 | A.     I gave my lead a note that said I |
| 01:37 | 19 | couldn't work. |
| 01:37 | 20 | Q.     And then that note was given at some |
| 01:37 | 21 | point to Moses; correct? |
| 01:37 | 22 | A.     Damian and -- Edgar and Moses, yes. |
| 01:37 | 23 | Q.     Did you expect Moses to question |
| 01:37 | 24 | whether that doctor was accurate or not in saying you |
| 01:37 | 25 | couldn't perform any work for the period of time |

Kusar  Keeping Your Word Is Our Business℠

01:37  1        THE WITNESS:  I didn't expect him to do

01:38  2   anything.  Like he got my doctor's note.  Okay.

       3   BY MR. LUBELEY:

01:38  4        Q.    You expected him to follow that note;

       5   correct?

01:38  6        A.    Expected my -- yes.  My doctor said I

01:38  7   couldn't come for a certain amount of time, yes.

01:38  8        Q.    And you expected Shonta to respect what

01:38  9   your doctor had said in the doctor's note; correct?

01:38  10       A.    Yes.

01:38  11       Q.    You didn't expect her to say, well, you

01:38  12  know, your doctor says you can't work but can you do

01:38  13  light duty instead?

01:38  14       A.    Did I expect her to do that?

01:38  15       Q.    Yes.

01:38  16       MR. GBEWONYO:  Incomplete hypothetical.

01:38  17       THE WITNESS:  I don't know what I expected.  I

01:38  18  expect them to care about their -- their employees.

01:38  19  That's what I expected, and if I was injured, then,

01:38  20  you know, be -- what's the word I'm looking for --

01:38  21  you know, I was -- I was injured.  Say, hey, is

01:38  22  everything okay?  Is everything all right?  Didn't

01:39  23  seem like anybody cared.

01:39  24       MR. LUBELEY:  Okay.

01:39  25       Q.    My question is:  Did you expect her to

12/2/2019
Jayme Tipton (v.II)                Jayme Tipton vs. Airport Terminal Services, Inc.                1149998

| | | |
|---|---|---|
| 01:39 | 1 | ignore the note?  You have a doctor's note that says |
| 01:39 | 2 | that you can't perform work for a period of time. |
| 01:39 | 3 | Did you want Shonta to say we're going to ignore that |
| 01:39 | 4 | note and offer you light duty? |
| 01:39 | 5 | A.    I didn't expect them -- no. |
| 01:39 | 6 | Q.    Okay.  You expected them to respect |
| 01:39 | 7 | what your doctor was saying; correct? |
| 01:39 | 8 | A.    Yes. |
| 01:39 | 9 | Q.    And if your doctor said that you could |
| 01:39 | 10 | come back to work with light duty, you would have |
| 01:39 | 11 | expected them to respect that as well? |
| 01:39 | 12 | A.    Yes. |
| 01:39 | 13 | Q.    And bring you back to work with light |
| 01:39 | 14 | duty? |
| 01:39 | 15 | A.    Yes. |
| 01:39 | 16 | Q.    You said you only had one car at the |
| 01:39 | 17 | time of your separation; correct? |
| 01:39 | 18 | A.    Yes. |
| 01:39 | 19 | Q.    Okay.  Whose car was it? |
| 01:39 | 20 | A.    Me and my husband's car. |
| 01:39 | 21 | Q.    You bought it together? |
| 01:39 | 22 | A.    Yes. |
| 01:39 | 23 | Q.    Okay.  How did you get to work before |
| 01:39 | 24 | you started dating your husband? |
| 01:40 | 25 | A.    Before I started dating my husband? |

**Kusar**® *Keeping Your Word Is Our Business*℠

| 01:40 | 1 | A.    Yes.  He did -- when he first got |
| 01:40 | 2 | hired, he was graveyard. |
| 01:40 | 3 | Q.    So when you testified under oath |
| 01:40 | 4 | earlier today that you couldn't drive due to your |
| 01:40 | 5 | doctor's restrictions, that was false testimony; |
|  | 6 | correct? |
| 01:41 | 7 | A.    No.  He drove. |
| 01:41 | 8 | Q.    No.  I understand.  But I'm asking when |
| 01:41 | 9 | you testified that you couldn't drive because of your |
| 01:41 | 10 | medical restrictions, was that truthful or was that |
| 01:41 | 11 | false? |
| 01:41 | 12 | A.    I couldn't drive. |
| 01:41 | 13 | MR. GBEWONYO:    Objection, argumentative. |
|  | 14 | BY MR. LUBELEY: |
| 01:41 | 15 | Q.    What's that? |
| 01:41 | 16 | A.    I couldn't drive.  I could drive but my |
| 01:41 | 17 | doctor's restriction said don't drive. |
| 01:41 | 18 | Q.    Okay.  So when your attorney asked you |
| 01:41 | 19 | if you would have driven in to work, you would have |
| 01:41 | 20 | done that against your doctor's orders; correct? |
| 01:41 | 21 | A.    Physically, yes, I can.  I can drive. |
| 01:41 | 22 | My doctor's restriction was don't drive.  Don't pick |
| 01:41 | 23 | up your kids.  Don't pick up heavy things.  That's my |
| 01:41 | 24 | doctor's restriction.  Physically, I could do it. |
| 01:41 | 25 | Q.    I understand that. |

Kusar® Keeping Your Word Is Our Business℠

| | | |
|---|---|---|
| 01:42 | 1 | starts his shift after 9:00.  That's when I'm at home |
| 01:43 | 2 | with my kids.  He's back at home by 3:00 in the |
| 01:43 | 3 | morning.  So I could work during the daytime. |
| 01:43 | 4 | Q.    But you can only work if you are on a |
| 01:43 | 5 | staggered shift? |
| 01:43 | 6 | A.    Yes. |
| 01:43 | 7 | Q.    You couldn't work the same shift? |
| 01:43 | 8 | A.    No. |
| 01:43 | 9 | Q.    Okay.  So that -- that situation with |
| 01:43 | 10 | the transportation limits the jobs that you can apply |
| 01:43 | 11 | for? |
| 01:43 | 12 | A.    That is what we came to agreements now. |
| 01:43 | 13 | Before we was working the same shift, it was -- we |
| 01:43 | 14 | was getting child care for our kids but now all of |
| 01:43 | 15 | that is not going great.  So we agreed to work |
| 01:43 | 16 | different shifts so one of us could care for our |
| 01:43 | 17 | children. |
| 01:44 | 18 | Q.    Did you ever ask Moses if you could |
| 01:44 | 19 | perform light duty? |
| 01:44 | 20 | MR. GBEWONYO:   Objection.   Asked and answered. |
| 01:44 | 21 | THE WITNESS:   No. |
| | 22 | BY MR. LUBELEY: |
| 01:44 | 23 | Q.    Did you ever ask Shonta if you could |
| 01:44 | 24 | perform light duty? |
| 01:44 | 25 | A.    No. |

364

Kusar  Keeping Your Word Is Our Business℠

01:44   1       MR. GBEWONYO:   Objection.   Asked and answered.

01:44   2   BY MR. LUBELEY:

01:44   3       Q.      Did you ever have a conversation

01:44   4   directly with Damian in which you asked if you could

01:44   5   perform light duty?

01:44   6       A.      Directly, no.

01:44   7       Q.      Yes.

01:44   8       MR. LUBELEY:   Okay.   I have no further

01:44   9   questions.   You want to do the same stipulation,

01:45  10   counsel?

01:45  11       MR. GBEWONYO:   I'm agreeable to the same

01:45  12   stipulation.   However, I'm assuming that we're not

01:45  13   keeping this deposition open given that we've now --

01:45  14   to the extent that -- same stipulation, but we're

01:45  15   concluding the deposition at this time.

01:45  16       MR. LUBELEY:   Well, I say I'm leaving it open

01:45  17   until we get the supplemental discovery responses.

01:45  18       MR. GBEWONYO:   We've produced those documents.

01:45  19       MR. LUBELEY:   I know.   I'm just leaving it

01:45  20   open.   I don't know that we'll ever continue it.   You

01:45  21   know we have some, I think, outstanding discovery

01:45  22   issues is the only thing that I think is outstanding.

01:45  23       MR. GBEWONYO:   Okay.   I also think that we've

01:45  24   exhausted the time period, but I'm happy to meet and

01:45  25   confer with you about that.

```
 1                          DECLARATION

 2                              OF

 3                     PENALTY OF PERJURY

 4

 5        I declare under penalty of perjury, under the

 6   laws of the State of California, that I have read the

 7   foregoing transcript, I have made any corrections,

 8   additions or deletions that I was desirous of making

 9   in order to render the within transcript true and

10   correct, and

11        IN WITNESS WHEREOF, I have hereunto subscribed

12   my name this _____ day of _____, _____.

13

14

15

16

17        _____

18        JAYME TIPTON

19

20

21

22

23

24

25
```

```
 1                    CERTIFICATION OF COURT REPORTER

 2                          FEDERAL JURAT

 3
                          I, the undersigned, a Certified
 4       Shorthand Reporter of the State of California do
         hereby certify:
 5

 6                        That the foregoing proceedings were
         taken before me at the time and place herein set
 7       forth; that any witnesses in the foregoing
         proceedings, prior to testifying, were placed under
 8       oath; that a verbatim record of the proceedings was
         made by me using machine shorthand which was
 9       thereafter transcribed under my direction; further,
         that the foregoing is an accurate transcription
10       thereof.

11
                          That before completion of the
12       deposition, a review of the transcript [X] was
         [ ] was not requested.
13

14                        I further certify that I am neither
         financially interested in the action nor a relative
15       or employee of any attorney of any of the parties.

16
                          IN WITNESS WHEREOF, I have this date
17       subscribed my name.

18
                          Dated: December 9, 2019
19

20

21

22                          <%signature%>

23

24                          _____
                            NORMA L. GADDISON, CSR
25                          Certificate No. 4214
```

# EXHIBIT

# 3

CERTIFIED COPY

```
 1              UNITED STATES DISTRICT COURT

 2        CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

 3

 4   JAYME TIPTON,                      )
                                        )
 5              Plaintiff,              )
                                        )
 6        vs.                           )   No. 2:18-cv-09503-
                                        )        AB-JEM
 7   AIRPORT TERMINAL SERVICES, INC.,   )
     EDGAR TRUJILLO, MELISSA DOE, and   )
 8   DOES 1 to 100, inclusive,          )
                                        )
 9              Defendants.             )
     _____)

10

11

12

13         DEPOSITION OF JEFF LUETKENHAUS

14              October 29, 2019

15

16

17

18

19

20

21

22

23

24   Theresa JoAnn Phillips-Blackwell, CSR 12700
     457811
25
```

**BARKLEY**
*Court Reporters*
barkley.com

SINCE 1972

(310) 207-8000 Los Angeles    (415) 433-5777 San Francisco    (949) 955-0400 Irvine    (858) 455-5444 San Diego
(310) 207-8000 Century City    (408) 885-0550 San Jose    (760) 322-2240 Palm Springs    (800) 222-1231 Carlsbad
(916) 922-5777 Sacramento    (800) 222-1231 Martinez    (702) 366-0500 Las Vegas    (800) 222-1231 Monterey
(951) 686-0606 Riverside    (818) 702-0202 Woodland Hills    (702) 366-0500 Henderson    (516) 277-9494 Garden City
(212) 808-8500 New York City    (347) 821-4611 Brooklyn    (518) 490-1910 Albany    (914) 510-9110 White Plains
(312) 379-5566 Chicago    00+1+800 222 1231 Paris    00+1+800 222 1231 Dubai    001+1+800 222 1231 Hong Kong

1              UNITED STATES DISTRICT COURT

2        CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

3

4    JAYME TIPTON,                      )
                                        )
5                  Plaintiff,           )
                                        )
6         vs.                           )   No. 2:18-cv-09503-
                                        )        AB-JEM
7    AIRPORT TERMINAL SERVICES, INC.,   )
     EDGAR TRUJILLO, MELISSA DOE, and   )
8    DOES 1 to 100, inclusive,          )
                                        )
9                  Defendants.          )
     _____)

10

11

12

13        DEPOSITION OF JEFF LUETKENHAUS taken at 225

14        Santa Monica Boulevard, Fourth Floor, Santa

15        Monica, California, at 10:15 a.m., Tuesday,

16        October 29, 2019, before Theresa JoAnn

17        Phillips-Blackwell, CSR 12700.

18

19

20

21

22

23

24

25

                              2

BARKLEY
Court Reporters

```
 1    APPEARANCES OF COUNSEL:

 2

 3

 4    For Plaintiff:

 5

 6                        AARON GBEWONYO, ESQ.

 7                        SHEGERIAN & ASSOCIATES, INC.

 8                        225 Santa Monica Boulevard

 9                        Suite 700

10                        Santa Monica, California  90401

11                        (310) 860-0770

12

13    For Defendants:

14

15                        MEAGAN SUE O'DELL, ESQ.

16                        SEYFARTH SHAW LLP

17                        601 South Figueroa Street

18                        Suite 3300

19                        Los Angeles, California  90017

20                        (213) 270-9649

21                        modell@seyfarth.com

22

23    Also Present:  Brandy Wallace

24

25
```

3

BARKLEY
Court Reporters

```
 1                      I N D E X

 2

 3    DEPONENT              EXAMINED BY              PAGE

 4    Jeff Luetkenhaus     Mr. Gbewonyo              5

 5

 6

 7

 8

 9                         EXHIBITS

10

11    PLAINTIFF                                     PAGE

12    1 - Plaintiff Jayme Tipton's Third Amended    10
          Notice Of Taking Deposition Of
13        Defendant Airport Terminal Services,
          Inc.'s Personal Most Knowledgeable
14        Regarding Defendants' Policies And
          Procedures; Request For Production Of
15        Documents At Deposition

16    2 - Voluntary Self-Identification of          18
          Disability Form
17
      3 - Employee Handbook                         21
18

19

20

21

22

23

24

25
```

JEFF LUETKENHAUS

BARKLEY
Court Reporters

1    on the business need.

2    BY MR. GBEWONYO:

3        Q.  You mentioned that it would be evaluated based

4    upon the business need.   Is there anywhere specifically

5    in that portion where it states that?

6            MS. O'DELL:   Take your time and review the

7    document.

8    BY MR. GBEWONYO:

9        Q.  Yeah.   Of course.   I don't want to rush you.

10       A.  Under Page 11, "Personal leaves of absences are

11   for personal reasons and may also be used for family

12   reasons, which employees do not meet all of the

13   requirements, personal leaves would be approved based

14   upon the employee's situation and the needs of ATS."

15       Q.   And so that which you've just read on Page 11

16   under Personal Leaves -- it's your belief that it also

17   applies to leaves of absence; correct?

18       A.   Define "leave of absences."

19       Q.   Leave of absence as defined on Page ATS000063.

20       A.   Which includes numerous types; correct?

21       Q.   That's what I'm trying to find out.

22       A.   That is correct.

23       Q.   Okay.   I'm sorry.   Was that was a question to

24   me?

25       A.   No.   That's stating leave of absences is

28

BARKLEY
Court Reporters

1    the employee?

2        A.   No.

3        Q.   Okay.  So after receiving those documents, are

4    you aware of any policy that would dictate where that

5    manager would have to place those doctors' notes?

6        A.   The leave of absence form with supporting

7    physicians' notes would be sent to our corporate office

8    representative for record retention.

9        Q.   And looking at ATS00065, specifically drawing

10   your attention to -- I believe it's the second-to-last

11   sentence, "For non-FMLA leaves ATS cannot guarantee that

12   a position for an employee will be available once an

13   extension has ended."

14        From your knowledge of this policy, does that

15   mean that employee will be terminated if on medical

16   non-FMLA leave?

17        A.   The last sentence of that page states, "ATS

18   will make an effort to reinstate an employee when

19   possible and practical."

20        Q.   Okay.  In order to reinstate -- if an employee

21   is still employed by ATS, they would not, in fact, need

22   to be reinstated; is that correct?

23        A.   Reinstated as the definition of being on

24   leave --

25        Q.   Okay.

36

JEFF LUETKENHAUS

BARKLEY
Court Reporters

1    BY MR. GBEWONYO:

2        Q.    And if an employee that was on a medical

3    non-FMLA leave was asked to resign, would that employee

4    be qualified for rehire?

5        A.    Yes.

6            MS. O'DELL:    Again, incomplete hypothetical.

7    BY MR. GBEWONYO:

8        Q.    Now, if an employee who was off on a medical

9    non-FMLA leave was terminated, could that employee be

10    asked to rehire -- I'm sorry -- be qualified for rehire?

11           MS. O'DELL:    Incomplete hypothetical --

12           THE WITNESS:    Yes.

13    BY MR. GBEWONYO:

14       Q.    So if an employee was off of work for a

15    non-FMLA medical leave and was -- nonmedical -- non-FMLA

16    medical leave and was asked to resign, would that

17    employee be provided anything in writing that said that

18    they were subject for rehire -- or qualified for rehire?

19       A.    No.

20           MS. O'DELL:    Incomplete hypothetical.

21    BY MR. GBEWONYO:

22       Q.    If an employee who took medical non-FMLA leave

23    was terminated during that period for which they took

24    medical non-FMLA leave, would that employee receive any

25    documentation -- anything in writing that would inform

40

JEFF LUETKENHAUS

BARKLEY
Court Reporters

1    I certify (or declare) under penalty of perjury under

2    the laws of the State of California that the foregoing

3    is true and correct.

4

5    Executed at _____ on_____ .
                      (Place)                      (Date)

6

7    _____
                    (Signature of Deponent)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

57

**BARKLEY**
Court Reporters

```
 1              DEPOSITION OFFICER'S CERTIFICATE

 2   STATE OF CALIFORNIA    )
                            ) ss.
 3   COUNTY OF LOS ANGELES  )

 4

 5

 6          I, Theresa Phillips-Blackwell, hereby certify:

 7          I am a duly qualified Certified Shorthand

 8   Reporter in the State of California, holder of

 9   Certificate Number CSR 12700 issued by the Certified Court

10   Reporters' Board of California and which is in full

11   force and effect.  (Fed. R. Civ. P. 28(a)(1)).

12          I am authorized to administer oaths or

13   affirmations pursuant to California Code of Civil

14   Procedure, Section 2093(b) and prior to being examined,

15   the witness was first duly sworn by me.  (Fed. R. Civ.

16   P. 28(a)(a)).

17          I am not a relative or employee or attorney or

18   counsel of any of the parties, nor am I a relative or

19   employee of such attorney or counsel, nor am I

20   financially interested in this action.  (Fed. R. Civ. P.

21   28).

22          I am the deposition officer that

23   stenographically recorded the testimony in the foregoing

24   deposition and the foregoing transcript is a true record

25                        / / /
```

JEFF LUETKENHAUS

BARKLEY
Court Reporters

```
 1    of the testimony given by the witness.  (Fed. R. Civ. P.

 2    30(f)(1)).

 3         Before completion of the deposition, review of

 4    the transcript [xx] was [  ] was not requested.  If

 5    requested, any changes made by the deponent (and

 6    provided to the reporter) during the period allowed, are

 7    appended hereto.  (Fed. R. Civ. P. 30(e)).

 8

 9    Dated: November 25, 2019

10

11

12

13                              Theresa Phillips-Blackwell

14                              _____

15

16

17

18

19

20

21

22

23

24

25
```

JEFF LUETKENHAUS

BARKLEY
Court Reporters

# EXHIBIT

# 4

**ORIGINAL**

1        UNITED STATES DISTRICT COURT

2    CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

3

4    JAYME TIPTON,                    )
                                      )
5              Plaintiff,             )
                                      )
6         VS.                         )    CASE NO.
                                      )    2:18-cv-09503-AB-JEM
7    AIRPORT TERMINAL SERVICES, INC.,)
     EDGAR TRUJILLO, MELISSA DOE,     )
8    And DOES 1 to 100, inclusive,    )
                                      )
9              Defendants.            )
     ─────────────────────────────── )

10

11

12

13

14        DEPOSITION OF SHONTA HENDERSON, PMK

15            November 22, 2019

16

17

18

19

20

21

22

23

24    JOY CHIOU, C.S.R. No. 13899, pursuant to NOTICE.
      459352

25

**BARKLEY**
*Court Reporters*
barkley.com

SINCE 1972 ✿

(310) 207-8000 Los Angeles    (415) 433-5777 San Francisco    (949) 955-0400 Irvine         (858) 455-5444 San Diego
(310) 207-8000 Century City   (408) 885-0550 San Jose         (760) 322-2240 Palm Springs   (800) 222-1231 Carlsbad
(916) 922-5777 Sacramento     (800) 222-1231 Martinez         (702) 366-0500 Las Vegas      (800) 222-1231 Monterey
(951) 686-0606 Riverside      (818) 702-0202 Woodland Hills   (702) 366-0500 Henderson      (516) 277-9494 Garden City
(212) 808-8500 New York City  (347) 821-4611 Brooklyn         (518) 490-1910 Albany         (914) 510-9110 White Plains
(312) 379-5566 Chicago        00+1+800 222 1231 Paris         00+1+800 222 1231 Dubai       001+1+800 222 1231 Hong Kong

1                UNITED STATES DISTRICT COURT

2         CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

3

4   JAYME TIPTON,                )
                           )

5          Plaintiff,       )
                           )

6      VS.                 )  CASE NO.
                           )  2:18-cv-09503-AB-JEM

7   AIRPORT TERMINAL SERVICES, INC.,)
    EDGAR TRUJILLO, MELISSA DOE,   )

8   And DOES 1 to 100, inclusive,  )
                           )

9          Defendants.      )
  _____)

10

11

12

13

14          DEPOSITION OF SHONTA HENDERSON, Person Most

15   Knowledgeable, taken on behalf of the Plaintiff, at 225 Santa

16   Monica Boulevard, Suite 700, Santa Monica, California,

17   commencing at 10:11 A.M., Friday, November 22, 2019, before

18   JOY CHIOU, C.S.R. No. 13899, pursuant to NOTICE.

19                     * * *

20

21

22

23

24

25

                         2

BARKLEY
Court Reporters

```
 1   APPEARANCES:

 2   For Plaintiff:

 3   SHEGERIAN & ASSOCIATES
     BY:  Aaron Gbewonyo, Esq.
 4   225 Santa Monica Boulevard,
     Suite 700
 5   Santa Monica, California 90401
     (310) 860-0770
 6   Agbewonyo@shegerialaw.com

 7

     For Defendant:
 8
     SEYFARTH SHAW
 9   BY:  Aaron R. Lubeley, Esq.
     601 South Figueroa Street
10   Suite 3300
     Los Angeles, California 90017
11   (213) 270-9636
     Alubeley@seyfarth.com
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

3

SHONTA HENDERSON, PMK

```
1                              I N D E X

2    WITNESS                EXAMINATION                    PAGE

3    SHONTA HENDERSON       By Mr. Gbewonyo                   5

4                           By Mr. Lubeley                   58

5

6

7

8

9

10                         E X H I B I T S

11   PLAINTIFF'S              DESCRIPTION                   PAGE

12   NO. 1    Plaintiff Jayme Tipton's Third Amended Notice   12

13            Of Taking Deposition of Defendant Airport

14            Terminal Services, Inc's Person Most

15            Knowledgeable, 6 pages.

16   NO. 2    E-mail Chain Subject: RE: LAXSIC Time, dated    45

17            5/8/17, 6 pages.

18   NO. 3    Pay Statement for Jayme Tipton, from pay        57

19            Period 4/10/17 to 4/16/17, 3 pages.

20

21

22

23

24

25
```

SHONTA HENDERSON, PMK

BARKLEY
Court Reporters

```
 1   those documents with you here today.

 2        A    I didn't find any additional documents.

 3             MR. LUBELEY:  We've produced all documents obtained

 4   in the case.

 5   BY MR. GBEWONYO:

 6        Q    And were you involved in the hiring of Ms. Tipton?

 7        A    I was.

 8        Q    And are you aware of approximately when Ms. Tipton

 9   was hired?

10        A    I do not recall.  It was the year 2016, but I don't

11   remember the month or date.

12        Q    Okay.  Do you remember approximately what season it

13   was at that time?

14        A    It's kind of hard to say.

15        Q    Of course.

16        A    I do not remember.

17        Q    Do you remember whether it was at the beginning of

18   the year or at the end of the year?

19        A    It was around the middle of the year.

20        Q    Okay.  Do you recall what position Ms. Tipton was

21   hired for?

22        A    Yes.

23        Q    Okay.  And what was Ms. Tipton's position when she

24   was hired?

25        A    A groomer.
```

14

BARKLEY
Court Reporters

1  Q And did you interview Ms. Tipton when she was hired?

2  A I did.

3  Q And did you make the decision to hire her?

4  A I did.

5  Q Are you aware of whether -- do you recall whether

6 there was anybody else in interviews with you when you hired

7 Ms. Tipton?

8  A I do not recall.

9  Q Let me rephrase the question.  Was it a group

10 interview that Ms. Tipton went to when you interviewed her?

11  A It was not a group interview.

12  Q Are you aware of whether Ms. Tipton had more than

13 one interview before she was hired with Airport Terminal

14 Services?

15  A I'm not aware.

16  Q And you made the ultimate decision to hire

17 Ms. Tipton; correct?

18  A I don't know if I made the ultimate decision, but I

19 can influence the hiring decision.

20  Q Okay.  And how do you influence the hiring decision?

21  A I would basically, you know, talk to the manager and

22 let him or her know how well a person interviewed.

23  Q Do you recall who the manager was at that time?

24  A At that time, it would have been Edgar Trujillo.

25  Q And are you aware of what Mr. Trujillo's position

15

BARKLEY
Court Reporters

```
 1            Do you believe that you're the person most
 2   knowledgeable to that subject, ma'am?
 3        A    Yes.
 4        Q    Okay.  And the documents that were just provided to
 5   you, you still have in front of you?
 6        A    Yes.
 7        Q    Will this assist you in being able to discuss that
 8   subject matter, ma'am?
 9        A    Yes.
10        Q    And are you aware of who plaintiff's supervisor was
11   when she was hired as a groomer at ATS?
12        A    Oh my goodness.  I'm going to say it was Damian
13   Neri.
14        Q    And at the time that the plaintiff was hired, are
15   you aware of whether she was on probation during that time
16   period?
17            MR. LUBELEY:  Objection.  Vague and ambiguous as to
18   probation.
19            Are you talking about the initial hiring probation
20   or a performance probation?
21            THE WITNESS:  That's correct.
22   BY MR. LUBELEY:
23            THE WITNESS:  No, she was not.
24   BY MR. GBEWONYO:
25        Q    And you understand that I'm referring to initial
```

25

SHONTA HENDERSON, PMK

BARKLEY
Court Reporters

```
 1            THE WITNESS:  Could have possibly been Ora, Ora
 2    Beasley.
 3    BY MR. GBEWONYO:
 4        Q    And can you spell Ora's last name for me, please?
 5            THE WITNESS:  B-E-A-S-L-E-Y.
 6    BY MR. GBEWONYO:
 7        Q    And are you aware of whether Ora is still an
 8    employee of ATS?
 9        A    Yes, she is.
10        Q    And it is your understanding that Ora was a crew
11    chief lead; is that correct, at that time, October 2016?
12        A    Correct.
13        Q    Are you aware of what the general duties of a crew
14    chief lead are?
15        A    Yes.
16        Q    And what are the general duties of a crew chief
17    lead?
18        A    Along with performing the same tasks as a groomer,
19    they would divide the group up as to how they would complete
20    their tasks.
21        Q    Are there any other general duties of a crew chief
22    lead?
23        A    They would perform the same duties.
24        Q    Okay.  And would a crew chief lead report directly
25    to the supervisor?
```

29

BARKLEY
Court Reporters

BY MR. GBEWONYO:

Q    I'm sorry, when you say wing walking, what does that mean?

A    When they're standing underneath the wings of the aircraft.

Q    And when they're standing underneath the wings of the aircraft, what are they doing?

A    They're basically guiding another ramp agent who is pushing the aircraft back to ensure that, you know, the wings are cleared, not going to hit anything.

And they also tow the aircraft across the airfield. They also load the luggage into the belly of the aircraft.

Q    And from your knowledge of a ramp agent, is it your understanding that a ramp agent is responsible for doing all of those tasks?

A    One or all of those tasks.

Q    Okay.  So as a ramp agent, are you aware of whether ramp agents require special training to perform that position?

A    To push the aircraft back, to drive any equipment, yes, that requires special training.

MR. LUBELEY:  I'm going to object.  This falls outside the scope of the PMK categories.

BY MR. GBEWONYO:

Q    And as to the groomer position, are you aware of

31

BARKLEY
Court Reporters

1  whether that position required special training?

2        MR. LUBELEY:  Same objections.

3        THE WITNESS:  Only if it's specific to the airline.

4  BY MR. GBEWONYO:

5    Q    And are you aware whether groomers were assigned to

6  specific airlines?

7    A    Yes.

8    Q    And how was it determined what airlines a groomer

9  was assigned to?

10    A    That was determined at hiring.  They were hired

11  specifically for an airline.

12    Q    I'm sorry, you said it was determined at hiring

13  which airline a groomer was specifically working on?

14    A    Correct.  We were only hiring for one airline.  It

15  was for one airline.

16    Q    And when ATS hired groomers for a specific airline,

17  for example -- and tell me if this is correct -- if a new

18  contract was obtained for ATS, would they start hiring new

19  groomers for that specific airline?

20    A    Yes.

21    Q    At the time that plaintiff was hired, are you aware

22  of whether there was a new contract that was acquired?

23    A    Yes.

24    Q    And what was that new contract that was acquired?

25    A    Jet Blue.

SHONTA HENDERSON, PMK

BARKLEY
Court Reporters

1     Q    So is it correct that plaintiff worked on the Jet

2  Blue airlines?

3     A    That is correct.

4     Q    And would it have been communicated to plaintiff

5  that she was being hired because a new contract was obtained?

6     A    Yes.

7     MR. LUBELEY:  Objection.  Relevance.

8  BY MR. GBEWONYO:

9     Q    Are you aware of approximately how many groomers

10  were hired for this new contract, for this new Jet Blue

11  contract?

12     A    I want to say -- if I could remember --

13     MR. LUBELEY:  Object.  Vague and ambiguous as to

14  time.  You can answer to the best of your memory.

15     THE WITNESS:  I want to say it was about 23, 22.

16  BY MR. GBEWONYO:

17     Q    Are you aware of the duration of time between

18  October 2016 and May of 2017 that, approximately, 22 to 23

19  new groomers were hired for the new Jet Blue contract?

20     MR. LUBELEY:  Objection.  Vague and ambiguous.

21     THE WITNESS:  To the best of my ability, as far as I

22  can recollect, I think so.

23  BY MR. GBEWONYO:

24     Q    So the 22 or 23 new groomers, would they have all

25  been hired when the contract was obtained to start service on

SHONTA HENDERSON, PMK

BARKLEY
Court Reporters

1    know.

2             THE WITNESS:  Okay.  I don't remember.

3    BY MR. GBEWONYO:

4        Q    Okay.  What about in May of 2017?

5        A    That would have been Edgar Trujillo.

6        Q    And is it your understanding that you are the person

7    most knowledgeable regarding plaintiff's termination?

8        A    Yes.

9        Q    Okay.  Great.  Are you aware of the facts relied

10   upon in Plaintiff's termination?

11            MR. LUBELEY:  I'm going to object to the extent that

12   it's assumes facts.  And it's vague and ambiguous as to the

13   termination.

14            THE WITNESS:  So what I remember is that Jayme

15   resigned.  She was not terminated.

16   BY MR. GBEWONYO:

17       Q    And what is the basis for your belief that the

18   plaintiff resigned?

19       A    My basis is from my recollection from our

20   conversation -- mine and Jayme's.

21       Q    Okay.  And this conversation that you're referring

22   to, do you recall whether Ms. Tipton called you, or did you

23   call Ms. Tipton?

24       A    I called her.

25       Q    Okay.  And do you recall why you called Ms. Tipton?

36

1      A    No.

2      Q    Okay.  Do you recall when you received that doctor's

3  note in relation to this May conversation?

4      A    I do not remember exactly.

5      Q    Okay.  Was it more than a week between the time you

6  had received the note and called Ms. Tipton in May of 2017?

7      A    I don't remember.

8           MR. LUBELEY:  Maybe this will help refresh your

9  recollection.

10  BY MR. GBEWONYO:

11      Q    That's okay.  We'll come to it in your individual

12  capacity deposition.

13      A    Okay.

14      Q    Do you happen to recall what the reason for

15  Ms. Tipton being out on medical leave was?

16      A    I do not remember the reason.

17      Q    And were you aware -- you mentioned that Ms. Tipton

18  had resigned; is that correct?

19      A    Correct.

20      Q    And when she resigned, did you communicate that to

21  anybody else within ATS?

22      A    I don't remember communicating that she resigned.  I

23  guess it depends on how you communicate.

24           MR. LUBELEY:  That's right.  It's vague and

25  ambiguous.  I think it's fair for you to walk through the

38

SHONTA HENDERSON, PMK

BARKLEY
Court Reporters

1  process that you undertook, what the purpose of the call was,

2  and then what happened, and what progressed from there.

3      THE WITNESS:  Okay.  So if I can remember clearly, I

4  do remember receiving a doctor's note for Jayme, which didn't

5  really state anything except that she was going to be off

6  work for quite some time.

7      So I called to check her status to see, you know,

8  how she was doing and when she would possibly be able to

9  return to work.  She didn't have an answer for me.  She

10  couldn't tell me when she was going to return to work.

11      So I do remember letting her know that if she wasn't

12  reporting to work, her tenure didn't allow her for any

13  protected leave if she wasn't going to report to work.  She

14  could possibly be terminated for accumulating too many

15  attendance infractions.

16      You know, the other option would be for her to

17  resign and then, you know, we would be able to hire her back

18  once when she was able to return, but she couldn't tell me

19  when she was going to return.

20  Q   So when you say the other option -- other option as

21  opposed to what?

22  A   Repeat that?  I'm sorry.

23  Q   I believe a moment ago you said that the other

24  option was that she could resign and then reapply; is that

25  correct?

39

SHONTA HENDERSON, PMK

BARKLEY
Court Reporters

1      A      Yes, I did say that.

2      Q      Okay.  So when you say other option, what was the

3   alternative?

4      A      The alternative would have been termination.

5             MR. LUBELEY:  I object.  It's asked and answered.

6   BY MR. GBEWONYO:

7      Q      Is it your understanding that during that

8   conversation, Ms. Tipton chose resignation?

9      A      That's my understanding.

10     Q      Okay.  And how did she communicate that to you?

11     A      She just left the conversation open ended and she

12   just said okay.

13     Q      And was there anything else that was said during

14   that conversation?

15     A      I don't recall.  I believe I asked her if she could

16   come down to the office and talk to me.  I don't know at what

17   point in the conversation she said that or I asked her that.

18   I don't know if I asked her that.  I know I asked her if she

19   could come down and talk to me.

20     Q      Okay.  But you're not sure whether that was in the

21   beginning of the conversation?

22     A      I'm not sure where in the conversation.

23     Q      Okay.  Do you recall asking Ms. Tipton to return her

24   badge at any point during that conversation?

25     A      I do.

                                    40

SHONTA HENDERSON, PMK

BARKLEY
Court Reporters

1    Q    Okay.  Do you recall when you asked her to return

2    the badge?

3    A    I don't remember when during the conversation, but

4    that is one of the things I would have said to her.  And

5    that's because if anybody is out on a leave for an extended

6    period of time, we have to return their badge to the airport

7    authority.

8    Q    And what is the reason for that?

9    A    It's a security breach.

10    Q    And after Ms. Tipton's separation, are you aware of

11    any communications?  And when I say communications, I mean

12    verbal or written that you may have had with anybody in

13    regards to Ms. Tipton's resignation?

14    A    I'm sorry, you said after her?  I'm sorry, can you

15    repeat that?

16    Q    Of course.  So after the May 2017 conversation that

17    you had with Ms. Tipton, what were the next steps that you

18    took after what you believed to have been her resignation?

19    A    The next steps would have been for me to send her a

20    letter requesting her badge.

21    Q    And in between what you believe to have been

22    Ms. Tipton's resignation, the phone call that you had in May,

23    how long after did you send her that letter?

24    A    Probably would have been over the next day or next

25    couple of days.

41

SHONTA HENDERSON, PMK

BARKLEY
Court Reporters

1   was not negatively impacted, and to see if it was okay for me

2   to reach out to her regarding her sick time and, you know,

3   talk to her about resignation.

4   BY MR. GBEWONYO:

5       Q    And is it your understanding that Jeff had approved

6   you discussing potential resignation with Ms. Tipton?

7       A    Yes.

8       Q    And did you need Jeff's approval before having that

9   discussion with Ms. Tipton?

10      A    Yes.

11      Q    And did you report to Jeff at that time?

12      A    No.

13      Q    And how did your two positions relate to one

14  another?

15      A    He is the employee services manager, and I am a

16  human resources representative.  So anything that involves a

17  separation of an employee voluntary or involuntarily, it

18  usually has to go through Jeff.

19           So -- sorry, looking back here on the -- I don't

20  know if I'm supposed to quote that number -- 093.

21      Q    Okay.

22      A    Down towards the bottom section, you'll see that I

23  was talking to Jeff about Jayme being away from work due to a

24  non-work-related injury and her tenure for, you know, not

25  having a protected leave.

46

BARKLEY
Court Reporters

1    Q    Okay.  So you're referring to the bottom of page ATS

2    0093, an e-mail sent from you on Friday May 5th, 2017; is

3    that correct?

4    A    Correct.

5    Q    Okay.  And I'm just going to go ahead and read the

6    e-mail.  I obviously understand that you can read, but just

7    for the record.

8         So the e-mail reads, "Hello Jeff/Sue."  I'm sorry,

9    who is Sue Wilson?

10   A    Sue Wilson was the payroll coordinator.

11   Q    Okay.  So the e-mail reads, "Hello Jeff/Sue:  How

12   can I tell if an employee has LAXSIC time available?"  What

13   is LAXSIC?

14   A    LAXSIC is just a code for any employee that works

15   out of the Los Angeles airport for ATS.

16   Q    Okay.  Great.

17        MR. GBEWONYO:  I'm sorry, go ahead.

18        MR. LUBELEY:  Can you read back her answer to me

19   again?  I think she said LAX was coded for any employee, but

20   I think your question may have been different if you're

21   asking what that stands for?

22        MR. GBEWONYO:  That's correct.  What it means.

23        MR. LUBELEY:  Not who it applies to?

24        THE WITNESS:  LAXSIC time.

25        MR. GBEWONYO:  Great.  Thank you.

47

SHONTA HENDERSON, PMK

BARKLEY
Court Reporters

1     Q     And why would she be terminated?

2     A     If she reached more than the allotted attendance

3     points, which was 15.

4     Q     And you had mentioned in your prior testimony that

5     she was ineligible for leave.  What do you mean by that?

6     A     She was not eligible for any protected leave because

7     our policy didn't allow for any leave of absence due to any

8     injuries that she had.

9           First, she wasn't eligible for a protected leave

10    because of her tenure.  And then no other leave -- no

11    personal leave of absences, because we couldn't

12    accommodate -- we don't even know what her restrictions were.

13    She couldn't drive into work.  That was one.  She said that.

14    Q     When you mentioned before that FMLA policy was part

15    of your discussion, is that what you were talking about, the

16    family leave policy and the eligibility requirements for

17    that?

18    A     Correct.

19    Q     Okay.  And she wasn't eligible because she hadn't

20    worked long time to be eligible to take a job protected

21    leave?

22    A     That is correct.

23    Q     And at any point in time, did Ms. Tipton tell you

24    that she had suffered an on-the-job injury?

25    A     No.

60

SHONTA HENDERSON, PMK

BARKLEY
Court Reporters

1    Q    During that discussion, did she mention anything
2    about the on-the-job injury?
3    A    No.
4    Q    During that discussion, did you speak with
5    Ms. Tipton about -- strike that.
6         During this discussion, did Ms. Tipton say anything
7    to you that she believed she would be able to return to work
8    May 15th as indicated in the doctor's note?
9    A    No.  In fact, she indicated that she didn't know
10   when she could return to work.
11   Q    Did she tell you why?
12   A    No.
13   Q    Was there any mention about her medical insurance
14   lapsing and not being able to get treatment or anything like
15   that?
16   A    No.
17   Q    And she did not receive any kind of medical benefits
18   through ATS; is that correct?
19   A    I don't know.
20   Q    And when you had a discussion with her -- strike
21   that.
22        Is there -- was there any reason why you couldn't
23   simply hold her position open while she was out, even though
24   she couldn't tell you exactly when she would return?
25   A    The contracts don't allow -- well, how can I

61

BARKLEY
Court Reporters

1    say this?  The contracts requires us to have a certain amount

2    of crews in certain positions, so we wouldn't have been able

3    to just hold the position open.

4        Q    What do you mean?  Explain that to me.

5        A    The way the contract is written with the customer or

6    by the customer, we have to have -- we have to maintain a

7    certain level of positions.  We can't have a lot of open

8    positions basically.

9             If the contract says that we have to have -- and I'm

10   just throwing a number out here -- 50 agents, we would have

11   to have 50 agents on duty to cover and to service them.

12       Q    And at the time, did this requirement apply to

13   groomers?

14       A    Yes.

15       Q    And at the time that you had this discussion with

16   Ms. Tipton, I believe it was May 8th; is that correct?  On or

17   about?

18       A    On or about, yes, May 8.

19       Q    How many open positions for groomers were there, if

20   you recall?

21       A    Three.

22       Q    And then if she -- if you left her out on an

23   unprotected leave during this time, that would have left four

24   open positions?

25       A    That is correct.

62

SHONTA HENDERSON, PMK

BARKLEY
Court Reporters

1    Q    Did you discuss that at all with her?  Did you tell
2    her you couldn't hold her position open?
3    A    I did let her know we had to fill the position.  We
4    had to have all positions filled within a certain timeframe,
5    yeah.  Not a certain timeframe, but as quickly as possible.
6    Q    When you explained this to Ms. Tipton, what did she
7    say in response?
8    A    If I can remember, she didn't know when she was
9    going to be able to return.
10    Q    And you had said before -- I just want to clarify --
11    you said in the discussion, you had mentioned her options as
12    resigning as one of them.
13        And then she said -- I think you said she said,
14    "Okay," and you just left the conversation open.  But why
15    don't you walk me through what you mean by that?
16    A    I remember talking to her about the two different
17    options.  And the way we ended the conversation, she just
18    sort of said, "Okay."  That's what I remember about the
19    conversation.
20    Q    And then you asked her to come in and bring her
21    badge?
22    A    I assumed -- yes, she was going to be coming into
23    the office.
24    Q    Did you record anywhere the status of her
25    termination?

63

BARKLEY
Court Reporters

1          MR. GBEWONYO:  Objection.  Asked and answered.

2  BY MR. LUBELEY:

3      Q      Strike that.  How did you -- how did you document

4  what had occurred?

5      A      Well, I -- I didn't document the conversation.

6          When she didn't show up, I did have to go into the

7  system and process her separation as a voluntary separation

8  as if she resigned.

9      Q      And you did that?

10     A      Yes.

11     Q      And that's in a document reflected somewhere?

12     A      Yes, it is.

13     Q      And when the company is terminating an employee

14  versus as employee resigning, are there separate codes for

15  that?

16     A      It is.

17     Q      And what code did you use?  A resignation code or a

18  termination code?

19     A      Resignation.

20     Q      Was it ambiguous to you that she was resigning or

21  being fired?  I mean, you were the decision maker on this;

22  right?

23     A      I was.  I was under the assumption that she was

24  resigning, and that we would bring her back.

25          MR. GBEWONYO:  Late objection.  Calls for

64

BARKLEY
Court Reporters

1  speculation.

2  BY MR. LUBELEY:

3      Q    At the time, based on what she had said in your

4  conversation; is that correct?

5      A    That is correct.

6      Q    And did she ever reach back out to -- strike that.

7          In the discussion -- in the discussion, did you tell

8  her, "I will hire you back once you're cleared, but we need

9  to fill the position" or words to that?

10      A    I did not say we needed to fill the position.  I

11  don't think I said that at the same time, no, but I let her

12  know, "We will hire you back.  Just reapply.  We will hire

13  you back.  We will bring you back on."

14      Q    Did she ever reach back out to you?

15      A    No.

16      Q    Did she ever reapply?

17      A    No.

18      Q    Would you hire her back?

19      A    We would hire her back.

20      Q    Would you hire her back today?

21      A    I would hire her back today.

22      Q    Do you have an opening today?

23      A    If I can think clearly, I'm going to say we do.

24  Possibly not on Jet Blue, but maybe a different contract.

25      Q    You would hire her for a different contract?

SHONTA HENDERSON, PMK



1       A       I would.

2       Q       Did you have any animosity towards her at all?

3       A       None whatsoever.   No.

4               MR. GBEWONYO:   Objection.   Vague as to animosity.

5    BY MR. LUBELEY:

6       Q       Do you have any negative feelings towards her?

7       A       Not at all.

8       Q       Do you have any opinion as to whether she was a good

9    or bad employee?

10              MR. GBEWONYO:   Calls for speculation.

11              THE WITNESS:   An opinion?   No.   But I don't have any

12   reason to believe she wasn't performing well.

13   BY MR. LUBELEY:

14      Q       Why is it that you wanted to check the coding on the

15   coding on the sick time?

16      A       Because I wanted to ensure that she wasn't going to

17   be impacted negatively.   I wanted to make sure that she was

18   given her correct pay and, you know, if there was other times

19   or more time that we could allow her, we gave it to her.

20      Q       Okay.   And to the best of your recollection, after

21   reviewing her time records, did it appear that she had

22   received all of her proper sick time?

23      A       After reviewing these, yes.

24      Q       When you mentioned the 48 hours, that's the total

25   amount of sick time an employee can earn?

SHONTA HENDERSON, PMK

BARKLEY
Court Reporters

1           I have read the foregoing deposition

2    transcript and by signing hereafter, subject to

3    any changes I have made, approve same.

4

5    Dated_____.

6

7

8                        _____

9                            (Signature of Deponent)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

68

BARKLEY
Court Reporters

1            DEPOSITION OFFICER'S CERTIFICATE

2   STATE OF CALIFORNIA    )
                           ) ss.
3   COUNTY OF LOS ANGELES  )

4

5

6        I, Joy Chiou, hereby certify:

7        I am a duly qualified Certified Shorthand

8   Reporter in the State of California, holder of

9   Certificate Number CSR 13899 issued by the Certified Court

10  Reporters' Board of California and which is in full

11  force and effect.  (Fed. R. Civ. P. 28(a)(1)).

12       I am authorized to administer oaths or

13  affirmations pursuant to California Code of Civil

14  Procedure, Section 2093(b) and prior to being examined,

15  the witness was first duly sworn by me.  (Fed. R. Civ.

16  P. 28(a)(a)).

17       I am not a relative or employee or attorney or

18  counsel of any of the parties, nor am I a relative or

19  employee of such attorney or counsel, nor am I

20  financially interested in this action.  (Fed. R. Civ. P.

21  28).

22       I am the deposition officer that

23  stenographically recorded the testimony in the foregoing

24  deposition and the foregoing transcript is a true record

25                    / / /

69

SHONTA HENDERSON, PMK

BARKLEY
Court Reporters

1    of the testimony given by the witness. (Fed. R. Civ. P.

2    30(f)(1)).

3         Before completion of the deposition, review of

4    the transcript [xx] was [  ] was not requested.  If

5    requested, any changes made by the deponent (and

6    provided to the reporter) during the period allowed, are

7    appended hereto. (Fed. R. Civ. P. 30(e)).

8

9    Dated: December 5, 2019

10

11

12

13

14    _____

15

16

17

18

19

20

21

22

23

24

25

SHONTA HENDERSON, PMK

BARKLEY
Court Reporters

ERRATA SHEET
CHANGES IN TESTIMONY

JAYME TIPTON v. AIRPORT TERMINAL SERVICES, INC.
SHONTA HENDERSON, PMK
November 22, 2019

PAGE     LINE     FROM                                    TO

_____  _____  _____  _____

_____  _____  _____  _____

_____  _____  _____  _____

_____  _____  _____  _____

_____  _____  _____  _____

_____  _____  _____  _____

_____  _____  _____  _____

_____  _____  _____  _____

_____  _____  _____  _____

_____  _____  _____  _____

_____  _____  _____  _____

_____  _____  _____  _____

_____  _____  _____  _____

_____  _____  _____  _____

_____  _____  _____  _____


_____          _____

SIGNATURE OF WITNESS                          DATE

Plaintiff's Exhibit ___2___
Date 11/24/2019
Depo/Case: Shonta Henderson, PmK
Joy Chiou, CSR #13899

**From:** Luetkenhaus, Jeff
**Sent:** Monday, May 08, 2017 8:44 AM
**To:** Henderson, Shonta <shenderson1@atsstl.com>
**Subject:** RE: LAXSIC Time

Shonta,
If someone is on some modified duty due to an outside of work incident and can't return to work, they should resign and reapply unless LAX wants to gran them a personal LOA.

---
**Jeff Luetkenhaus | Airport Terminal Services**
Manager, Employee Relations, Corporate Employee Services
111 Westport Plaza Drive, Suite 400
St. Louis, MO. 63146
+1 (314) 739-1900 Ext. 330 (O)
jluetkenhaus@atsstl.com

www.ATSSTL.com [atsstl.com]

 

**From:** Henderson, Shonta
**Sent:** Monday, May 08, 2017 10:43 AM
**To:** Luetkenhaus, Jeff <jluetkenhaus@atsstl.com>
**Subject:** RE: LAXSIC Time

7

ATS 000090

Jeff, in this case Jayme is still not covered under any protected leave. Do you support me contacting her today and informing her of that fact and let her know that she has the option to resign and reapply once she's received a full return to duty with no restrictions?

Regards,
Shonta Henderson
**ATS - Airport Terminal Services**
Human Resource Generalist Assistant
5777 Century Blvd, #715
Los Angeles, CA 90045
Office: +1 (310) 417-5110
shenderson1@atsstl.com
www.atsstl.com [atsstl.com]

 

**From:** Henderson, Shonta
**Sent:** Monday, May 08, 2017 7:49 AM
**To:** Jeans, Monique <mjeans@atsstl.com>; Luetkenhaus, Jeff <jluetkenhaus@atsstl.com>
**Subject:** RE: LAXSIC Time

Thanks Jeff/Monique

Regards,
Shonta Henderson
**ATS - Airport Terminal Services**
Human Resource Generalist Assistant
5777 Century Blvd, #715
Los Angeles, CA 90045
Office: +1 (310) 417-5110
shenderson1@atsstl.com
www.atsstl.com [atsstl.com]

 

**From:** Jeans, Monique
**Sent:** Monday, May 08, 2017 7:47 AM
**To:** Luetkenhaus, Jeff <jluetkenhaus@atsstl.com>
**Cc:** Henderson, Shonta <shenderson1@atsstl.com>
**Subject:** RE: LAXSIC Time

Yes, his Sick should be LAX sick, I will be it updated

Monique Jeans | Airport Terminal Services

8

Employee Services Rep, Employee Services
111 Westport Plaza Dr. Suite 400
St. Louis, MO 63146
+1 (314) 739-1900 ext. 334 (O)
+1 (314) 392-5978 (F)
mjeans@atsstl.com

www.ATSSTL.com [atsstl.com]



**From:** Luetkenhaus, Jeff
**Sent:** Monday, May 08, 2017 9:45 AM
**To:** Jeans, Monique <mjeans@atsstl.com>
**Subject:** FW: LAXSIC Time

Hi Monique,
Can you review Jayme Tipton's sick time code. I believe it should read "LAXSIC" vs. "CALSIC."

_____
**Jeff Luetkenhaus | Airport Terminal Services**
Manager, Employee Relations, Corporate Employee Services
111 Westport Plaza Drive, Suite 400
St. Louis, MO. 63146
+1 (314) 739-1900 Ext. 330 (O)
jluetkenhaus@atsstl.com

www.ATSSTL.com [atsstl.com]



**From:** Henderson, Shonta
**Sent:** Monday, May 08, 2017 9:23 AM
**To:** Luetkenhaus, Jeff <jluetkenhaus@atsstl.com>; Wilson, Sue <swilson@atsstl.com>
**Subject:** RE: LAXSIC Time

Morning Jeff, I will run the report to be sure. Her name is Jayme Tipton.

Regards,
Shonta Henderson
**ATS - Airport Terminal Services**
Human Resource Generalist Assistant
5777 Century Blvd, #715
Los Angeles, CA 90045
**Office:** +1 (310) 417-5110
shenderson1@atsstl.com
www.atsstl.com [atsstl.com]

9

ATS 000092



**From:** Luetkenhaus, Jeff
**Sent:** Monday, May 08, 2017 6:40 AM
**To:** Henderson, Shonta <shenderson1@atsstl.com>; Wilson, Sue <swilson@atsstl.com>
**Subject:** RE: LAXSIC Time

Hi Shonta,
The ordinance is attached. If someone has worked 90 days, they are eligible to use their protected sick time.

What is her name so I can confirm?

You can run a report in UTA called Balance Detail Report that will provide you available balances of PTO and what has been used.

---

**Jeff Luetkenhaus | Airport Terminal Services**
Manager, Employee Relations, Corporate Employee Services
111 Westport Plaza Drive, Suite 400
St. Louis, MO. 63146
+1 (314) 739-1900 Ext. 330 (O)
jluetkenhaus@atsstl.com

www.ATSSTL.com [atsstl.com]

 

**From:** Henderson, Shonta
**Sent:** Friday, May 05, 2017 5:21 PM
**To:** Luetkenhaus, Jeff <jluetkenhaus@atsstl.com>; Wilson, Sue <swilson@atsstl.com>
**Subject:** LAXSIC Time

Hello Jeff/Sue:
How can I tell if an employee has LAXSIC time available?

I'm asking because I have an employee who is currently away from work due to a non-work-related injury and her tenure is too short to qualify her for any protected leave. She's been coded to some sick days but not LAXSIC and I want to ensure she's not penalized for any protected of the 48hours of protected leave.

DOH: 10/31/16

Regards,
Shonta Henderson
**ATS - Airport Terminal Services**
Human Resource Generalist Assistant
5777 Century Blvd, #715

ATS 000093

Los Angeles, CA 90045
**Office**: +1 (310) 417-5110
shenderson1@atsstl.com
www.atsstl.com [atsstl.com]




ATS 000094

| NAME | MON | TUES | WED | THUR | FRI | SAT | SUN | TOTAL |
|------|-----|------|-----|------|-----|-----|-----|-------|
|      |     |      |     |      |     |     |     |       |

11-15
ATS 000114

# EXHIBIT

# 5

ORIGINAL

1                    UNITED STATES DISTRICT COURT

2            CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

3

4    JAYME TIPTON,                    )
                                      )
5              Plaintiff,             )
                                      )
6         VS.                         )    CASE NO.
                                      )    2:18-cv-09503-AB-JEM
7    AIRPORT TERMINAL SERVICES, INC.,)
     EDGAR TRUJILLO, MELISSA DOE,     )
8    And DOES 1 to 100, inclusive,    )
                                      )
9              Defendants.            )
     _____)

10

11

12

13

14          DEPOSITION OF SHONTA HENDERSON, As An Individual

15                    November 22, 2019

16

17

18

19

20

21

22

23

24    JOY CHIOU, C.S.R. No. 13899
      458758
25

**BARKLEY**
*Court Reporters*
barkley.com

SINCE 1972

(310) 207-8000 Los Angeles      (415) 433-5777 San Francisco    (949) 955-0400 Irvine        (858) 455-5444 San Diego
(310) 207-8000 Century City     (408) 885-0550 San Jose         (760) 322-2240 Palm Springs   (800) 222-1231 Carlsbad
(916) 922-5777 Sacramento       (800) 222-1231 Martinez         (702) 366-0500 Las Vegas      (800) 222-1231 Monterey
(051) 686-0606 Riverside        (818) 702-0202 Woodland Hills   (702) 366-0500 Henderson      (516) 277-9494 Garden City
(212) 808-8500 New York City    (347) 821-4611 Brooklyn         (518) 480-1910 Albany         (914) 510-9110 White Plains
(312) 379-5566 Chicago          00+1+800 222 1231 Paris         00+1+800 222 1231 Dubai       001+1+800 222 1231 Hong Kong

1              UNITED STATES DISTRICT COURT

2        CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

3

4    JAYME TIPTON,                    )
                                      )
5              Plaintiff,             )
                                      )
6        VS.                          )    CASE NO.
                                      )    2:18-cv-09503-AB-JEM
7    AIRPORT TERMINAL SERVICES, INC.,)
     EDGAR TRUJILLO, MELISSA DOE,     )
8    And DOES 1 to 100, inclusive,    )
                                      )
9              Defendants.            )
     _____)

10

11

12

13

14         DEPOSITION OF SHONTA HENDERSON, As An Individual,

15    taken on behalf of the Plaintiff, at 225 Santa Monica

16    Boulevard, Suite 700, Santa Monica, California, commencing at

17    1:17 P.M., Friday, November 22, 2019, before JOY CHIOU,

18    C.S.R. No. 13899, pursuant to NOTICE.

19                            *  *  *

20

21

22

23

24

25

                                2

SHONTA HENDERSON, As An Individual

BARKLEY
Court Reporters

```
 1   APPEARANCES:

 2   For Plaintiff:

 3   SHEGERIAN & ASSOCIATES
     BY:  Aaron Gbewonyo, Esq.
 4   225 Santa Monica Boulevard,
     Suite 700
 5   Santa Monica, California 90401
     (310) 860-0770
 6   Agbewonyo@shegerialaw.com

 7

     For Defendant:
 8
     SEYFARTH SHAW
 9   BY:  Aaron R. Lubeley, Esq.
     601 South Figueroa Street
10   Suite 3300
     Los Angeles, California 90017
11   (213) 270-9636
     Alubeley@seyfarth.com
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

SHONTA HENDERSON, As An Individual

BARKLEY
Court Reporters

```
 1                        I N D E X

 2    WITNESS                 EXAMINATION                PAGE

 3    SHONTA HENDERSON        By Mr. Gbewonyo              6

 4                           By Mr. Lubeley              56

 5                           By Mr. Gbewonyo             73

 6                           By Mr. Lubeley              77

 7

 8

 9

10

11                        E X H I B I T S

12    PLAINTIFF'S             DESCRIPTION                PAGE

13    NO. 1    Plaintiff Jayme Tipton's Second Amended Notice     7

14             Of Taking Deposition of Shonta Henderson:

15             Request for Production of Documents, 6 pages.

16    NO. 2    ATS Employee Handbook, 18 pages.          18

17    NO. 3    Doctor's return to work note 4/20/17, 1 page.   28

18    NO. 4    Doctor's return to work note 5/1/17, 1 page.    31

19    NO. 5    Doctor's return to work note 5/15/17, 1 page.   32

20    NO. 6    Plaintiff Jayme Tipton's Second Amended         35

21             Complaint for Damages, 26 pages.

22    NO. 7    E-mail from Moses Guillen to Shonta Henderson,  48

23             Subject: Jayme Tipton, dated 5/4/17, 1 page.

24    NO. 8    Separation of Employment letter dated 5/9/17,   52

25             1 page.
```

SHONTA HENDERSON, As An Individual

BARKLEY
Court Reporters

```
 1              C O N T I N U E D    E X H I B I T S

 2    PLAINTIFF'S              DESCRIPTION              PAGE

 3    NO. 9    US Termination ESF for Tipton Jayme Station:    70

 4             LAX 87, 1 page.

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

SHONTA HENDERSON, As An Individual

BARKLEY
Court Reporters

1  from?

2      A    The computer learning center.

3      Q    And when did you receive your associate's degree?

4      A    In the late 90s.

5      Q    Okay.  And do you hold any professional licenses?

6      A    No.

7      Q    What about any professional certificates?

8      A    No.

9           MR. LUBELEY:  Not sure?

10          THE WITNESS:  No.

11 BY MR. GBEWONYO:

12     Q    Are you a member of any professional organizations?

13     A    No.

14     Q    And who is your current employer?

15     A    Airport Terminal Services.

16     Q    And what is your current position at Airport

17 Terminal Services?

18     A    Human resources generalist, admin assistant.

19     Q    And how long have you served in the capacity as

20 human resources generalist?

21     A    With Airport Terminal Services?

22     Q    Yes.

23     A    Just over three years.

24     Q    So approximately 2015, 2016?

25     A    2016.

9

BARKLEY
Court Reporters

1   BY MR. GBEWONYO:

2       Q    Okay.  So.  Again, as it relates to this April 19th

3   note, were you ever informed that this note was brought to

4   ATS regarding plaintiff's injury?

5       A    No.

6       Q    So the doctor reads, "Ora then called Neri, who

7   instructed Ora to make copies of plaintiff's medical doctor's

8   note and instructed Ora to leave them for him so that they

9   could be added to plaintiff's employee file."  Do you see

10  that?

11      A    Yes.

12      Q    Okay.  Plaintiff then asked Ora, who was still on

13  the phone with Neri to ask Neri whether she could be approved

14  to work light duty, because she still desired to work.  Are

15  you aware whether ATS offers injured employees light duty?

16          MR. LUBELEY:  I'm going to object.  That prior

17  statement lacks foundation.  You can answer the question.

18          THE WITNESS:  Am I aware if --

19          MR. LUBELEY:  I'm going to object.  Vague and

20  ambiguous, and compound.

21          THE WITNESS:  If -- you're asking if ATS offers

22  light duty to employees?

23  BY MR. GBEWONYO:

24      Q    Correct.

25      A    I mean, if light duty was available.

43

BARKLEY
Court Reporters

1    Q    And what do you mean by "if light duty was

2    available"?

3    A    If there was a task that an employee could perform,

4    you know, if they could perform their duties, you know, as a

5    light duty.   Depends on what the restrictions were.

6    Q    But that would, of course, require a conversation;

7    is that correct?

8    A    Correct.

9    Q    Are you aware whether anyone had a conversation with

10   plaintiff about whether she could perform light duties?

11   A    No.

12   Q    Were you ever informed of plaintiff inquiring about

13   light duties?

14   A    No.

15   Q    If plaintiff had inquired light duty, is that a

16   discussion that you as human resources would be involved in?

17   A    Possibly.  I would possibly be involved, yes.

18   Q    Have you ever been involved in the past with

19   providing groomers with an ATS with light duties?

20   A    Me specifically?  No.  It's up to the department if

21   they can accommodate the light duties.

22   Q    Have you ever been informed of groomers within ATS

23   of having light duties?

24   A    I cannot say that I've been advised or informed of

25   any agents that are requiring light duty.

44

SHONTA HENDERSON, As An Individual

BARKLEY
Court Reporters

1    Q    Okay.  Did she mention that she was still out

2  because of her doctor's note and that she was injured?

3    A    I don't recall that.

4    Q    We can put this to the side.  I believe you

5  testified earlier that the plaintiff could be rehired; is

6  that correct?

7    A    Correct.

8    Q    Okay.  And do you remember communicating that to the

9  plaintiff?

10    A    Yes.

11    Q    Okay.  Did you have any subsequent communications

12  with the plaintiff whether verbally or in writing after that

13  May phone call?

14    A    I did.

15    Q    Okay.  And what communications did you have with the

16  plaintiff after that?

17    A    I sent her the letter requiring her or asking if she

18  could come down and bring me her badge.

19    Q    Did you send any other letters other than that

20  letter that you're referring to?

21    A    No.

22    Q    Do you recall ever sending anything to the plaintiff

23  in writing that she was -- could be eligible for rehire?

24    A    No.

25    Q    Is there any particular reason why you didn't send

46

BARKLEY
Court Reporters

1    in California a new contract or was that a renewed contract?

2        A    It was a new contract.

3        Q    So was it just Copa and Jet Blue that were new

4    contracts at that time?

5        A    Yes.  I'm sorry, go ahead.

6        Q    After you.

7        A    Copa did not have groomers.  Those were only ramp

8    agents.

9        Q    So when you're referring to ongoing recruitment

10   efforts, were you referring to both Copa and Jet Blue, or

11   were you referring to Jet Blue specifically?

12       A    Specifically to Jet Blue.

13       Q    And when you're referring to those positions

14   specific for Jet Blue, were you referring specifically

15   groomers?

16       A    Correct.

17       Q    Okay.  And have you seen Exhibit 8 before?

18       A    Yes.

19       Q    Okay.  And Exhibit 8 appears to be a separation of

20   employment sent to plaintiff by you on May 9th; correct?

21       A    Correct.

22       Q    And do you recall how long after you had that phone

23   call with plaintiff this letter was sent?

24       A    It would have been about the next day.

25       Q    Okay.  And so on this letter dated May 9th, 2017 to

53

SHONTA HENDERSON, As An Individual

BARKLEY
Court Reporters

1    Q    And in fact, when I talked about a return to work

2    day, when you called her on May 8th, did you inquire whether

3    she was expected or knew when she would come back to work?

4    A    I asked her that, and she didn't know when she was

5    able to return.

6    Q    Did she explain to you why if she gave a note for

7    May 15th that, at that point of that call, she didn't know

8    when she could return?

9    A    No.

10   Q    No?

11   A    No.

12   Q    Were you aware that Ms. Tipton remained on leave for

13   almost another year after that?

14   A    No.

15   Q    Do you know when Ms. Tipton was finally cleared to

16   return to work?

17        MR. GBEWONYO:  Objection.  Calls for speculation.

18        THE WITNESS:  No.

19   BY MR. LUBELEY:

20   Q    If you take a look at the leave of absence policy --

21   I want you to read that.  Are you familiar with that policy?

22   A    Yes, I am.

23   Q    And what is that policy?

24   A    Basically, the company can allow an employee to take

25   a personal leave of absence, not necessarily medical related,

60

SHONTA HENDERSON, As An Individual

BARKLEY
Court Reporters

1  but a personal leave of absence if it doesn't place undue

2  hardship on the company.  But in this case, for sure, it

3  would have placed undue hardship on the company because of

4  the way the contract was written.

5      Q    Explain to me this undue hardship.  Why was it undue

6  hardship?

7      A    Because we had to have so many cabin grooming agents

8  in the position per the contract.  And so with her position

9  being open, we wouldn't have had -- I wouldn't be able to

10  fulfill our contract to service our client.

11      Q    Prior to you learning that Ms. Tipton had been out

12  on a leave of absence, whether it was approved, protected,

13  non-protected, just that she was out, had you been

14  interviewing people?

15      A    Yes.

16      Q    In fact, didn't you hire people even during this

17  time to fill the open position?

18      A    I did.  At least one person.

19      Q    Why wouldn't it be appropriate to just leave her

20  position open during this time, you know, as you're

21  interviewing until you filled it?

22          MR. GBEWONYO:  Objection.  Asked and answered.

23          THE WITNESS:  Because the contract -- the way the

24  contract states, we have to have so many agents, groomers

25  specifically, and groomers and ramp agents in positions in

61

SHONTA HENDERSON, As An Individual

BARKLEY
Court Reporters

1    order to service the contract.

2    BY MR. LUBELEY:

3        Q    What happens if you violate that contract?

4        A    We failed.  It's against the company's procard and

5    more than likely, it reduces our ability to be able to

6    service them.  We could possibly lose the contract.

7        Q    Lose the contract and all of those employees would

8    be out of work; right?

9        A    Everyone.

10       Q    And at the time that Ms. Tipton had her injuries,

11   were you short staffed?

12       A    We were.

13       Q    And how many employees were you short staffed at

14   that time at the groomer level?

15       A    Three.  I'm trying to think.  It was three.

16       Q    Okay.  Now, this leave of absence policy here on

17   Page 8, this talks about -- this is a broad leave of absence

18   discussion?

19       A    Right.

20       Q    This outlines the number of different leaves of

21   absences that are available to an employee; doesn't it?

22       A    Correct.

23       Q    And it says, the third paragraph says, "Employees

24   may take a leave of absence for the following reasons as

25   outlined below: Family medical leave."  Did Ms. Tipton take a

62

BARKLEY
Court Reporters

1   resigned.  She had an injury away from work, which our tenure

2   didn't allow for any protected leave, but we would rehire.

3           MR. LUBELEY:  I would like to mark the next exhibit

4   as document Bates No. ATS 000115.

5           THE REPORTER:  Mark it 9, next in order?

6           MR. LUBELEY:  Yeah.

7           MR. GBEWONYO:  I'm going to object that it's not

8   produced.

9           MR. LUBELEY:  It's been produced.

10          (Plaintiff's Exhibit 9 was marked

11          for identification.)

12  BY MR. LUBELEY:

13      Q   Why don't you look at this document?  What does

14  Exhibit 9 reflect to you?

15      A   A voluntary resignation indicating that I would

16  rehire her.

17      Q   Does this appear to be an e-mail?  It says from

18  noreply@ATSconnect.com?

19      A   Yes.

20      Q   What is that?

21      A   That is the system where all separations are

22  processed through.

23      Q   And who processes it?

24      A   It had to have gone through payroll.

25      Q   Who typed this?

70

BARKLEY
Court Reporters

1    A    No.

2    Q    So when you testified earlier that it could take

3    weeks to fill a position, what's the reason for that?

4    A    The high security factors of getting through the

5    airport authority, the LAX World Airport Authority, meaning

6    that they have to get a fingerprint clearance that can take

7    up to 30 days.

8    Q    So it's the background process that takes a long

9    time?

10   A    Through the airport authority.

11   Q    Okay.  Do you have a number of people that you'd

12   want to hire, but for some reason, they can't get through

13   that background process?

14   A    Yeah, I would say that.

15   Q    Okay.  Is it pretty often?

16   A    If happens every now and then.

17         MR. GBEWONYO:  No further questions.  Did you?

18                     EXAMINATION

19         MR. LUBELEY:  Yeah, I just have one follow up.

20   BY MR. LUBELEY:

21   Q    Is part of the reason why you can't hire temporary

22   employees due to the high security nature?

23   A    More than likely of them getting --

24         MR. GBEWONYO:  Objection.  Calls for speculation.

25         THE WITNESS:  Them being able to obtain a clearance,

77

SHONTA HENDERSON, As An Individual

BARKLEY
Court Reporters

1    possibly.

2          MR. GBEWONYO:    Same objection.

3    BY MR. LUBELEY:

4      Q    And all employees that are at the airport have to

5    undergo very strict security requirements at the airport?

6      A    Yes.

7          MR. GBEWONYO:    Overbroad.    Calls for speculation.

8    BY MR. LUBELEY:

9      Q    Background checks?

10     A    Their background checks, the airport authority's.

11     Q    Drug tests?

12     A    That would be ATS, and that issue is listed.

13     Q    And they get issued security clearance by the

14   airport?

15     A    Yes.

16     Q    And does -- what are the requirement of an employee

17   that is out on an extended leave?

18     A    They have to return their badge to me.

19     Q    And they have to be deactivated as an inactive

20   employee?

21     A    That is correct.

22          MR. LUBELEY:    I have no further questions.    Do you

23   want to talk about how long we have the transcript?

24          MR. GBEWONYO:    As far as the transcript, I think

25   both parties have to order a copy?

78

SHONTA HENDERSON, As An Individual

BARKLEY
Court Reporters

1        I certify (or declare) under penalty of

2  perjury under the laws of the State of California

3  that the foregoing is true and correct.

4

5  Executed at _____ on _____.
                      (Place)             (Date)

6

7                _____
                 (Signature of Deponent)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

80

SHONTA HENDERSON, As An Individual

BARKLEY
Court Reporters

```
 1                DEPOSITION OFFICER'S CERTIFICATE

 2   STATE OF CALIFORNIA    )
                            ) ss.
 3   COUNTY OF LOS ANGELES  )

 4

 5

 6        I, Joy Chiou, hereby certify:

 7        I am a duly qualified Certified Shorthand

 8   Reporter in the State of California, holder of

 9   Certificate Number CSR 13899 issued by the Certified Court

10   Reporters' Board of California and which is in full

11   force and effect.  (Fed. R. Civ. P. 28(a)(1)).

12        I am authorized to administer oaths or

13   affirmations pursuant to California Code of Civil

14   Procedure, Section 2093(b) and prior to being examined,

15   the witness was first duly sworn by me.  (Fed. R. Civ.

16   P. 28(a)(a)).

17        I am not a relative or employee or attorney or

18   counsel of any of the parties, nor am I a relative or

19   employee of such attorney or counsel, nor am I

20   financially interested in this action.  (Fed. R. Civ. P.

21   28).

22        I am the deposition officer that

23   stenographically recorded the testimony in the foregoing

24   deposition and the foregoing transcript is a true record

25                        / / /
```

SHONTA HENDERSON, As An Individual

BARKLEY
Court Reporters

1   of the testimony given by the witness.  (Fed. R. Civ. P.

2   30(f)(1)).

3         Before completion of the deposition, review of

4   the transcript [xx] was [  ] was not requested.  If

5   requested, any changes made by the deponent (and

6   provided to the reporter) during the period allowed, are

7   appended hereto.  (Fed. R. Civ. P. 30(e)).

8

9   Dated: December 9, 2019

10

11

12

13

14

15   _____

16

17

18

19

20

21

22

23

24

25

82

SHONTA HENDERSON, As An Individual

BARKLEY
Court Reporters

## ERRATA SHEET
### CHANGES IN TESTIMONY

JAYME TIPTON  v.  AIRPORT TERMINAL SERVICES, INC.
SHONTA HENDERSON, As An Individual
November 22, 2019

| PAGE | LINE | FROM | TO |
|------|------|------|-----|
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |

_____        _____

SIGNATURE OF WITNESS                    DATE



**Airport Terminal Services**
111 Westport Plaza Drive, Suite 400
Saint Louis, Missouri 63146
314.739.1900
www.ATSSTL.com

May 9, 2017

Jayme Tipton

Palmdale, Ca 93550

*Plaintiff's* Exhibit _8_
Date: _11/24/2019_
Depo/Case: _Henderson, Individual_
Joy Chiou, CSR #13899

RE: Separation of Employment                    cc: personnel file

Dear Ms. Tipton:

Your employment recently ended with Airport Terminal Services. At the time of your separation, you did not turn in your Airport ID Badge issued by Los Angeles International Airport. As indicated in your security training, this badge is Federal property and belongs to Los Angeles International Airport and, as such, must be returned to ATS immediately so that we may then return it to the Airport Badge Office.

You must contact ATS at 310-417-5110 within three (3) business days of receiving this letter so that we can make arrangements to obtain your badge. Or to make it as easy as possible, **you may mail the badge back to us in the enclosed self-addressed envelope. Just cut your badge in half and return it using the envelope.**

If we do not receive your badge, we have no alternative but to notify the Los Angeles International Airport badge office and the Police Department that you are refusing to return your badge. This may result in a police report of stolen Federal property and legal action may be initiated to include, but not limited to, fines and court fees.

This is a very serious matter and I cannot stress enough, to avoid the hassle for all parties involved, to contact us immediately to arrange the return of your badge. It does not matter what condition the badge is in. Please contact us at the above number immediately.

In the event that the sending of this letter and the return of your badge has crossed, please disregard this notice.

Thank you in advance for your cooperation,

Sincerely,

Shonta Henderson
LAX HRG/A
Airport Terminal Services





**From:** noreply@atsconnect.com [mailto:noreply@atsconnect.com]
**Sent:** Tuesday, May 09, 2017 5:27 PM
**Cc:** Schaefer, Karen <kschaefer@atsstl.com>; Henderson, Shonta <shenderson1@atsstl.com>; Wilson, Sue <swilson@atsstl.com>; USsepESF <USsepESF@atsstl.com>
**Subject:** US Termination ESF for: Tipton, Jayme Station: LAX87

Termination ESF for Tipton Jayme @ LAX87
Completed By: Shonta Henderson @ 5/9/2017 6:26:36 PM

*Plaintiff's Exhibit 9*
*Date 11/22/2019*
*Depo/Case: Shonta Henderson, Individual*
*Joy Chiou, CSR #13899*

Last Name: Tipton
First Name: Jayme, D
Employee ID: 0029942

Date of Termination: 04/17/2017
Last Day Worked: 04/14/2017
Home Phone: ██████
Address on file correct: Y

Section 2: Termination Specific:
Reason for Termination: 77 -Other -Voluntary. Will Rehire
Eligible for Rehire: Y
Termination Type: Voluntary
Unionized Station: N

Uniforms Returned: N
Not returned
Airport Badge Returned: N

Other Items Returned: N/A

Remarks:
EE suffered a non work related injury. Department unable to accommodate and EE's tenure doesn't offer any protected leave. EE resigns and will reapply when able to return to full duty, no restrictions.

2

>ATS 000115

# EXHIBIT

# 6

CERTIFIED COPY

1          UNITED STATES DISTRICT COURT

2     CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

3

4    JAYME TIPTON,                    )
                                      )
5              Plaintiff,             )
                                      )
6         vs.                         )    No. 2:18-cv-09503-
                                      )       AB-JEM
7    AIRPORT TERMINAL SERVICES, INC., )
     EDGAR TRUJILLO, MELISSA DOE, and )
8    DOES 1 to 100, inclusive,        )
                                      )
9              Defendants.            )
     _____)

10

11

12

13              DEPOSITION OF DAMIAN NERI

14                 November 25, 2019

15

16

17

18

19

20

21

22

23

24   Theresa JoAnn Phillips-Blackwell, CSR No. 12700
     458760

25

SINCE 1972 ✪

BARKLEY
Court Reporters
barkley.com

(310) 207-8000 Los Angeles    (415) 433-5777 San Francisco    (949) 955-0400 Irvine           (858) 455-5444 San Diego
(310) 207-8000 Century City   (408) 885-0550 San Jose         (760) 322-2240 Palm Springs      (800) 222-1231 Carlsbad
(916) 922-5777 Sacramento     (800) 222-1231 Martinez         (702) 366-0500 Las Vegas         (800) 222-1231 Monterey
(951) 686-0606 Riverside      (818) 702-0202 Woodland Hills   (702) 366-0500 Henderson         (516) 277-9494 Garden City
(212) 808-8500 New York City  (347) 821-4611 Brooklyn         (518) 490-1910 Albany            (914) 510-9110 White Plains
(312) 379-5566 Chicago        00+1+800 222 1231 Paris         00+1+800 222 1231 Dubai          001+1+800 222 1231 Hong Kong

1                    UNITED STATES DISTRICT COURT

2          CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

3

4    JAYME TIPTON,                    )
                                      )
5                  Plaintiff,         )
                                      )
6        vs.                          )   No. 2:18-cv-09503-
                                      )        AB-JEM
7    AIRPORT TERMINAL SERVICES, INC., )
     EDGAR TRUJILLO, MELISSA DOE, and )
8    DOES 1 to 100, inclusive,        )
                                      )
9                  Defendants.        )
     _____)

10

11

12

13        DEPOSITION OF DAMIAN NERI taken at 225 Santa

14    Monica Boulevard, Seventh Floor, Santa Monica,

15    California, at 2:10 p.m., Monday, November 25,

16    2019, before Theresa JoAnn Phillips-Blackwell,

17    CSR 12700.

18

19

20

21

22

23

24

25

2

DAMIAN NERI

BARKLEY
Court Reporters

```
1    APPEARANCES OF COUNSEL:

2

3

4    For Plaintiff:

5

6                    AARON ESLAMBOLY, ESQ.

7                    SHEGERIAN & ASSOCIATES, INC.

8                    225 Santa Monica Boulevard

9                    Suite 700

10                   Santa Monica, California  90401

11                   (310) 860-0770

12

13   For Defendants:

14

15                   MEAGAN SUE O'DELL, ESQ.

16                   SEYFARTH SHAW LLP

17                   601 South Figueroa Street

18                   Suite 3300

19                   Los Angeles, California  90017

20                   (213) 270-9649

21                   modell@seyfarth.com

22

23

24

25
```

3

**BARKLEY**
Court Reporters

```
 1                        I N D E X

 2

 3   DEPONENT              EXAMINED BY            PAGE

 4   Damian Neri          Mr. Eslambolly         5, 90

 5                        Ms. O'Dell             88

 6

 7

 8                         EXHIBITS

 9

10   PLAINTIFF                                    PAGE

11   1 - Plaintiff Jayme Tipton's First Amended   11
         Notice Of Taking Deposition Of Damian
12       Neri; Request For Production Of
         Documents
13
     2 - Doctor's Note                            60
14
     3 - Doctor's Note                            66
15
     4 - Doctor's Note                            67
16
     5 - Plaintiff Jayme Tipton's Second          77
17       Amended Complaint

18   6 - Written Warning Notice - U.S.            87

19

20

21

22

23

24

25
```

4

DAMIAN NERI

BARKLEY
Court Reporters

1       A.  Trujillo.

2       Q.  Trujillo?

3       A.  Uh-huh.

4       Q.  Is that T-r-u-j-i-l-l-o?

5       A.  T-r-u-g-i-l-l-o.

6       Q.  And what was Edgar's position?

7       A.  Supervisor.

8       Q.  What's your current title with ATS?

9       A.  Supervisor.

10      Q.  And the steps to get to supervisor from ramp

11  agent -- what are they?

12      A.  Start as a ramp agent, then a lead, then a

13  supervisor.

14      Q.  Is a supervisor the same thing as a operations

15  manager?

16      A.  No.

17      Q.  Is there another name for a supervisor?

18      A.  Well, there is -- there's ramp supervisor, and

19  then there's ramp grooming and different titles.  That's

20  as supervisors.

21      Q.  So your supervisor title currently is --

22      A.  Ramp.

23      Q.  -- ramp supervisor?

24      A.  Yes.  Well, take it back.  Tow operator

25  supervisor.

18

DAMIAN NERI

BARKLEY
Court Reporters

```
 1        A.   No.
 2        Q.   So it was a separate supervisor position?
 3        A.   No.  So when -- when I got promoted to
 4   supervisor, he was a manager already.
 5        Q.   Oh, he had --
 6        A.   Yeah.  He went --
 7        Q.   He had been promoted himself?
 8        A.   Ramp manager.
 9        Q.   When you became a ramp supervisor, who did you
10   report to?
11        A.   Edgar Trujillo.
12        Q.   Is he the only person?
13        A.   Yes.
14        Q.   And how many people reported to you -- how many
15   people did you supervise as a ramp supervisor?
16        A.   I don't recall.
17        Q.   Was it less than 50 people?
18             MS. O'DELL:  May call for speculation.
19             Don't guess.  But if you can estimate, that's
20   fine.
21             THE WITNESS:  Fifteen.
22   BY MR. ESLAMBOLY:
23        Q.   What are your responsibilities as a ramp
24   supervisor?
25        A.   Make sure the ramp operation goes smooth and
```

24

BARKLEY
Court Reporters

1  well.  And safety, which the ramp agents leads as well.

2      Q.  What were your responsibilities as a lead?

3      A.  Making sure the flight goes out on time,

4  everybody's -- then safety.

5      Q.  As a ramp supervisor, did you have any duties

6  with respect to the people you -- the 15 people you

7  supervise?

8      A.  Can you repeat that.

9      Q.  Sure.  When it comes to your duties, did you

10  have any duties that related to the 15 people you

11  supervised?

12          MS. O'DELL:  Objection.  Vague and ambiguous.

13          If you understand, you can answer.

14          THE WITNESS:  No, I don't understand it.

15  BY MR. ESLAMBOLY:

16      Q.  So as a supervisor, you have about 15 people

17  who work under you; right?

18      A.  Yes.

19      Q.  How do you interact with those people?

20      A.  Just workers?

21      Q.  Yes, the workers.  How do you interact with

22  them?

23      A.  "Hi.  How is it going?"  Polite.

24  Everything's...

25      Q.  Do you ever direct them to do certain tasks?

25

DAMIAN NERI

BARKLEY
Court Reporters

1      A.   They vacuum.   They wipe the windows.   They pick

2   up trash.

3      Q.   And for ramp agents, what were their duties?

4      A.   Their duties are to offload cargo and bags and

5   load them.

6      Q.   And what were the general duties for leads?

7      A.   Leads.   To run the flights, make sure the

8   flight goes smooth, everything goes to their -- their

9   bins correctly, the weight -- weight and balance, and

10  all that stuff.

11     Q.   To -- does the position of groomer require

12  special training?

13         MS. O'DELL:   Objection.   May call for

14  speculation.

15         THE WITNESS:   Yes.

16  BY MR. ESLAMBOLY:

17     Q.   Okay.   What kind of training is that?

18         MS. O'DELL:   Again, may call for speculation.

19         Go ahead.

20         THE WITNESS:   They do watch a video about

21  how -- they show them how to do their pickup, how to

22  move their -- because they also do -- they put blankets

23  in the aircraft; so they got to know how they put the

24  blankets, the pillows, how to do a security search.   So

25  there is a video that they show them how to do that

32

BARKLEY
Court Reporters

1    stuff.

2    BY MR. ESLAMBOLY:

3        Q.    Do they get certified?

4        A.    Yes.

5        Q.    Who certifies them?

6            MS. O'DELL:    May call for speculation.

7            THE WITNESS:    The airline.

8    BY MR. ESLAMBOLY:

9        Q.    Do they get a certificate?

10           MS. O'DELL:    May call for speculation.

11           THE WITNESS:    I don't recall.

12   BY MR. ESLAMBOLY:

13       Q.    How do you know if someone is certified or not?

14       A.    They sign a sheet.    And that's when I say I

15   don't recall on the certificate because I'm not -- I

16   don't remember they do get a certificate.

17       Q.    Is it someone from the airline that does the

18   certification?

19       A.    Yes.

20       Q.    Your position, ramp supervisor -- does it

21   require any special training?

22       A.    Yes.

23       Q.    What kind of training is that?

24       A.    It's also a video.    The supervisor take a

25   video.    And it's a class as well -- a group of class --

33

BARKLEY
Court Reporters

```
 1        Q.   And what's her position?

 2        A.   What was her position?

 3        Q.   Yes.

 4        A.   Groomer.

 5        Q.   She was under your supervision?

 6        A.   Yes.

 7        Q.   And the type of work she did as a groomer is

 8   what we've talked about already; right?

 9        A.   Yes.

10        Q.   You're familiar with what those duties were?

11        A.   Yes.

12        Q.   Were you familiar with her performance in those

13   duties?

14        A.   Yes.

15        Q.   How did she perform her duties?

16             MS. O'DELL:   Vague as phrased.

17             Go ahead.

18             THE WITNESS:   Well, the lead will tell me

19   because I will -- I will not go up there a lot because I

20   had the lead.   If there was any issue with them, then

21   that's where the lead will tell me.

22             But she'll -- she'll be taking care of

23   everything.   There was almost no issues with the

24   groomers.

25   ///
```

DAMIAN NERI

BARKLEY
Court Reporters

1              I certify (or declare) under penalty of

2     perjury under the laws of the State of California

3     that the foregoing is true and correct.

4

5     Executed at _____ on _____.
                          (Place)                    (Date)

6

7                    _____
                          (Signature of Deponent)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

92

DAMIAN NERI

BARKLEY
Court Reporters

```
 1                  DEPOSITION OFFICER'S CERTIFICATE

 2

 3      STATE OF CALIFORNIA       }
                                  }   ss.
 4      COUNTY OF LOS ANGELES     }

 5

 6           I, THERESA JOANN PHILLIPS-BLACKWELL, hereby

 7      certify:

 8           I am a duly qualified Certified Shorthand

 9      Reporter in the State of California, holder of

10      Certificate Number CSR 12700 issued by the Court

11      Reporters Board of California and which is in full force

12      and effect.  (Fed. R Civ. P. 28(a)).

13           I am authorized to administer oaths or

14      affirmations pursuant to California Code of Civil

15      Procedure, Section 2093(b) and prior to being examined,

16      the witness was first duly sworn by me.  (Fed. R. Civ.

17      P. 28(a), 30(f)(1)).

18           I am not a relative or employee or attorney or

19      counsel of any of the parties, nor am I a relative or of

20      such attorney or counsel, nor am I financially

21      interested in this action.  (Fed. R. Civ. P. 28).

22           I am the deposition officer that

23      stenographically recorded the testimony in the foregoing

24      deposition and the foregoing transcript is a true record

25                            ///
```

93

BARKLEY
Court Reporters

1    of the testimony given by the witness.  (Fed. R. Civ. P.

2    30(f)(1)).

3         Before Completion of the deposition, review of

4    the transcript {xx} was {  } was not requested.  If

5    requested, any changes made by the deponent (and

6    provided to the reporter) during the period allowed, are

7    appended hereto.  (Fed. R. Civ. P. 30(e)).

8

9    Dated: December 23, 2019

10

11   _____

12

13

14

15

16

17

18

19

20

21

22

23

24

25

94

DAMIAN NERI

BARKLEY
Court Reporters

ERRATA SHEET
CHANGES IN TESTIMONY

JAYME TIPTON v. AIRPORT TERMINAL SERVICES, INC.
DAMIAN NERI
November 25, 2019


PAGE        LINE        FROM                                    TO

_____     _____     _____           _____

_____     _____     _____           _____

_____     _____     _____           _____

_____     _____     _____           _____

_____     _____     _____           _____

_____     _____     _____           _____

_____     _____     _____           _____

_____     _____     _____           _____

_____     _____     _____           _____

_____     _____     _____           _____

_____     _____     _____           _____

_____     _____     _____           _____

_____     _____     _____           _____

_____     _____     _____           _____


                  _____            _____

                  SIGNATURE OF WITNESS                DATE

# EXHIBIT

# 7

**CERTIFIED COPY**

1          UNITED STATES DISTRICT COURT

2     CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

3

4    JAYME TIPTON,                      )
                                        )
5              Plaintiff,               )
                                        )
6         vs.                           )   No. 2:18-cv-09503-
                                        )        AB-JEM
7    AIRPORT TERMINAL SERVICES, INC.,   )
     EDGAR TRUJILLO, MELISSA DOE, and   )
8    DOES 1 to 100, inclusive,          )
                                        )
9              Defendants.              )
     _____)

10

11

12

13          DEPOSITION OF MOSES GUILLEN

14             November 25, 2019

15

16

17

18

19

20

21

22

23

24   Theresa JoAnn Phillips-Blackwell, CSR 12700.
     458759

25

SINCE 1972

BARKLEY
Court Reporters
barkley.com

(310) 207-8000 Los Angeles      (415) 433-5777 San Francisco    (949) 955-0400 Irvine          (858) 455-5444 San Diego
(310) 207-8000 Century City     (408) 885-0550 San Jose         (760) 322-2240 Palm Springs     (800) 222-1231 Carlsbad
(916) 922-5777 Sacramento       (800) 222-1231 Martinez         (702) 366-0500 Las Vegas        (800) 222-1231 Monterey
(951) 686-0606 Riverside        (818) 702-0202 Woodland Hills   (702) 366-0500 Henderson        (516) 277-9494 Garden City
(212) 808-8500 New York City    (347) 821-4611 Brooklyn         (518) 490-1910 Albany           (914) 510-9110 White Plains
(312) 379-5566 Chicago          00+1+800 222 1231 Paris         00+1+800 222 1231 Dubai         001+1+800 222 1231 Hong Kong

1               UNITED STATES DISTRICT COURT

2       CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

3

4    JAYME TIPTON,                    )
                                      )
5              Plaintiff,             )
                                      )
6       vs.                          )   No. 2:18-cv-09503-
                                      )      AB-JEM
7    AIRPORT TERMINAL SERVICES, INC., )
     EDGAR TRUJILLO, MELISSA DOE, and )
8    DOES 1 to 100, inclusive,        )
                                      )
9              Defendants.            )
     _____)

10

11

12

13        DEPOSITION OF MOSES GUILLEN taken at 225 Santa

14    Monica Boulevard, Seventh Floor, Santa Monica,

15    California, at 10:27 a.m., Monday,

16    November 25, 2019, before Theresa JoAnn

17    Phillips-Blackwell, CSR 12700.

18

19

20

21

22

23

24

25

                            2

MOSES GUILLEN

BARKLEY
Court Reporters

```
 1    APPEARANCES OF COUNSEL:

 2

 3

 4    For Plaintiff:

 5

 6                    AARON ESLAMBOLY, ESQ.

 7                    SHEGERIAN & ASSOCIATES, INC.

 8                    225 Santa Monica Boulevard

 9                    Suite 700

10                    Santa Monica, California   90401

11                    (310) 860-0770

12

13    For Defendants:

14

15                    MEAGAN SUE O'DELL, ESQ.

16                    SEYFARTH SHAW LLP

17                    601 South Figueroa Street

18                    Suite 3300

19                    Los Angeles, California   90017

20                    (213) 270-9649

21                    modell@seyfarth.com

22

23

24

25
```

3

BARKLEY
Court Reporters

```
1                           I N D E X

2

3    DEPONENT                EXAMINED BY              PAGE

4    Moses Guillen          Mr. Eslamboly           5, 124

5                           Ms. O'Dell                124

6

7                           EXHIBITS

8

9    PLAINTIFF                                       PAGE

10   1 - Plaintiff Jayme Tipton's First Amended     15
         Notice Of Taking Deposition Of Moses
11       Gillian [sic]; Request For Production
         Of Documents
12
     2 - Doctor's Note                               80
13
     3 - Doctor's Note                               87
14
     4 - Doctor's Note                               90
15
     5 - E-Mail Dated May 4, 2017                    100
16
     6 - Plaintiff Jayme Tipton's Second Amended    104
17       Complaint
18   7 - E-Mail Dated May 9, 2017                    119

19   8 - E-Mail Dated May 4, 2017, with             125
         Attachment
20

21

22

23

24

25
```

4

MOSES GUILLEN

BARKLEY
Court Reporters

1   a doctor's note or if they have any challenges in the

2   operation, if they want to grow within the company as

3   well, extra training, you know.

4       Q.   Would you classify this position as a human

5   resources position?

6       A.   No.

7       Q.   How is it different than human resources?

8            MS. O'DELL:   Objection.  May be --

9            THE WITNESS:  I don't know.

10           MS. O'DELL:   -- outside his personal knowledge.

11  BY MR. ESLAMBOLY:

12      Q.   What was your answer?

13      A.   I don't know.

14      Q.   Did you have any hiring or firing ability?

15      A.   No.

16      Q.   So when you're dealing with these employee

17  relations where -- if an employee comes to you and says

18  they have an issue -- if they come to you, do you

19  immediately know who that employee is?

20           MS. O'DELL:   Incomplete hypothetical.  And

21  vague.

22           If you understand the question, you can

23  respond.

24           THE WITNESS:  By knowing them -- their name.

25  ///

MOSES GUILLEN

BARKLEY
Court Reporters

1    May 2017?

2         A.   I don't recall the exact dates, but that sounds

3    about the time that I was under that station.

4         Q.   Do you remember when you moved to Station 86?

5         A.   I don't recall the exact date.

6         Q.   So those dates that I just read off,

7    October 2016 to May 2017 -- you were the ramp manager at

8    that time; is that right?

9         A.   I believe so.

10        Q.   Okay.  So in this position, while at

11   Station 087 -- I'm just going to call it Station 87 --

12   who would -- what types -- strike that.

13        While you were working at Station 87, what were

14   the titles of employees who would come to you?

15        MS. O'DELL:  Object that it's vague and

16   overbroad.

17        But go ahead.  You can respond.

18        THE WITNESS:  Anywhere from grooming agents,

19   ramp agents, leads, supervisors.

20   BY MR. ESLAMBOLY:

21        Q.   Is there any other position that you can think

22   of?

23        A.   Safety trainer officer.

24        Q.   That's going to be the next one I asked.

25        A.   Yeah.

41

MOSES GUILLEN

BARKLEY
Court Reporters

1  a medical opinion.  Lack of personal knowledge.

2  BY MR. ESLAMBOLY:

3      Q.  Go ahead.

4      A.  From what this statement -- or this letter is

5  saying that she is.

6      Q.  Okay.  Do you know how her injury occurred?

7      A.  No.

8      Q.  When her injury occurred were you not involved

9  in the process for reporting the injury?

10         MS. O'DELL:  Assumes facts not in evidence as

11  to where her injury occurred.

12         THE WITNESS:  To my knowledge -- to my

13  knowledge, I wasn't at work; so I didn't make any.

14  BY MR. ESLAMBOLY:

15      Q.  When you say you weren't at work, meaning, you

16  weren't on duty at that time?

17      A.  No.  Like, whatever was going on wasn't at work

18  with the injury.

19      Q.  You mean it was an off-duty injury?

20      A.  From my understanding.

21      Q.  So your understanding was her injury didn't

22  occur because of her job.  Is that what you're saying?

23      A.  To my knowledge.

24      Q.  How did you find out that she was injured?

25      A.  I was doing payroll, and I noticed she didn't

82

MOSES GUILLEN

BARKLEY
Court Reporters

1    have any time sheets on our payroll system, so I

2    notified HR.  And I don't really recall, but I think I

3    took the liberty to reach out to her to see what was

4    going on.

5        Q.  So you had a phone conversation with her?

6        A.  I think so.

7        Q.  What did she tell you?

8        A.  From -- I mean, it was a while ago; but I think

9    from what I recall, she was put off of work by her

10   doctor.  I don't know any details; but I just asked her,

11   I think -- just like I would ask anybody, What's going

12   on?  She just couldn't come into work because of

13   whatever was going on.

14       Q.  She told you she was injured?

15       A.  (No audible response.)

16       Q.  Did she tell you she was injured while on the

17   job?

18       A.  No.  She told me that there was something else

19   wrong with her.  It had nothing to do with work.

20       Q.  She said it had nothing to do with work?

21       A.  (No audible response.)

22           MS. O'DELL:  Is that a yes?

23           THE WITNESS:  Yes.

24   BY MR. ESLAMBOLY:

25       Q.  Do you remember when this conversation

83

MOSES GUILLEN

BARKLEY
Court Reporters

1   I certify (or declare) under penalty of perjury under

2   the laws of the State of California that the foregoing

3   is true and correct.

4

5   Executed at _____ on_____.
                        (Place)                        (Date)

6

7   _____
                    (Signature of Deponent)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

MOSES GUILLEN

BARKLEY
Court Reporters

```
 1              DEPOSITION OFFICER'S CERTIFICATE

 2    STATE OF CALIFORNIA    )
                             ) ss.
 3    COUNTY OF LOS ANGELES )

 4

 5

 6    I, Theresa Phillips-Blackwell, hereby certify:

 7          I am a duly qualified Certified Shorthand

 8    Reporter in the State of California, holder of

 9    Certificate Number CSR 12700 issued by the Certified Court

10    Reporters' Board of California and which is in full

11    force and effect.  (Fed. R. Civ. P. 28(a)(1)).

12          I am authorized to administer oaths or

13    affirmations pursuant to California Code of Civil

14    Procedure, Section 2093(b) and prior to being examined,

15    the witness was first duly sworn by me.  (Fed. R. Civ.

16    P. 28(a)(a)).

17          I am not a relative or employee or attorney or

18    counsel of any of the parties, nor am I a relative or

19    employee of such attorney or counsel, nor am I

20    financially interested in this action.  (Fed. R. Civ. P.

21    28).

22          I am the deposition officer that

23    stenographically recorded the testimony in the foregoing

24    deposition and the foregoing transcript is a true record

25                         / / /
```

131

MOSES GUILLEN

BARKLEY
Court Reporters

1   of the testimony given by the witness.  (Fed. R. Civ. P.

2   30(f)(1)).

3          Before completion of the deposition, review of

4   the transcript [XX] was [  ] was not requested.  If

5   requested, any changes made by the deponent (and

6   provided to the reporter) during the period allowed, are

7   appended hereto.  (Fed. R. Civ. P. 30(e)).

8   Dated: 12/12/19

9

10

11  _____

12

13

14

15

16

17

18

19

20

21

22

23

24

25

132

MOSES GUILLEN

BARKLEY
Court Reporters

# EXHIBIT

# 8

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA


IN RE MATTER OF:                    )
                                    )
JAYME TIPTON,                       )
                                    )
          Plaintiff,                )
                                    )
     vs.                            )     CASE NO.
                                    )     2:18-cv-09503-AB-JEM
                                    )
AIRPORT TERMINAL SERVICES,          )
INC., and DOES 1 to 100,            )
inclusive,                          )
                                    )
          Defendants.               )
_____)


DEPOSITION OF DEON KEITH BROWN

LOS ANGELES, CALIFORNIA

Wednesday, December 18, 2019




Stenographically Reported by:

HEATHER J. BAUTISTA, CSR, CRR, RPR

```
 1              DEPOSITION of DEON KEITH BROWN, taken before

 2    Heather J. Bautista, CSR No. 11600, a Certified

 3    Shorthand Reporter for the State of California, with

 4    principal office in the County of Santa Clara,

 5    commencing on Wednesday, December 18, 2019, 10:01 a.m.,

 6    at 601 South Figueroa Street, Suite 3300, Los Angeles,

 7    California 90017-5793.

 8

 9

10

11    APPEARANCES OF COUNSEL:

12

13         For the Plaintiff:

14              Shegerian & Associates, Inc.
                BY:  AARON GBEWONYO, ESQ.
15              225 Santa Monica Boulevard
                Suite 700
16              Santa Monica, California 90401
                Phone:  (310) 860-0770 / Fax:  (310) 860-0771
17              agbewonyo@shegerianlaw.com

18

19         For the Defendant:

20              Seyfarth Shaw LLP
                BY:  MEAGAN SUE O'DELL, ESQ.
21              601 South Figueroa Street
                Suite 3300
22              Los Angeles, California 90017-5793
                Phone:  (213) 270-9600 / Fax:  (213) 270-9601
23              modell@seyfarth.com

24

25
```

**Kusar** *Keeping Your Word Is Our Business* ℠

12/18/2019
Deon Keith Brown                    Jayme Tipton vs. Airport Terminal Services, Inc.                    1150037

```
 1                    INDEX OF EXAMINATION

 2                                               PAGE

 3   DEON KEITH BROWN

 4      EXAMINATION BY MS. O'DELL                 4

 5

 6

 7                      --oOo--

 8

 9

10                    INDEX OF EXHIBITS

11   Exhibit No.  Description                    Page

12   Exhibit 1    Notice of Deposition and Subpoena    7

13   Exhibit 2    Medical note from Tarzana Treatment  29
                  Centers
14
     Exhibit 3    Doctor's note                  33
15
     Exhibit 4    Doctor's note                  35
16
     Exhibit 5    Second Amended Complaint       52
17

18

19

20

21

22

23

24

25
```



3

```
 1    indicated she could return to work on April 20th.  Do

 2    you remember if she went to the doctor again after that,

 3    if she went back to work?

 4        A.   She went back to the doctor again after that.

 5    I drove to the doctor, and this time, I just basically

 6    took the paper -- I got the paperwork, because there was

 7    no point of me -- of her going all the way to the

 8    airport when I'm going there anyway.  So I basically got

 9    the paperwork, and I turned in the paper to Edgar.

10    That's who I gave the paperwork to.

11        Q.   When you say "paperwork," are you referring to

12    a doctor's note?

13        A.   Yes, a doctor's note.

14        Q.   Did that doctor's note also place Ms. Tipton

15    off work?

16        A.   Yes.

17             MS. O'DELL:  Mark as Exhibit 3.

18             (Exhibit 3 was marked for identification.)

19        Q.   (By Ms. O'Dell)  Please take a second and look

20    at Exhibit 3, and let me know, is this one of the notes

21    that you believe you turned in to ATS?

22        A.   Yes.

23        Q.   Do you remember who you gave Exhibit 3 to?

24        A.   I gave this paper right here to Edgar.

25        Q.   When did you give it to Edgar?
```

```
 1        A.    April 20th.

 2        Q.    What makes you think April 20th?

 3        A.    Because she went to the doctor the 19th?  Was

 4   it the 19th?  I'm not sure, but I know when I took her

 5   to the doctor, I got the paperwork, and I took it

 6   straight to work.  So I just know I turned this paper in

 7   to Edgar.

 8        Q.    But you're thinking maybe April 20 because it

 9   would have been the day after she went to the doctor?

10        A.    Yeah.  I'm not sure.  It's around that time,

11   that time frame, so --

12        Q.    Did you personally hand it to Edgar?

13        A.    Yes, I did.

14        Q.    What did Edgar say?

15        A.    He just said, "Thank you," and I went back to

16   work.

17        Q.    Did he ask you any questions about the note?

18        A.    No.

19        Q.    Did you ask him any questions?

20        A.    No.  Basically, because he already knew the

21   situation.  So I gave it to him, and he said, "All

22   right.  Thank you," and I left and went back to doing my

23   job.

24        Q.    Did you talk to anybody else about Exhibit 3 at

25   ATS?
```

**Kusar** *Keeping Your Word Is Our Business* ℠

1      A.    No.

2      Q.    Did you have any follow-up conversations with

3   Edgar about Exhibit 3?

4      A.    No.

5      Q.    And I think you mentioned paperwork.  I think

6   you were referring in the plural.  Was there potentially

7   another doctor's note that you provided?

8      A.    I turned in two papers.

9      Q.    Two papers?

10     A.    I turned in this one.  I think another one -- I

11  turned in another one, and I gave it to Damian.

12          MS. O'DELL:  We'll mark as Exhibit 4.

13          (Exhibit 4 was marked for identification.)

14     Q.    (By Ms. O'Dell)  Take a second, please, and

15  look at Exhibit 4 and let me know, does this look like

16  the other doctor's note that you were referring to?

17     A.    I'm not sure if it was this one or not, but I

18  know I turned in another paper, and I turned it in to

19  Damian, the supervisor.

20     Q.    When you say "paper," you're referring to a

21  doctor's note?

22     A.    Yeah.  I'm sorry, the doctor's note.

23     Q.    Is it your recollection that the first time you

24  brought a note to ATS, it went to Edgar, and the second

25  time you brought a note, it went to Damian?

1       A.    Yes.

2       Q.    Do you remember approximately when you gave the

3    note to Damian?

4       A.    I gave the note to Damian around my lunchtime.

5    I came in in the morning.  He was working.  I said,

6    "Hey.  I got Jayme's doctor's note."  And he told me

7    give it to him later.  So I gave it to him around, like,

8    maybe 12:30, my lunch break, and he took it.  I know I

9    gave it to him in the office, in Edgar's office, and

10   that was it.

11      Q.    At the time that you handed it to Damian, did

12   you have a conversation about the note?

13      A.    No.

14      Q.    Did Damian ask you any questions?

15      A.    No.

16      Q.    You literally just said, "Here's the note"?

17      A.    "Here you go," and I went to my lunch.

18      Q.    Was anybody else around at the time you gave it

19   to Damian?

20      A.    No.

21      Q.    Do you remember whether this was in April?

22   May?

23      A.    I would say around -- it's about April-ish,

24   maybe.

25      Q.    Okay.

Kusar® Keeping Your Word Is Our Business℠

```
 1                    DECLARATION OF WITNESS

 2

 3         I hereby declare I am the deponent in the
     within matter; that I have read the foregoing deposition
 4   and know the contents thereof, and I declare that the
     same is true of my knowledge except as to the matters
 5   which are therein stated upon my information or belief,
     and as to those matters, I believe them to be true.
 6         I declare under the penalties of perjury of the
     State of California that the foregoing is true and
 7   correct.

 8

         Executed this _____ day of _____,
 9
     20_____, at _____, _____.
10                 (City)                        (State)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Kusar   Keeping Your Word Is Our Business℠

12/18/2019
Deon Keith Brown                Jayme Tipton vs. Airport Terminal Services, Inc.                1150037

 1          I, HEATHER J. BAUTISTA, CSR No. 11600, Certified

 2     Shorthand Reporter, certify:

 3          That the foregoing  proceedings were taken before

 4     me at the time and place therein set forth, at which

 5     time the witness declared under penalty of perjury; that

 6     the testimony of the witness and all objections made at

 7     the time of the examination were recorded

 8     stenographically by me and were thereafter transcribed

 9     under my direction and supervision;

10          That the foregoing is a full, true, and correct

11     transcript of my shorthand notes so taken and of the

12     testimony so given;

13          (XX) Reading and signing was requested.

14          (  ) Reading and signing was waived.

15          (  ) Reading and signing was not requested.

16          I further certify that I am not financially

17     interested in the action, and I am not a relative or

18     employee of any attorney of the parties, nor of any of

19     the parties.

20          I declare under penalty of perjury under the laws

21     of California that the foregoing is true and correct.

22          Dated:  December 23, 2019

23

24          _____

25          HEATHER J. BAUTISTA, CSR, CRR, RPR, CLR

Kusar® Keeping Your Word Is Our Business℠

# EXHIBIT
# 9

 **Seyfarth**

**Seyfarth Shaw LLP**
601 South Figueroa Street
Suite 3300
Los Angeles, California  90017-5793
T (213) 270-9600
F (213) 270-9601

modell@seyfarth.com
T (213) 270-9649

www.seyfarth.com

December 10, 2019

**VIA E-MAIL AND U.S. MAIL**

Aaron Gbewonyo
Shegerian & Associates
225 Santa Monica Boulevard
Suite 700
Santa Monica, California 90401
agbewonyo@shegerianlaw.com

Re:     Jayme Tipton v. ATS

Dear Mr. Gbewonyo:

Please allow this correspondence to initiate meet and confer efforts under the Central District of California Local Rule 7-3 and Federal Rules of Civil Procedure Rule 11.

As we've noted in the past, Defendant intends to file a Motion for Summary Judgment or Summary Adjudication.  Below please find the specific grounds on which we intend to move for summary judgment and/or summary adjudication.  Please advise no later than **December 16, 2019**, if you are willing to dismiss any or all of Plaintiff's claims.

In addition, in light of Plaintiff's deposition testimony indicating that there was and is clearly no basis for numerous allegations found in her Second Amended Complaint (as well as her First Amended Complaint and Complaint), please allow this communication to advise you that we intend to seek Rule 11 sanctions against you and your firm.  The specific bases for this request are outlined below.  Should you fail to cure or respond to your Rule 11 violations by **December 16, 2019,** Defendant will file a motion for sanctions under Rule 11(c)(2).  Defendant will seek the recovery of its fees and costs in bringing the motion, as well its fees and costs in filing three motions to dismiss based on the false allegations of Plaintiff's pleadings.

Please advise of your availability to continue the meet and confer efforts regarding these motions at my office.  I am currently available as follows:

December 10: 10:00 a.m. to 1:00 p.m.

December 11: 10:00 - 11:00 a.m.

December 12: 11:00 a.m. to 2:30 p.m.

60585872v.1

 **Seyfarth**

## Motion for Summary Judgment/Summary Adjudication

Defendant will be seeking summary judgment as to the entirety of Plaintiff's Second Amended Complaint on the grounds that she lacks the required evidence to support her claims.  More specifically, Defendant seeks summary judgment/adjudication of Plaintiff's claims for the reasons stated below.

### Disability Discrimination

Plaintiff cannot meet the elements of this claim.  Most notably, Plaintiff testified in deposition that she was unable to perform the functions of her position.  Plaintiff's own pleadings further indicate that performing her job duties caused her pain.  (SAC ¶ 8.)  In addition, Plaintiff's doctor took her off work; thus, implying that she could not perform the duties of her position.

There is also no evidence that Plaintiff suffered an adverse employment action.  Plaintiff testified at deposition that her allegation (in the SAC) that she received a write-up after reporting her injury was false.  Ms. Henderson testified that she did not terminate Plaintiff, and Plaintiff acknowledged how her conversation with Ms. Henderson conveyed her resignation.

Even if Plaintiff could somehow tackle these hurdles, there is nothing to tie any adverse employment action to her disability.  Plaintiff was encouraged to reapply with ATS, and the evidence is clear that she would have been rehired had she done so.  However, she failed to do so, and she cannot tie her departure from ATS to her alleged disability.

### Retaliation

Again, for the same reasons noted above, Plaintiff has not suffered an adverse employment action, and there is nothing to tie her departure from ATS to protected activity.  Thus, she cannot succeed on her claim.

### Failure to Engage in the Interactive Process and Failure to Accommodate

Plaintiff testified at deposition that she spoke to Edgar Trujillo, Moses Guillen, and Shonta Henderson about her need to be off work.  Plaintiff was provided the exact accommodation she requested - an entire month off work.  None of Plaintiff's doctors notes cleared her for light duty.  Instead, each note specifically stated that she was placed off work until a specified date.  Ms. Henderson, Mr. Neri, and Mr. Guillen's deposition testimony was clear that there were no light duty positions available in April and May 2017, and Plaintiff's doctor had not cleared her to perform any duties of her position.  Moreover, Plaintiff testified that she was not released to return to work in any capacity until June 2018 - over one year after her injury.

Defendant properly engaged Plaintiff in the interactive process, and reasonably relied on Plaintiff's doctor's instructions that she be placed off work.  Defendant provided the exact accommodation requested - time off - for one month.  After that time, it became necessary for Defendant to fill the position so that it could continue to meet its obligations to its client, Jet Blue.  Plaintiff was encouraged to reapply when her doctor cleared her to return to work; however, she has not done so.  There is no evidence to support Plaintiff's claims.



<u>Wrongful Termination</u>

Plaintiff acknowledged in deposition that ATS did not inform her that she was "terminated." Plaintiff testified that Ms. Henderson advised her that she could resign, and further acknowledged how Ms. Henderson perceived Plaintiff's response of "okay" as her resignation. Thus, the evidence establishes that Plaintiff was not wrongfully terminated, as she resigned her position.

Please advise no later than **December 16, 2019**, if you are willing to dismiss any or all of Plaintiff's claims.  If Plaintiff is unwilling to do so, Defendant will proceed with filing its motion.

## Rule 11 Sanctions

Federal Rules of Civil Procedure Rule 11 provides in relevant part:

> (b) Representations to the Court. By presenting to the court a pleading, written motion, or other paper—whether by signing, filing, submitting, or later advocating it—an attorney or unrepresented party certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances:
>
> > (1) it is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation;
> >
> > (2) the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law;
> >
> > (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and
> >
> > (4) the denials of factual contentions are warranted on the evidence or, if specifically so identified, are reasonably based on belief or a lack of information.

In filing Plaintiff's Complaint, First Amended Complaint, and Second Amended Complaint, you represented to the Court that each of the pleadings were accurate and truthful.  The significant revisions between the three pleading versions and Plaintiff's deposition testimony make clear that this representation was false.

For example, Plaintiff changed her story to indicate that her husband, instead of her, delivered her doctors' notes to ATS.  A simple phone call to Plaintiff should have been able to establish these basic facts at the outset of the case.  As such, only two conclusions can be drawn: 1) your office failed to communicate with Plaintiff regarding the facts of her case and you simply

 **Seyfarth**

Aaron Gbewonyo
Shegerian & Associates
December 10, 2019
Page 4

speculated as to what might have happened, or 2) Plaintiff lied about the timeline of events. Either way, your office failed to conduct its required reasonable inquiry to determine the contents of the pleadings.

As another example, each of Plaintiff's versions of the complaint state that she was injured in March 2017, and that she received a write-up shortly after reporting her alleged injury to ATS. Plaintiff testified in deposition that both of these allegations are patently false. Instead, Plaintiff was allegedly injured in April 2017, after she received a write-up. Despite knowing of the falsity of these allegations, Plaintiff has made no effort to amend her Second Amended Complaint (or even her discovery responses). Again, it appears that only two conclusions can be drawn: 1) your office failed to communicate with Plaintiff regarding the facts of her case; or 2) Plaintiff lied. Your failure to conduct the required reasonable inquiry before certifying to the Court that the allegations were truthful is in violation of Rule 11.

Perhaps some of the confusion stems from the fact that Plaintiff does not even know the individual who filed the DFEH charge on her behalf. It would appear that no fact gathering efforts were undertaken by your firm before filing the DFEH charge and Complaint on Plaintiff's behalf (or such little efforts were undertaken that relevant facts were not discussed). This failure was compounded when you again failed to conduct due diligence before filing the First Amended Complaint and Second Amended Complaint. You failed to comply with your obligations under Rule 11, and despite notice on more than one occasion of your shortcomings, you've failed to remedy those shortcomings in the filings before the Court.

Should you fail to cure or respond to your Rule 11 violations by **December 16, 2019,** Defendant will file a motion for sanctions under Rule 11(c)(2). Defendant will seek the recovery of its fees and costs in bringing the motion, as well its fees and costs in filing three motions to dismiss based on the false allegations of Plaintiff's pleadings.

Very truly yours,

SEYFARTH SHAW LLP

Meagan Sue O'Dell

cc:     cshegerian@shegerianlaw.com
        anguyen@shegerianlaw.com

# EXHIBIT

# 10

**O'Dell, Meagan S.**

| | |
|---|---|
| **From:** | O'Dell, Meagan S. |
| **Sent:** | Monday, December 30, 2019 12:01 PM |
| **To:** | 'Aaron Gbewonyo' |
| **Cc:** | Lubeley, Aaron; Yang, Simon |
| **Subject:** | RE: Tipton v. ATS - Meet and Confer re: MSJ |

Aaron,

I haven't heard from you since the 20th, and wanted to circle back to see if Plaintiff was willing to forego any of her claims in light of our intended MSJ and the bases for the same.

Best,

Meagan

**From:** O'Dell, Meagan S.
**Sent:** Friday, December 20, 2019 12:51 PM
**To:** Aaron Gbewonyo <agbewonyo@shegerianlaw.com>
**Cc:** Lubeley, Aaron <alubeley@seyfarth.com>; Yang, Simon <syang@seyfarth.com>
**Subject:** RE: Tipton v. ATS - Meet and Confer re: MSJ

Thank you, Aaron.  Please note that Defendant's MSJ is due to be filed on January 3, so time is of the essence for any potential resolution.

Best,

Meagan

**From:** Aaron Gbewonyo <agbewonyo@shegerianlaw.com>
**Sent:** Friday, December 20, 2019 11:29 AM
**To:** O'Dell, Meagan S. <modell@seyfarth.com>
**Cc:** Lubeley, Aaron <ALubeley@seyfarth.com>; Yang, Simon <syang@seyfarth.com>
**Subject:** RE: Tipton v. ATS - Meet and Confer re: MSJ

**[EXT. Sender]**

Meagan,

To be clear, my proposition to dismiss the claims for wrongful termination and retaliation (which is no indication of our belief in the legitimacy of those claims) was as a compromise to Defendant's agreement to forgo filing a MSJ. I did not have the opportunity to review the case law you provided, however, I would be happy to review and discuss with my client. To the extent that I am able to discuss your position with my client prior to the Holidays, I will aim to have a response to you by next week.

1

Aaron Gbewonyo | Associate Attorney
225 Santa Monica Blvd, Suite 700 | Santa Monica, CA 90401
Office: (310) 860-0770 | Facsimile: (310) 860-0771
agbewonyo@shegerianlaw.com | shegerianlaw.com [shegerianlaw.com]

## SHEGERIAN & ASSOCIATES
• PROTECTING YOUR RIGHTS •



Please do not print this e-mail unless absolutely necessary. CONFIDENTIALITY NOTICE: This communication and any accompanying document(s) are privileged and confidential and are intended for the sole use of the addressee(s). If you have received this transmission in error, you are advised that any disclosure, copying, distribution, or the taking of any action in reliance upon it is strictly prohibited. Moreover, any such inadvertent disclosure shall not compromise or waive the Shegerian Law client privilege as to this communication or otherwise. If you have received this communication in error, please immediately delete it and contact us at privacy@shegerianlaw.com or by telephone at (310) 860-0770. Thank you.

**From:** O'Dell, Meagan S. <modell@seyfarth.com>
**Sent:** Friday, December 20, 2019 10:55 AM
**To:** Aaron Gbewonyo <agbewonyo@shegerianlaw.com>
**Cc:** Lubeley, Aaron <ALubeley@seyfarth.com>; Yang, Simon <syang@seyfarth.com>
**Subject:** Tipton v. ATS - Meet and Confer re: MSJ

Aaron,

I wanted to see if you had a chance to review the *Shamir* and *Swonke* cases that I provided yesterday in an effort to continue our meet and confer efforts related to Defendants' anticipated MSJ. I understand that Plaintiff is willing to consider dismissal of the retaliation and wrongful termination claims with prejudice; however, we believe there is supportive case law to require the dismissal of all of Plaintiff's claims. Below please find a brief summary of our points as to the remaining claims for disability discrimination, failure to accommodate, and failure to engage in the interactive process, along with the two cases provided yesterday that support our position. Please let me know if you are available to discuss further today, as Defendant's deadline to file its MSJ is fast approaching.

### Disability Discrimination and Failure to Accommodate

In order to establish a prima facie case, Plaintiff must show that: 1) she suffers from a disability; 2) she is otherwise qualified to do her job; 3) she suffered an adverse employment action; and 4) the employer harbored discriminatory intent.

Here, Plaintiff cannot establish that she was otherwise qualified.  Plaintiff's doctor's notes unequivocally place her off work.  Plaintiff's deposition testimony states that she was not clear to return to work until approximately June 2018 - over 13 months after first being placed off work (and further admits that she never received a return to work authorization from her doctor).  In addition, if Plaintiff concedes that her wrongful termination claim has no merit, I am confused as to what adverse employment action she allegedly suffered.

Plaintiff is attempting to make the same arguments that were denied in the *Shamir v. SCCA Store Holdings, Inc.* case (2014 WL 12597151, June 9, 2014, C.D. Cal.).  Plaintiff seeks to fault Defendant for not providing accommodations other than leave.  Only one accommodation could be read to be consistent with Plaintiff's doctor's note - time off work.  Defendant provided this to Plaintiff for approximately one month, but Plaintiff did not qualify for any protected leave and a personal leave could not be granted.

The *Shamir* court evaluated these exact contentions.  As the court noted, "to rule in favor of plaintiff on this point would be to hold that the employer should have returned plaintiff to work when the professional medical judgment was that [she] was physically incapacitated."  *Id.* at *5; citing *Swonke v. Sprint*, 327 F.Supp.2d 1128, 1133 (N.D. Cal. 2004).  The court found that there was no basis to require such action by an employer.  As a result, the *Shamir* court held that both Plaintiff's disability discrimination and failure to accommodate claims failed, and the court granted Defendant's MSJ.

The same is true here where ATS reasonably relied on the medical judgment of Plaintiff's doctor.

## Failure to Engage in the Interactive Process

Both the *Shamir* and *Swonke* courts found no reason to require an employer to engage in a futile interactive process.  The courts found that an employer's reliance on a plaintiff's doctors' medical opinions that the plaintiff was not cleared to return to work was sufficient.  The employer had no occasion to discuss accommodations because there was nothing the employer could do until it received notice that the plaintiff could return to work.  *Shamir*, at *6; *Swonke*, at 1137.

The same is true here.  Plaintiff's doctor placed her off work, and Plaintiff's own testimony is that she was unable to return to work until June 2018.  It was not only reasonable for ATS to rely on the doctor's notes, but there was simply nothing ATS could do until it received notice that Plaintiff could return to work.  ATS never received this notice.  Any interactive process would have been futile.  ATS was not obligated to engage in the interactive process with Plaintiff to identify accommodations needed upon her return to work because Plaintiff's doctors never authorized her to return to work.  *See, Shamir*, at *6.

As such, her claim for failure to engage in the interactive process will also fail.

Please note that as Plaintiff's claims for retaliation and wrongful termination are premised on her disability discrimination claims, they also fail for the same reasons noted above.  *See, Shamir*, at *7.

I look forward to hearing from you soon to see if we can resolve the anticipated MSJ without court involvement.

Best,

Meagan

---

**Meagan S. O'Dell** | Associate | Seyfarth Shaw LLP
601 South Figueroa Street |  Suite 3300 | Los Angeles, California 90017-5793
Direct: +1-213-270-9649 | Fax: +1-310-551-8498
modell@seyfarth.com | http://www.seyfarth.com

3

The information contained in this transmission is attorney privileged and/or confidential information intended for the use of the individual or entity named above.  If the reader of this message is not the intended recipient, you are hereby notified that any use, dissemination, distribution or copying of this communication is strictly prohibited.

**O'Dell, Meagan S.**

| | |
|---|---|
| **From:** | Aaron Gbewonyo <agbewonyo@shegerianlaw.com> |
| **Sent:** | Monday, December 30, 2019 1:37 PM |
| **To:** | O'Dell, Meagan S. |
| **Cc:** | Lubeley, Aaron; Yang, Simon |
| **Subject:** | RE: Tipton v. ATS - Meet and Confer re: MSJ |
| **Attachments:** | ~WRD0001.jpg |

| | |
|---|---|
| **Follow Up Flag:** | Flag for follow up |
| **Flag Status:** | Completed |

**[EXT. Sender]**

Meagan,

I apologize for the delay in responding to your message. As I anticipated, it was difficult to reach my client given the holidays.

However, to be clear, Plaintiff did not and does not concede that her wrongful termination or retaliation claims are without merit. As I previously stated, Plaintiff purposed the agreement to dismiss her wrongful termination and retaliation causes of action were strictly for the purposes of avoiding further motion practice, and have nothing to do with the merits of these causes of action. The merits of which to be discussed further below.

**Disability Discrimination and Failure to Accommodate**

The evidence from Plaintiff and Mr. Brown's testimony clearly establish that Plaintiff had a disability which Defendant's failed to accommodate. (1) Plaintiff had a physical or mental condition (her shoulder injury) that limited one or more major life activity. Plaintiff testified that she had difficulty caring for her children and had difficulty carrying very heavy items with her right harm, however, this did not preclude her from doing so with her left; (2) Plaintiff testified that she could in fact perform each and every one of her job responsibilities (i.e. vacuum, pick up blankets/trash , wipe down seats, wipe down the laboratories on the airlines) and "viewed all of her duties as light duties; (3) She suffered an adverse employment action in that she was told that if she did not resign, she would be terminated. She refused to resign because she loved her job, and was in fact terminated because of this refusal; and (4) there is direct evidence of discriminatory intent, including the phone call with Ms. Henderson, in which Ms. Henderson advises Plaintiff that because of her condition and medical leave that she must either resign or be terminated. Further, there is indirect evidence of discriminatory animus, including, but not limited to the temporal proximity between Ms. Henderson becoming aware of Ms. Tipton's injury/leave and the subsequent termination, and Defendant's deviation from policy in providing employees with medical non-FMLA leave or limiting that leave, just to provide you with some examples of the  indirect evidence of discriminatory animus harbored toward Plaintiff.

As it relates to Shamir v. SCCA Store holdings, that case can clearly be distinguished from the present case, where Defendants indeed acknowledged receipt of the plaintiff's medical notes for nearly a year, where said note unequivocally established the plaintiff's limitations that could not be performed. Here, it is clear from the testimony of the decision makers that this was not the case. However, if there is something that I am not aware of factually, please advise, and I would be happy to discuss further.

Further, unlike in Shamir, Plaintiff advised Henderson of her condition and her anticipated return to work date a week later when Henderson called on or around May 9, 2017. Unlike in Shamir, Defendant did not request further clarification

of any concerns regarding any limitation Plaintiff had. Further, Plaintiff was **never** advised that if she did not come back within a certain duration of time that she would be fired. She was simply given the ultimatum that she should resign or be terminated. For the reasons stated and those that may be further discussed in Plaintiff's opposition, should Defendant wish to move forward with these causes of action, Plaintiff will not dismiss her disability discrimination, failure to accommodate, or wrongful termination causes of action.

**Failure to Engage in the Interactive Process**

Again, here there is no evidence of reliance upon Plaintiff's doctor's note, as only days after receiving Plaintiff's third medical note place her off work, the decision makers made clear their intent to provide Plaintiff the ultimatum of resigning or being terminated. As previously noted, it is not established here, as was in Shamir and Swoken that Defendants had any reason, based upon the reliance of Plaintiff's doctor's notes to believe that her leave had become indefinite, as the plaintiff's in Swoken and Shamir did not return to their employment with the defendants for a year in Shamir and 2 years in Swoken. That was not the case here. Further, the plaintiffs in both cases had issues related to movement, while Plaintiff did not have any limitation that would render her sedimentary. Further, the court noted in Swoken that defendants were informed of plaintiff's injury resulting in the need for surgery, and that several others were required, and based upon reliance of this, as well as the doctor's dictation that "Mr. Swoken is unable to perform the job duties as dictated by his occupation." That is not the case here where there is no unequivocal statement based upon Plaintiff's occupation.

Addressing a defense that a plaintiff's prior claim of total disability should provide a basis for judicial estoppel of any later inconsistent claim, the court has held that the plaintiff is not automatically barred. *Kennedy v. Applause, Inc.* 90 F 3d 1477 (9th Cir. 1996).

The Ninth Circuit explained in *Johnson v. State of Oregon*, 141 F 3d 1361 (9th Cir. 1999), that the standard governing the decision of whether to grant disability benefits may be different than the standard under the ADA or FEHA. Thus, the courts must take a case-by case approach by evaluating the particular statements and facts that have been asserted. The situation presented in this case is the exact situation which the ADA seeks to thwart. For the reasons stated, Plaintiff will not agree to dismiss her failure to engage in the interactive cause of action.

**Plaintiff's Retaliation Claim**

As you noted, Plaintiff's retaliation claim is derivative of her discrimination and wrongful termination claims. Because there are ample facts to support those claims, so too are there facts to support Plaintiff's retaliation claim. For that reason, Plaintiff will not dismiss this claim absent an agreement to do so for the purposes of foregoing motion practice.

Should Defendant wish to proceed with motion practice at this juncture, I would propose that the parties stipulate to a briefing schedule, whereby, Plaintiff would be given an extension to her opposition in return for an extension for Defendant's reply brief.

I look forward to your response and/or discussing this matter further.


Aaron Gbewonyo | Associate Attorney
225 Santa Monica Blvd, Suite 700 | Santa Monica, CA 90401
Office: (310) 860-0770 | Facsimile: (310) 860-0771
agbewonyo@shegerianlaw.com | shegerianlaw.com [shegerianlaw.com]

**SHEGERIAN & ASSOCIATES**
• PROTECTING YOUR RIGHTS •

Please do not print this e-mail unless absolutely necessary. CONFIDENTIALITY NOTICE: This communication and any accompanying document(s) are privileged and confidential and are intended for the sole use of the addressee(s). If you have received this transmission in error, you are advised that any

disclosure, copying, distribution, or the taking of any action in reliance upon it is strictly prohibited. Moreover, any such inadvertent disclosure shall not compromise or waive the Shegerian Law client privilege as to this communication or otherwise. If you have received this communication in error, please immediately delete it and contact us at privacy@shegerianlaw.com or by telephone at (310) 860-0770. Thank you.