Carney R. Shegerian, Esq., State Bar No. 150461
CShegerian@Shegerianlaw.com
Anthony Nguyen, Esq., State Bar No. 259154
ANguyen@Shegerianlaw.com
Aaron Gbewonyo, Esq, State Bar No. 315889
AGbewonyo@Shegerianlaw.com
SHEGERIAN & ASSOCIATES, INC.
145 South Spring Street, Suite 400
Los Angeles, California 90012
Telephone Number:  (310) 860-0770
Facsimile Number:   (310) 860-0771

Attorneys for Plaintiff,
JAYME TIPTON

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JAYME TIPTON,<br><br>    Plaintiff,<br><br>vs.<br><br>AIRPORT TERMINAL SERVICES, INC.,DOES 1 through 100, Inclusive<br><br>    Defendants. | Case No.:  2:18-cv-09503-AB- JEM<br><br>**The Honorable Andre Birotte, Jr.**<br><br>**PLAINTIFF JAYME TIPTON'S EVIDENCE IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, SUMMARY ADJUDICATION**<br><br>Date:    February 7. 2020<br>Time:   10:00 a.m.<br>Ctrm.:  7B<br><br>Trial Date:     May 19, 2020<br>Action Filed:  October 4. 2018 |

# TABLE OF CONTENTS

| No. | Declaration |
|-----|-------------|
| 1 | Declaration of Carney R. Shegerian |
| 2 | Declaration of Jayme Tipton |
| 3 | Declaration of Melissa Celestine |
| 4 | Declaration of Daniel Schlosser |

| Exhibit | Evidence |
|---------|----------|
| 1 | Defendant's Employee Handbook: ATS000055-ATS000072 |
| 2 | Plaintiff's April 11, 2017 doctor's note JT 000068 |
| 3 | Plaintiff's May 1, 2017 doctor's note JT000069 |
| 4 | Plaintiff's May 15, 2017 doctor's note JT000070 |
| 5 | May 4, 2017 Email to Henderson from Guillen ATS 000079 |
| 6 | May 8, 2017 Email Chain ATS000090-ATS000094 |
| 7 | Excerpts from the deposition of Damian Neri |
| 8 | Excerpts from the deposition of Moses Guillien |
| 9 | Excerpts from the deposition of Shonte Henderson (an individual) |
| 10 | Excerpts from the deposition of Shonte Henderson PMK in re Termination |
| 11 | Excerpts from the deposition of Jeff Leukenhaus (an individual) |
| 12 | Excerpts from the deposition of Jeff Leukenhaus PMK in re Policies |
| 13 | Excerpts from the deposition of plaintiff, Jayme Tipton |
| 14 | Excerpts from the deposition of defendant Deon Brown |

Dated:  November 17, 2019

SHEGERIAN & ASSOCIATES, INC.

By: _____
Carney R. Shegerian, Esq.

Attorneys for Plaintiff,
JAYME TIPTON

PLAINTIFF'S EVIDENCE IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT/ADJUDICATION

# DECLARATION

## DECLARATION OF CARNEY R. SHEGERIAN

I, Carney R. Shegerian, declare as follows:

1.   I am an attorney at law, duly authorized to practice law before all of the courts of the State of California and this Court.  I am the attorney of record for plaintiff, Jayme Tipton, in this case.  I am familiar with the files, pleadings, and facts in this case and could and would competently testify to the following facts on the basis of my own personal knowledge.

## AUTHENTICATION OF EXCERPTS OF
## DEPOSITION TRANSCRIPTS FILED

2.   Filed concurrently with plaintiff's Notice of Filing Excerpts of Deposition Transcripts as **Exhibit 7** are true copies of excerpts from the deposition of Damian Neri.

3.   Filed concurrently with plaintiff's Notice of Filing Excerpts of Deposition Transcripts as **Exhibit 8** are true copies of excerpts from the deposition of Moses Guillien.

4.   Filed concurrently with plaintiff's Notice of Filing Excerpts of Deposition Transcripts as **Exhibit 9** are true copies of excerpts from the deposition of Shonte Henderson in her individual capacity.

5.   Filed concurrently with plaintiff's Notice of Filing Excerpts of Deposition Transcripts as **Exhibit 10** are true copies of excerpts from the deposition of Shonte Henderson as Defendant's person most knowledgeable in re termination.

6.   Filed concurrently with plaintiff's Notice of Filing Excerpts of Deposition Transcripts as **Exhibit 11** are true copies of excerpts from the deposition of Jeff Leukenhaus in his individual capacity.

7.   Filed concurrently with plaintiff's Notice of Filing Excerpts of Deposition Transcripts as **Exhibit 12** are true copies of excerpts from the deposition of Jeff Leukenhaus as Defendant's person most knowledgeable in re policies.

8.  Filed concurrently with plaintiff's Notice of Filing Excerpts of Deposition Transcripts as **Exhibit 13** are true copies of excerpts from the deposition of Plaintiff Jayme Tipton.

9.  Filed concurrently with plaintiff's Notice of Filing Excerpts of Deposition Transcripts as **Exhibit 14** are true copies of excerpts from the deposition of Deon Brown.

## AUTHENTICATION OF EXHIBITS

10.  Filed concurrently with plaintiff's Appendix of Evidence as **Exhibit 1** is a true and correct copy of Defendants' production of the Defendant's Employee Handbook (ATS000055-ATS000072).

11.  Filed concurrently with plaintiff's Appendix of Evidence as **Exhibit 2** is a true and correct copy of Plaintiff's April 11, 2017 doctor's note (JT 000068).

12.  Filed concurrently with Plaintiff's Appendix of Evidence as **Exhibit 3** is a true and correct copy of Plaintiff's May 1, 2017 doctor's note (JT000069).

13.  Filed concurrently with Plaintiff's Appendix of Evidence as **Exhibit 4** is a true and correct copy of Plaintiff's May 15, 2017 doctor's note (JT000070).

14.  Filed concurrently with plaintiff's Appendix of Evidence as **Exhibit 5** is a true and correct copy of an email correspondence to Shonte Henderson notifying her of Plaintiff's disability and leave of absence ATS 000079.

15.  Filed concurrently with plaintiff's Appendix of Evidence as **Exhibit 6** is a true copy of an email correspondence between Defendant's decision makers regarding Plaintiff's termination ATS000090-ATS000094.

///

///

///

///

///

I declare, under penalty of perjury under the laws of the State of California and the United States of America, that the foregoing is true and correct.

Executed on this 17th day of January, 2020, at Los Angeles, California.

Carney R. Shegerian, Esq.

DECLARATION

# DECLARATION OF JAYME TIPTON

I, Jayme Tipton, declare as follows:

1.  I am over the age of 18 years, and I am the plaintiff in this case.  I am familiar with the facts stated in this declaration, and I could and would competently testify to the following facts on the basis of my own personal knowledge.

2.  My date of birth is September 7, 1986.

3.  On October 24, 2016, I began working at Airport Terminal Services ("ATS") as a Groomer. I held the position of groomer throughout my seven-month tenure with ATS. At my time of hire, I understood that I was being hired to satisfy a recently acquired contract with Jet Blue airlines, however, myself as well as my crew of fellow groomers often worked on other airlines outside of Jet Blue.

4.  I was excited when I first received employment with ATS because ATS was among the highest paying companies that offered its employees opportunities for growth. My grandmother was a groomer who had a long and rewarding career working for airlines. She was a driving force in my decision to pursue a career as a groomer. It was my dream to follow in her footsteps.

5.  I had previous experience as a groomer which allowed me to excel. It was my understanding that it was this experience that resulted in me receiving my job with ATS. I was passionate about my role as a groomer and was confident that I would soon become a crew lead.

6.  My job with ATS was perfect because my now husband, then fiancé, Dion Brown ("Brown"), also worked for ATS as a ramp agent. He worked the same general hours as me, which allowed us to carpool to work, as we only had one car. Further, it did not pose a hardship on he or I, as we were able to work while our children were in childcare and make it home in time to pick them up thereafter. In addition to these benefits, it also allowed us to spend quality time bonding on our two-and-a-half-hour commute to Los Angeles World Airports from Palmdale.

7.  Unfortunately, on or around April 9, 2017, as I was in the process of cleaning

one of the airplanes that my crew was assigned to, I reached down to pick up a piece of trash and heard a pop, followed by a sharp pain in my right arm. Despite this pain, I continued to work, however, the pain in my arm continued to hurt.  At the end of my shift, I informed my supervisor, Damian Neri ("Neri"), that I had injured myself during my shift. I then proceeded to wait for my husband to get off work so that we could drive home together.

8.   On or around April 10, 2017, I returned to work with my husband. I performed all my duties that day without any accommodations, however, I continued to feel pain in my arm. I again advised my manager, Neri about my pain and advised him of my intent to be seen by a doctor regarding her injury.

9.   On April 10, 2017, my husband took me to the doctor to be seen for my shoulder. My doctor advised me that I may have torn my rotator cuff and advised me that I should avoid lifting my children, driving with my right arm, and any other strenuous heavy lifting with my right arm.

10.   On the morning of Thursday, April 13, 2017, I returned to work with my husband. With my doctor's note in hand, I went to my supervisor office to request light duties. However, Neri was not present, so I spoke to my Crew Lead, Ora Beasley ("Beasley"). I asked Beasley to speak with Neri, however, she advised that he was not available, and asked what she could do for me. I proceeded to inform Beasley that I had injured myself on April 9, 2017 and requested that I be allowed to work light-duty. Beasley informed me that I would need approval from a supervisor for light-duties and proceeded to call Neri in front of me. As Beasley was on the phone with Neri, she informed me, "There are no light-duties, give me your note and go home." I then proceeded to give Beasley my doctor's note which she advised she would provide my note to Neri. At no time did Beasley inquire what, if any limitations I may have, or which of my duties I would be able to perform. Further, I was not informed under what circumstances, if any, I could return to work. I also was not informed that I was being placed off because of my doctor's note, or that further information was required

regarding my medical status. Additionally, I was not informed that I required a doctor's release to return to work. I was simply prevented from working and was forced to go home, although I later returned to ATS that afternoon to pick up my husband from work.

11.   I did not understand why I was being sent home rather than provided light duties. It was my understanding that ATS provided light duties to its employees, and I have seen other employees receive light duties. My duties included vacuuming, picking up trash, collecting dirty blankets, and wiping down laboratories on the plane. Each of these tasks were relatively light duties, or otherwise could have been performed with my off hand. Further, each of these tasks were assigned to a pair of groomers. I, like the other eight groomers assigned to a plane, would not have been required to perform any of these duties by themselves.

12.   After I was denied light duties, I proceeded to take Medical Non-FMLA leave. It was my understanding per the ATS employee handbook that ATS provides medical leaves to employees who were not eligible for Family Medical Leave or California Family Rights Act leave. It is my understanding that as an employee of ATS, that I was entitled to this time. I was never advised otherwise.

13.   After being instructed that I had to be 100% to return to work, my husband took me back to my doctor on or around April 19, 2017, prior to my return to work date as indicated on my April 11, 2017, doctor's note. My doctor informed me that although my shoulder was improving, that he would be extending my medical leave until May 1, 2017. I proceeded to give this doctor's note to my husband, and he advised me that he would take it to my supervisor, when he returned to work on or around April 20, 2017. When my husband returned home that day, I asked him if he had given my doctor's note to Trujillo, and he told me that he had. My husband informed me that in response, Trujillo simply said, "Thank you." I was not contacted by Trujillo or anyone from ATS immediately after my husband delivered this doctor's note.

14.   On or around April 26, 2017, prior to the lapse of my April 19, 2017 doctor's note, I had my husband take me back to my doctor once again. Again, my doctor advised

me that although I continued to experience improvement in my condition, that he would be extending my medical leave once again so that I could continue to receive treatment. When my husband returned from work on or around April 27, 2017, my husband advised me that he had provided my doctor's note to Damian Neri, my supervisor.

15.    On or around May 4, 2017, I received a text message from Moses Guillen ("Guillen"). This was the first communication that I had received from Guillen or anyone from ATS since beginning my Medical Non-FMLA leave. This text message read, "Jayme right?" Shortly thereafter, I responded, "Yes Jayme Tipton." Gullian then replied, "Okay thank you." To this day, I do not know the reason for this text message, as it was never communicated to me by Guillen or anyone from ATS.

16.    On May 8, 2017, I received a text message from Guillen, this text message read, "Need you to call me asap please." I subsequently had a phone call with Guillen. During this call, Guillen advised me that he had received my doctor's note. He informed me that he was calling to introduce himself, asked how I was doing, and I informed him that I was feeling better, however, I had a doctor's appointment the following week, and that I anticipated returning to work May 15, 2017. Guillen did not offer me light duties. He also did not inform me that I was at risk of being terminated, nor that additional medical documentation was required of me. He did not advise me that ATS required a doctor's note releasing me to return to work or allowing me to work light duties.

17.    The following day, May 9, 2017, I received a call from ATS Human Resources Generalist, Shonte Henderson ("Henderson'"). Henderson advised me that she was made aware of my injury and advised that she was calling to inform me that I could not take time off work because of my injury, and therefore would be required to return to work without limitations, or resign. I was shocked. This was the first time this was communicated to me, and I believed it to be illegal to require me to quit because of my disability. I became upset and complained to Henderson that she could not require me to quit because of my condition. I explained to her that I was under the oversight of my doctor, but that I anticipated returning to work the following week, May 15, 2017.

Henderson disregarded this statement. She again demanded that I immediately resign. I again reiterated to her that I would not resign because I loved my job and wanted to continue working for ATS. Henderson proceeded to tell me, "You have to resign today, and if you will not resign, I will terminate you." I felt my throat drop into my stomach as I began to cry hysterically and exclaimed, "You can't terminate me because of my disability, and I am not going to quit!" Again, Henderson dismissively responded, "Your employment is being terminated." She continued to repeat this several times. Feeling helpless and hopeless, I simply stated, "Okay."  At no time during our call did Henderson ask whether I could return to work with or without accommodations; nor did she advise me that if I received medical clearance to return to work, I would not be terminated. Further, she did not advise me that I could be rehired if I resigned as oppose to being terminated, I could be rehired. I was extremely upset by the exchange I had with Henderson and found myself crying hours later when my husband returned from work later that day. After my injury, no one from ATS ever attempted to discuss my limitations, and what duties, if any, I was able to perform with my condition. Further, no one from ATS ever contacted me to seek clarification regarding my limitations in any of my doctor's notes. Although I was expected to return to work on May 15, 2017, I would have returned sooner had I been provided light duties or been advised that I could only return to work with zero restrictions.

18.   I believe that I was terminated because of my disability and because I attempted to take a Medical Non-FMLA leave as provided by ATS company policy and its employee handbook.

19.   I was devastated by the loss of my job.

20.   I never applied for long term disability. After my termination, I filed for workers' compensation and remained under the supervision of my medical provider, as I no longer had a job to return to and focused on my health while I continued to apply to alternative positions.

///

I declare, under penalty of perjury under the laws of the State of California and the United States of America, that the foregoing is true and correct.

Executed on this 17th day of January, 2020, at Palmdale, California.

JAYME TIPTON

# DECLARATION

DocuSign Envelope ID: 2E222579-DB28-4FBA-98EC-C24D9C585B35

# DECLARATION OF MELISSA CELESTINE

I, Melissa Celestine, declare as follows:

1.  I am over the age of 18 years and not a party to this action.

2.  My date of birth is March 6, 1988.

3.  I am a former employee of Airport Terminal Services, Inc. I was employed as a Crew Chief from approximately August 2016 to October 2017.

4.  I have known Jayme Tipton ("Jayme") for approximately a year and a half, beginning in approximately 2016.  We first met at Airport Terminal services. Tipton was a new employee, and I was responsible for training her for her position as a Groomer. Although we held different titles, our responsibilities were the same. I knew Tipton predominantly in a work capacity, working alongside each other at the same location of Los Angeles International Airport. Tipton and I were both full time employees, and worked the same hours on a regular basis.

5.  Specifically, Tipton and I shared the responsibility of providing housekeeping of airplanes. We were responsible for ensuring that the airplanes remained clean and sanitary. We had to engage in such task as vacuuming, picking up trash, and cleaning bathrooms. Further, we had to remove and restock blankets from the first-class section of the plane to ensure that sanitary blankets were available for new passengers in first-class.

6.  On the basis of my personal observations of Tipton's work performance and results on the job, she was qualified to work in her position as Groomer with Airport Terminal Services.  Tipton was consistently a very hard worker, conscientious, thoughtful, focused, knowledgeable, intelligent, professional, respectful, and extremely productive. She took her job very seriously and was consistently one of the top performers that I saw working for Airport Support Services. She was extremely dedicated to her position. Tipton was always willing to put in extra hours to make sure that all of the planes were cleaned.

7.  There were approximately 9 employees in our group. However, on a number of occasions, we had to work with as few as 4 to 5 employees, and were expected to complete

DECLARATION OF

JT000114

DocuSign Envelope ID: 2E222579-DB28-4FBA-98EC-C24D9C585B35

the same amount of work, irrespective of the number of employees on staff on any given day.

8.    After the termination of Tipton, I continued to work for Airport Terminal Services for seven months. After Tipton was terminated, we did not receive additional staff to replace Tipton for approximately two months.

9.    I never perceived any work issue with Tipton at any time we worked together. Specifically, to the best of my knowledge, Tipton never took a day off from work, and appeared every day in a professional manner, prepared to work. I was surprised to hear that Tipton was let go from the company while out of work for her injury.

10.    I was never informed as to the reason for Tipton's termination. Neither Moses Gillian, the new manager who replacing Edgar Trujillo while Tipton was on leave, nor anyone in management or human resources was able to provide myself or my co-workers with answers to why our colleague would not be rejoining us.

I declare under penalty of perjury under the laws of the State of California and the United States of America that the foregoing is true and correct.

Executed on this _____ day of November, 2018, in Los Angeles, California.
November 16, 2018

_____
Melissa Celestine

DECLARATION OF MELISSA CELESTINE

JT000115

# DECLARATION

DocuSign Envelope ID: 5E47CCF8-951D-46B9-B50A-DBFF862E1B4E

# DECLARATION OF DANIEL SCHLOSSER

I, Daniel Schlosser, declare as follows:

1.   I am over the age of 18 years and not a party to this action.

2.   I currently employed by Jet Blue Airways Corporation, also known as Jet Blue Airlines ("Jet Blue"), where I serve as a Litigation Regulatory Analyst.

3.   In my capacity as Litigation Regulatory Analyst, I am able for reviewing any and all contracts that Jet Blue has with another company, including Airport Terminal Services ("ATS"). In performing these duties, I access a system known as Ariba, which Jet Blue utilizes to maintain its contracts with its business partners. Contracts are maintained in Ariba in the regular course of business. Any contract with Jet Blue is stored in Ariba.

4.   I am readily familiar with the Ariba system. I have received training in searching for records to obtain contracts for the purpose of any litigation.

5.   I received a subpoena from the office of Shegerian & Associates for a contract between Airport Terminal Services and Jet Blue regarding the hiring of Groomers at the Los Angeles World Airports. I subsequently conducted a search of the Ariba system for any active contracts or contracts entered into between the years 2014 to 2017. There are no contracts entered into between these times nor any active contracts between these dates for the hiring of Groomers with ATS on behalf of Jet Blue at Los Angeles World Airports.

6.   The only contracts in existence between Jet Blue and ATS were at Houston Airport, Portland Airport, and Fort Meyer Southwest Florida Airport, however, none of which were for the hiring of Groomers.  These contracts were all for the hiring of ground handling, cargo, and human remains employees.

7.   I am familiar with the contracts that Jet Blue has with ATS regarding staffing. These contracts provide for an hourly rate for which the employee should be hired, required training, and an overview of the respective position. These contacts do not

JT000116

DocuSign Envelope ID: 5E47CCF8-951D-46B9-B50A-DBFF862E1B4E

provide for a minimum number of employees that must be maintained throughout the course of the agreement. Agreements between Jet Blue and ATS and other business partners provide that if there is an issue with work force, it is the business partner or ATS's duty to reassign the work force. The agreement does not mention anything about terminating employees. There is no specific number of employees that must be maintained for a contract between Jet Blue and ATS or its other business partners that would result in the termination of that agreement. However, ATS or any business partner with a contract to hire employees is responsible for providing invoices to Jet Blue, including the number of staff and hours for each position for each day and the worker type for the applicable billing period.

I declare under penalty of perjury under the laws of the State of New York and the United States of America that the foregoing is true and correct.

Executed on this ___7th___ day of January, 2020, in Long Island City, New York.

*Daniel Schlosser*
DANIEL SCHLOSSER

JT000117

# EXHIBIT 1





AIRPORT TERMINAL SERVICES

# EMPLOYEE HANDBOOK

Airport Terminal Services, Inc
Headquarters: 111 Westport Plaza Dr
Suite 400
St Louis, MO 63146
(314) 739-1900
http://www.atsstl.com

Created January 15, 2008

Revised January 1, 2016

ATS 000055

ATS Handbook: Table of contents (alphabetical order)

Airport Identification Badges........................................ 4
Attendance ........................................................... 7
Bulletin Boards..................................................... 15
Change of Personal Information............................... 12
Complaint and Suggestion Procedures.................... 12
Dismissal ............................................................ 16
Driving Company Vehicles/Equipment.................... 12
Driving Personal Vehicles on Company Business ..... 13
Employment-At-Will ............................................... 3
Employment Eligibility ........................................... 3
Equal Employment Policy ........................................ 3
Family Medical Leave.............................................. 9
Funeral Leave...................................................... 11
General Disclaimer..................................................2
Hazardous Chemicals and Waste............................. 5
History................................................................. 2
Leave of Absence .................................................. 8
Lunch and Rest Periods.......................................... 6
Medical Non-FMLA Leave ...................................... 10
Military Family Leave Entitlements..........................10
Military Leave ..................................................... 11
Mission Statement................................................. 2
Outside Employment and Conflict of Interest.......... 14
Overtime/Additional Hours ..................................... 7
Pay .................................................................... 7
Personal Leave .................................................... 11
Pilferage ............................................................. 4
Professional Appearance ........................................ 5
Promotions, Demotions and Transfers.................... 14
Resignation ........................................................ 16
Safety and Safety Equipment ................................. 4
Security Background Check ...................................... 3
Sick Time ............................................................. 8
Smoking ............................................................. 13
Solicitation and Distribution .................................. 15
Temporary Duty Assignments (TDY)....................... 14
Timekeeping ........................................................ 6
Tools.................................................................. 15
Violation of Work Rules ........................................ 16
Welcome............................................................... 2
Work Schedule...................................................... 6
Worker's Compensation ......................................... 8

Created January 15, 2008                                    Revised January 1, 2016

ATS 000056

## Mission Statement

*We, the employees of ATS, will provide the highest quality service in the safest environment to the airlines, airports and the customers they serve.*

**GENERAL DISCLAIMER**

The contents of this handbook have been presented as a matter of information only. Airport Terminal Services (ATS) believes wholeheartedly in the policies and procedures described herein. However, because circumstances and operational needs can change, it reserves the right to modify, revoke, deviate, suspend, terminate or change any or all of such policies or procedures, in whole or in part, at any time with or without notice. Additionally, while considerable effort has been made to provide clear and accurate information, the contents of this handbook should not be considered to be exhaustive. Neither this handbook nor any other policy, rule, procedure, practice, or form is intended or should be construed as any sort of contract, express or implied, or as creating any contractual rights.

If you have questions concerning these guidelines, please consult with your Manager, HRG/A, or an Employee Services Manager at (314) 739-1900.

ATS operates in a number of different states, and the laws of all states vary to some degree. In the event that any provision of this handbook is contradictory to state or local law, ATS will follow the applicable state law, if required.

**WELCOME**

On behalf of Airport Terminal Services, welcome to the ATS family. We hope that your employment with ATS will be a mutually rewarding experience.

We must keep in mind that our efforts are for the purpose of rendering the best possible quality service in the safest way to each of our customers. This is the purpose of our existence, and our efforts should be directed accordingly.

Remember, each and every one of us, in our own way, represents ATS to our customers and the patrons of each airport. You should be proud and happy to be part of the finest team of any ground handling company.

Again, welcome to our family.

**HISTORY**

Airport Terminal Services was formed in 1975 as a subsidiary of Midcoast Aviation. Midcoast Aviation, and its subsidiary, were purchased by Ozark Airlines, who was in turn purchased by Trans World Airlines in 1986. In September of 1994, ATS was sold by TWA to Mr. Richard B. Hawes, a local investor and an eighth generation St. Louisan. Since 1986, ATS has expanded to major airports across the United States. In 2000, ATS expanded into Canada.

Throughout the ever-changing airline industry, Airport Terminal Services meets the challenges of a diverse customer base and their corresponding requirements by creating and nurturing long term partnerships.

Created January 15, 2008                                        Revised January 1, 2016

ATS 000057

## EQUAL EMPLOYMENT POLICY

Airport Terminal Services is an Equal Opportunity Employer and as such does not discriminate against or deprive an individual of equal employment opportunities on the basis of race, color, religion, sex (including pregnancy), age (40 or older), national origin, citizenship status, disability, genetic information, veteran status, or any other legally protected status in accordance with applicable local, state and federal law.  No one will be retaliated against by ATS in any manner for exercising their rights under this policy.

Any employee who feels they have been the target of or a witness to any form of unlawful discrimination should immediately file a written or verbal complaint with the General Manager, Human Resources Generalist, Employee Hotline (877.702.0190), or Employee Relations Manager or above at corporate office (314.739.1900). All complaints are promptly investigated. Cooperation is required with investigations. Information obtained during investigations is confidential and only disclosed to those who have a need for the information.

If ATS determines that unlawful discrimination has occurred, corrective action will be taken. Appropriate action will also be taken to deter any future discrimination. ATS will not retaliate against you for filing a complaint and will not knowingly permit retaliation by management, employees or your co-workers.

## EMPLOYMENT-AT-WILL

Employees covered by this handbook are employees-at-will.  This means that either you or ATS can terminate your employment at any time.  No representative of ATS, other than an Officer of the Company, has the authority to enter into any agreement modifying your status as an employee-at-will, and any such agreement must be in writing and signed by an Officer of the Company.  No one has the authority to make any verbal statements of any kind, at any time, which are inconsistent with the foregoing and binding upon ATS.  If you have any questions concerning policies or procedures, contact your manager or Employee Services Manager or above at corporate office.

## EMPLOYMENT ELIGIBILITY

Employees must continue to meet certain minimum eligibility requirements in order to maintain employment with ATS.  Where applicable, these include, but are not limited to:  Being approved by the Airport Badging Office to obtain, and continue to keep, an Authorized Airport Identification Badge, obtaining and keeping a U.S. Customs' badge, being authorized to have access to U.S. Postal mail, having a valid driver's license with a good driving history as defined by ATS in those positions that have such requirement, being able to pass required training in designated time allowed or up to the standards of ATS and/or customer, being able to perform the essential functions of the position with or without reasonable accommodations, continued eligibility and documentation to work in the United States and remaining conviction-free of any FAA disqualifying crimes or other crimes that are relevant to our workplace.  It is the employee's responsibility to notify their station manager within 24 hours of any circumstances that may alter one's employment eligibility.

Employees must be a minimum of 18 years of age.

## SECURITY BACKGROUND CHECK

Due to the nature of our positions, employees may be required to go through various background checks.  These may include, but not limited to; an FBI Criminal History Records Check (CHRC), U.S. Customs background and criminal check, fingerprint check coordinated by the United States Postal Service. ATS will also run its own criminal background check.  There may be some instances where employees will be required to obtain or clarify information based off of these

background checks.  Failure to fully and promptly cooperate and disclose all necessary information with the completion of this background investigation may result in refusal to employ or termination of employment.  Convictions found may be grounds for dismissal or for refusal to hire.

## AIRPORT IDENTIFICATION BADGES

Once your security background clearance has been completed, an Airport Identification (I.D.) Badge will be issued by the Airport Authority.  This badge must be displayed in strict compliance with FAA regulations at all times (i.e. prominently on the outer most garment above the waist) when in the Security Identification Display Area (SIDA).  Lost or stolen badges must be reported immediately to your immediate supervisor, and the cost of replacement is the responsibility of the employee.  Each employee is responsible for authorized or unauthorized use of his/her I.D. badge.  These badges are the property of the airport and must be turned in at the time of resignation or separation from the company.

## SAFETY AND SAFETY EQUIPMENT

It is the policy of ATS to provide and maintain safe and healthful working conditions, follow operating practices that will safeguard all employees and result in safe working conditions and efficient operation. This includes compliance with EPA and OSHA standards and adherence to all other applicable laws and procedures.

New employees will receive a primary safety orientation to provide a basis for future safety attitude development and are informed of airport operations handling and general shop rules and practices.  Safe practices and procedures are reviewed to show how accidents are prevented. Individual responsibility for job safety is emphasized. It is the employee's responsibility not to perform any task or function until they are trained <u>and</u> signed off on by the safety officer.  Employees who violate ATS' safety policies or perform their work in an unsafe manner are subject to disciplinary action up to and including termination of employment.

Department safety meetings are held regularly and employees are paid for the time they attend.  These meetings are to communicate operational issues that are key to us providing a safe working environment for our employees and the equipment with which we work.  All employees are expected to attend these safety meetings.

ATS provides, at no cost, personal protection equipment required by state or federal mandate, to all employees whose jobs necessitate such protection.  Safety devices must be used as directed.  Check with your station manager to see if such equipment is applicable to your area.  First-Aid cabinets and eye wash stations are in several locations.  Locate the closest one to your work area and use these facilities if needed.  Report any injury to your supervisor as soon as possible, even if it seems minor at the time. The cooperation of all employees in eliminating hazards and developing safe working habits is a primary ingredient in a successful safety program.  If you see an unsafe condition or work practice, report this to a supervisor or your station manager immediately. Safety concerns, hazards, and other factors (weather, equipment, procedures, facilities) can be reported via the ATS Connection Intranet by using the "Safety Concern Reporting" tool. Employees may leave their name, phone and email if they want to be contacted.

## PILFERAGE

Given the nature of our business, our customers and the traveling public place a great deal of trust in our company and our employees.  It is everyone's responsibility to ensure pilferage does not occur.  Employees who witness pilferage must contact their station manager immediately so it may be investigated.  If, for any reason, the employee does not feel comfortable contacting the station

manager, the employee may also contact the corporate office or use the toll free hotline number (877.702.0190). ATS will cooperate with the authorities to ensure those found pilfering are prosecuted to the fullest extent of the law.

In addition, ATS also has a established reward program to anyone who provides information that leads to the involuntary separation of an ATS employee, who, in the scope of his/her duties, it is determined the employee was pilfering.

As such, ATS reserves the right to search property, lockers, desks, vehicles or clothing of our employees. When these situations may arise, it is not something we take lightly, but it is a step we must take to ensure any pilferage stops. We will make every effort we can to have our work environment one where employees are not working next to someone who is breaking the law.

## HAZARDOUS CHEMICAL AND WASTE

ATS abides by all State, Local and Federal regulations regarding the storage, use, disposal and transportation of hazardous materials. All employees exposed to hazardous material will be appropriately trained and informed in accordance with governmental regulations. Employees will be expected to follow established procedures for the safe storage, use and disposal of hazardous material and will use protective equipment and clothing at all times. Employees are also expected to become familiar with the hazardous nature of materials they come in contact with and should request assistance from their immediate supervisor for this familiarization.

## PROFESSIONAL APPEARANCE

Due to the nature of our business, where our public image directly affects our business relationship with our customer, we have established general guidelines on personal appearance for all employees, listed on the Uniform policy. Where applicable, ATS employees may be required to follow our customers' dress code or more specific guidelines.

ATS reserves the right to determine what is appropriate dress and grooming, not only for appearance, but also for those situations which are defined by safety practices and/or customer requirements.

ATS furnishes uniforms to employees whose jobs require uniform attire. Employees will be expected to wear clean, fully pressed uniforms and to keep the shirt tail tucked into the trousers, shorts or skirt at all times. Uniforms must be worn during all working hours. Employees will receive any specific uniform requirements applicable to their position when they are hired. You will also be required to sign a Garment Liability form that identifies all uniforms issued to you.

If a uniform becomes torn or damaged, or cannot be properly cleaned, please report it to your supervisor so that a replacement can be ordered.

Employees contribute money (non refundable) to the cost of uniforms through payroll deductions (as allowable by law).

For certain positions however, a uniform security deposit will be deducted from your initial paychecks to cover a complete set of uniforms. This security deposit will be returned to you when you return all uniforms upon departure from the company. The cost of unreturned uniforms, or uniforms returned past the specified time frame, will be deducted from this deposit amount.

All employees not issued uniforms are expected to dress in appropriate business attire, maintaining neat and clean grooming habits and appearance at all times. Your supervisor will explain attire for your particular work area at the time of your orientation.

Employees' hair should be of a natural color, clean, combed and neatly trimmed. Untidy or extreme hair arrangements are considered unsuitable (extreme hair colors may include pink, purple, blue, etc). Sideburns should be well trimmed and neat. Should any employee wish to wear a mustache

Created January 15, 2008                                    Revised January 1, 2016

ATS 000060

or beard, he may do so provided our customer contract permits such appearance, and if permitted, the mustache or beard must be kept trim and neat in appearance. Other male employees will be expected to be clean-shaven at all times. Any jewelry worn should be simple and not excessive.

Employees are expected at all times to practice acceptable standards of personal hygiene.

### TIMEKEEPING

Hourly employees are required to badge/clock-in and out unless other arrangements have been authorized by the station manager in advance. Each employee shall personally record his/her starting time, quitting time, and any other required time keeping. Employees shall not begin working prior to scheduled starting time without the prior approval of their station manager. Employees should not badge/clock-in earlier than 5 minutes before their scheduled starting time. Unless authorized to do so, employees are to begin working at their scheduled start time, not before.

One swipe card will be provided at no charge to hourly employees. Lost or stolen swipe cards must be reported immediately to your immediate supervisor, and the cost of replacement is the responsibility of the employee.

Clocking in or out for another employee or falsifying one's own or another's time is prohibited and will result in disciplinary action up to and including termination. All employees are expected to be clocked in and ready to work at their work stations in order to be considered "on time".

Failing to clock-in and/or out, clocking in more than 5 minutes ahead of the start time, or working unauthorized hours may result in disciplinary action up to and including termination.

### LUNCH AND REST PERIODS

A full-time employee's work day will vary from station to station and department to department. Normally, it will be either 8½ or 10½ hours with a half an hour lunch or 9 or 11 hours with an hour lunch. Rest periods will vary depending on station/departmental needs. Lunch and rest periods should be approved by one's supervisor or manager to ensure safety and/or customer service is not compromised.

### WORK SCHEDULE

Your work schedule will be explained at the time of employment. ATS operates 24 hours a day, seven days a week. Given the nature of our business, it is very likely that employees work schedules and responsibilities will change over time. It is critical that employees have the flexibility to alter their work schedule if needed. This includes, but is not limited to, rotating or changing days off, shifts or assigned work areas. In addition, employees may have to change their full-time or part-time status depending on the new work schedule, such change may affect eligibility for company benefits. Employees may be required to work additional hours dependent upon station/departmental needs. This includes staying past one's normal quitting time, coming in early, or working different days. Fulltime is defined as a regular schedule of forty (40) hours per week.

An employee working when the clocks are set back or forward an hour will be paid for the actual hours worked. For example, for an eight (8) hours shift, the employee will receive seven (7) hours of pay if the clocks are moved forward and nine (9) hours of pay if the clocks are moved backward.

The workweek begins at 12:01 a.m. (0001) Monday morning and ends Sunday at 12:00 a.m. (2400). The established workday for any employee will be the start of the employee's regularly scheduled shift and ends 24 hours later.

In addition, employees may have to change their full- or part-time status depending on the new work schedule. Employees may be required to work additional hours dependent upon

Created January 15, 2008                                   Revised January 1, 2016

ATS 000061

station/departmental needs.  This includes staying past one's normal quitting time, coming in early, or working different days.

An employee working when the clocks are set back or forward an hour will be paid for the actual hours worked.  For example, for an eight (8) hours shift, the employee will receive seven (7) hours of pay if the clocks are moved forward and nine (9) hours of pay if the clocks are moved backward.

## OVERTIME / ADDITIONAL HOURS

Because of the customer oriented nature of our business, all employees may be required to work overtime or additional hours and must be available when it is necessary.  Although every effort will be made to schedule this in advance and consider the availability of the individual, an employee may be required to work overtime without prior notice, depending on the demands of the work schedule.  Overtime for hourly employees is paid in compliance with all applicable State and Federal Laws.

Any overtime or additional hours must be authorized in advance by one's supervisor. Overtime pay is calculated based on the hours worked by an employee.  Vacation, Sick, Holiday, Funeral pay, Jury Duty pay, Three (3) Hour Minimum or any other pay provided for hours not actually worked does not count towards hours worked in calculation of overtime. Working unauthorized overtime may result in disciplinary action up to and including termination.

## ATTENDANCE

It is essential for the success of ATS and for the security of everyone's job that ATS meet its work schedules on time.  In order to accomplish this objective, regular and prompt attendance at work is required of all employees.  Excessive absenteeism and lateness is expensive, disruptive and places an unfair burden on other employees.  Many areas are schedule sensitive, and absence or tardiness directly influences ATS' ability to meet the customers' needs and may result in a loss of business.  Therefore, prompt attendance is a priority.

If an employee is going to be late or absent for any reason, he/she must personally notify either the Station Manager or designated member of management no later than three (3) hours in advance of starting time.  Depending on station needs, a station may have a requirement for greater than three (3) hours notice.  It is the employee's responsibility to ensure that proper notification is given.  Asking another employee, friend or relative to give this notification is not considered proper, except under emergency conditions.  Failure to report an absence from work is unexcused and is grounds for disciplinary action.  Failure to call or report in for two (2) consecutive scheduled days will result in the assumption that the employee has voluntarily quit and the separation will be processed by ATS effective the first day of the absence.  One no-call/no-show within the first sixty (60) days of employment will result in termination.

If it is necessary to be absent for an extended period, employees are expected to keep in constant contact with their supervisor.

## PAY

Any employee who works a short shift lasting less than three (3) hours, will receive a minimum of three (3) hours pay.  For example, if you are scheduled to work one (1) hour, you will receive three (3) hours of pay.  The three (3) hour minimum does not apply if you are sent home for disciplinary reasons, attend training classes, meetings, clock in late, or go home from work due to illness or other special circumstance. Hourly employees are paid weekly.  Corporate hourly employees are paid every

two (2) weeks. Salaried, exempt employees are paid on the 15th and last day of the month. If a payday falls on a weekend or holiday, paychecks will normally be issued on the last work day prior to the normal pay date.

An employee's immediate supervisor or station manager should be consulted to resolve questions concerning paychecks. Any errors in pay should be reported to the supervisor as soon as possible. Whether an error causes underpayment or overpayment, employees are expected to advise their supervisor to ensure the error is corrected as promptly as possible.

If it becomes necessary for an employee to contact Payroll, the supervisor or station manager may request the employee discuss the matter in the supervisor's or station manager's presence.

## SICK TIME

Sick time is for the protection of a full-time employee who is unable to attend work for short-term illnesses unless otherwise authorized by state law. Use of sick time for other than a personal confining illness may result in disciplinary action up to and including termination.

Accumulated sick time may be used after six (6) months of continuous employment. An employee can accumulate a maximum of ten (10) sick days. Sick days are not paid out upon separation from the company.

## WORKER'S COMPENSATION

Worker's Compensation Insurance is carried for all of our employees. In order to insure coverage under Worker's Compensation, it is necessary to follow some basic rules. All on-the-job injuries or illnesses must be reported to the employee's station manager immediately or no later than the end of shift, even if the injury or illness seems small at the time and may not appear to require medical attention. Failure to notify your station manager of an injury immediately or no later than the end of your shift may impact your benefits. If the injury requires treatment, your station manager may instruct you where to go for treatment.

Each employee is required to supply a copy of the doctor's notes following the initial and follow-up visits. Failure to do so, or failure to follow doctor's orders may result in disciplinary action, up to and including termination. ATS strongly believes in a restricted duty program to aid the employee in his/her recovery and to return to work as quickly as possible. If the injury results in restricted duty, the employee must obtain a doctor's release before being able to return to full duty. Employees who do not return to work after being released to restricted duty are subject to ATS Attendance Policy and related disciplinary action.

If an employee loses time from work (lost-time injury), the employee is required to contact his/her station manager regularly to update ATS on his/her status. The frequency of these contacts will vary based on how long it is estimated the employee will be out from work, but in no case should be less than monthly.

## LEAVE OF ABSENCE (LOA)

ATS offers a Leave of Absence policy to help meet the needs of the employee while at the same time ensuring high quality service to our customers and minimal interruption to the work flow. Employees will not normally be granted a Leave of Absence with less than three (3) months of service. Employees requesting a Leave of Absence must give thirty (30) days notice to their manager in writing. If the leave is not foreseeable, notice must be given as soon as possible and practical. In the event an employee is unable to obtain necessary forms and physician certification prior to the start of a leave, forms will be sent to the employee and must be returned to Employee Services within fifteen (15) days of the start of the leave.

Created January 15, 2008                                    Revised January 1, 2016

ATS 000063

Employees may not be employed elsewhere while on a Leave of Absence without indicating so and obtaining written approval from the employee's manager and the Vice President of Employee Services.

Employees may take a Leave of Absence for the following reasons as outlined below: Family Medical Leave, Medical non-FMLA, personal and military.  In addition, employees may be placed on an Administrative Leave.

Some states may have other types of leaves of absence or different requirements.  Where this is the case, ATS will comply with such requirements.

**Family and Medical Leave (FMLA)**

Employees at sites that are covered by the Family Medical Leave Act (location with at least 50 employees employed by ATS within 75 miles) must meet the following eligibility guidelines for a Family Medical Leave of Absence.  The employees must: 1) have been employed with ATS for at least twelve (12) months; and, 2) have worked for ATS at least 1,250 hours during the previous 12-month period.

An employee may take a Family Medical Leave for the birth of a child or the placement of a child with the employee for adoption or foster care.  For adoption or foster care, the child must be under 18 years of age or 18 years of age or older but incapable of self-care because of a mental or physical disability.  Appropriate medical or legal documentation must accompany the request.  Leave for birth or placement must take place within twelve (12) months of the birth or placement.

An employee may take a Family Medical Leave for a serious health condition of the employee (including pregnancy or worker's compensation) or an immediate family member.  This means an illness, injury, impairment or a physical or mental condition that involves inpatient care or continuing treatments by a health care provider.  Immediate family members include the employee's child, spouse or parent.

The Family Medical Leave of Absence may be up to a total of twelve (12) weeks (full-time employee week defined as 40 hours, part-time defined as average hours worked per week) in duration within a 12-month period.  If medically necessary, leave may be taken on an intermittent basis.

Employees must provide 30 days advance notice of the need to take FMLA leave when the need is foreseeable. When 30 days notice is not possible, the employee must provide notice as soon as practicable and generally must comply with an employer's normal call-in procedures.

Employees must provide sufficient information for the employer to determine if the leave may qualify for FMLA protection and the anticipated timing and duration of the leave.

Sufficient information may include that the employee is unable to perform job functions, the family member is unable to perform daily activities, the need for hospitalization or continuing treatment by a health care provider, or circumstances supporting the need for military family leave. Employees also must inform the employer if the requested leave is for a reason for which FMLA leave was previously taken or certified. Employees also may be required to provide a certification and periodic recertification supporting the need for leave.

An employee on a Family Medical Leave who returns within the 12-week period will be returned to the same or similar position.

An employee returning from a Leave of Absence must contact his/her supervisor immediately upon the employee's release to return to work from his/her physician.  Prior to returning to work from a Leave for the employee's health reasons, the employee must present a fitness-for-duty certification from a qualified health care provider to their manager for final approval to return to work.

An employee must use his/her benefit time (i.e. vacation, floating holiday) during a leave.  For

Created January 15, 2008                                                         Revised January 1, 2016

ATS 000064

medical leaves, the employee must use sick time first and then any other remaining benefit time.  If all benefit time has been exhausted, the remaining leave will be unpaid.  Unless allowed by state law, sick time may only be used for the personal confining illness of the employee.

If an employee does not return from a leave of absence, or get an approved extended leave of absence (see Extended Leave of Absence section below), he/she may be terminated.

During a Family Medical Leave, if an employee has insurance, his or her medical and/or dental coverage will continue during the leave as long as the employee paying only the employee portion of the premium.

The FMLA does not replace or supplant any state or local laws that offer **greater** employee protections than the FMLA.

ATS complies with all requirements, prohibitions, and other provisions of the state and local laws applicable in areas where it operates or does business.  If a state law entitles an employee to more generous benefits than FMLA does, the employee receives the more generous benefits.

*If you have any questions about FMLA, please contact your Station Manager, HRG or Director of Employee Services at (314) 739-1900.*

### Military Family Leave Entitlements

Eligible employees whose spouse, son, daughter or parent is on covered active duty or call to covered active duty status may use their 12-week leave entitlement to address certain qualifying exigencies. Qualifying exigencies may include attending certain military events, arranging for alternative childcare, addressing certain financial and legal arrangements, attending certain counseling sessions, and attending post-deployment reintegration briefings.

FMLA also includes a special leave entitlement that permits eligible employees to take up to 26 weeks of leave to care for a covered servicemember during a single 12-month period. A covered servicemember is:

(1) a current member of the Armed Forces, including a member of the National Guard or Reserves, who is undergoing medical treatment, recuperation or therapy, is otherwise in outpatient status, or is otherwise on the temporary disability retired list, for a serious injury or illness*; or

(2) (2) a veteran who was discharged or released under conditions other than dishonorable at any time during the five-year period prior to the first date the eligible  employee takes FMLA leave to care for the covered veteran, and who is undergoing medical treatment, recuperation, or therapy for a serious injury or illness.*

### Medical Non-FMLA Leave

Requests for medical leaves by employees who are not eligible for the Family Medical Leave will be considered a Medical Non-FMLA leave.

Request for extension to a Family Medical Leave over the twelve week time limit will be considered a Medical Non-FMLA leave and may be granted based upon employee and departmental needs.  Employees who remain on an unpaid medical non-FMLA leave will be placed on COBRA and will receive information from Employee Services.

For non-FMLA leaves, ATS cannot guarantee that a position for the employee will be available once an extension has ended.  ATS will make an effort to reinstate an employee when possible and practical to do so.

Created January 15, 2008                                              Revised January 1, 2016

ATS 000065

**Personal Leave**

An employee may request a Personal Leave of Absence for a period of up to three (3) months. The employee must use available benefit time during this leave.  If all benefit time has been exhausted, the remaining leave will be unpaid.  Personal leaves of absence are for personal reasons and may also be used for family reasons in cases where employees do not meet the eligibility for the Family Medical Leave Act.  Personal leaves will be approved based upon the employee's situation and the needs of ATS.  Full-time employees going on a Personal Leave will stop accruing vacation time.

Employees may be placed on COBRA during an unpaid period of their Personal Leave of Absence and will receive information from Employee Services.

ATS cannot guarantee that a position for the employee will be available once a personal leave has ended.  ATS will make an effort to reinstate an employee when possible and practical to do so.

**Military Leave**

Eligibility for Military Leaves of Absence will be as required by both federal and state law.

An employee may request a Military Leave of Absence.  The employee should give ATS at least two (2) weeks notice of such active duty periods, and furnish ATS with a copy of official orders relating to such active activity.  This leave would be in force until the military obligation is fulfilled. Reinstatement of the employee will be made in accordance with applicable federal and state law. Employees must reapply for re-employment within ninety (90) days of discharge from military service or hospitalization for service-related illnesses or injury continuing after service discharge for a period of not more than one (1) year.

A full-time employee who is a member of the military reserve unit and is called to temporary active duty, including annual training, or for a state or national emergency will be reimbursed the difference between a normal work week's wages at straight time and reservist pay, up to a maximum of two weeks per year, if the reservist pay is less than the employee's normal wages.  In order to receive this pay, the military pay voucher must be submitted to the employee's supervisor upon return from active duty.

**Funeral Leave**

All full-time employees may be granted up to three (3) days paid leave to attend the funeral of an immediate family member.  Immediate family member is defined as parent or step-parent, spouse, child or step-child, minor child if legal guardian, sister or brother or step-sister or step-brother.  An employee may be granted funeral pay for their scheduled hours, not to exceed eight hours per day for up to three scheduled days.  The final funeral paid day may not be later than one day following the funeral.

If an employee is scheduled to work on the day of the funeral for a father-in-law, mother-in-law, grandmother, grandfather or grandchild, the employee will be paid for their scheduled hours not to exceed eight hours for that day.

The days granted for funeral leave are not deducted from eligible vacation or personal holidays.

**CHANGE OF PERSONAL INFORMATION**

Any change of name, address, telephone number or beneficiary information should be reported immediately to the Employee Services Department.

**COMPLAINT AND SUGGESTION PROCEDURE**

It is the policy of ATS to insure that all employees are free to discuss their problems and

Created January 15, 2008                                                      Revised January 1, 2016

ATS 000066

suggestions with management.

If you have a complaint or suggestion concerning your job or any other matter which affects you at work, you should take the matter up with your immediate supervisor.

If the complaint or suggestion is taken to the immediate supervisor and cannot be handled or settled by your supervisor, or if you feel, for whatever reason that you cannot address your complaint or suggestion with your immediate supervisor, it should then be taken to their manager who will attempt to work out a satisfactory solution. If the matter cannot be settled at this point, you should arrange to discuss your issue with their manager. If a satisfactory solution is not arranged, the employee should continue with the chain of command up to the President of the company.

If the problem is of such a nature that you would like to discuss it with the Vice President of Employee Services, you should feel free to do so at any stage of this procedure. The Vice President of Employee Services will listen to the problem, counsel with you, and if necessary, refer you to anyone who can best take action on the matter involved.

ATS hopes that this procedure will provide a free and open means for understanding and cooperation among all employees at all levels of the organization.

In addition, ATS maintains an "open door" policy in order to make it possible for employees to express serious concerns directly to any member of management up to and including the President. Concerns may be expressed directly to the President at informal meetings conducted occasionally with members of the various stations.

ATS has a formal Suggestion Program whereby employees may earn cash rewards for suggestions which have a positive impact for ATS.

ATS also maintains a toll-free number (877.702.0190) and website http://www.atsstl.com/contact.asp that is checked by the Employee Services department. Any employee may call or email, anonymously or otherwise, to notify the corporate office of any issues that he/she feels is important to communicate and, for whatever reason, does not feel comfortable reporting at the local station level. Employees are encouraged to provide their name and number so that the employee may be contacted to gather further information, clarify issues, etc., however, this is not required.

These calls and emails will be kept as confidential as possible, however, because many times a follow-up investigation is needed, absolute confidentiality cannot be guaranteed. ATS will do its utmost to maintain confidentiality. No one will be retaliated against for making a call to the hotline. Making calls for malicious purposes or giving information that is blatantly false in order to harass another individual or individuals will result in disciplinary action up to and including termination.

## DRIVING COMPANY VEHICLES/ EQUIPMENT

Only properly trained, authorized, and individuals with a valid driver's license may drive ATS vehicles or equipment or any vehicle operated in the course of employment.

Employees should keep in mind that in the eyes of the public, they are representatives of ATS and must observe safe and courteous operating procedures at all times. For safety and insurance reasons, it is imperative that any employee who drives a company vehicle or equipment maintains a safe and acceptable personal driving record and immediately inform his/her supervisor of any license suspension or revocation. Any employee operating an ATS vehicle or equipment with a suspended, or invalid or no driver's license may be disciplined up to and including termination.

Initial Moving Violation Reports (MVR) will be required of all employees being hired in positions that include driving. Anyone whose record is considered marginal by ATS or its insurance company or whose license is suspended or revoked will not be eligible to drive and may be terminated from employment. ATS reserves the right to obtain an MVR for individuals, on an ongoing basis, to

ensure employees driving records are current and have maintained a good driving record.

## DRIVING PERSONAL VEHICLES ON COMPANY BUSINESS

During the performance of their duties, employees may be requested to drive their personal vehicle on ATS business. Company insurance policies cannot provide corporate coverage for vehicles that are also used for non-work purposes. Therefore, when this occurs, employees are not covered by ATS' automotive insurance for physical damage or liability. In the event of an accident, the employee's personal insurance will be considered the primary coverage and the employee will be responsible for any deductibles and any other loss not covered by their personal insurance.

Employees who use their personal vehicles for company business should be aware that ATS does not provide insurance coverage for physical damage to these vehicles during such use and only provides liability coverage in excess of $300,000. This means that if an employee's personal vehicle is damaged while it is being used for company business, the repair of the vehicle will be at the employee's expense (or through reimbursement from his/her personal insurance coverage). In addition, if the employee is liable for physical damage or personal injury to the property of others, he/she will be personally responsible for such liability up to the limit of $300,000 (this may be covered by the employee's automobile liability coverage if they have coverage of $300,000 or more).

Employees using their personal vehicle for company business are encouraged to review their insurance coverage, particularly with respect to liability coverage, and where possible, obtain liability coverage with limits of $300,000 or more. Physical damage coverage (collision coverage) should also be given serious consideration.

Employees are encouraged to check their personal vehicle's insurance coverage to insure adequate insurance coverage exists.

Employees may be reimbursed for mileage driven on company business in accordance with current ATS policy. Your station manager will explain what reimbursement documentation is needed and must approve such reimbursement requests.

## SMOKING

Because of the number of flammable items used in many locations, smoking is allowed only in designated areas. This policy must be strictly enforced. Smoking by anyone, whether employee, customer, or visitor, is prohibited within 50 feet of any fuel vehicle or aircraft and everywhere in the hangars or on the ramps. It is each person's responsibility to see that smoking in unauthorized areas does not occur.

In consideration of others and in respect for a healthful environment, ATS has adopted a smoke free policy which includes all company vehicles. Violations may result in disciplinary action up to and including termination of employment.

## OUTSIDE EMPLOYMENT AND CONFLICT OF INTEREST

Employees will not be permitted to engage in activities during or after normal working hours that would be in competition with ATS or would in any way affect the Company's profitability, or the employee's usefulness and efficiency. This would include performing work for an existing or potential customer that could or would normally be performed by ATS. It is the responsibility of the employee to report any requests of this nature by a customer to his/her supervisor or other management.

Normally, manager positions and above are not allowed to engage in employment outside of ATS and in no circumstances by a customer or competitor. Such employment would result in a direct conflict of interest with ATS. Manager positions and above will be required to sign a Conflict of Interest form.

The following will provide helpful guides in more obvious areas of activities to be avoided.

Created January 15, 2008                                                      Revised January 1, 2016

ATS 000068

These examples are not meant to be all inclusive, but rather are areas where conflicts of interest may arise.

      <u>Use of Company Information</u> - Information not of public record obtained from Company sources shall not be used for personal gain, nor disclosed to others, except for Company purposes.

      <u>Interest in Suppliers</u> - No Employee or related party should have any interest, direct or indirect, in any supplier of the Company.  If this situation arises, the employee needs to disclose the potential conflict of interest in writing and explain the relationship and give to the Employee's supervisor.

      <u>Employment</u> - Due to the high demands of managing in our service environment, the Employee may not normally engage in other employment.  In a rare circumstance, other employment may be approved by your supervisor, as long as such employment does not create a conflict of interest and does not impact the Employee's duties and responsibilities to the Company.   Any other employment must be disclosed by the Employee, in writing, to the Employee's supervisor.

      <u>Gifts</u> - No Employee may receive a gift from a supplier that could potentially cause a conflict of interest.  For these purposes, one-time or occasional gifts valued under $100 need not be disclosed.  Gifts exceeding $100, or gifts that are on-going, must be disclosed to the Employee's supervisor.

      For any potential conflicts of interest as described above, the Executive Committee of the Company will determine if there is a conflict of interest and what appropriate action must be taken to ensure this potential conflict of interest is not to the detriment of the Company.

## TEMPORARY DUTY ASSIGNMENTS (TDY)

      When one station is busy and another slow, or during a station start-up, ATS needs may make it necessary to assign an employee to another department or location.  Employees will report to work and clock in at that location as if that were their regular assignment.  In order to continue to provide continuity and good service, employee cooperation in these events is appreciated.

      Employees may be required to sign Travel/TDY guidelines before traveling to the new assignment.

## PROMOTIONS, DEMOTIONS AND TRANSFERS

      Employees are selected because of their skills, abilities and suitability for particular jobs and the business needs of ATS.  However, should other openings become available for which they would also be qualified, employees may request a transfer. ATS encourages employees to seek advancement within the organization.

      Selection criteria may include experience, formal education, location, performance reviews, attendance, discipline records, seniority, ability to perform the duties of the new position and prior related training.  ATS reserves the right to consider outside candidates as it deems necessary.

      Notices of corporate office opportunities and other positions with a title of manager, will normally be posted throughout the company.

      An employee will <u>not</u> normally be considered eligible if he/she has been employed for less than six (6) months in a position (twelve (12) months for those in management positions) or if their performance is unsatisfactory in the position he/she is presently employed.

      In situations where an employee's performance is not meeting standards, or where company situations require it, an employee may be demoted into a different position.  Employees who are demoted may receive a corresponding reduction in pay to reflect the new position.

## SOLICITATION AND DISTRIBUTION

      ATS believes that employees should be provided with an environment free from unwarranted

distractions and interruptions.  ATS also believes in ensuring a highly productive work environment. In order to prevent possible distractions in our operations, and to avoid interference with work and inconvenience to any employees, we have established the following guidelines concerning solicitation and distribution on ATS premises:

Solicitation or distribution by non-employees is not allowed.

A)      Employees may not solicit other employees or distribute documents or literature which are not work related during working time.

B)      Tip solicitation is strictly prohibited.

## BULLETIN BOARDS

Bulletin boards have been placed in various departments for company memos, employee information, training and safety messages, and department correspondence.  Please consult these bulletin boards on a regular basis for information or updates.

These boards are not to be used in connection with solicitation for meetings or charities, clubs, group organizations, or for the sale of commercial products.

## TOOLS

Mechanics are required to provide their personal hand tools.  Your station manager can advise you on the necessity to bring your own tools.  If you work in such an area, a current tool inventory must be maintained in your personnel file and a copy must also be on file at the corporate office so ATS can verify any losses.  If any additional tools are purchased from the original inventory, it is the responsibility of the employee to ensure the inventory list is updated both at the station and the corporate office.  Theft of tools must be reported immediately to your supervisor, and a police report is required.

The employee should prepare a statement explaining when the loss was discovered and the circumstances surrounding the loss.  Employees must also prepare a list of all tools missing and their original or replacement value.  Employees should give the statement and the list to their station manager, who will forward them to Employee Services after investigation to determine the validity of the claim.  Reimbursement for stolen tools is entirely at the discretion of ATS.

If a personal tool used for repairing ATS equipment breaks and is not covered by the tool manufacture warranty, ATS at its discretion may pay for a replacement or repair of the tool. This will be handled on a case by case basis.

## RESIGNATION

Any employee who resigns should give proper resignation notice to their immediate supervisor.  Proper notice is defined as two (2) weeks for hourly employees, and four (4) weeks for manager positions and above.  Vacation time cannot normally be used once a notice of resignation is given.  Failure to give the proper notice may result in the employee being ineligible for re-hire. Floating holidays and sick time are not paid out upon separation of employment.

On the last day of work, employees must return identification credentials, keys, uniforms (PAX only) and any other ATS property to their supervisor.

Failure to call in or report for work for two (2) consecutive scheduled days is considered a voluntary resignation.

## DISMISSAL

ATS expects its employees to act at all times in the best interests of ATS.  Any employee who

Created January 15, 2008                                                    Revised January 1, 2016

pg. 15

ATS 000070

violates the company's rules, regulations, policies and/or procedures may be subject to disciplinary action up to and including termination. ATS may impose disciplinary action procedures in those instances where management decides it is appropriate, and/or bypass discipline policies as each situation warrants. ATS reserves the right to determine what discipline will be imposed in each situation. If any employee is terminated due to what may be illegal activity (e.g. pilferage, assault, battery), ATS will cooperate fully with the authorities to determine if any criminal activity took place.

The following list of standards is not exhaustive, but simply illustrates the type of conduct that may lead to discipline and/or discharge. Conduct not specifically listed may also, at the company's discretion, result in discipline and/or discharge.

## VIOLATIONS OF WORK RULES
The following actions are causes for discipline, up to and including termination:

1. Disorderly conduct, abuse or ill treatment of a customer or fellow co-worker.
2. Unauthorized disclosure or use of confidential information.
3. Absence without notification to a supervisor or manager.
4. Failure to report regularly for work or failure to report regularly on time for work.
5. Use of sick time for other than a personal confining illness (unless specifically allowed by state law).
6. Dishonesty, theft, fraud, or assisting or protecting others in attempting such actions.
7. Any attempt to falsify time worked, badging in or out for another employee, or requesting another employee to badge in or out for you.
8. Fighting, horseplay, or any violent or unprofessional behavior on the job.
9. Using profane, abusive or threatening language toward, or in the presence of, other employees or customers.
10. Insubordination or non-compliance with requests from management.
11. Neglect of duty or failure to perform duties. Use of poor judgment during the course of duty.
12. Failure to promptly return from a leave of absence when released to do so.
13. Destruction of company, customer and/or co-worker's property or destruction of such property through neglect. Wasting or misusing company and/or customer property and/or products.
14. Failure to report an accident or injury while on duty.
15. Improper, unauthorized or illegal possession, sale, distribution, manufacture, or use of prescriptive or controlled substance drugs, or possession, sale, distribution, or use of alcoholic beverage while on duty.
16. Reporting to work under the influence of controlled substance drugs and/or alcohol.
17. Having possession while on duty of any weapon including firearms or knives or the use of any tool or object in a threatening, intimidating or injurious manner.
18. Sleeping on the job or otherwise neglecting work, carelessness, unsatisfactory work or repeated mistakes.
19. Refusal to leave company premises upon the request of an authorized representative of the company.
20. Permitting minor children to remain on company premises during working hours.
21. Failure to follow established company procedures and/or policies.
22. Failure to comply with safety rules and practices including creating or contributing to unsafe or unsanitary conditions.
23. Working in competition with the company or in any situations that may create a conflict of interest without approval from.

Created January 15, 2008                                    Revised January 1, 2016

ATS 000071

24. Conviction of a crime while employed by the company. Violating the law during the course of duty and/or bringing discredit to the company.

25. Misrepresentation in obtaining employment (includes, but is not limited to, providing false information, omission or misrepresentation in an application for employment or in any written or verbal communication).

26. Misrepresentation in obtaining employee benefits or privileges or misuse of employee benefits or privileges including the utilization of computers or other medium for personal use.

27. Refusal to cooperate in an investigation, including refusal to submit to a search of property, lockers, desks, vehicles or clothing, or refusal to cooperate with any investigative or diagnostic test (including but not limited to drug and/or alcohol tests).

28. Falsification of any company record.

29. Disregard for quality services and customer service including making disparaging remarks about ATS, a customer, or a passenger.

30. Inability to retain a SIDA badge.

Created January 15, 2008

Revised January 1, 2016

ATS 000072

EXHIBIT 2

BOARD OFFICERS

Scott Taylor
President
Chief Executive Officer

Albert M. Senella
Secretary / Treasurer
Chief Operating Officer

Bobbi Sloan, Ph.D
Vice President



# TARZANA TREATMENT CENTERS
### Integrated Behavioral Healthcare

18646 Oxnard Street, Tarzana, CA 91356 • (818) 996-1051 • (818) 345-3778 fax • www.tarzanatc.org

Reply Address:

## Certificate To Return To Work/School

TIPTON,JAYME - 201475
38708 Glenbush Ave - Palmdale 93550
DOB: 9/7/1986    Age: 30    Gender: Female
Home: 424-205-0972 - Cell: 424-205-0972
L.A. Care Medi-Cal LAMC Capitated

Name_____

has been under my care from __4/11/17__ to __4/19/17__

and will be able to return to work/school on __4/28/17__

Limitations/Remarks:___ ℗ should push

____ referred to Orthopedic

4/11/17

Dr._____ Phone_____

Address TARZANA TREATMENT CENTER    Date_____
907 W. LANCASTER BLVD.
LANCASTER, CA 93534
(661) 723-4829

TARZANA TREATMENT CENTER
907 W. LANCASTER BLVD.
LANCASTER, CA 93534
(661) 723-4829

### INCORPORATED IN 1972

TARZANA • RESEDA • NORTHRIDGE • LONG BEACH • LANCASTER

DETOXIFICATION • RESIDENTIAL • PREVENTION • WOMEN'S SERVICES • COMMUNITY EDUCATION • FAMILY MEDICAL CARE • MENTAL HEALTH
OUTPATIENT • YOUTH SERVICES • SOBER LIVING • HIV/AIDS SERVICES • AFTER CARE • FAMILY SERVICES • DOMESTIC VIOLENCE

Credited by the Joint Commission on Accreditation of Healthcare Organizations, A Los Angeles County and State of California Contract Agency, Partially Funded by the Drug Programs of Los Angeles. Rules its Acceptance and Participation in the Program are the same for Everyone Without Regard to Race, Color, National Origin, Age, Sex, or Handicap.

JT000068

EXHIBIT 3

**BOARD OFFICERS**

Scott Taylor
President
Chief Executive Officer

Albert M. Senella
Secretary / Treasurer
Chief Operating Officer

Bobbi Sloan, Ph.D
Vice President



# TARZANA TREATMENT CENTERS

### Integrated Behavioral Healthcare

18646 Oxnard Street, Tarzana, CA 91356  •  (818) 996-1051  •  (818) 345-3778 fax  •  www.tarzanatc.org

Reply Address:

## Certificate To Return To Work/School

TIPTON, JAYME - 201475
38708 Glenbush Ave - Palmdale 93550
DOB: 9/7/1986    Age: 29   Gender: Female
Home: 424-205-0972 - Cell: 424-205-0972
Name L.A. Care Medi-Cal LAMC _____

has been under my care from_____ to _____

and will be able to return to work/school on __5/1/17__

Limitations/Remarks:_____ (R) sh nldr_____

_____

_____

Dr._____ Phone_____
TARZANA TREATMENT CENTER
Address 907 W. LANCASTER BLVD.      Date_____
LANCASTER, CA 93534
(661) 723-4829

TARZANA TREATMENT CENTER
907 W. LANCASTER BLVD.
LANCASTER, CA 93534
(661) 723-4829

### INCORPORATED IN 1972

TARZANA  •  RESEDA  •  NORTHRIDGE  •  LONG BEACH  •  LANCASTER

DETOXIFICATION • RESIDENTIAL • PREVENTION • WOMEN'S SERVICES • COMMUNITY EDUCATION • FAMILY MEDICAL CARE • MENTAL HEALTH
OUTPATIENT • YOUTH SERVICES • SOBER LIVING • HIV/AIDS SERVICES • AFTER CARE • FAMILY SERVICES • DOMESTIC VIOLENCE

Accredited by The Joint Commission on Accreditation of Healthcare Organizations. A Los Angeles County and State of California Contract Agency. Partially Funded by the Drug Programs of the County of Los Angeles. Rules for Acceptance and Participation in the Program are the same for Everyone Without Regard to Race, Color, National Origin, Age, Sex, or Handicap.

JT000069

# EXHIBIT 4

**BOARD OFFICERS**

Scott Taylor
President
Chief Executive Officer

Albert M. Senella
Secretary / Treasurer
Chief Operating Officer

Bobbi Sloan, Ph.D
Vice President



# TARZANA TREATMENT CENTERS
### Integrated Behavioral Healthcare

18646 Oxnard Street, Tarzana, CA 91356 • (818) 996-1051 • (818) 345-3778 fax • www.tarzanatc.org

Reply Address:

## Return To Work/School

TIPTON, JAYME - 201475
38708 Glenbush Ave - Palmdale 93550
DOB: 9/7/1986   Age: 30   Gender: Female
Home: 424-205-0972 - Cell: 424-205-0972
L.A. Care Medi-Cal LAMC Capitated

Name _____

has been under my care from _____ to _____

and will be able to return to work/school on _5 | 15 | 17_

Limitations/Remarks: B shoulder sur

_____

_____

Dr. _____ MD __phone_____

Address 907 W. LANCASTER BLVD. _____ Date _____
TARZANA TREATMENT CENTER
LANCASTER, CA 93534
(661) 723-4829

TARZANA TREATMENT CENTER
907 W. LANCASTER BLVD.
LANCASTER, CA 93534
(661) 723-4829

### INCORPORATED IN 1972
TARZANA • RESEDA • NORTHRIDGE • LONG BEACH • LANCASTER

DETOXIFICATION • RESIDENTIAL • PREVENTION • WOMEN'S SERVICES • COMMUNITY EDUCATION • FAMILY MEDICAL CARE • MENTAL HEALTH
OUTPATIENT • YOUTH SERVICES • SOBER LIVING • HIV/AIDS SERVICES • AFTER CARE • FAMILY SERVICES • DOMESTIC VIOLENCE

Accredited by the Joint Commission on Accreditation of Healthcare Organizations • Los Angeles County and State of California Contract Agency Partially Funded by the Drug Program Administration of the County of Los Angeles

JT000070

EXHIBIT 5

**From:**           Guillen, Moses <mguillen@atsstl.com>
**Sent:**           Thursday, May 4, 2017 2:01 PM
**To:**             Henderson, Shonta
**Subject:**        Jayme Tipton
**Attachments:**    jayme.pdf


Just sending this document over. Don't know if it will help her.

_____

**Moses Guillen | Airport Terminal Services**
Account Manager JetBlue, LAX 87
5777 Century Blvd, #715
Los Angeles, CA 90045
+1 (310) 342-9955 (O)
+1 (949) 500-7609 (C)
mguillen@atsstl.com
www.atsstl.com [atsstl.com]

 

1

ATS 000079

EXHIBIT 6

**From:** Luetkenhaus, Jeff
**Sent:** Monday, May 08, 2017 8:44 AM
**To:** Henderson, Shonta <shenderson1@atsstl.com>
**Subject:** RE: LAXSIC Time

Shonta,
If someone is on some modified duty due to an outside of work incident and can't return to work, they should resign and reapply unless LAX wants to gran them a personal LOA.

**Jeff Luetkenhaus | Airport Terminal Services**
Manager, Employee Relations, Corporate Employee Services
111 Westport Plaza Drive, Suite 400
St. Louis, MO. 63146
+1 (314) 739-1900 Ext. 330 (O)
jluetkenhaus@atsstl.com

www.ATSSTL.com [atsstl.com]

 

**From:** Henderson, Shonta
**Sent:** Monday, May 08, 2017 10:43 AM
**To:** Luetkenhaus, Jeff <jluetkenhaus@atsstl.com>
**Subject:** RE: LAXSIC Time

7

ATS 000090

Jeff, in this case Jayme is still not covered under any protected leave. Do you support me contacting her today and informing her of that fact and let her know that she has the option to resign and reapply once she's received a full return to duty with no restrictions?


Regards,
Shonta Henderson
**ATS - Airport Terminal Services**
Human Resource Generalist Assistant
5777 Century Blvd, #715
Los Angeles, CA 90045
**Office:** +1 (310) 417-5110
shenderson1@atsstl.com
www.atsstl.com [atsstl.com]

 

**From:** Henderson, Shonta
**Sent:** Monday, May 08, 2017 7:49 AM
**To:** Jeans, Monique <mjeans@atsstl.com>; Luetkenhaus, Jeff <jluetkenhaus@atsstl.com>
**Subject:** RE: LAXSIC Time

Thanks Jeff/Monique

Regards,
Shonta Henderson
**ATS - Airport Terminal Services**
Human Resource Generalist Assistant
5777 Century Blvd, #715
Los Angeles, CA 90045
**Office:** +1 (310) 417-5110
shenderson1@atsstl.com
www.atsstl.com [atsstl.com]

 

**From:** Jeans, Monique
**Sent:** Monday, May 08, 2017 7:47 AM
**To:** Luetkenhaus, Jeff <jluetkenhaus@atsstl.com>
**Cc:** Henderson, Shonta <shenderson1@atsstl.com>
**Subject:** RE: LAXSIC Time

Yes, his Sick should be LAX sick, I will be it updated

Monique Jeans | Airport Terminal Services

ATS 000091

Employee Services Rep, Employee Services
111 Westport Plaza Dr. Suite 400
St. Louis, MO 63146
+1 (314) 739-1900 ext. 334 (O)
+1 (314) 392-5978 (F)
mjeans@atsstl.com

www.ATSSTL.com [atsstl.com]



---

**From:** Luetkenhaus, Jeff
**Sent:** Monday, May 08, 2017 9:45 AM
**To:** Jeans, Monique <mjeans@atsstl.com>
**Subject:** FW: LAXSIC Time

Hi Monique,
Can you review Jayme Tipton's sick time code. I believe it should read "LAXSIC" vs. "CALSIC."

---

**Jeff Luetkenhaus | Airport Terminal Services**
Manager, Employee Relations, Corporate Employee Services
111 Westport Plaza Drive, Suite 400
St. Louis, MO. 63146
+1 (314) 739-1900 Ext. 330 (O)
jluetkenhaus@atsstl.com

www.ATSSTL.com [atsstl.com]



---

**From:** Henderson, Shonta
**Sent:** Monday, May 08, 2017 9:23 AM
**To:** Luetkenhaus, Jeff <jluetkenhaus@atsstl.com>; Wilson, Sue <swilson@atsstl.com>
**Subject:** RE: LAXSIC Time

Morning Jeff, I will run the report to be sure. Her name is Jayme Tipton.

Regards,
Shonta Henderson
**ATS - Airport Terminal Services**
Human Resource Generalist Assistant
5777 Century Blvd, #715
Los Angeles, CA 90045
**Office:** +1 (310) 417-5110
shenderson1@atsstl.com
www.atsstl.com [atsstl.com]

ATS 000092



**From:** Luetkenhaus, Jeff
**Sent:** Monday, May 08, 2017 6:40 AM
**To:** Henderson, Shonta <shenderson1@atsstl.com>; Wilson, Sue <swilson@atsstl.com>
**Subject:** RE: LAXSIC Time

Hi Shonta,
The ordinance is attached. If someone has worked 90 days, they are eligible to use their protected sick time.

What is her name so I can confirm?

You can run a report in UTA called Balance Detail Report that will provide you available balances of PTO and what has been used.

_____
**Jeff Luetkenhaus | Airport Terminal Services**
Manager, Employee Relations, Corporate Employee Services
111 Westport Plaza Drive, Suite 400
St. Louis, MO. 63146
+1 (314) 739-1900 Ext. 330 (O)
jluetkenhaus@atsstl.com

www.ATSSTL.com [atsstl.com]



**From:** Henderson, Shonta
**Sent:** Friday, May 05, 2017 5:21 PM
**To:** Luetkenhaus, Jeff <jluetkenhaus@atsstl.com>; Wilson, Sue <swilson@atsstl.com>
**Subject:** LAXSIC Time

Hello Jeff/Sue:
How can I tell if an employee has LAXSIC time available?

I'm asking because I have an employee who is currently away from work due to a non-work-related injury and her tenure is too short to qualify her for any protected leave. She's been coded to some sick days but not LAXSIC and I want to ensure she's not penalized for any protected of the 48hours of protected leave.

DOH: 10/31/16

Regards,
Shonta Henderson
**ATS - Airport Terminal Services**
Human Resource Generalist Assistant
5777 Century Blvd, #715

10

ATS 000093

Los Angeles, CA 90045
**Office:** +1 (310) 417-5110
shenderson1@atsstl.com
www.atsstl.com [atsstl.com]

 

ATS 000094

EXHIBIT 7

CERTIFIED COPY

1                    UNITED STATES DISTRICT COURT

2           CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

3

4    JAYME TIPTON,                    )
                                      )
5                   Plaintiff,        )
                                      )
6       vs.                           )    No. 2:18-cv-09503-
                                      )         AB-JEM
7    AIRPORT TERMINAL SERVICES, INC., )
     EDGAR TRUJILLO, MELISSA DOE, and )
8    DOES 1 to 100, inclusive,        )
                                      )
9                   Defendants.       )
     _____)

10

11

12

13              DEPOSITION OF DAMIAN NERI

14                 November 25, 2019

15

16

17

18

19

20

21

22

23

24   Theresa JoAnn Phillips-Blackwell, CSR No. 12700
     458760

25

**BARKLEY**
*Court Reporters*
barkley.com

SINCE 1972

(310) 207-8000 Los Angeles    (415) 433-5777 San Francisco    (949) 955-0400 Irvine          (858) 455-5444 San Diego
(310) 207-8000 Century City   (408) 885-0550 San Jose         (760) 322-2240 Palm Springs    (800) 222-1231 Carlsbad
(916) 922-5777 Sacramento     (800) 222-1231 Martinez         (702) 366-0500 Las Vegas       (800) 222-1231 Monterey
(951) 686-0606 Riverside      (818) 702-0202 Woodland Hills   (702) 366-0500 Henderson       (516) 277-9494 Garden City
(212) 808-8500 New York City  (347) 821-4611 Brooklyn         (518) 490-1910 Albany          (914) 510-9110 White Plains
(312) 379-5566 Chicago        00+1+800 222 1231 Paris         00+1+800 222 1231 Dubai        001+1+800 222 1231 Hong Kong

1              UNITED STATES DISTRICT COURT

2        CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

3

4   JAYME TIPTON,                    )
                                     )
5              Plaintiff,            )
                                     )
6       vs.                          )  No. 2:18-cv-09503-
                                     )        AB-JEM
7   AIRPORT TERMINAL SERVICES, INC., )
    EDGAR TRUJILLO, MELISSA DOE, and )
8   DOES 1 to 100, inclusive,        )
                                     )
9              Defendants.           )
    _____)

10

11

12

13        DEPOSITION OF DAMIAN NERI taken at 225 Santa

14        Monica Boulevard, Seventh Floor, Santa Monica,

15        California, at 2:10 p.m., Monday, November 25,

16        2019, before Theresa JoAnn Phillips-Blackwell,

17        CSR 12700.

18

19

20

21

22

23

24

25

                              2

BARKLEY
Court Reporters

```
 1   APPEARANCES OF COUNSEL:

 2

 3

 4   For Plaintiff:

 5

 6                    AARON ESLAMBOLY, ESQ.

 7                    SHEGERIAN & ASSOCIATES, INC.

 8                    225 Santa Monica Boulevard

 9                    Suite 700

10                    Santa Monica, California  90401

11                    (310) 860-0770

12

13   For Defendants:

14

15                    MEAGAN SUE O'DELL, ESQ.

16                    SEYFARTH SHAW LLP

17                    601 South Figueroa Street

18                    Suite 3300

19                    Los Angeles, California  90017

20                    (213) 270-9649

21                    modell@seyfarth.com

22

23

24

25
```

3

BARKLEY
Court Reporters

```
 1                      I N D E X

 2

 3   DEPONENT            EXAMINED BY             PAGE

 4   Damian Neri         Mr. Eslamboly          5, 90

 5                       Ms. O'Dell             88

 6

 7

 8                      EXHIBITS

 9

10   PLAINTIFF                                  PAGE

11   1 - Plaintiff Jayme Tipton's First Amended 11
         Notice Of Taking Deposition Of Damian
12       Neri; Request For Production Of
         Documents
13
     2 - Doctor's Note                          60
14
     3 - Doctor's Note                          66
15
     4 - Doctor's Note                          67
16
     5 - Plaintiff Jayme Tipton's Second        77
17       Amended Complaint

18   6 - Written Warning Notice - U.S.          87

19

20

21

22

23

24

25
```

                                    4

```
 1          (Damian Neri, deponent, was sworn, examined and

 2                     testified as follows:)

 3

 4          DEPOSITION OFFICER:  You do solemnly state that

 5     the evidence you shall give in this matter shall be the

 6     truth, the whole truth, and nothing but the truth, so

 7     help you God?

 8          THE WITNESS:  The truth.

 9

10                      EXAMINATION

11

12     BY MR. ESLAMBOLY:

13          Q.  Please state your name for the record.

14          A.  Damian Neri.

15          Q.  You can put your arm down now.  It's okay.

16              Can you spell your name, please.

17          A.  D-a-m-i-a-n N-e-r-i.

18          Q.  Is that your full name?

19          A.  My first name was Damian.  Then Neri is my last

20     name.

21          Q.  Do you have a middle name?

22          A.  No.

23          Q.  Have you ever had your deposition taken before?

24          A.  No.

25          Q.  So I'm just going to give you some rules just
```

DAMIAN NERI

BARKLEY
Court Reporters

1  lead in the future?

2       A.  Like I said, there was no issues with no one.

3  That Melissa will tell me so.  I believe so.

4       Q.  Are you aware that she wanted to become a crew

5  chief?

6       A.  No.

7       Q.  Are you aware that she wanted to become a

8  grooming lead?

9       A.  No.

10          MR. ESLAMBOLY:  I'm going to attach as a

11  Exhibit 2 a doctor's note.

12          (Whereupon the document referred to is marked

13  by the reporter as Plaintiff Exhibit 2 for

14  identification.)

15  BY MR. ESLAMBOLY:

16       Q.  Please take a look at the document, and let me

17  know when you're done looking at it -- reviewing it.

18       A.  There.

19       Q.  Have you seen this document before?

20       A.  I don't recall.

21       Q.  Do you know what this document is?

22       A.  By seeing it, it's a doctor's note.

23       Q.  It's a doctor's note that places Ms. Tipton off

24  of work from April 11th, 2017, to April 19, 2017;

25  correct?

60

DAMIAN NERI

BARKLEY
Court Reporters

1         MS. O'DELL:  The document speaks for itself.

2         THE WITNESS:  Correct.

3    BY MR. ESLAMBOLY:

4         Q.  And did you ever receive this note?

5         A.  I don't recall.

6         Q.  Typically, when a employee that you supervise

7    has a doctor's note, do they bring it to you?

8         MS. O'DELL:  Calls for speculation.  Incomplete

9    hypothetical.

10        THE WITNESS:  Yes.  They're supposed to show it

11   to me, and then I'll show it to my manager.

12   BY MR. ESLAMBOLY:

13        Q.  And in this case that would be Moses; correct?

14        A.  Yes.

15        Q.  Do you know how Ms. Tipton's injury occurred

16   that placed her off of work, like it says in this

17   doctor's note?

18        A.  No.

19        Q.  Do you know what her injury was?

20        A.  What I remember is her elbow or arm.  Something

21   like that.

22        Q.  Do you remember when she told you she had

23   gotten that injury?

24        A.  Melissa had told me.  That's what I remember.

25   Something about her arm.  That she couldn't perform

61

BARKLEY
Court Reporters

```
 1              -- off of what Melissa told you; correct?

 2        A.   Correct.

 3              MR. ESLAMBOLY:   I'm going to attach as

 4    Exhibit 3 another doctor's note.

 5              (Whereupon the document referred to is marked

 6    by the reporter as Plaintiff Exhibit 3 for

 7    identification.)

 8    BY MR. ESLAMBOLY:

 9        Q.   Have you seen -- have you had a chance to look

10    at this document?

11        A.   Yeah.

12        Q.   Have you ever seen this document before?

13        A.   No.

14        Q.   What does this document look like to you?

15        A.   Doctor's note.

16        Q.   Did you ever receive this doctor's note?

17        A.   I don't recall.

18        Q.   If this was a note that Ms. Tipton had, she was

19    supposed to bring it to you; right?

20        A.   Yes.

21        Q.   Did anyone tell you -- anyone at ATS tell you

22    that Ms. Tipton's husband brought this note in?

23        A.   I don't recall.

24        Q.   And this is a doctor's note that extended

25    Ms. Tipton's leave to May 1st, 2017; correct?
```

66

BARKLEY
Court Reporters

```
 1                    FURTHER EXAMINATION

 2

 3   BY MR. ESLAMBOLY:

 4       Q.   Okay.  With that, I'm going to ask, Is there

 5   anything you want to change about your testimony today?

 6   Actually -- okay.  Yeah.

 7            Is there anything about your testimony you want

 8   to change?

 9       A.   No.

10       Q.   And I assume you've been truthful in all of

11   your answers today?

12       A.   Correct.

13            MR. ESLAMBOLY:  I'm going to propose a

14   stipulation that the court reporter be relieved of her

15   duty under the code; that she provide the original

16   transcript to counsel for ATS, who will make available

17   the transcript to the deponent.

18            Deponent will have 30 days --

19            MS. O'DELL:  Will you be around the next 30

20   days?

21            THE WITNESS:  Yes.

22            MS. O'DELL:  That's fine.  Go ahead.

23            MR. ESLAMBOLY:  The deponent will have 30 days

24   to review the transcript, make any changes, and sign the

25   transcript under penalty of perjury.
```

DAMIAN NERI

BARKLEY
Court Reporters

1          Counsel for deponent will agree to maintain the

2    original transcript and will notify counsel if there are

3    any changes and will agree to produce the transcript at

4    the time of trial or for any other proceeding necessary

5    and if there are any changes made to the transcript.

6          If there is additional time that is necessary,

7    counsel can advise counsel for plaintiff; and we'll do

8    our best to accommodate such request.

9          Then if the original transcript is for any

10   reason lost, stolen, or destroyed or for any reason

11   unavailable, a certified copy may be used in its place.

12         MS. O'DELL:  So stipulated.

13         DEPOSITION OFFICER:  Would you like to order a

14   copy?

15         MS. O'DELL:  Yes, please.

16       (Deposition session concluded at 4:20 p.m.)

17                         -oOo-

18

19

20

21

22

23

24

25

91

BARKLEY
Court Reporters

1        I certify (or declare) under penalty of

2    perjury under the laws of the State of California

3    that the foregoing is true and correct.

4

5    Executed at _____ on _____.
                           (Place)                    (Date)

6

7                        _____
                              (Signature of Deponent)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

92

BARKLEY
Court Reporters

```
 1                  DEPOSITION OFFICER'S CERTIFICATE

 2

 3      STATE OF CALIFORNIA    }
                               }
                               }   ss.
 4      COUNTY OF LOS ANGELES  }

 5

 6              I, THERESA JOANN PHILLIPS-BLACKWELL, hereby

 7      certify:

 8              I am a duly qualified Certified Shorthand

 9      Reporter in the State of California, holder of

10      Certificate Number CSR 12700 issued by the Court

11      Reporters Board of California and which is in full force

12      and effect.  (Fed. R Civ. P. 28(a)).

13              I am authorized to administer oaths or

14      affirmations pursuant to California Code of Civil

15      Procedure, Section 2093(b) and prior to being examined,

16      the witness was first duly sworn by me.  (Fed. R. Civ.

17      P. 28(a), 30(f)(1)).

18              I am not a relative or employee or attorney or

19      counsel of any of the parties, nor am I a relative or of

20      such attorney or counsel, nor am I financially

21      interested in this action.  (Fed. R. Civ. P. 28).

22              I am the deposition officer that

23      stenographically recorded the testimony in the foregoing

24      deposition and the foregoing transcript is a true record

25                              ///
```

93

DAMIAN NERI

BARKLEY
Court Reporters

1     of the testimony given by the witness.  (Fed. R. Civ. P.

2     30(f)(1)).

3          Before Completion of the deposition, review of

4     the transcript {xx} was {  } was not requested.  If

5     requested, any changes made by the deponent (and

6     provided to the reporter) during the period allowed, are

7     appended hereto.  (Fed. R. Civ. P. 30(e)).

8

9     Dated: December 23, 2019

10

11     _____

12

13

14

15

16

17

18

19

20

21

22

23

24

25

94

BARKLEY
Court Reporters

EXHIBIT 8

**CERTIFIED COPY**

1              UNITED STATES DISTRICT COURT

2        CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

3

4   JAYME TIPTON,                    )
                                     )
5                  Plaintiff,        )
                                     )
6        vs.                         )   No. 2:18-cv-09503-
                                     )        AB-JEM
7   AIRPORT TERMINAL SERVICES, INC., )
    EDGAR TRUJILLO, MELISSA DOE, and )
8   DOES 1 to 100, inclusive,       )
                                     )
9                  Defendants.       )
    ─────────────────────────────────)

10

11

12

13            DEPOSITION OF MOSES GUILLEN

14              November 25, 2019

15

16

17

18

19

20

21

22

23

24   Theresa JoAnn Phillips-Blackwell, CSR 12700.
     458759

25

**BARKLEY**
*Court Reporters*
barkley.com

SINCE 1972

(310) 207-8000 Los Angeles      (415) 433-5777 San Francisco    (949) 955-0400 Irvine           (858) 455-5444 San Diego
(310) 207-8000 Century City     (408) 885-0550 San Jose         (760) 322-2240 Palm Springs     (800) 222-1231 Carlsbad
(916) 922-5777 Sacramento       (800) 222-1231 Martinez         (702) 366-0500 Las Vegas        (800) 222-1231 Monterey
(951) 686-0606 Riverside        (818) 702-0202 Woodland Hills   (702) 366-0500 Henderson        (516) 277-9494 Garden City
(212) 808-8500 New York City    (347) 821-4611 Brooklyn         (518) 490-1910 Albany           (914) 510-9110 White Plains
(312) 379-5566 Chicago          00+1+800 222 1231 Paris         00+1+800 222 1231 Dubai         001+1+800 222 1231 Hong Kong

1          UNITED STATES DISTRICT COURT

2      CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

3

4   JAYME TIPTON,                    )
                                     )
5                Plaintiff,          )
                                     )
6       vs.                          )  No. 2:18-cv-09503-
                                     )         AB-JEM
7   AIRPORT TERMINAL SERVICES, INC., )
    EDGAR TRUJILLO, MELISSA DOE, and )
8   DOES 1 to 100, inclusive,        )
                                     )
9                Defendants.         )
    ─────────────────────────────────)

10

11

12

13      DEPOSITION OF MOSES GUILLEN taken at 225 Santa

14      Monica Boulevard, Seventh Floor, Santa Monica,

15      California, at 10:27 a.m., Monday,

16      November 25, 2019, before Theresa JoAnn

17      Phillips-Blackwell, CSR 12700.

18

19

20

21

22

23

24

25

                          2

BARKLEY
Court Reporters

```
 1   APPEARANCES OF COUNSEL:

 2

 3

 4   For Plaintiff:

 5

 6                     AARON ESLAMBOLY, ESQ.

 7                     SHEGERIAN & ASSOCIATES, INC.

 8                     225 Santa Monica Boulevard

 9                     Suite 700

10                     Santa Monica, California  90401

11                     (310) 860-0770

12

13   For Defendants:

14

15                     MEAGAN SUE O'DELL, ESQ.

16                     SEYFARTH SHAW LLP

17                     601 South Figueroa Street

18                     Suite 3300

19                     Los Angeles, California  90017

20                     (213) 270-9649

21                     modell@seyfarth.com

22

23

24

25
```

3

BARKLEY
Court Reporters

1                          I N D E X

2

3    DEPONENT              EXAMINED BY              PAGE

4    Moses Guillen         Mr. Eslamboly          5, 124

5                          Ms. O'Dell              124

6

7                          EXHIBITS

8

9    PLAINTIFF                                     PAGE

10   1 - Plaintiff Jayme Tipton's First Amended   15
         Notice Of Taking Deposition Of Moses
11       Gillian [sic]; Request For Production
         Of Documents
12
     2 - Doctor's Note                            80
13
     3 - Doctor's Note                            87
14
     4 - Doctor's Note                            90
15
     5 - E-Mail Dated May 4, 2017                 100
16
     6 - Plaintiff Jayme Tipton's Second Amended 104
17       Complaint

18   7 - E-Mail Dated May 9, 2017                 119

19   8 - E-Mail Dated May 4, 2017, with          125
         Attachment
20

21

22

23

24

25


                             4

MOSES GUILLEN

BARKLEY
Court Reporters

```
 1          (Moses Guillen, deponent, was sworn, examined and

 2                      testified as follows:)

 3

 4          DEPOSITION OFFICER:  You do solemnly state that

 5     the evidence you shall give in this matter shall be the

 6     truth, the whole truth, and nothing but the truth, so

 7     help you God?

 8          THE WITNESS:  Yes.

 9

10                      EXAMINATION

11

12     BY MR. ESLAMBOLY:

13          Q.  Please state your name for the record.

14          A.  Moses Guillen.

15          Q.  And can you spell that, please.

16          A.  M-o-s-e-s, last name G-u-i-l-l-e-n.

17          Q.  Have you ever had your deposition taken before?

18          A.  No.

19          Q.  So I'm going to go through some rules just very

20     quickly so that we can make it easier for everybody

21     here.  Okay?

22              Today is a deposition, and so what this is --

23     it gives us an opportunity to understand what you know

24     and to ask you oral questions while you're under oath.

25     Okay?  So you understand you've just been given an oath;
```

5

MOSES GUILLEN

BARKLEY
Court Reporters

1              (Whereupon the document referred to is marked

2      by the reporter as Plaintiff Exhibit 2 for

3      identification.)

4      BY MR. ESLAMBOLY:

5          Q.   Moses, please take a moment to look through

6      this document; and let me know when you're finished

7      reviewing it.

8          A.   I'm finished.

9          Q.   Do you recognize this document?

10         A.   Yes.

11         Q.   Have you ever seen it before?

12         A.   The last time I recall seeing it was in an

13     e-mail I sent.

14         Q.   This would be the doctor's note that we talked

15     about earlier attached in some form to that e-mail that

16     you reviewed?

17         A.   That's correct.

18             MS. O'DELL:   Can we take a break really quick?

19             MR. ESLAMBOLY:   Sure.

20                (A recess is taken.)

21     BY MR. ESLAMBOLY:

22         Q.   So you just had the opportunity to discuss with

23     your attorney -- your attorney's told me that there is a

24     point of clarification you'd like to make, so go ahead.

25         A.   This is -- this isn't the note -- this isn't

80

MOSES GUILLEN

BARKLEY
Court Reporters

1    the note that I've seen.

2        Q.  This isn't the note?

3        A.  No.

4        Q.  Have you ever seen this note before?

5        A.  I don't believe so.

6        Q.  Okay.  This is a document that relates to

7    Ms. Tipton, though; right?

8            MS. O'DELL:  Calls for speculation.  The

9    document speaks for itself.

10           THE WITNESS:  That's correct.  It says her name

11   on it.

12   BY MR. ESLAMBOLY:

13       Q.  Okay.  And according to this, it places

14   Ms. Tipton off duty or off work from April 11th, 2017,

15   to April 19th, 2017; correct?

16           MS. O'DELL:  The document speaks for itself.

17           THE WITNESS:  That's what's reflected on here.

18   BY MR. ESLAMBOLY:

19       Q.  So you don't recall ever receiving this note?

20       A.  No.

21       Q.  You said you received a different note.  How is

22   that note different than this?  Do you recall?

23       A.  I don't know.  I have to see it.

24       Q.  So obviously, Ms. Tipton was injured; correct?

25           MS. O'DELL:  Calls for speculation.  Calls for

MOSES GUILLEN

BARKLEY
Court Reporters

1    Ms. Tipton told him that.

2    BY MR. ESLAMBOLY:

3         Q.   Let me try again.

4              The information that Ms. Tipton gave you over

5    the phone -- allegedly gave you over the phone -- did

6    you share that with anybody else?

7         A.   Just HR.

8         Q.   Shonta?

9         A.   That's correct.

10        Q.   Did Shonta follow up -- do you know if Shonta

11   followed up with Ms. Tipton?

12        A.   I have no idea what happened after that.

13             MR. ESLAMBOLY:   I'm going to attach as

14   Exhibit 3 another doctor's note.

15             (Whereupon the document referred to is marked

16   by the reporter as Plaintiff Exhibit 3 for

17   identification.)

18             MS. O'DELL:   Take your time to look at the

19   document even though they all look similar.

20   BY MR. ESLAMBOLY:

21        Q.   Are you done reviewing the document?

22        A.   Yes.

23        Q.   Have you seen this document before?

24        A.   No.

25        Q.   So you didn't receive this doctor's note?

87

MOSES GUILLEN

BARKLEY
Court Reporters

1   like, her to deal with.  She was --

2        Q.  "Her" being Shonta?

3        A.  Yeah.  HR to deal with.  I -- if she were to

4   come back, then I would have been notified.

5        Q.  And when you said obviously there was a reason,

6   the reason being the injury?

7        A.  From my understanding.

8        Q.  Was that only time you communicated with

9   Ms. Tipton?

10       A.  I believe so.

11            MR. ESLAMBOLY:  I'm going to attach as

12   Exhibit 5 an e-mail.

13            (Whereupon the document referred to is marked

14   by the reporter as Plaintiff Exhibit 5 for

15   identification.)

16   BY MR. ESLAMBOLY:

17       Q.  Please let me know when you've read the

18   document.

19       A.  Done.

20       Q.  Have you seen this document before, whether

21   physically like this or electronically?

22       A.  Yes.

23       Q.  What is it?

24            MS. O'DELL:  The document speaks for itself.

25            Go ahead.

100

MOSES GUILLEN

BARKLEY
Court Reporters

1           THE WITNESS:  It's a printout of an e-mail I

2    sent out with an attachment.

3    BY MR. ESLAMBOLY:

4        Q.  And you sent it to Shonta Henderson; is that

5    correct?

6        A.  That's correct.

7        Q.  We've already talked about this.  I believe

8    Shonta Henderson was the human resources?

9        A.  That's correct.

10       Q.  Do you know what her official title is?

11       A.  HR.

12       Q.  Why did you send this e-mail?

13       A.  Because she was dealing with this situation.

14       Q.  What situation?

15       A.  To my understanding, the fact that Tipton

16   wasn't reporting to work.

17       Q.  So in the e-mail you say, "Just sending this

18   document over."

19           So there was an attachment; correct?

20       A.  That's what it's reflecting.

21       Q.  What was that attachment?

22           MS. O'DELL:  The document speaks for itself.

23   May call for speculation because it's only one page and

24   an incomplete exhibit.

25   ///

101

MOSES GUILLEN

BARKLEY
Court Reporters

1   all your answers so far?

2       A.   Yes.

3            MR. ESLAMBOLY:  Do you want to give a sec to

4   figure out this --

5            MS. O'DELL:  It's going to take me 15 to 20

6   minutes by the time I get logged on to the computer.  I

7   tried to have them send me the stuff.  But my

8   recollection is that either it was in our initial

9   production or it would have been given to Aaron Gbewonyo

10  on Friday.

11           THE WITNESS:  I thought you had it too.

12           MR. ESLAMBOLY:  Let's go off the record.

13           (A recess is taken.)

14           MR. ESLAMBOLY:  We're back on the record.

15  BY MR. ESLAMBOLY:

16      Q.   Moses, I'm going to attach as Exhibit 8 two

17  documents produced by your attorneys previously in this

18  litigation.  This is similar to Exhibit 6 -- excuse

19  me -- Exhibit 5.  Take a look at Exhibit 8, and tell me

20  if you recognize the first page.

21           (Whereupon the document referred to is marked

22  by the reporter as Plaintiff Exhibit 8 for

23  identification.)

24      A.   I recognize it because my name is on it.

25      Q.   This is the same e-mail we were looking at in

125

MOSES GUILLEN

BARKLEY
Court Reporters

1    Exhibit 5; correct?

2        A.   Looks like it, yes.

3        Q.   Except this time in Exhibit 8 we have the next

4    Bates stamp page number and the attachment.

5             Is this the attachment to that e-mail?

6        A.   That's what it looks like now.

7        Q.   So this would be the doctor's note that you

8    received, then?

9        A.   That's correct.

10        Q.   Can you verify that exhibit -- the second page

11    of Exhibit 8 is the same as Exhibit 3?

12             MS. O'DELL:  The documents speak for

13    themselves.

14             That's Exhibit 3?

15             THE WITNESS:  Are you sure?

16             MR. ESLAMBOLY:  Did I -- might be Exhibit 4.

17             MS. O'DELL:  I still maintain the document

18    speaks for itself but now asking about Exhibit 4.

19    BY MR. ESLAMBOLY:

20        Q.   So does the second page of Exhibit 8 -- is it

21    the same as in Exhibit 4?

22             MS. O'DELL:  The documents speak for

23    themselves.

24             THE WITNESS:  That's correct.

25    ///

126

BARKLEY
Court Reporters

1    BY MR. ESLAMBOLY:

2        Q.  All right.  That's it.

3            Anything you want to change about your

4    testimony?  Have all your answers been truthful?

5        A.  Negative.  And yes.

6            MS. O'DELL:  Do you need clarity on that?

7            DEPOSITION OFFICER:  Yes.

8            MS. O'DELL:  I think you asked two questions at

9    once, and she struggled with them.

10   BY MR. ESLAMBOLY:

11       Q.  So all your answers have been truthful?

12       A.  Yes.

13       Q.  And there's no changes you'd like to make to

14   your testimony?

15       A.  No.

16           MR. ESLAMBOLY:  Okay.  I'm going to propose a

17   stipulation that we relieve the court reporter of her

18   duty and her obligations under the code as to the

19   maintenance of the original transcript.

20           The original transcript will be forwarded to

21   counsel for ATS, who will make available the transcript

22   to the deponent.

23           You'll have 30 days to review the transcript,

24   make any changes, and sign the transcript under penalty

25   of perjury.

128

BARKLEY
Court Reporters

1          Counsel for deponent will agree to maintain for

2     safekeeping the original transcript and agree to notify

3     Ms. -- counsel for plaintiff within the said time if

4     there are any changes and will agree to produce the

5     transcript at the time of trial for any other

6     proceedings that's necessary.

7          If you need additional time, please advise us.

8          And then further, if the transcript is lost,

9     stolen, or destroyed for any reason, a certified copy

10    may be used in its place.

11         So stipulated?

12         MS. O'DELL:  So stipulated.

13         DEPOSITION OFFICER:  Would you like to order a

14    copy?

15         MS. O'DELL:  Yes, please.

16         (Deposition session concluded at 1:39 p.m.)

17                         -oOo-

18

19

20

21

22

23

24

25

MOSES GUILLEN

**BARKLEY**
Court Reporters

1  I certify (or declare) under penalty of perjury under

2  the laws of the State of California that the foregoing

3  is true and correct.

4

5  Executed at _____on_____.
                        (Place)                      (Date)

6

7  _____
                        (Signature of Deponent)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

MOSES GUILLEN

BARKLEY
Court Reporters

```
 1            DEPOSITION OFFICER'S CERTIFICATE

 2   STATE OF CALIFORNIA   )
                           ) ss.
 3   COUNTY OF LOS ANGELES )

 4

 5

 6   I, Theresa Phillips-Blackwell, hereby certify:

 7          I am a duly qualified Certified Shorthand

 8   Reporter in the State of California, holder of

 9   Certificate Number CSR 12700 issued by the Certified Court

10   Reporters' Board of California and which is in full

11   force and effect.  (Fed. R. Civ. P. 28(a)(1)).

12          I am authorized to administer oaths or

13   affirmations pursuant to California Code of Civil

14   Procedure, Section 2093(b) and prior to being examined,

15   the witness was first duly sworn by me.  (Fed. R. Civ.

16   P. 28(a)(a)).

17          I am not a relative or employee or attorney or

18   counsel of any of the parties, nor am I a relative or

19   employee of such attorney or counsel, nor am I

20   financially interested in this action.  (Fed. R. Civ. P.

21   28).

22          I am the deposition officer that

23   stenographically recorded the testimony in the foregoing

24   deposition and the foregoing transcript is a true record

25                        / / /
```

131

MOSES GUILLEN

BARKLEY
Court Reporters

1   of the testimony given by the witness.  (Fed. R. Civ. P.

2   30(f)(1)).

3         Before completion of the deposition, review of

4   the transcript [XX] was [  ] was not requested.  If

5   requested, any changes made by the deponent (and

6   provided to the reporter) during the period allowed, are

7   appended hereto.  (Fed. R. Civ. P. 30(e)).

8   Dated: 12/12/19

9

10                    *Theresa Phillips-Blackwell*

11   _____

12

13

14

15

16

17

18

19

20

21

22

23

24

25

132

BARKLEY
Court Reporters

# EXHIBIT 9

**CERTIFIED COPY**

1               UNITED STATES DISTRICT COURT

2         CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

3

4   JAYME TIPTON,               )
                             )

5           Plaintiff,     )
                             )

6      VS.              )  CASE NO.
                             )  2:18-cv-09503-AB-JEM

7   AIRPORT TERMINAL SERVICES, INC.,)
   EDGAR TRUJILLO, MELISSA DOE,   )

8   And DOES 1 to 100, inclusive, )
                             )

9          Defendants.    )
   _____)

10

11

12

13

14      DEPOSITION OF SHONTA HENDERSON, As An Individual

15              November 22, 2019

16

17

18

19

20

21

22

23

24   JOY CHIOU, C.S.R. No. 13899
   458758

25

BARKLEY
Court Reporters
barkley.com
SINCE 1972

(310) 207-8000 Los Angeles  (415) 433-5777 San Francisco  (949) 955-0400 Irvine  (858) 455-5444 San Diego
(310) 207-8000 Century City  (408) 885-0550 San Jose  (760) 322-2240 Palm Springs  (800) 222-1231 Carlsbad
(916) 922-5777 Sacramento  (800) 222-1231 Martinez  (702) 366-0500 Las Vegas  (800) 222-1231 Monterey
(951) 686-0606 Riverside  (818) 702-0202 Woodland Hills  (702) 366-0500 Henderson  (516) 277-9494 Garden City
(212) 808-8500 New York City  (347) 821-4611 Brooklyn  (518) 490-1910 Albany  (914) 510-9110 White Plains
(312) 379-5566 Chicago  00+1+800 222 1231 Paris  00+1+800 222 1231 Dubai  001+1+800 222 1231 Hong Kong

1                UNITED STATES DISTRICT COURT

2         CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

3

4  JAYME TIPTON,              )
                        )

5          Plaintiff,     )
                        )

6     VS.            )  CASE NO.
                        )  2:18-cv-09503-AB-JEM

7  AIRPORT TERMINAL SERVICES, INC.,)
  EDGAR TRUJILLO, MELISSA DOE,   )

8  And DOES 1 to 100, inclusive,  )
                        )

9          Defendants.    )
  _____)

10

11

12

13

14        DEPOSITION OF SHONTA HENDERSON, As An Individual,

15  taken on behalf of the Plaintiff, at 225 Santa Monica

16  Boulevard, Suite 700, Santa Monica, California, commencing at

17  1:17 P.M., Friday, November 22, 2019, before JOY CHIOU,

18  C.S.R. No. 13899, pursuant to NOTICE.

19                     * * *

20

21

22

23

24

25

SHONTA HENDERSON, As An Individual

BARKLEY
Court Reporters

```
 1   APPEARANCES:

 2   For Plaintiff:

 3   SHEGERIAN & ASSOCIATES
     BY:  Aaron Gbewonyo, Esq.
 4   225 Santa Monica Boulevard,
     Suite 700
 5   Santa Monica, California 90401
     (310) 860-0770
 6   Agbewonyo@shegerialaw.com

 7
     For Defendant:
 8
     SEYFARTH SHAW
 9   BY:  Aaron R. Lubeley, Esq.
     601 South Figueroa Street
10   Suite 3300
     Los Angeles, California 90017
11   (213) 270-9636
     Alubeley@seyfarth.com
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

3

BARKLEY
Court Reporters

```
 1                      I N D E X

 2    WITNESS              EXAMINATION              PAGE

 3    SHONTA HENDERSON       By Mr. Gbewonyo           6

 4                          By Mr. Lubeley           56

 5                          By Mr. Gbewonyo          73

 6                          By Mr. Lubeley           77

 7

 8

 9

10

11                    E X H I B I T S

12    PLAINTIFF'S            DESCRIPTION             PAGE

13    NO. 1    Plaintiff Jayme Tipton's Second Amended Notice    7

14             Of Taking Deposition of Shonta Henderson:

15             Request for Production of Documents, 6 pages.

16    NO. 2    ATS Employee Handbook, 18 pages.        18

17    NO. 3    Doctor's return to work note 4/20/17, 1 page.    28

18    NO. 4    Doctor's return to work note 5/1/17, 1 page.    31

19    NO. 5    Doctor's return to work note 5/15/17, 1 page.    32

20    NO. 6    Plaintiff Jayme Tipton's Second Amended    35

21             Complaint for Damages, 26 pages.

22    NO. 7    E-mail from Moses Guillen to Shonta Henderson,    48

23             Subject: Jayme Tipton, dated 5/4/17, 1 page.

24    NO. 8    Separation of Employment letter dated 5/9/17,    52

25             1 page.
```

4

SHONTA HENDERSON, As An Individual

BARKLEY
Court Reporters

1              C O N T I N U E D    E X H I B I T S

2    PLAINTIFF'S              DESCRIPTION                    PAGE

3    NO. 9    US Termination ESF for Tipton Jayme Station:    70

4         LAX 87, 1 page.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

5

SHONTA HENDERSON, As An Individual

BARKLEY
Court Reporters

1       Q     And when you say you would be a witness to a
2   termination, what does that mean?
3       A     The manager would usually terminate an employee, so
4   I would sit in as a witness.
5       Q     And under what circumstances might you be asked to
6   sit in as a witness for a manager who was terminating an
7   employee?
8       A     Basically all circumstances where a termination
9   would occur, I would be asked to sit in.
10      Q     So for all circumstances where a termination might
11  occur, is it correct that the manager would make the
12  termination decision, but you would sit in as a witness?
13      A     Correct.
14      Q     Exhibit 3.  You could put this one away.
15            (Plaintiff's Exhibit 3 was marked
16            for identification.)
17  BY MR. GBEWONYO:
18      Q     Have you ever seen this document before, ma'am?
19      A     I have not.
20      Q     Do you know what this document is?
21      A     Looking at it, it looks like a return to work for
22  Jayme.
23      Q     Okay.  And you said you've never seen this document
24  before?
25      A     I've never seen this.

28

BARKLEY
Court Reporters

```
 1   of a work-related injury, they would contact a nurse hotline.
 2        You would call it, and they would have to -- the
 3   hotline would instruct if the person needs to see a doctor or
 4   if they can administrator self-care.
 5        The supervisor or the manager would also have to
 6   create an incident report, receive a statement from the
 7   employee, and they should be getting this information over to
 8   myself so that I could, in turn, get it to the benefits
 9   coordinator or at least they should be copying me in on
10   sending this information and getting it over to the employee
11   benefits coordinator.
12     Q    And this is pursuant to the Workers' Compensation
13   also; correct?
14     A    That is correct.
15     Q    We could put Exhibit 3 to the side.
16          (Plaintiff's Exhibit 4 was marked
17          for identification.)
18   BY MR. GBEWONYO:
19     Q    Have you ever seen this document before, ma'am?
20     A    I have not.
21     Q    Are you aware of what this document is?
22     A    Yes.
23     Q    And what is this document?
24     A    This is a return to work for Jayme on May 1st.
25     Q    Did anybody at ATS ever inform you that this
```

31

SHONTA HENDERSON, As An Individual

BARKLEY
Court Reporters

1      document had been received by anyone at ATS?

2             MR. LUBELEY:  Objection.  Assumes facts.

3             THE WITNESS:  No.

4    BY MR. GBEWONYO:

5      Q    Did Mr. Guillen ever inform you that plaintiff's

6    husband had brought this document to him?

7      A    No.

8      Q    Was Mr. Guillen the plaintiff's supervisor as of

9    May 1st, 2017; if you're aware?

10     A    I do not know.  I don't remember.

11     Q    You can put Exhibit 4 to the side.

12            (Plaintiff's Exhibit 5 was marked

13            for identification.)

14   BY MR. GBEWONYO:

15     Q    Have you ever seen this document before?

16     A    I've seen this one.

17     Q    And do you recall how you saw this document?

18     A    This was e-mailed to me by Moses.

19     Q    Okay.  Is it your understanding that Moses was

20   plaintiff's manager at this time?

21     A    At this time.

22     Q    As of the date that you had received this note, had

23   you had any other communications with Moses about the

24   plaintiff?

25     A    No, not that I remember.

32

SHONTA HENDERSON, As An Individual

BARKLEY
Court Reporters

```
 1              (Plaintiff's Exhibit 7 was marked

 2              for identification.)

 3   BY MR. GBEWONYO:

 4      Q     Do you recall seeing this e-mail before?

 5      A     Yes.

 6      Q     And do you recall there being an attachment to this

 7   document?

 8      A     Yes, I believe that was the doctor's note for May

 9   15th, I think.

10      Q     Okay.  And do you know whether you responded to this

11   e-mail?

12      A     I don't remember.

13      Q     Okay.  And do you recall whether you called the

14   plaintiff after receiving this doctor's note?

15      A     Yes, it would have been after.

16      Q     Okay.  Do you recall whether you spoke to

17   Mr. Guillen regarding the plaintiff's doctor's note after or

18   before receiving this e-mail?

19      A     I believe it would have been around the same time.

20   It could have been just before, but I'm not 100 percent sure.

21      Q     Do you recall that being the first time that you

22   were informed that the plaintiff was out because of an

23   injury?

24      A     That is about correct.

25      Q     Do you know how long plaintiff had been out because
```

                                    48

SHONTA HENDERSON, As An Individual

BARKLEY
Court Reporters

1    plaintiff, separation of employment, it reads, "Dear

2    Ms. Tipton, your employment recently ended with Airport

3    Terminal Services."

4            When Ms. Tipton -- I believe you said that she

5    resigned -- did you ask her to send over any formal documents

6    that she was resigning?

7        A    No.

8        Q    Okay.  Is there any policy that would require that

9    an employee who was resigning send any formal notice of

10   resignation?

11           MR. LUBELEY:  Objection.  Vague and ambiguous.

12           THE WITNESS:  I mean, they can.  No formal document,

13   no.  It can be e-mail or it can be a letter of resignation.

14   BY MR. GBEWONYO:

15       Q    Okay.  And if there was a separation based upon

16   whether voluntary or involuntary, would you note that in the

17   letter that was sent to an employee?

18       A    Not usually.

19       Q    So it would be a uniform letter that was sent out

20   irrespective of the reason for termination; is that right?

21       A    Let me take that back.

22           If someone abandoned their job, then that is a

23   different letter that would go out stating that they

24   abandoned their job versus a resignation letter.

25       Q    So it was not your understanding that the plaintiff

54

BARKLEY
Court Reporters

1    had abandoned her job; correct?

2        A    It was not my understanding that she abandoned her

3    job.

4        Q    Okay.  So was it your understanding then that the

5    plaintiff intended on returning to her job?

6        A    It was my understanding that she didn't know when

7    she was going to come back to work.

8        Q    Okay.  Did she tell you that she no longer wanted to

9    work for ATS?

10       A    She did not say that.

11       Q    So going back through this document, it reads, "Your

12   employment recently ended with Airport Terminal Services.  At

13   the time of your separation, you did not return your ID badge

14   issued by Los Angeles International Airports."  Do you see

15   that?

16       A    Yes.

17       Q    "As indicated in your security training, this badge

18   is Federal property.  It belongs to Los Angeles Airports, and

19   as such, must be returned to ATS immediately so that we may

20   then return it to the airport badge office."

21           Do you recall informing the plaintiff during your

22   phone call that she had to return her badge to ATS?

23       A    I do remember having that conversation with her.

24       Q    Okay.  Do you happen to recall whether you informed

25   her of this before or after she had allegedly resigned?

                                 55

BARKLEY
Court Reporters

1        Q    And in fact, when I talked about a return to work

2    day, when you called her on May 8th, did you inquire whether

3    she was expected or knew when she would come back to work?

4        A    I asked her that, and she didn't know when she was

5    able to return.

6        Q    Did she explain to you why if she gave a note for

7    May 15th that, at that point of that call, she didn't know

8    when she could return?

9        A    No.

10       Q    No?

11       A    No.

12       Q    Were you aware that Ms. Tipton remained on leave for

13   almost another year after that?

14       A    No.

15       Q    Do you know when Ms. Tipton was finally cleared to

16   return to work?

17            MR. GBEWONYO:  Objection.  Calls for speculation.

18            THE WITNESS:  No.

19   BY MR. LUBELEY:

20       Q    If you take a look at the leave of absence policy --

21   I want you to read that.  Are you familiar with that policy?

22       A    Yes, I am.

23       Q    And what is that policy?

24       A    Basically, the company can allow an employee to take

25   a personal leave of absence, not necessarily medical related,

60

BARKLEY
Court Reporters

1    but a personal leave of absence if it doesn't place undue

2    hardship on the company.  But in this case, for sure, it

3    would have placed undue hardship on the company because of

4    the way the contract was written.

5        Q    Explain to me this undue hardship.  Why was it undue

6    hardship?

7        A    Because we had to have so many cabin grooming agents

8    in the position per the contract.  And so with her position

9    being open, we wouldn't have had -- I wouldn't be able to

10   fulfill our contract to service our client.

11       Q    Prior to you learning that Ms. Tipton had been out

12   on a leave of absence, whether it was approved, protected,

13   non-protected, just that she was out, had you been

14   interviewing people?

15       A    Yes.

16       Q    In fact, didn't you hire people even during this

17   time to fill the open position?

18       A    I did.  At least one person.

19       Q    Why wouldn't it be appropriate to just leave her

20   position open during this time, you know, as you're

21   interviewing until you filled it?

22            MR. GBEWONYO:  Objection.  Asked and answered.

23            THE WITNESS:  Because the contract -- the way the

24   contract states, we have to have so many agents, groomers

25   specifically, and groomers and ramp agents in positions in

61

SHONTA HENDERSON, As An Individual

BARKLEY
Court Reporters

1    order to service the contract.

2    BY MR. LUBELEY:

3        Q    What happens if you violate that contract?

4        A    We failed.  It's against the company's procard and

5    more than likely, it reduces our ability to be able to

6    service them.  We could possibly lose the contract.

7        Q    Lose the contract and all of those employees would

8    be out of work; right?

9        A    Everyone.

10        Q    And at the time that Ms. Tipton had her injuries,

11    were you short staffed?

12        A    We were.

13        Q    And how many employees were you short staffed at

14    that time at the groomer level?

15        A    Three.  I'm trying to think.  It was three.

16        Q    Okay.  Now, this leave of absence policy here on

17    Page 8, this talks about -- this is a broad leave of absence

18    discussion?

19        A    Right.

20        Q    This outlines the number of different leaves of

21    absences that are available to an employee; doesn't it?

22        A    Correct.

23        Q    And it says, the third paragraph says, "Employees

24    may take a leave of absence for the following reasons as

25    outlined below: Family medical leave."  Did Ms. Tipton take a

62

BARKLEY
Court Reporters

1    Q    And she never reapplied; right?

2    A    No.

3         MR. LUBELEY:  Okay.  I have no further questions.

4         MR. GBEWONYO:  Can I see that document?

5                    EXAMINATION

6    BY MR. GBEWONYO:

7    Q    In looking at Exhibit 9, I have a few follow-up

8    questions.

9         The document notes that on April 17th, the plaintiff

10   was terminated; correct?

11   A    Correct.

12   Q    However, you didn't speak with the plaintiff to ask

13   her to resign until May of 2017; is that correct?

14   A    Correct.

15   Q    Okay.  And why would that document -- do you know if

16   you typed that in or whether that pre-populated?

17   A    I would probably have typed that in looking back at

18   her employment records.

19   Q    And it says "date of termination;" correct?

20   A    Correct.

21   Q    It does not say "date of resignation"?

22   A    Correct.

23   Q    If plaintiff had resigned, would it say "date of

24   resignation"?

25   A    No.

73

SHONTA HENDERSON, As An Individual

BARKLEY
Court Reporters

1    Q    It would say?

2    A    Date of termination.

3    Q    And is it your understanding that, as of April 17,

4    2017, the plaintiff had resigned?

5    A    Well, I would say, yes.   But it usually is always

6    retro backed to the last day -- well, the first day they were

7    scheduled and didn't report to work, if that makes sense.

8    Q    Okay.  And did you note anywhere on that document

9    that the plaintiff had resigned?

10   A    Yes.  I did, at the bottom of the form in my

11   remarks.

12   Q    Okay.  And I believe you testified earlier that you

13   weren't aware of when the plaintiff would return; is that

14   correct?

15   A    Correct.

16   Q    Isn't it correct that Mr. Guillen provided you with

17   a doctor's note that had plaintiff's expected date of return?

18   A    Correct.

19   Q    And did you ask -- that date of return was after the

20   date that she had spoke to the plaintiff; correct?

21   A    Correct.

22   Q    And did you ask plaintiff on whether she would be

23   able to return on that date per her doctor's note?

24         MR. LUBELEY:  Objection.  Asked and answered.

25         THE WITNESS:  I want to say, I don't remember

74

SHONTA HENDERSON, As An Individual

BARKLEY
Court Reporters

1    possibly.

2           MR. GBEWONYO:  Same objection.

3    BY MR. LUBELEY:

4       Q    And all employees that are at the airport have to

5    undergo very strict security requirements at the airport?

6       A    Yes.

7           MR. GBEWONYO:  Overbroad.  Calls for speculation.

8    BY MR. LUBELEY:

9       Q    Background checks?

10      A    Their background checks, the airport authority's.

11      Q    Drug tests?

12      A    That would be ATS, and that issue is listed.

13      Q    And they get issued security clearance by the

14   airport?

15      A    Yes.

16      Q    And does -- what are the requirement of an employee

17   that is out on an extended leave?

18      A    They have to return their badge to me.

19      Q    And they have to be deactivated as an inactive

20   employee?

21      A    That is correct.

22          MR. LUBELEY:  I have no further questions.  Do you

23   want to talk about how long we have the transcript?

24          MR. GBEWONYO:  As far as the transcript, I think

25   both parties have to order a copy?

78

BARKLEY
Court Reporters

1          THE REPORTER:  Right, if counsel wants a copy.

2          MR. LUBELEY:  We relieve the reporter of her duty

3    under the Code.  The original can be sent to the witness to

4    review and make changes.  How long do you want to give her to

5    make changes?

6          MR. GBEWONYO:  I mean, it's 30 days.  I'm not sure.

7    It's Federal court.

8          MR. LUBELEY:  Yeah, under the Federal rules.  It's

9    whatever we stipulate.  Yeah, we'll do 30 days.  If we do not

10   sign it -- if she doesn't sign it under penalty of perjury,

11   then it will be deemed to be signed under penalty of perjury.

12         And any certified copy can be used as the original

13   at the time of trial.

14         MR. GBEWONYO:  So stipulated.

15         (The deposition was concluded

16         at 3:24 P.M.)

17                        --o0o--

18

19

20

21

22

23

24

25

79

BARKLEY
Court Reporters

1          I certify (or declare) under penalty of

2  perjury under the laws of the State of California

3  that the foregoing is true and correct.

4

5  Executed at _____ on _____.
                        (Place)              (Date)

6

7                  _____
                        (Signature of Deponent)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SHONTA HENDERSON, As An Individual

BARKLEY
Court Reporters

```
1                 DEPOSITION OFFICER'S CERTIFICATE

2    STATE OF CALIFORNIA   )
                           ) ss.
3    COUNTY OF LOS ANGELES )

4

5

6            I, Joy Chiou, hereby certify:

7            I am a duly qualified Certified Shorthand

8    Reporter in the State of California, holder of

9    Certificate Number CSR 13899 issued by the Certified Court

10   Reporters' Board of California and which is in full

11   force and effect.  (Fed. R. Civ. P. 28(a)(1)).

12           I am authorized to administer oaths or

13   affirmations pursuant to California Code of Civil

14   Procedure, Section 2093(b) and prior to being examined,

15   the witness was first duly sworn by me.  (Fed. R. Civ.

16   P. 28(a)(a)).

17           I am not a relative or employee or attorney or

18   counsel of any of the parties, nor am I a relative or

19   employee of such attorney or counsel, nor am I

20   financially interested in this action.  (Fed. R. Civ. P.

21   28).

22           I am the deposition officer that

23   stenographically recorded the testimony in the foregoing

24   deposition and the foregoing transcript is a true record

25                          / / /
```

SHONTA HENDERSON, As An Individual

BARKLEY
Court Reporters

1   of the testimony given by the witness.  (Fed. R. Civ. P.

2   30(f)(1)).

3        Before completion of the deposition, review of

4   the transcript [xx] was [  ] was not requested.  If

5   requested, any changes made by the deponent (and

6   provided to the reporter) during the period allowed, are

7   appended hereto.  (Fed. R. Civ. P. 30(e)).

8

9   Dated: December 9, 2019

10

11

12

13

14

15   _____

16

17

18

19

20

21

22

23

24

25

82

BARKLEY
Court Reporters

EXHIBIT 10

**CERTIFIED COPY**

1    UNITED STATES DISTRICT COURT

2    CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

3

4    JAYME TIPTON,                    )
                                      )
5              Plaintiff,             )
                                      )
6         VS.                         )    CASE NO.
                                      )    2:18-cv-09503-AB-JEM
7    AIRPORT TERMINAL SERVICES, INC.,)
     EDGAR TRUJILLO, MELISSA DOE,     )
8    And DOES 1 to 100, inclusive,    )
                                      )
9              Defendants.            )
     _____)

10

11

12

13

14    DEPOSITION OF SHONTA HENDERSON, PMK

15    November 22, 2019

16

17

18

19

20

21

22

23

24    JOY CHIOU, C.S.R. No. 13899
      459352

**BARKLEY**
*Court Reporters*
barkley.com

SINCE 1972

(310) 207-8000 Los Angeles    (415) 433-5777 San Francisco    (949) 955-0400 Irvine    (858) 455-5444 San Diego
(310) 207-8000 Century City    (408) 885-0550 San Jose    (760) 322-2240 Palm Springs    (800) 222-1231 Carlsbad
(916) 922-5777 Sacramento    (800) 222-1231 Martinez    (702) 366-0500 Las Vegas    (800) 222-1231 Monterey
(951) 686-0606 Riverside    (818) 702-0202 Woodland Hills    (702) 366-0500 Henderson    (516) 277-9494 Garden City
(212) 808-8500 New York City    (347) 821-4611 Brooklyn    (518) 490-1910 Albany    (914) 510-9110 White Plains
(312) 379-5566 Chicago    00+1+800 222 1231 Paris    00+1+800 222 1231 Dubai    001+1+800 222 1231 Hong Kong

1                    UNITED STATES DISTRICT COURT

2              CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

3

4    JAYME TIPTON,                   )
                                     )
5              Plaintiff,            )
                                     )
6         VS.                        )  CASE NO.
                                     )  2:18-cv-09503-AB-JEM
7    AIRPORT TERMINAL SERVICES, INC.,)
     EDGAR TRUJILLO, MELISSA DOE,    )
8    And DOES 1 to 100, inclusive,   )
                                     )
9              Defendants.           )
     _____)

10

11

12

13

14            DEPOSITION OF SHONTA HENDERSON, Person Most

15   Knowledgeable, taken on behalf of the Plaintiff, at 225 Santa

16   Monica Boulevard, Suite 700, Santa Monica, California,

17   commencing at 10:11 A.M., Friday, November 22, 2019, before

18   JOY CHIOU, C.S.R. No. 13899, pursuant to NOTICE.

19                              *  *  *

20

21

22

23

24

25

                                  2

BARKLEY
Court Reporters

```
 1   APPEARANCES:

 2   For Plaintiff:

 3   SHEGERIAN & ASSOCIATES
     BY:  Aaron Gbewonyo, Esq.
 4   225 Santa Monica Boulevard,
     Suite 700
 5   Santa Monica, California 90401
     (310) 860-0770
 6   Agbewonyo@shegerialaw.com

 7
     For Defendant:
 8
     SEYFARTH SHAW
 9   BY:  Aaron R. Lubeley, Esq.
     601 South Figueroa Street
10   Suite 3300
     Los Angeles, California 90017
11   (213) 270-9636
     Alubeley@seyfarth.com
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

3

BARKLEY
Court Reporters

```
 1                       I N D E X

 2    WITNESS                 EXAMINATION                    PAGE

 3    SHONTA HENDERSON        By Mr. Gbewonyo                  5

 4                           By Mr. Lubeley                   58

 5

 6

 7

 8

 9

10                       E X H I B I T S

11    PLAINTIFF'S                 DESCRIPTION                PAGE

12    NO. 1   Plaintiff Jayme Tipton's Third Amended Notice   12

13            Of Taking Deposition of Defendant Airport

14            Terminal Services, Inc's Person Most

15            Knowledgeable, 6 pages.

16    NO. 2   E-mail Chain Subject: RE: LAXSIC Time, dated    45

17            5/8/17, 6 pages.

18    NO. 3   Pay Statement for Jayme Tipton, from pay        57

19            Period 4/10/17 to 4/16/17, 3 pages.

20

21

22

23

24

25
```

4

SHONTA HENDERSON, PMK

BARKLEY
Court Reporters

```
 1              SANTA MONICA, CALIFORNIA; FRIDAY, NOVEMBER 22, 2019

 2                              10:11 A.M.

 3

 4                          SHONTA HENDERSON,

 5      called as a witness on behalf of Plaintiff, having been

 6      administered an oath in accordance with C.C.P. Section 2094,

 7      was examined and testified as follows:

 8

 9                              EXAMINATION

10      BY MR. GBEWONYO:

11          Q    Good morning, Ms. Henderson.  How are you doing

12      today?

13          A    Doing well.  Thank you.

14          Q    Can you please state and spell your first and last

15      name for me?

16          A    Shonta Henderson, S-H-O-N-T-A, H-E-N-D-E-R-S-O-N.

17          Q    Great.  Have you ever had your deposition taken

18      before Ms. Henderson?

19          A    I have not.

20          Q    Okay.  So I'll go over kind of the preliminary

21      background on what a deposition is with you.

22               Before I get into that, for today's deposition, what

23      would you like me to call you?

24          A    Shonta is fine.

25          Q    Okay.  Great.  So a deposition is very much like a
```

5

SHONTA HENDERSON, PMK

BARKLEY
Court Reporters

1    her to figure out what her status was?

2         A    I do.

3         Q    And who did you speak to?

4         A    I spoke to our employee relations manager.

5         Q    And who is that?

6         A    Jeff Luetkenhaus.

7         Q    And do you recall what you discussed with Jeff

8    Luetkenhaus at that time?

9         A    Yes.   I recall speaking with him about her sick time

10   and where she was to ensure that it was coded appropriately

11   so that we can ensure it did not impact her negatively.   And

12   I also spoke with Jeff about her or me if he was going to be

13   reaching out to her because she was coded appropriately for

14   her sick time, or that we had to go in and code her

15   appropriately, which she didn't have anymore.

16              MR. GBEWONYO:   I'm sorry.   You were doing a

17   document.   What number is that?

18              (Plaintiff's Exhibit 2 was marked

19              for identification.)

20              MR. LUBELEY:   Bates number -- it's an e-mail chain.

21   It's Bates number 90 through 94.   You can tell counsel what

22   these are.

23              THE WITNESS:   This is an e-mail chain that -- where

24   I was talking to Jeff Luetkenhaus about her sick time and

25   ensuring that she was coded appropriately again so that she

                                45

BARKLEY
Court Reporters

1    was not negatively impacted, and to see if it was okay for me

2    to reach out to her regarding her sick time and, you know,

3    talk to her about resignation.

4    BY MR. GBEWONYO:

5        Q    And is it your understanding that Jeff had approved

6    you discussing potential resignation with Ms. Tipton?

7        A    Yes.

8        Q    And did you need Jeff's approval before having that

9    discussion with Ms. Tipton?

10       A    Yes.

11       Q    And did you report to Jeff at that time?

12       A    No.

13       Q    And how did your two positions relate to one

14   another?

15       A    He is the employee services manager, and I am a

16   human resources representative.  So anything that involves a

17   separation of an employee voluntary or involuntarily, it

18   usually has to go through Jeff.

19            So -- sorry, looking back here on the -- I don't

20   know if I'm supposed to quote that number -- 093.

21       Q    Okay.

22       A    Down towards the bottom section, you'll see that I

23   was talking to Jeff about Jayme being away from work due to a

24   non-work-related injury and her tenure for, you know, not

25   having a protected leave.

46

BARKLEY
Court Reporters

```
 1            MR. LUBELEY:  Just want to make sure the record is
 2   clear when we go back later.
 3   BY MR. GBEWONYO:
 4       Q     So the e-mail goes on to state, "I am asking because
 5   I have an employee who is currently away from work due to a
 6   non-work-related injury, and her tenure is too short to
 7   qualify her for a protected leave."  Do you see that?
 8       A     Yes.
 9       Q     And how are you aware that Ms. Tipton's injury was
10   non-work-related?
11       A     If I remember, she mentioned that she was not
12   injured at work during our conversation.
13       Q     And when was that conversation again?
14       A     Maybe it was not with her.  I'm sorry, it was
15   probably with a manager.  It was with a manager.  It was not
16   with Jayme.
17       Q     Okay.
18       A     It would have to be from a manager.
19       Q     Do you remember whether that manager was
20   Mr. Trujillo?
21       A     I don't remember if it was Edgar.
22       Q     Do you recall whether it was Mr. Neri?
23       A     It would not have been Damian.
24       Q     Could it have been somebody other than those two
25   individuals?
```

48

SHONTA HENDERSON, PMK

BARKLEY
Court Reporters

1      A    I would.

2      Q    Did you have any animosity towards her at all?

3      A    None whatsoever.  No.

4           MR. GBEWONYO:  Objection.  Vague as to animosity.

5   BY MR. LUBELEY:

6      Q    Do you have any negative feelings towards her?

7      A    Not at all.

8      Q    Do you have any opinion as to whether she was a good

9   or bad employee?

10          MR. GBEWONYO:  Calls for speculation.

11          THE WITNESS:  An opinion?  No.  But I don't have any

12   reason to believe she wasn't performing well.

13  BY MR. LUBELEY:

14     Q    Why is it that you wanted to check the coding on the

15   coding on the sick time?

16     A    Because I wanted to ensure that she wasn't going to

17   be impacted negatively.  I wanted to make sure that she was

18   given her correct pay and, you know, if there was other times

19   or more time that we could allow her, we gave it to her.

20     Q    Okay.  And to the best of your recollection, after

21   reviewing her time records, did it appear that she had

22   received all of her proper sick time?

23     A    After reviewing these, yes.

24     Q    When you mentioned the 48 hours, that's the total

25   amount of sick time an employee can earn?

66

BARKLEY
*Court Reporters*

1      A    Up to -- I believe they can possibly earn more.

2      Q    Those are capped?

3      A    Yeah.

4           MR. GBEWONYO:  Objection.  Vague as to capped.

5  BY MR. LUBELEY:

6      Q    Do you understand what that means?

7      A    Explain that a little more.

8      Q    Is there an amount that you earn for every hour

9  worked up to a maximum amount?

10     A    There is a maximum amount.  I can't tell you what it

11 is, but there is.

12          MR. LUBELEY:  I have no further questions.

13          MR. GBEWONYO:  I think we're done with that.

14          (The deposition was concluded

15          at 12:11 P.M.)

16                              --o0o--

17

18

19

20

21

22

23

24

25

67

SHONTA HENDERSON, PMK

BARKLEY
Court Reporters

1          I have read the foregoing deposition

2    transcript and by signing hereafter, subject to

3    any changes I have made, approve same.

4

5    Dated_____.

6

7

8                    _____
                         (Signature of Deponent)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

68

BARKLEY
Court Reporters

```
1              DEPOSITION OFFICER'S CERTIFICATE

2    STATE OF CALIFORNIA   )
                           ) ss.
3    COUNTY OF LOS ANGELES )

4

5

6          I, Joy Chiou, hereby certify:

7          I am a duly qualified Certified Shorthand

8    Reporter in the State of California, holder of

9    Certificate Number CSR 13899 issued by the Certified Court

10   Reporters' Board of California and which is in full

11   force and effect.  (Fed. R. Civ. P. 28(a)(1)).

12         I am authorized to administer oaths or

13   affirmations pursuant to California Code of Civil

14   Procedure, Section 2093(b) and prior to being examined,

15   the witness was first duly sworn by me.  (Fed. R. Civ.

16   P. 28(a)(a)).

17         I am not a relative or employee or attorney or

18   counsel of any of the parties, nor am I a relative or

19   employee of such attorney or counsel, nor am I

20   financially interested in this action.  (Fed. R. Civ. P.

21   28).

22         I am the deposition officer that

23   stenographically recorded the testimony in the foregoing

24   deposition and the foregoing transcript is a true record

25                         / / /
```

69

SHONTA HENDERSON, PMK

BARKLEY
Court Reporters

1  of the testimony given by the witness.  (Fed. R. Civ. P.

2  30(f)(1)).

3       Before completion of the deposition, review of

4  the transcript [xx] was [  ] was not requested.  If

5  requested, any changes made by the deponent (and

6  provided to the reporter) during the period allowed, are

7  appended hereto.  (Fed. R. Civ. P. 30(e)).

8

9  Dated: December 5, 2019

10

11

12

13

14  _____

15

16

17

18

19

20

21

22

23

24

25

70

BARKLEY
Court Reporters

# EXHIBIT 11

1                  UNITED STATES DISTRICT COURT
                   CENTRAL DISTRICT OF CALIFORNIA
2                       WESTERN DIVISION

3

4                       JAYME TIPTON

5                          VS

6      AIRPORT TERMINAL SERVICES, INC., and DOES 1 to 100,

7                        Inclusive

8

9              CASE NO. 2:18-cv-09503ABJEM

10

11

12

             DEPOSITION OF JEFF LEAUTKENHAUSE

13

14          Taken on behalf of the Plaintiff

15              December 20, 2019

16

17

18

19

20

21

22

23

24   before Susan M. Moody, MO-CCR

25

                              1

BARKLEY
Court Reporters

1           I N D E X   O F   E X A M I N A T I O N

2

3       WITNESS:   JEFF LEAUTKENHAUSE

4               Examination By Mr. Gbewonyo..........5

5

6           I N D E X   O F   E X H I B I T S

7       PLAINTIFF'S EXHIBIT 1..........................10
            NOTICE OF DEPOSITION
8
        PLAINTIFF'S EXHIBIT 2..........................21
9           ATS EMPLOYEE HANDBOOK

10      PLAINTIFF'S EXHIBIT 3..........................29
            JOB TITLE - MANAGER OF EMPLOYEE
11          RELATIONS

12      PLAINTIFF'S EXHIBIT 4..........................32
            NOTE RE:  RETURN TO WORK
13
        PLAINTIFF'S EXHIBIT 5..........................34
14          NOTE RE:  RETURN TO WORK

15      PLAINTIFF'S EXHIBIT 6..........................35
            NOTE RE:  RETURN TO WORK
16
        PLAINTIFF'S EXHIBIT 7..........................36
17          5/8/17 EMAIL FROM JEFF LEAUTKENHAUSE

18      PLAINTIFF'S EXHIBIT 8..........................54
            TERMINATION DOCUMENT
19
        PLAINTIFF'S EXHIBIT 9..........................58
20          LETTER REGARDING ATS BADGE RETURN

21
        (Exhibits retained by the Court Reporter.)
22

23

24

25

2

JEFF LEAUTKENHAUSE

BARKLEY
Court Reporters

1              UNITED STATES DISTRICT COURT
              CENTRAL DISTRICT OF CALIFORNIA
2                    WESTERN DIVISION

3

4                    JAYME TIPTON

5                        VS

6    AIRPORT TERMINAL SERVICES, INC., and DOES 1 to 100,

7                     Inclusive

8

9          CASE NO. 2:18-cv-09503ABJEM

10

11

12

13           THE DEPOSITION OF JEFF LEAUTKENHAUSE,

14   produced, sworn, and examined on behalf of the

15   Plaintiff, December 20, 2019, between the hours of

16   eight o'clock in the forenoon and five o'clock in

17   the afternoon on that day, at the offices of

18   of Alaris Litigation Services, 711 North 11th

19   Street, St. Louis, Missouri, before Susan M. Moody,

20   a Certified Court Reporter within and for the State

21   of Missouri.

22

23

24

25

                           3

BARKLEY
Court Reporters

```
 1                    A P P E A R A N C E S

 2
     TELEPHONICALLY PRESENT FOR THE PLAINTIFF:
 3
             AARON GBEWONYO
 4           SHEGERIAN & ASSOCIATES
             145 S. Spring Street, Suite 400
 5           Los Angeles, CA 90012
             (310) 860-0770
 6           agbewonyo@shegerianlaw.com

 7

 8   TELEPHONICALLY PRESENT FOR THE DEFENDANT:

 9           MEAGAN O'DELL
             SEYFARTH SHAW LLP
10           601 South Figueroa Street, Suite 3300
             Los Angeles, CA 90017-5793
11           (213) 270-9649
             modell@seyfarth.com
12

13

14   REPORTED BY:

15           SUSAN M. MOODY, MO-CCR

16

17

18

19

20

21

22

23

24

25


                           4
```

BARKLEY
Court Reporters

1           IT IS STIPULATED AND AGREED by and between

2     counsel for the Plaintiff and counsel for the

3     Defendants that the deposition of JEFF LEAUTKENHAUSE

4     may be taken in shorthand by Susan M. Moody, a

5     Certified Court Reporter, and afterwards transcribed

6     into typewriting, and the signature of the witness

7     is waived by agreement of counsel and the witness.

8     PROCEEDINGS BEGAN AT 10:32 A.M.

9               (Whereupon, Plaintiff's Exhibits 1 through

10    9 were marked by the reporter prior to the

11    commencement of the deposition.)

12                      * * * * *

13                JEFF LEAUTKENHAUSE,

14    of lawful age, being produced, sworn, and examined

15    on the part of the Plaintiff, and after responding

16    "Yes" to the oath administered by the court

17    reporter, deposes and says:

18                      * * * * *

19                DIRECT EXAMINATION

20    BY MR. GBEWONYO:

21        Q    Good morning, sir.  How are you doing

22    today?

23        A    I'm doing well.  Yourself?

24        Q    I'm doing well.

25               Can you please state your name for the

5

JEFF LEAUTKENHAUSE

BARKLEY
Court Reporters

1        A    Okay.

2        Q    So specifically I want to draw your

3    attention to Medical Non-FMLA Leave.

4        A    Okay.

5        Q    Do you see that, sir, at the bottom of

6    Page 10 or 65?

7        A    I do.

8        Q    Okay.  Do you need time to review this

9    portion of the policy?

10       A    No, sir.

11       Q    So as it relates this policy, would

12   medical non-FMLA leave be provided for an employee

13   if they were injured on the job?

14            MS. O'DELL:   Incomplete hypothetical.

15       Vague and ambiguous as phrased.

16       A    Yes.

17       Q    (By Mr. Gbewonyo) Okay.  And for medical

18   non-FMLA leave, would it be provided to an employee

19   who was injured off of the job, so somewhere other

20   than at work?

21            MS. O'DELL:   Again, incomplete

22       hypothetical, and vague and ambiguous.

23            THE WITNESS:   Yes.

24            MR. GBEWONYO:   Okay.

25            Can you please provide the witness with

28

BARKLEY
Court Reporters

1       A    Yes, it appears that it is a response.

2       Q    (By Mr. Gbewonyo) Okay.   Great.

3            So looking at Miss Henderson's email to

4  you, the text of the email, which begins on ATS91,

5  reads:  "Jeff, in this case Jayme is still not

6  covered under any protected leave.   Do you support

7  me contacting her today and informing her of the

8  fact and let her know that she has the option to

9  resign and reapply once she's received a full return

10 to duty with no restrictions?"

11           Do you see that?

12      A    I do.

13      Q    Okay.   And do you recall whether you

14 supported Miss Henderson informing Miss Tipton that

15 she could resign and reapply once she could return

16 to work with no restrictions?

17           MS. O'DELL:   The document speaks for

18      itself.   Also asked and answered.

19      A    So my response is on Page 7 of ATS000090.

20      Q    (By Mr. Gbewonyo) Okay.   So in your

21 response you state:   "If someone is on some modified

22 duty due to an outside injury" -- I'm sorry.

23           "If someone is on some modified duty due

24 to an outside-of-work incident and can't work --

25 return to work, they should resign and reapply,

47

BARKLEY
Court Reporters

1   unless LAX wants to grant them a personal leave of

2   absence."

3           I'm assuming that's what "LOA" stands for;

4   is that correct?

5       A    That is.

6       Q    Okay.  So was it your understanding -- did

7   you have some reason to believe that Miss Tipton was

8   on some modified duty?

9           MS. O'DELL:  Objection.  Misstates his

10          prior testimony.  Assumes facts not in evidence

11          and calls for speculation.

12      A    No.  My assumption was if someone can't

13  work, those are options to provide.

14      Q    (By Mr. Gbewonyo) Okay.  And what was the

15  basis of your belief for which you felt that

16  Miss Tipton could not work?

17          MS. O'DELL:  Misstates his prior

18          testimony.

19      A    Due to the May 5th email from Shonta on

20  Page 10 of this email stream.

21      Q    (By Mr. Gbewonyo) Okay.  The May 5th email

22  that you're referring to, is that the 5:21 p.m.

23  email?

24      A    It is.

25      Q    Okay.  So just to kind of go over the

48

BARKLEY
Court Reporters

1          presented to the witness.

2               MS. O'DELL:  I have it as well.

3               MR. GBEWONYO:  Okay.  Great.

4     Q     (By Mr. Gbewonyo) So before we jump into

5   Exhibit 8, I just have one last follow up question

6   that I realize I forgot to hit on.

7               So as it relates to your response to

8   Miss Henderson's May 8, 2017, email, did you support

9   Miss Henderson's email that I just read on May 8,

10  2017, sent to you at 10:43 a.m.?

11              MS. O'DELL:  Objection.  The document

12       speaks for itself, and it's vague and ambiguous

13       as phrased.

14    A     I'm sorry.  I'm getting to it.  Can you

15  rephrase which one that was again?

16    Q     (By Mr. Gbewonyo) Of course.  So I'm

17  referring specifically to Miss Henderson's Monday

18  May 8th, 2017, email a 10:43 a.m.

19              Did you support this email, Miss Henderson

20  moving forward with that plan?

21              MS. O'DELL:  Document speaks for itself

22       and it's vague and ambiguous as phrased.

23    A     I'm still struggling to get to that page.

24  I'm sorry.

25    Q     (By Mr. Gbewonyo) It's Page 8 ATS91.

55

BARKLEY
Court Reporters

1   That's where the text of Miss Henderson's email is.

2        A    So on Page 8, the top question -- or the

3   top email?

4        Q    Correct.

5        A    So my response was on May 8th, on Page 7.

6   That's providing her options based on her email to

7   me.

8        Q    Okay.  But -- so my question is did you

9   support or give Miss Henderson the okay to move

10  forward with this plan that she provides to you on

11  Page 8 ATS0091?

12            MS. O'DELL:  Again, vague and ambiguous.

13       And the document speaks for itself.

14       A    As I previously stated, I don't direct

15  stations.  I provide recommendations.

16       Q    (By Mr. Gbewonyo) Okay.

17       A    So Page 7 of my response provides that

18  recommendation and option.

19       Q    Okay.  And outside of this email, did you

20  have any further discussions regarding this matter

21  with Miss Henderson prior to Miss Tipton's

22  separation?

23       A    I do not recall, no.

24       Q    Have you spoken to Miss Henderson

25  regarding this matter since the lawsuit was filed?

JEFF LEAUTKENHAUSE

BARKLEY
Court Reporters

1    being filed.

2            I'm sorry.  Go ahead, Jeff.

3        A    This exact one or this form?

4        Q    (By Mr. Gbewonyo) This exact document.

5        A    I can't say that I recall seeing this, no.

6        Q    And have you ever seen a similar document

7    before?

8        A    Yes.

9        Q    Okay.  And is this an internal document?

10   Meaning that an employee outside of human resources

11   or a human resource's capacity would be able to see?

12       A    See or initiate?

13       Q    So let me rephrase the question.  I

14   apologize.  That question was poorly stated.

15            In regards to Miss Tipton whom this

16   document is about, are you aware of whether she

17   would have received this document?

18       A    No, she would not.

19       Q    Okay.  Are you aware of whether she would

20   have had access to this document?

21       A    No.

22            MS. O'DELL:  May call for speculation.

23       A    I don't believe she would.

24            MR. GBEWONYO:  If you could please provide

25       the witness with Exhibit 9.

58

BARKLEY
Court Reporters

1       Q    Okay.  And are you familiar with what this

2   document is?

3       A    I am.

4       Q    And what is this document?

5       A    This is ATS' efforts to insure that we

6   receive an airport sita-badge when a team member is

7   no longer employed by ATS.

8       Q    Okay.  And would this be provided to an

9   ATS team member after they're no longer employed by

10  ATS irrespective of their reason for separation?

11      A    Correct.  If a badge has not been returned

12  to ATS, this is a standard letter issued.

13      Q    Okay.  Great.  And if an employee is

14  eligible for rehire, would that be communicated to

15  an employee in writing?

16      A    No.

17      Q    Okay.  I have no further questions.

18           Meagan, did you have any follow-up

19  questions?

20           MS. O'DELL:  Let me just double check my

21      notes really quickly.

22           No, I don't think I have anything.

23           MR. GBEWONYO:  Okay.  Great.  So in

24      regards to the original transcript, that will

25      be handled pursuant to code.

60

JEFF LEAUTKENHAUSE

BARKLEY
Court Reporters

```
 1              Obviously you'll have the opportunity to
 2        review the transcript, Jeff.  To the extent
 3        that additional time is required, please feel
 4        free to notify my office.  We'll make our best
 5        attempts to provide you with that time.  I
 6        understand we have the holidays.
 7              Yeah, to the extent that the original
 8        transcript is lost or can be unfound, then a
 9        certified unsigned copy may be used in its
10        place including at trial.
11              Anything further, Meagan?
12              MS. O'DELL:  Did you give him 30 days?  I
13        apologize.
14              MR. GBEWONYO:  I'm sorry.  I believe I
15        said 30 days, but if I didn't you'll have 30
16        days to review the transcript and make any
17        changes.  However, if additional time is
18        required, please feel free to let me know.
19              MS. O'DELL:  So stipulated.
20              MR. GBEWONYO:  All right.  Great.  Thank
21        you both for your time.  Everybody have a happy
22        holiday.
23              (Whereupon, an off-the-record discussion
24     was held with the court reporter.)
25              MR. GBEWONYO:  My office will be ordering
```

BARKLEY
Court Reporters

```
 1        a copy for plaintiff.
 2             MS. O'DELL:  We'll need -- we'll need a
 3        copy for defendant as well.
 4             MR. GBEWONYO:  Electronic copy for
 5        plaintiff.
 6             MS. O'DELL:  Electronic for defendant is
 7        fine as well.
 8             MR. GBEWONYO:  PDF.
 9             MS. O'DELL:  This is Meagan.  We'll make
10        arrangements.  If you can send us the
11        transcript, we'll make arrangements with
12        Mr. Leautkenhause for him to review the
13        deposition transcript, and we will submit any
14        changes both to plaintiff's counsel and to you,
15        madam court reporter.
16                      * * * * *
17             (Whereupon, the deposition of JEFF
18     LEAUTKENHAUSE was concluded at 12:10 A.M.)
19             (Whereupon, the signature of the witness
20     was not waived in my presence.)
21
22
23
24
25
```

62

JEFF LEAUTKENHAUSE

BARKLEY
Court Reporters

1              I have read the foregoing deposition

2    transcript and by signing hereafter, approve same.

3

4    Dated_____.

5

6

                        _____

7                         (Signature of Deponent)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

63

BARKLEY
Court Reporters

```
 1                    REPORTER CERTIFICATE

 2       I, SUSAN M. MOODY, a Certified Court Reporter,
      within and for the State of Missouri, do hereby
 3    certify that there came before me on December 20,
      2019, at the offices of Alaris Litigation Services,
 4    711 North 11th Street, St. Louis, Missouri,

 5                    JEFF LEAUTKENHAUSE

 6    who was by me first duly sworn; that the witness
      was carefully examined; that said examination was
 7    reported by myself, translated and proofread using
      computer-aided transcription; and the above
 8    transcript of proceedings is a true and accurate
      transcript of my notes as taken at the time of the
 9    examination of this witness.

10            I further certify that I am neither
      attorney nor counsel for nor related nor employed by
11    any of the parties to the action in which this
      examination is taken; further, that I am not a
12    relative or employee of any attorney or counsel
      employed by the parties hereto or financially
13    interested in this action.

14

15       Dated this 6th day of December, 2019.

16

17

18

19    _____
      Susan M. Moody, CCR

20

21

22

23

24

25

                        64
```

# EXHIBIT 12

CERTIFIED COPY

1              UNITED STATES DISTRICT COURT

2        CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

3

4    JAYME TIPTON,                     )
                                       )
5              Plaintiff,              )
                                       )
6         vs.                          )   No. 2:18-cv-09503-
                                       )        AB-JEM
7    AIRPORT TERMINAL SERVICES, INC.,  )
     EDGAR TRUJILLO, MELISSA DOE, and  )
8    DOES 1 to 100, inclusive,         )
                                       )
9              Defendants.             )
     _____)

10

11

12

13         DEPOSITION OF JEFF LUETKENHAUS

14              October 29, 2019

15

16

17

18

19

20

21

22

23

24   Theresa JoAnn Phillips-Blackwell, CSR 12700
     457811

25

SINCE 1972

BARKLEY
Court Reporters
barkley.com

(310) 207-8000 Los Angeles    (415) 433-5777 San Francisco    (949) 955-0400 Irvine    (858) 455-5444 San Diego
(310) 207-8000 Century City   (408) 885-0550 San Jose          (760) 322-2240 Palm Springs   (800) 222-1231 Carlsbad
(916) 922-5777 Sacramento     (800) 222-1231 Martinez          (702) 366-0500 Las Vegas     (800) 222-1231 Monterey
(951) 686-0606 Riverside      (818) 702-0202 Woodland Hills    (702) 366-0500 Henderson     (516) 277-9494 Garden City
(212) 808-8500 New York City  (347) 821-4611 Brooklyn          (518) 490-1910 Albany        (914) 510-9110 White Plains
(312) 379-5566 Chicago        00+1+800 222 1231 Paris          00+1+800 222 1231 Dubai       001+1+800 222 1231 Hong Kong

1              UNITED STATES DISTRICT COURT

2       CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

3

4   JAYME TIPTON,                    )
                                     )
5              Plaintiff,            )
                                     )
6       vs.                          )  No. 2:18-cv-09503-
                                     )       AB-JEM
7   AIRPORT TERMINAL SERVICES, INC., )
    EDGAR TRUJILLO, MELISSA DOE, and )
8   DOES 1 to 100, inclusive,        )
                                     )
9              Defendants.           )
    _____)

10

11

12

13       DEPOSITION OF JEFF LUETKENHAUS taken at 225

14       Santa Monica Boulevard, Fourth Floor, Santa

15       Monica, California, at 10:15 a.m., Tuesday,

16       October 29, 2019, before Theresa JoAnn

17       Phillips-Blackwell, CSR 12700.

18

19

20

21

22

23

24

25

                             2

BARKLEY
Court Reporters

```
 1    APPEARANCES OF COUNSEL:

 2

 3

 4    For Plaintiff:

 5

 6                      AARON GBEWONYO, ESQ.

 7                      SHEGERIAN & ASSOCIATES, INC.

 8                      225 Santa Monica Boulevard

 9                      Suite 700

10                      Santa Monica, California  90401

11                      (310) 860-0770

12

13    For Defendants:

14

15                      MEAGAN SUE O'DELL, ESQ.

16                      SEYFARTH SHAW LLP

17                      601 South Figueroa Street

18                      Suite 3300

19                      Los Angeles, California  90017

20                      (213) 270-9649

21                      modell@seyfarth.com

22

23    Also Present:  Brandy Wallace

24

25
```

3

BARKLEY
Court Reporters

```
1                        I N D E X

2

3    DEPONENT              EXAMINED BY          PAGE

4    Jeff Luetkenhaus    Mr. Gbewonyo          5

5

6

7

8

9                        EXHIBITS

10

11   PLAINTIFF                                 PAGE

12   1 - Plaintiff Jayme Tipton's Third Amended  10
         Notice Of Taking Deposition Of
13       Defendant Airport Terminal Services,
         Inc.'s Personal Most Knowledgeable
14       Regarding Defendants' Policies And
         Procedures; Request For Production Of
15       Documents At Deposition

16   2 - Voluntary Self-Identification of     18
         Disability Form
17
     3 - Employee Handbook                    21
18

19

20

21

22

23

24

25
```

4

1        (Jeff Luetkenhaus, deponent, was sworn, examined and

2                    testified as follows:)

3

4            DEPOSITION OFFICER:  You do solemnly state that

5    the evidence you shall give in this matter shall be the

6    truth, the whole truth, and nothing but the truth, so

7    help you God?

8            THE WITNESS:  I do.

9

10                        EXAMINATION

11

12   BY MR. GBEWONYO:

13       Q.  Good morning.  How are you doing today, sir?

14       A.  Good.

15       Q.  Can you please spell and state your name for

16   me.

17       A.  Jeffrey, J-e-f-f-r-e-y, Michael Luetkenhaus,

18   L-u-e-t-k-e-n-h-a-u-s.

19       Q.  And for purposes of today's deposition, what

20   would you like me to call you?

21       A.  Jeff.

22       Q.  Okay.  Thank you.  I don't want to butcher your

23   last name, so --

24       A.  I appreciate that.

25       Q.  And have you had your deposition taken before,

5

BARKLEY
Court Reporters

1   you served as the manager of employee relations?

2        A.   2015 to 2019.

3        Q.   And as the manager of employee relations, what

4   were your general duties?

5        A.   Review concerns, policies, practices.  That's a

6   summary of --

7        Q.   Okay.  Great.  In part of your duties as the

8   manager of employee relations, were you responsible for

9   drafting any of the policies that you previously

10   mentioned?

11        A.   Assisted in drafting, yes.

12        Q.   And does ATS have more than one location?

13        A.   Please define "location."

14        Q.   Of course.  So ATS has facilities in

15   Los Angeles; correct?

16        A.   Correct.

17        Q.   Are there any facilities outside of the state

18   [sic] of Los Angeles?

19        A.   Yes.

20        Q.   Okay.  So the policies that I'll generally be

21   referring to are those policies that would apply to

22   employees in Los Angeles.  Okay?

23        A.   Correct.  Yes.

24        Q.   And you're familiar with those policies?

25        A.   I am.

14

BARKLEY
Court Reporters

1        A.   -- placed back on active status.

2        Q.   So is it your belief that upon clearance to

3   return to work, that ATS would try and place that

4   employee in a different position?   Correct?

5        A.   Similar.

6        Q.   Similar.   Okay.

7             So does that mean that while even on a non-FMLA

8   medical leave, that an employee would not be terminated?

9             MS. O'DELL:   Incomplete hypothetical.

10            THE WITNESS:   As the last statement says, we

11   make every effort to reinstate that employee.

12            MR. GBEWONYO:   If there were any limitations

13   that were placed -- and, of course, I'm still referring

14   to relevant time period of October 2016 to May 2017 --

15            MS. O'DELL:   If it helps, we can stipulate for

16   the day that all of your questions are October 1, 2016,

17   to May 11, 2017.

18            MR. GBEWONYO:   I appreciate that.   Okay.

19   BY MR. GBEWONYO:

20        Q.   So as it relates to an employee seeking an

21   extension, are you aware of there being any limitations

22   on an employee's ability to seek extensions to non -- to

23   a medical non-FMLA leave?

24        A.   No.

25        Q.   Are you aware of whether ATS would inform an

37

BARKLEY
Court Reporters

```
 1                    (The record is read by the reporter as
 2              follows:
 3              "Q.  Do you believe that ATS's equal employment
 4              policy would prohibit terminating an employee
 5              for taking a medical non-FMLA leave?")
 6              THE WITNESS:  So ATS does not terminate team
 7     members for exercising their rights to take leave.
 8     BY MR. GBEWONYO:
 9         Q.  Okay.  And when you say, "ATS does not
10     terminate employees for exercising their rights," does
11     that mean that ATS would not terminate an employee for
12     exercising their right to taking a leave -- a leave due
13     to a medical reason?
14         A.  Correct.
15         Q.  And ATS policy would prohibit that; correct?
16              MS. O'DELL:  Asked and answered.  Again, the
17     document speaks for itself.
18              MR. GBEWONYO:  Let me just make -- all right.
19     So I don't have any further questions.
20              Did you have any questions you wanted to ask
21     the witness?
22              MS. O'DELL:  No.  I'm okay.
23              MR. GBEWONYO:  So I'll propose the following
24     stipulation:  We relieve the court reporter of her
25     duties.
```

JEFF LUETKENHAUS

BARKLEY
Court Reporters

```
 1              As far as the original transcript, it will be
 2    sent to counsel for the witness, who will -- witness
 3    will have -- I'll take those.  The witness will have 30
 4    days to review the transcript, make any changes under
 5    the penalty of perjury.
 6              To the extent that any changes are required or
 7    you need additional time, please feel free to have --
 8    let my office know, and we'll be happy to accommodate to
 9    the best of our abilities.
10              The parties further stipulate that if the
11    transcript is lost or cannot be unfound, then the
12    original certified copy may be used for any purposes in
13    its place, including at trial.
14              MS. O'DELL:  You're not going to be gone on
15    vacation anytime soon that you --
16              THE WITNESS:  One week.
17              MS. O'DELL:  One week.  Okay.
18              THE WITNESS:  Okay.
19              MS. O'DELL:  Thirty days should still be okay.
20              So stipulated.
21                  (Discussion held off the record.)
22              DEPOSITION OFFICER:  Would you like to order a
23    copy?
24              MS. O'DELL:  Yes, please.
25              (Deposition session concluded at 11:43 a.m.)
```

56

JEFF LUETKENHAUS

BARKLEY
Court Reporters

1    I certify (or declare) under penalty of perjury under

2    the laws of the State of California that the foregoing

3    is true and correct.

4

5    Executed at _____on_____.
                        (Place)                    (Date)

6

7    _____
                    (Signature of Deponent)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

57

JEFF LUETKENHAUS

BARKLEY
Court Reporters

DEPOSITION OFFICER'S CERTIFICATE

STATE OF CALIFORNIA    )
                       ) ss.
COUNTY OF LOS ANGELES )




         I, Theresa Phillips-Blackwell, hereby certify:

         I am a duly qualified Certified Shorthand

Reporter in the State of California, holder of

Certificate Number CSR 12700 issued by the Certified Court

Reporters' Board of California and which is in full

force and effect.  (Fed. R. Civ. P. 28(a)(1)).

         I am authorized to administer oaths or

affirmations pursuant to California Code of Civil

Procedure, Section 2093(b) and prior to being examined,

the witness was first duly sworn by me.  (Fed. R. Civ.

P. 28(a)(a)).

         I am not a relative or employee or attorney or

counsel of any of the parties, nor am I a relative or

employee of such attorney or counsel, nor am I

financially interested in this action.  (Fed. R. Civ. P.

28).

         I am the deposition officer that

stenographically recorded the testimony in the foregoing

deposition and the foregoing transcript is a true record

                        / / /

BARKLEY
Court Reporters

1  of the testimony given by the witness.  (Fed. R. Civ. P.

2  30(f)(1)).

3          Before completion of the deposition, review of

4  the transcript [xx] was [  ] was not requested.  If

5  requested, any changes made by the deponent (and

6  provided to the reporter) during the period allowed, are

7  appended hereto.  (Fed. R. Civ. P. 30(e)).

8

9  Dated: November 25, 2019

10

11

12

13                                   _Theresa Phelps-Blackwell_

14                                   _____

15

16

17

18

19

20

21

22

23

24

25

59

JEFF LUETKENHAUS

**BARKLEY**
Court Reporters

EXHIBIT 13

1              UNITED STATES DISTRICT COURT

2            CENTRAL DISTRICT OF CALIFORNIA

3

4

5   JAYME TIPTON,                    )
                                     )
6          Plaintiff,                )
                                     )
7   vs.                              ) Case No.
                                     ) 2:18-cv-09503
8   AIRPORT TERMINAL SERVICES, INC., ) AB-JEM
    et al.,                          )
9                                    )
           Defendants.               )
10                                   )
    _____)

11

12

13

14                 VOLUME I

15      VIDEOTAPED DEPOSITION OF JAYME TIPTON

16           Los Angeles, California

17         Wednesday, October 23, 2019

18

19

20   Reported by:

21   Norma L. Gaddison, CSR No. 4214,
     Certified Realtime Professional
22

23

24

25

**Kusar**®  Keeping Your Word Is Our Business℠

```
 1                     UNITED STATES DISTRICT COURT

 2                     CENTRAL DISTRICT OF CALIFORNIA

 3

 4

 5   JAYME TIPTON,                     )
                                       )
 6           Plaintiff,                )
                                       )
 7   vs.                               ) Case No.
                                       ) 2:18-cv-09503
 8   AIRPORT TERMINAL SERVICES, INC., ) AB-JEM
     et al.,                           )
 9                                     )
             Defendants.               )
10                                     )
     _____)
11

12

13

14                     Videotaped deposition of JAYME TIPTON,

15   Volume One, taken on behalf of Defendants, at 601 S.

16   Figueroa Street, Suite 3300, Los Angeles, California,

17   beginning at 10:18 A.M. and ending at 3:46 P.M., on

18   October 23, 2019, before NORMA L. GADDISON, Certified

19   Shorthand Reporter No. 4214.

20

21

22

23

24

25
```

**Kusar**® *Keeping Your Word Is Our Business℠*

Jayme Tipton (v.I)                 Jayme Tipton v. Airport Terminal Services, Inc.                    1147705

```
 1   APPEARANCES:

 2   For Plaintiff:

 3                SHEGERIAN & ASSOCIATES
                  BY:  AARON GBEWONYO, Esq.
 4                225 Santa Monica Boulevard, Suite 700
                  Santa Monica, California 90401
 5                (310) 860-0770
                  agbewonyo@shergerianlaw.com
 6

 7   For Defendants:

 8
                  SEYFARTH SHAW
 9                BY:  AARON LUBELEY, Esq.
                  601 S. Figueroa Street, Suite 3300
10                Los Angeles, California 90017
                  (213) 270-9600
11                alubeley@seyfarth.com

12

13   Also Present:

14                SPENCER BENVENISTE, Videographer
                  CAROLINA NUNEZ
15

16

17

18

19

20

21

22

23

24

25
```

3

**Kusar**® Keeping Your Word Is Our Business℠

Case 2:18-cv-09503-AB-JEM    Document 55-1    Filed 01/17/20    Page 156 of 265    Page
ID #:1791
Jayme Tipton (v.I)          Jayme Tipton v. Airport Terminal Services, Inc.          1147705

```
 1                    I N D E X

 2   WITNESS                      EXAMINATION

 3   JAYME TIPTON

 4                                    PAGE

 5             BY MR. LUBELEY         7

 6

 7                  EXHIBITS

 8   NUMBER        DESCRIPTION                 PAGE

 9   Exhibit 1     Amended Notice of Deposition    17
                   of Plaintiff Jayme Tipton
10
     Exhibit 2     Plaintiff Jayme Tipton's        17
11                 Responses to Defendant Airport
                   Terminal Services, Inc.'s
12                 Requests for Production of
                   Documents (Set One)
13
     Exhibit 3     Defendant's Interrogatories     18
14                 Propounded to Plaintiff (Set
                   One)
15
     Exhibit 4     Plaintiff Jayme Tipton's        19
16                 Responses to Defendant Airport
                   Terminal Services, Inc.'s
17                 Interrogatories (Set One)

18   Exhibit 5     Written Warning Notice - U.S.,   22
                   4/8/2017
19
     Exhibit 6     Medical record, under           37
20                 separate cover (Confidential)

21   Exhibit 7     May 9, 2017 Separation of       49
                   Employment letter, signed
22
     Exhibit 8     May 9, 2017 Separation of       49
23                 Employment letter, unsigned

24   Exhibit 9     Tarzana Treatment Center        74
                   Certificate to Return to
25                 Work/School, return 4/20/17
```



Jayme Tipton (v.I)                Jayme Tipton v. Airport Terminal Services, Inc.                1147705

```
 1   INDEX (CONTINUED):

 2                           EXHIBITS

 3   NUMBER          DESCRIPTION                      PAGE

 4   Exhibit 10      4/12/2017 Lancaster Imaging       75
                     x-ray results
 5
     Exhibit 11      Referral Request No. 67227211     83
 6
     Exhibit 12      Tarzana Treatment Center          89
 7                   Certificate to Return to
                     Work/School, return 5/1/17
 8
     Exhibit 13      Tarzana Treatment Center          97
 9                   Certificate to Return to
                     Work/School, return 5/15/17
10
     Exhibit 14      ATS Employee Handbook            121
11
     Exhibit 15      Employee Services Policy and     122
12                   Procedures Acknowledgment

13   Exhibit 16      Voluntary Self-Identification    131
                     of Disability
14
     Exhibit 17      Form W-4 (2016) Jayme Tipton     150
15
     Exhibit 18      October 30, 2017 Notice of       164
16                   Complainant or Complainant's
                     Attorney Right to Sue
17
     Exhibit 19      Plaintiff Jayme Tipton's         169
18                   Second Amended Complaint for
                     Damages
19

20

21

22

23

24

25
```

5



| | | |
|---|---|---|
| 11:13 | 1 | A.    Yes. |
| 11:13 | 2 | Q.    I'd like to have these marked as |
| 11:13 | 3 | exhibits 6 and 7. |
| 11:13 | 4 | THE REPORTER:  I think seven and eight. |
| 11:13 | 5 | MR. LUBELEY:  Okay. |
| | 6 | (Deposition Exhibits 7-8 were marked for |
| | 7 | identification by the reporter and are |
| | 8 | attached herewith.) |
| | 9 | BY MR. LUBELEY: |
| 11:14 | 10 | Q.    This was not the first notice you |
| 11:14 | 11 | received that your employment was terminated, was it? |
| 11:14 | 12 | A.    Yes.  This is the first letter. |
| 11:14 | 13 | Q.    Did you have any discussions with |
| 11:14 | 14 | anyone prior to this about your employment? |
| 11:14 | 15 | A.    No. |
| 11:14 | 16 | Q.    Okay.  Do you recall being told that |
| 11:14 | 17 | once you were cleared to return to work that you |
| 11:14 | 18 | could reapply to an open position? |
| 11:14 | 19 | A.    No. |
| 11:14 | 20 | Q.    Are you aware that in your -- in the |
| 11:14 | 21 | company's separation paperwork that you were eligible |
| 11:14 | 22 | for rehire? |
| 11:14 | 23 | A.    No. |
| 11:14 | 24 | Q.    Okay.  Did you ever ask to be rehired |
| 11:14 | 25 | or reapply to Airport Terminal Services? |

49

Case 2:18-cv-09503-AB-JEM    Document 55-1    Filed 01/17/20    Page 159 of 265    Page
ID #:1794
Jayme Tipton (v.I)                    Jayme Tipton v. Airport Terminal Services, Inc.                    1147705

| 11:16 | 1 | A. That meant that she wanted to let me go |
| 11:16 | 2 | because she wanted to fill my -- my position on the |
| 11:16 | 3 | crew. |
| 11:16 | 4 | Q. You said she needed to fill your spot |
| 11:16 | 5 | on the crew. Do you know why she needed to fill your |
| 11:16 | 6 | spot on the crew? |
| 11:16 | 7 | A. I have no idea. I'm sorry. |
| 11:16 | 8 | Q. Were you ever short staffed when you |
| 11:16 | 9 | were working at Airport Terminal Services? |
| 11:16 | 10 | A. I wouldn't say that we were short |
| 11:16 | 11 | staffed. They was -- they were -- we had enough |
| 11:17 | 12 | people on the crew to pursue the cleaning on the |
| 11:17 | 13 | airplane. We had enough people. |
| 11:17 | 14 | Q. But if someone's gone, that would |
| 11:17 | 15 | impact how many people you had; right? |
| 11:17 | 16 | A. No. |
| 11:17 | 17 | Q. Why not? |
| 11:17 | 18 | A. Because we had enough people to do what |
| 11:17 | 19 | we have to do. They always had an extra person there |
| 11:17 | 20 | just in case somebody didn't come to work. |
| 11:17 | 21 | Q. And while you were out, did you know |
| 11:17 | 22 | how many employees were there and what the |
| 11:17 | 23 | availability of crew members were at that time? |
| 11:17 | 24 | A. No. |
| 11:17 | 25 | MR. GBEWONYO: Objection, compound. Calls for |

Kusar® Keeping Your Word Is Our Business℠

Case 2:18-cv-09503-AB-JEM    Document 55-1    Filed 01/17/20    Page 160 of 265    Page
ID #:1795
Jayme Tipton (v.I)                    Jayme Tipton v. Amport Terminal Services, Inc.                    1147705

| | | |
|---|---|---|
| 11:17 | 1 | speculation. |
| | 2 | BY MR. LUBELEY: |
| 11:17 | 3 | Q. Tell me everything you recall about |
| 11:17 | 4 | that conversation with Shonta. |
| 11:17 | 5 | MR. GBEWONYO: Objection, calls for a |
| 11:17 | 6 | narrative. |
| 11:17 | 7 | MR. LUBELEY: You can answer. |
| 11:18 | 8 | THE WITNESS: She just said that I need to |
| 11:18 | 9 | resign. And I said why? My doctor has me out. |
| 11:18 | 10 | Eventually I want to come back to work. I'm just |
| 11:18 | 11 | trying to see what's going on with my arm, and she |
| 11:18 | 12 | said -- she just basically kept repeating herself. |
| 11:18 | 13 | I need to resign, and I was like that's |
| 11:18 | 14 | not -- that's not right, and she was like, well, if |
| 11:18 | 15 | you're not going to resign, that we're going to |
| 11:18 | 16 | terminate you. She actually said that I needed to |
| 11:18 | 17 | come into the office. |
| 11:18 | 18 | MR. LUBELEY: Okay. |
| 11:18 | 19 | THE WITNESS: I needed to come into the office |
| 11:18 | 20 | that day to return my badge and to resign. |
| | 21 | BY MR. LUBELEY: |
| 11:18 | 22 | Q. And did she -- this was by telephone? |
| 11:19 | 23 | A. Yes. |
| 11:19 | 24 | Q. Okay. And in this conversation, did |
| 11:19 | 25 | Shonta explain to you why it was that they needed you |

Kusar ® Keeping Your Word Is Our Business℠

| 11:19 | 1 | to resign other than what you've said so far? |
| 11:19 | 2 | A.    I do not recall. |
| 11:19 | 3 | Q.    Okay.  Did she tell you during this -- |
| 11:19 | 4 | do you recall her telling you during this telephone |
| 11:19 | 5 | conversation that once you were able to return to |
| 11:19 | 6 | work you could reapply? |
| 11:19 | 7 | A.    No. |
| 11:19 | 8 | Q.    Do you have any reason to believe that |
| 11:19 | 9 | she would lie about that? |
| 11:19 | 10 | A.    No. |
| 11:19 | 11 | MR. GBEWONYO:  Objection.  Calls for |
| 11:19 | 12 | speculation. |
| | 13 | BY MR. LUBELEY: |
| 11:19 | 14 | Q.    Is it possible that she mentioned that |
| 11:19 | 15 | in the call that, you know, you can resign but you |
| 11:19 | 16 | can always reapply?  We just need to fill your |
| 11:19 | 17 | position? |
| 11:19 | 18 | MR. GBEWONYO:  Objection.  Asked and answered. |
| 11:19 | 19 | You can answer. |
| 11:19 | 20 | THE WITNESS:  I do not recall her saying that, |
| 11:19 | 21 | but I know that if you resign, I believe you can |
| 11:20 | 22 | always apply for your job again, but if you're |
| 11:20 | 23 | terminated, you can't.  So -- |
| 11:20 | 24 | BY MR. LUBELEY: |
| 11:20 | 25 | Q.    Well, what's that based on?  What's |

Kusar  ® Keeping Your Word Is Our Business℠

```
11:20    1    your understanding of that based on?

11:20    2         A.      Just past jobs that I had and -- I

11:20    3    don't know.  That's just what I've always thought.

11:20    4         MR. LUBELEY:   Can we get the employment

11:20    5    document that showed she was eligible for rehire.

11:20    6         Q.      Did you understand -- did Shonta

11:20    7    explain to you -- did Shonta explain to you that your

11:20    8    -- because of your short time with the company that

11:20    9    you did not have job protected leave available to

11:20   10    you?

11:20   11         A.     No.

11:20   12         Q.     Did you have any understanding about

11:20   13    that or what that issue is?

11:20   14         A.     No.

11:21   15         Q.     Okay.  Anything else you can recall

11:21   16    about that telephone call?

11:21   17         A.      I just told her that I did not want to

11:21   18    resign, and she said okay.  We're going to terminate

11:21   19    you.  And that was the end of the phone call.

11:21   20         Q.     When is it that you began a leave of

11:21   21    absence?

11:21   22         A.     April 11, 2017.

11:21   23         Q.     And what was the reason that you began

11:21   24    a leave of absence?

11:21   25         A.     Because I injured my right shoulder.
```

54

Case 2:18-cv-09503-AB-JEM    Document 55-1    Filed 01/17/20    Page 163 of 265    Page
ID #:1798
Jayme Tipton (v.I)              Jayme Tipton v. APM Terminal Services, Inc.                    1147705

| 11:23 | 1 | Q. Do you have any understanding about |
| 11:23 | 2 | that? |
| 11:23 | 3 | A. No. No. |
| 11:23 | 4 | Q. Okay. And you were not paid during |
| 11:23 | 5 | this time? |
| 11:23 | 6 | A. No. |
| 11:23 | 7 | Q. Did you apply for disability with the |
| 11:23 | 8 | State of California? |
| 11:23 | 9 | A. No. |
| 11:23 | 10 | Q. Okay. So you just were not being paid |
| 11:23 | 11 | during this period? |
| 11:23 | 12 | A. Yes. |
| 11:23 | 13 | Q. Okay. I'm going to just represent to |
| 11:23 | 14 | you -- and then ask you some questions -- under the |
| 11:23 | 15 | law, there are different types of leaves that you can |
| 11:23 | 16 | take for different reasons. Some may be paid leave, |
| 11:23 | 17 | some might be unpaid leave. |
| 11:23 | 18 | Did you have any discussions with |
| 11:23 | 19 | anyone about the type of leave that you needed to |
| 11:24 | 20 | take? |
| 11:24 | 21 | MR. GBEWONYO: Objection, vague as to |
| 11:24 | 22 | "anyone." |
| 11:24 | 23 | THE WITNESS: No. |
| 11:24 | 24 | MR. GBEWONYO: Vague as to time as well. |
| 11:24 | 25 | THE WITNESS: Can I use the bathroom, please? |

Kusar ® Keeping Your Word Is Our Business℠

Case 2:18-cv-09503-AB-JEM    Document 55-1    Filed 01/17/20    Page 164 of 265    Page
ID #:1799
Jayme Tipton (v.I)                  Jayme Tipton v. Airport Terminal Services, Inc.                    1147705

| 11:24 | 1  | MR. LUBELEY:  Yes.  We can take a break. |
| 11:24 | 2  | THE WITNESS:  Okay. |
| 11:24 | 3  | MR. LUBELEY:  Off the record |
| 11:24 | 4  | THE VIDEOGRAPHER:  The time is 11:23 A.M.  We |
| 11:24 | 5  | are off the record. |
| 11:35 | 6  | (Short break.) |
| 11:39 | 7  | THE VIDEOGRAPHER:  We're back on the record. |
| 11:39 | 8  | The time is 11:38 A.M. |
| 11:39 | 9  | MR. LUBELEY:  Okay.  We're back on the record. |
| 11:39 | 10 | Q.    Ms. Tipton, before the break, we were |
| 11:39 | 11 | discussing the call that you received from |
| 11:39 | 12 | Ms. Henderson. |
| 11:39 | 13 | A.    Yes. |
| 11:39 | 14 | Q.    And you believe that that occurred |
| 11:39 | 15 | either on May 8th or May 9th? |
| 11:39 | 16 | A.    Yes. |
| 11:39 | 17 | Q.    All right.  And recall your testimony |
| 11:39 | 18 | regarding that call, what you just testified to about |
| 11:39 | 19 | the call? |
| 11:39 | 20 | A.    Yes. |
| 11:39 | 21 | Q.    Okay.  The conversation you had with |
| 11:39 | 22 | Shonta Henderson in which she asked you to resign, |
| 11:39 | 23 | did she tell you if you didn't resign you would be |
| 11:39 | 24 | terminated? |
| 11:39 | 25 | A.    Yes. |

57


Kusar® Keeping Your Word Is Our Business℠

| | | |
|---|---|---|
| 11:39 | 1 | Q.    For the reasons you testified to? |
| 11:39 | 2 | A.    Yes. |
| 11:39 | 3 | Q.    Okay.  And did you -- why did you |
| 11:39 | 4 | decide not to voluntarily resign and then reapply for |
| 11:39 | 5 | a position? |
| 11:39 | 6 | A.    Because I wanted to keep my job. |
| 11:40 | 7 | Q.    Okay.  Did you mention that to Shonta? |
| 11:40 | 8 | A.    Yes. |
| 11:40 | 9 | Q.    And do you recall her telling you that |
| 11:40 | 10 | you could reapply once you were cleared to return to |
| 11:40 | 11 | work? |
| 11:40 | 12 | MR. GBEWONYO:  Objection.  Asked and answered. |
| 11:40 | 13 | THE WITNESS:  I don't recall. |
| 11:40 | 14 | MR. LUBELEY:  Okay. |
| 11:40 | 15 | Q.    Do you have any reason to disagree with |
| 11:40 | 16 | her account that she did mention that to you? |
| 11:40 | 17 | MR. GBEWONYO:  Objection, argumentative. |
| 11:40 | 18 | MR. LUBELEY:  You can answer. |
| 11:40 | 19 | THE WITNESS:  Can you repeat that, please? |
| | 20 | BY MR. LUBELEY: |
| 11:40 | 21 | Q.    Do you have any reason to disagree with |
| 11:40 | 22 | her account that she did mention that to you in the |
| 11:40 | 23 | call? |
| 11:40 | 24 | A.    No. |
| 11:40 | 25 | Q.    Your counsel said you had a question |

**Kusar** ® Keeping Your Word Is Our Business℠

| | | |
|---|---|---|
| 11:41 | 1 | BY MR. LUBELEY: |
| 11:41 | 2 | Q.    What's that? |
| 11:41 | 3 | A.    That's okay. |
| 11:41 | 4 | Q.    Was there a question?  Something about |
| 11:41 | 5 | the date? |
| 11:41 | 6 | A.    I just noticed that it said the date of |
| 11:41 | 7 | injury was in March. |
| 11:41 | 8 | Q.    Okay.  Is that -- |
| 11:42 | 9 | A.    But this is the doctor's note. |
| 11:42 | 10 | Q.    Yeah.  I'm not sure what -- that |
| 11:42 | 11 | appears to be the doctor's note, yes. |
| 11:42 | 12 | Did you tell someone that you had been |
| 11:42 | 13 | injured in March? |
| 11:42 | 14 | A.    No.  I'm trying to -- it's okay. |
| 11:42 | 15 | Q.    When -- what was the date that you |
| 11:42 | 16 | injured yourself?  Do you recall? |
| 11:42 | 17 | A.    No, I do not recall. |
| 11:42 | 18 | Q.    Okay.  And do you think it was in March |
| 11:42 | 19 | or it may have been a different time? |
| 11:42 | 20 | A.    I believe it was in April. |
| 11:42 | 21 | Q.    Okay.  Because you'd seen the doctor in |
| 11:42 | 22 | April 11? |
| 11:42 | 23 | A.    Between March and April.  So -- |
| 11:42 | 24 | Q.    Okay.  Do you recall when you filed a |
| 11:42 | 25 | workers' comp claim? |

Kusar ® Keeping Your Word Is Our Business℠

| 11:46 | 1 | I do not recall. |
|---|---|---|
| 11:46 | 2 | Q.    Were there other people? |
| 11:46 | 3 | A.    I know -- I do not recall the people |
| 11:46 | 4 | that was on the shift that day. |
| 11:46 | 5 | Q.    How many people work with you when you |
| 11:46 | 6 | are cleaning a plane?  Like what's the crew size? |
| 11:46 | 7 | A.    About eight people. |
| 11:46 | 8 | Q.    And when you -- there were eight people |
| 11:46 | 9 | working on the plane at the same time? |
| 11:46 | 10 | A.    Yes. |
| 11:46 | 11 | Q.    That's how you get it done so quickly, |
| 11:46 | 12 | huh? |
| 11:46 | 13 | A.    Yes. |
| 11:46 | 14 | Q.    I always wondered about that. |
| 11:46 | 15 | When you suffered your injury, when you |
| 11:47 | 16 | heard the pop, what did you do next? |
| 11:47 | 17 | A.    Well, I had to continue to do my job, |
| 11:47 | 18 | but once I got off the plane, that's when I told |
| 11:47 | 19 | Damian. |
| 11:47 | 20 | Q.    What time of day was this? |
| 11:47 | 21 | A.    This was at the end of my shift, maybe |
| 11:47 | 22 | around 3:00. |
| 11:47 | 23 | Q.    At the end of your shift, maybe what |
| 11:47 | 24 | time? |
| 11:47 | 25 | A.    About 3:00. |

Kusar ® Keeping Your Word Is Our Business℠

| | | |
|---|---|---|
| 11:47 | 1 | Q.    3:00 P.M. in the afternoon? |
| 11:47 | 2 | A.    Yes. |
| 11:47 | 3 | Q.    And you don't recall -- was Damian on |
| 11:47 | 4 | the plane with you? |
| 11:47 | 5 | A.    No. |
| 11:47 | 6 | Q.    Hold on one second. |
| 11:48 | 7 | Did you go to the doctor on that same |
| 11:48 | 8 | day? |
| 11:48 | 9 | A.    No. |
| 11:48 | 10 | Q.    And you believe this occurred -- it was |
| 11:48 | 11 | sometime after April 8th but before April 11th when |
| 11:48 | 12 | you went to the doctor -- |
| 11:48 | 13 | A.    Yes. |
| 11:48 | 14 | Q.    -- that the injury occurred? |
| 11:48 | 15 | A.    Yes. |
| 11:48 | 16 | Q.    Okay.  Did you go home that day? |
| 11:48 | 17 | A.    No.  Because it was the end of the |
| 11:48 | 18 | shift. |
| 11:48 | 19 | Q.    What time does your shift end? |
| 11:48 | 20 | A.    3:00 P.M.  3:30.  Excuse me. |
| 11:48 | 21 | Q.    And what did -- what did you tell |
| 11:48 | 22 | Damian? |
| 11:48 | 23 | A.    That I was reaching for trash, and I |
| 11:49 | 24 | felt my shoulder pop, and it was -- I felt tingling |
| 11:49 | 25 | in my shoulder and slight pain, and I said that I was |

Kusar® Keeping Your Word Is Our Business℠

Case 2:18-cv-09503-AB-JEM    Document 55-1    Filed 01/17/20    Page 169 of 265    Page
                                                                ID #:1804
Jayme Tipton (v.I)          Jayme Tipton v. Airport Terminal Services, Inc.          1147705

11:49    1    going to go home and see -- and see how I feel and I

11:49    2    had to come back the next day.

11:49    3         Q.    Okay.  Were you scheduled to work the

11:49    4    next day?

11:49    5         A.    Yes.

11:49    6         Q.    That's okay.

11:49    7              You were scheduled to work.  So if the

11:49    8    8th you had your write-up -- let me pull a calendar

11:49    9    here so I can see what day of the week.

11:49   10              Did you work a fixed schedule?

11:49   11         A.    Yes.

11:49   12         Q.    And what was your normal work schedule?

11:49   13         A.    7:00 A.M. to 3:30 P.M.

11:49   14         Q.    And what days did you work?

11:49   15         A.    My off days were Tuesday and Wednesday.

11:50   16    So I worked Thursday, Friday, Saturday, Sunday,

11:50   17    Monday.

11:50   18         Q.    So Tuesdays and Thursdays.

11:50   19         A.    Yes.  No.  Tuesday and Wednesday.

11:50   20         Q.    Those are your off days?

11:50   21         A.    Off days, yes.

11:50   22         Q.    Was that true the entire time of your

11:50   23    employment?

11:50   24         A.    Yes.

11:50   25         Q.    Let me look at what the calendar was on



Jayme Tipton (v.I)                    Jayme Tipton v. West Terminal Services, Inc.                    1147705

| | | |
|---|---|---|
| 11:50 | 1 | that date.  Okay.  So April 8th is a Saturday, and |
| 11:50 | 2 | April 11th was a Tuesday.  So you had your write-up |
| 11:50 | 3 | on Saturday. |
| 11:50 | 4 | Do you remember if the injury occurred |
| 11:50 | 5 | on that Sunday or the next Monday? |
| 11:50 | 6 | A.    I'm sorry.  Say that again. |
| 11:50 | 7 | Q.    Okay.  It looks like in 2017 April 8th |
| 11:51 | 8 | was a Saturday, the day you had the write-up. |
| 11:51 | 9 | A.    The write-up, yes. |
| 11:51 | 10 | Q.    And then you said you had an injury |
| 11:51 | 11 | that occurred sometime after that but before April 11 |
| 11:51 | 12 | when you saw the doctor? |
| 11:51 | 13 | A.    Yes. |
| 11:51 | 14 | Q.    Do you -- |
| 11:51 | 15 | A.    I didn't see -- I'm sorry.  I didn't |
| 11:51 | 16 | see the doctor on April 11.  That's when the doctor |
| 11:51 | 17 | took me off work, April 11. |
| 11:51 | 18 | Q.    Okay.  Do you recall when you saw the |
| 11:51 | 19 | doctor? |
| 11:51 | 20 | A.    No. |
| 11:51 | 21 | MR. GBEWONYO:  Objection, vague as to time. |
| | 22 | BY MR. LUBELEY: |
| 11:51 | 23 | Q.    Had you seen the doctor before April |
| 11:51 | 24 | 11? |
| 11:51 | 25 | A.    Yes. |

67

Kusar ® Keeping Your Word Is Our Business℠

Jayme Tipton (v.I)                    Jayme Tipton v. Impact Terminal Services, Inc.                    1147705

11:51    1        Q.      Okay.  Do you know what the --

11:51    2        A.      I need to see a calendar.

11:51    3        Q.      You can pull it up, or I can show --

11:51    4    let the record reflect that I am showing a calendar

11:52    5    for 2017 off of an iPhone calendar app.

11:52    6        MR. GBEWONYO:  Make sure it's 2017.  Okay.

11:52    7        MR. LUBELEY:  Yeah, counsel, you can look at

11:52    8    it.  Just don't respond to any text messages she

11:52    9    might receive.

11:52    10       MR. GBEWONYO:  April 8 is a Saturday and the

11:52    11    11th appear to be a Tuesday.

11:52    12       THE WITNESS:  Yeah, it was the day before.

11:52    13       MR. GBEWONYO:  April 10.

11:52    14       THE WITNESS:  Uh-huh.

11:53    15    BY MR. LUBELEY:

11:53    16       Q.      So there is a -- in that time period,

11:53    17    did you see -- so you get injured working on the

11:53    18    plane, but it had to be either -- it would have been

11:53    19    either the 9th or 10th, which are workdays for you;

11:53    20    correct?

11:53    21       A.      Yes.

11:53    22       Q.      Okay.  Do you remember whether it was

11:53    23    the 9th or 10th of April?

11:53    24       A.      I do not recall.

11:53    25       Q.      Did you return to work -- do we have

**Kusar** ® Keeping Your Word Is Our Business℠

Case 2:18-cv-09503-AB-JEM   Document 55-1   Filed 01/17/20   Page 172 of 265   Page
ID #:1807
Jayme Tipton (v.I)                Jayme Tipton v. Airport Terminal Services, Inc.        1147705

| 11:53 | 1 | her schedules? |
| 11:53 | 2 | Did you return to work after you |
| 11:53 | 3 | injured your shoulder?  So you said you had the |
| 11:53 | 4 | injury -- |
| 11:53 | 5 | A.     Yes. |
| 11:53 | 6 | Q.     -- on the plane? |
| 11:53 | 7 | A.     Yes. |
| 11:53 | 8 | Q.     Did you go to the doctor or did you |
| 11:53 | 9 | come back to work the next day? |
| 11:53 | 10 | A.     I brought in the doctor's note on April |
| 11:54 | 11 | 11. |
| 11:54 | 12 | Q.     Before the doctor's note, because that |
| 11:54 | 13 | would have been on -- that would have been on -- |
| 11:54 | 14 | April 11 was a Tuesday. |
| 11:54 | 15 | A.     Tuesday. |
| 11:54 | 16 | Q.     That would have been your day off.  And |
| 11:54 | 17 | you recall going to -- you recall going to the doctor |
| 11:54 | 18 | -- well, let me back up. |
| 11:54 | 19 | On April 11, did you have another |
| 11:54 | 20 | doctor's appointment already prearranged for |
| 11:54 | 21 | fertility issues? |
| 11:54 | 22 | A.     Not that I'm aware of. |
| 11:54 | 23 | Q.     I'll show you a document.  Maybe this |
| 11:54 | 24 | will refresh your recollection.  Because I'm just |
| 11:54 | 25 | trying to understand -- I guess before I show you |

69



Case 2:18-cv-09503-AB-JEM    Document 55-1    Filed 01/17/20    Page 173 of 265    Page
ID #:1808
Jayme Tipton (v.I)                Jayme Tipton v. Best Terminal Services, Inc.              1147705

| | | |
|---|---|---|
| 11:54 | 1 | this, you injure at work at the end of your shift? |
| 11:54 | 2 | A.    Yes. |
| 11:54 | 3 | Q.    The next day after that injury, did you |
| 11:54 | 4 | come back to work? |
| 11:55 | 5 | A.    Yes. |
| 11:55 | 6 | Q.    Okay.  And did you actually work that |
| 11:55 | 7 | day? |
| 11:55 | 8 | A.    Yes. |
| 11:55 | 9 | Q.    Okay.  Even though you were injured? |
| 11:55 | 10 | A.    Yes. |
| 11:55 | 11 | Q.    And why did you do that? |
| 11:55 | 12 | A.    Because I had to complete my shift. |
| 11:55 | 13 | Q.    Well, I'm saying that you have -- your |
| 11:55 | 14 | shift ends at 3:30? |
| 11:55 | 15 | A.    Yes. |
| 11:55 | 16 | Q.    Okay.  You got injured -- your |
| 11:55 | 17 | testimony is you got injured around 3:00? |
| 11:55 | 18 | A.    Yes. |
| 11:55 | 19 | Q.    Okay.  Then you told your supervisor |
| 11:55 | 20 | that you injured your shoulder? |
| 11:55 | 21 | A.    Yes. |
| 11:55 | 22 | Q.    The next day, do you recall that being |
| 11:55 | 23 | a workday or a day that you had off? |
| 11:55 | 24 | A.    The next day after I injured my |
| 11:55 | 25 | shoulder. |


Kusar ® Keeping Your Word Is Our Business℠

Case 2:18-cv-09503-AB-JEM    Document 55-1    Filed 01/17/20    Page 174 of 265    Page
ID #:1800
Jayme Tipton (v.I)                Jayme Tipton v. Airport Terminal Services, Inc.        1147705

| | | |
|---|---|---|
| 11:55 | 1 | Q.    Yes.  So your shift ends at 3:30.  You |
| 11:55 | 2 | go home.  The next day, do you recall that you had to |
| 11:55 | 3 | go back to work or was the next day your day off? |
| 11:55 | 4 | In other words, is it possible it |
| 11:55 | 5 | happened maybe on April 10 which would have been |
| 11:55 | 6 | Monday and then April 11 is a day off? |
| 11:55 | 7 | A.    I don't recall.  It's been so long |
| 11:56 | 8 | since.  So -- yeah.  I don't recall exactly. |
| 11:56 | 9 | Q.    Okay.  Maybe this will help. |
| 11:56 | 10 | Do you recall whether from the date you |
| 11:56 | 11 | suffered the injury, okay, 3:00 on that day, I mean |
| 11:56 | 12 | we're not clear which day of the week it was, right? |
| 11:56 | 13 | You never went back to work after that shift ended? |
| 11:56 | 14 | A.    I did go back to work. |
| 11:56 | 15 | Q.    Okay.  When did you go back to work? |
| 11:56 | 16 | A.    I went -- you mean after the injury? |
| 11:56 | 17 | Q.    Yes.  So you injure your shoulder |
| 11:56 | 18 | cleaning the plane? |
| 11:56 | 19 | A.    Yes.  Yes. |
| 11:56 | 20 | Q.    Your shift ends half an hour later, |
| 11:56 | 21 | right? |
| 11:56 | 22 | A.    Yes. |
| 11:56 | 23 | Q.    You go home? |
| 11:56 | 24 | A.    Yes. |
| 11:56 | 25 | Q.    When was the next time you came back to |

71


Kusar® Keeping Your Word Is Our Business℠

| 11:56 | 1 | ATS? |
| 11:56 | 2 | A. | The next day. |
| 11:56 | 3 | Q. | The next day? |
| 11:56 | 4 | A. | Yes. |
| 11:56 | 5 | Q. | So you showed up at 7:00 A.M. for your |
| 11:56 | 6 | next day of work? |
| 11:56 | 7 | A. | Yes. |
| 11:56 | 8 | Q. | Okay.  Were you able to work that day? |
| 11:57 | 9 | A. | Yes. |
| 11:57 | 10 | Q. | Even with the shoulder pop? |
| 11:57 | 11 | A. | Yes. |
| 11:57 | 12 | Q. | Okay.  So you performed your job? |
| 11:57 | 13 | A. | Yes. |
| 11:57 | 14 | Q. | Did you tell anyone about the injury |
| 11:57 | 15 | that day? |
| 11:57 | 16 | A. | Yes. |
| 11:57 | 17 | Q. | And who did you tell on the next day |
| 11:57 | 18 | when you came back to work? |
| 11:57 | 19 | A. | Damian. |
| 11:57 | 20 | Q. | And what did you tell Damian? |
| 11:57 | 21 | A. | I told him that my arm was getting |
| 11:57 | 22 | worse.  That it was starting to throb more, and I |
| 11:57 | 23 | told him that I was going to go see a doctor. |
| 11:57 | 24 | Q. | Okay.  And did you leave work that day? |
| 11:57 | 25 | A. | At the end of my shift. |

Kusar® Keeping Your Word Is Our Business℠

|  |  |  |
|---|---|---|
|  | 1 | (Deposition Exhibit 9 was marked for |
|  | 2 | identification by the reporter and is |
|  | 3 | attached herewith.) |
| 11:59 | 4 | MR. LUBELEY:  This appears to be a document |
| 11:59 | 5 | from Tarzana treatment centers, dated April 11, 2017. |
| 11:59 | 6 | THE WITNESS:  Okay. |
| 11:59 | 7 | BY MR. LUBELEY: |
| 11:59 | 8 | Q.    Have you seen this document before? |
| 11:59 | 9 | A.    Yes. |
| 11:59 | 10 | Q.    And what is it? |
| 11:59 | 11 | A.    This is my -- my doctor's note from my |
| 12:00 | 12 | doctor. |
| 12:00 | 13 | Q.    Okay.  And do you recall when you |
| 12:00 | 14 | obtained this doctor's note? |
| 12:00 | 15 | A.    Yes. |
| 12:00 | 16 | Q.    And when was that? |
| 12:00 | 17 | A.    4-11. |
| 12:00 | 18 | Q.    Okay.  And what was the -- you said |
| 12:00 | 19 | that -- had you seen a doctor before that date when |
| 12:00 | 20 | you received that note? |
| 12:00 | 21 | A.    No.  This is when I seen my doctor. |
| 12:00 | 22 | Q.    Okay.  So you went in to the doctor on |
| 12:00 | 23 | April 11 and he provided you a note taking you off |
| 12:00 | 24 | work? |
| 12:00 | 25 | A.    Yes. |



74

Case 2:18-cv-09503-AB-JEM    Document 55-1    Filed 01/17/20    Page 177 of 265    Page
ID #:1812
Jayme Tipton (v.I)          Jayme Tipton v. Airport Terminal Services, Inc.          1147705

| 12:03 | 1 | Q. And which -- what was the name of the |
| | | person you gave this to? |
| 12:03 | 2 | |
| 12:03 | 3 | A. Ora. |
| 12:03 | 4 | Q. Ora. That's on or about that Thursday, |
| 12:04 | 5 | like April 13. |
| 12:04 | 6 | What did you -- what time did you give |
| 12:04 | 7 | it to Ora? |
| 12:04 | 8 | A. It was -- right before my shift was |
| 12:04 | 9 | about to start. |
| 12:04 | 10 | Q. Okay. Did you call anyone to tell them |
| 12:04 | 11 | that you weren't able to work? Like did you call in |
| 12:04 | 12 | to let anyone know, hey, can you schedule -- you know |
| 12:04 | 13 | I'm not going to be able to work today? |
| 12:04 | 14 | A. No. |
| 12:04 | 15 | Q. You showed up at the start of your |
| 12:04 | 16 | shift with just the note? |
| 12:04 | 17 | A. Yes. |
| 12:04 | 18 | Q. Okay. Why didn't you call ahead of |
| 12:04 | 19 | time? |
| 12:04 | 20 | A. Not sure. |
| 12:04 | 21 | Q. Okay. But you weren't going to be able |
| 12:04 | 22 | to perform your work that day, right? |
| 12:04 | 23 | A. No. But I asked to be on light duty. |
| 12:04 | 24 | Q. Oh, when you brought the note you asked |
| 12:04 | 25 | to be on light duty? |

Kusar® Keeping Your Word Is Our Business℠

Jayme Tipton (v.I)                    Jayme Tipton v. West Terminal Services, Inc.                    1147705

| | | |
|---|---|---|
| 12:04 | 1 | A.      Yes. |
| 12:04 | 2 | Q.      Now, I didn't see -- it doesn't say |
| 12:04 | 3 | anything in the note about light duty? |
| 12:05 | 4 | A.      No. |
| 12:05 | 5 | Q.      Did the doctor recommend that you could |
| 12:05 | 6 | do light duty? |
| 12:05 | 7 | A.      No. |
| 12:05 | 8 | Q.      Okay.  Why did you ask for light duty? |
| 12:05 | 9 | A.      Because I wanted to be there for my |
| 12:05 | 10 | shift.  I needed -- you know, I didn't want to miss |
| 12:05 | 11 | days. |
| 12:05 | 12 | Q.      You wanted to get paid? |
| 12:05 | 13 | A.      Yeah.  Yes. |
| 12:05 | 14 | Q.      I understand that. |
| 12:05 | 15 | So you brought the note to Ora, and at |
| 12:05 | 16 | the beginning of your shift, so around 7:00 A.M.? |
| 12:05 | 17 | A.      Yes. |
| 12:05 | 18 | Q.      And you described what you do as a |
| 12:05 | 19 | groomer for the plane on the plane? |
| 12:05 | 20 | A.      Yes. |
| 12:05 | 21 | Q.      And it involves lifting.  What were you |
| 12:05 | 22 | thinking about in terms of light duty? |
| 12:05 | 23 | A.      Light duty, I could pick up trash with |
| 12:05 | 24 | my other arm.  Because what -- what happens on a |
| 12:05 | 25 | shift is two people are doing the same job.  So it's |

79

Kusar  ® Keeping Your Word Is Our Business℠

Case 2:18-cv-09503-AB-JEM    Document 55-1    Filed 01/17/20    Page 179 of 265    Page
ID #:1814
Jayme Tipton (v.I)                    Jayme Tipton v. Airport Terminal Services, Inc.                    1147705

12:06   1    two people in first class.  There's two people

12:06   2    vacuuming.  Two people picking up trash and two

12:06   3    people doing the bathrooms.

12:06   4        Q.    Okay.

12:06   5        A.    So they could have me picking up trash.

12:06   6    I could have done something light like that, or

12:06   7    sometimes if there's no planes coming in, they have

12:06   8    us cleaning up the break room all the time because

12:06   9    we're cleaners.  So I could have cleaned the break

12:06   10   room.  I could have -- anything light, light duty

12:06   11   like that.

12:06   12       Q.    But do you recall Ora saying they

12:06   13   needed a note from a doctor about what your

12:06   14   restrictions were --

12:06   15       A.    No.

12:06   16       Q.    -- for light duty?

12:06   17       A.    No.

12:06   18       Q.    There's nothing in the note that you

12:06   19   provided that said you could perform light duty.

12:07   20       A.    No.

12:07   21       Q.    The note only said that you couldn't

12:07   22   perform work.

12:07   23       A.    Yes.

12:07   24       Q.    Okay.  Are you aware of the policies of

12:07   25   Airport Terminal Services as it relates to employees



Case 2:18-cv-09503-AB-JEM    Document 55-1    Filed 01/17/20    Page 180 of 265    Page
ID #:1815
Jayme Tipton (v.I)                    Jayme Tipton v. Target Terminal Services, Inc.                    1147705

| | | |
|---|---|---|
| 12:07 | 1 | working while injured? |
| 12:07 | 2 | A.      No. |
| 12:07 | 3 | MR. GBEWONYO:  Calls for speculation. |
| 12:07 | 4 | MR. LUBELEY:  Okay. |
| 12:07 | 5 | Q.      We can go over those in just a little |
| 12:07 | 6 | bit, but what did Ora tell you about your request? |
| 12:07 | 7 | A.      Ora said that she will have to ask the |
| 12:07 | 8 | supervisor, which is Damian, and she called Damian |
| 12:07 | 9 | right there in front of me. |
| 12:07 | 10 | Q.      And what did she say? |
| 12:07 | 11 | A.      And she told Damian that I asked if I |
| 12:07 | 12 | can be on light duty and Damian said no. |
| 12:07 | 13 | Q.      Did Damian say that there was no light |
| 12:07 | 14 | duty available? |
| 12:07 | 15 | A.      Yes. |
| 12:07 | 16 | Q.      Was there any discussion about the |
| 12:07 | 17 | doctor's note you brought in? |
| 12:08 | 18 | A.      Before -- before I asked for light |
| 12:08 | 19 | duty, yes.  Ora told Damian that I brought in a |
| 12:08 | 20 | doctor's note, and he told Ora to make a copy of it. |
| 12:08 | 21 | Q.      Okay.  Do you recall them discussing |
| 12:08 | 22 | that the note did not refer to light duty? |
| 12:08 | 23 | A.      No. |
| 12:08 | 24 | Q.      And what do you recall happening after |
| 12:08 | 25 | that? |

Kusar ® Keeping Your Word Is Our Business℠

```
12:08    1         A.    After that, once he said that there was

12:08    2    no light duty available, I went home.

12:08    3         Q.    What did they tell you at the time?

12:08    4    What did Ora tell you?

12:08    5         A.    As far as?

12:08    6         Q.    Did she tell you to go home?

12:08    7         A.    Yes.

12:08    8         Q.    Okay.  And when did she tell you you

12:08    9    could come back?

12:08   10         A.    She didn't tell me when to come back.

12:08   11    My doctor's note said that I can return to work on

12:08   12    the 20th.

12:08   13         Q.    Okay.  So you planned to come back on

12:08   14    the 20th?

12:08   15         A.    Yes.

12:09   16         Q.    Did you talk to your doctor at all

12:09   17    about whether your doctor would allow you to perform

12:09   18    light duty?

12:09   19         A.    No.

12:09   20         Q.    And why not?

12:09   21         A.    Well, once they denied my light duty

12:09   22    request, I just -- I didn't think anymore of it.  I

12:09   23    just said okay.  And I was focused on my arm at that

12:09   24    time with my doctor.

12:09   25         Q.    Okay.  You were undergoing continuing
```



82

Case 2:18-cv-09503-AB-JEM    Document 55-1    Filed 01/17/20    Page 182 of 265    Page
ID #:1817
Jayme Tipton (v.I)            Jayme Tipton v. Flagship Airport Terminal Services, Inc.            1147705

| 12:13 | 1 | MR. LUBELEY: Okay. |
| 12:13 | 2 | Q. So what happened on the 20th? Did you |
| 12:13 | 3 | come back to work? |
| 12:13 | 4 | A. No, I did not. |
| 12:13 | 5 | Q. And why not? |
| 12:13 | 6 | A. Because my doctor took me off again. |
| 12:13 | 7 | Q. And why? |
| 12:13 | 8 | A. Because my arm was still -- I was still |
| 12:13 | 9 | going care -- I was still doing -- going through |
| 12:14 | 10 | waiting on -- waiting or the MRI approval and stuff |
| 12:14 | 11 | like that with my doctor. |
| 12:14 | 12 | Q. Okay. And when did -- when did you |
| 12:14 | 13 | first understand you were not going able to return to |
| 12:14 | 14 | work? |
| 12:14 | 15 | A. On the 19th. |
| 12:14 | 16 | Q. On the 20th? |
| 12:14 | 17 | A. I'm sorry. |
| 12:14 | 18 | MR. GBEWONYO: Make sure you wait until he's |
| 12:14 | 19 | finished with the question, okay? |
| 12:14 | 20 | THE WITNESS: I'm sorry. |
| 12:14 | 21 | BY MR. LUBELEY: |
| 12:14 | 22 | Q. And how is this that you came to |
| 12:14 | 23 | understand this? Did you have a doctor's appointment |
| 12:14 | 24 | on the 19th? |
| 12:14 | 25 | A. Yes. |



87

Case 2:18-cv-09503-AB-JEM    Document 55-1    Filed 01/17/20    Page 183 of 265    Page
ID #:1818
Jayme Tipton (v.I)                    Jayme Tipton v. West Terminal Services, Inc.                    1147705

| | | |
|---|---|---|
| 12:14 | 1 | Q.    And what did your doctor say during |
| 12:14 | 2 | that appointment if you recall? |
| 12:14 | 3 | A.    That he's going to extend my -- my -- |
| 12:14 | 4 | the doctor leave. |
| 12:14 | 5 | Q.    The leave off of work? |
| 12:14 | 6 | A.    Yes. |
| 12:14 | 7 | Q.    Now, did you have any discussions with |
| 12:14 | 8 | your doctor at this time saying -- asking him whether |
| 12:15 | 9 | or not you could perform light duty? |
| 12:15 | 10 | MR. GBEWONYO:  Objection.  Asked and answered. |
| 12:15 | 11 | MR. LUBELEY:  At this time during your April |
| 12:15 | 12 | 19th meeting with the doctor. |
| 12:15 | 13 | THE WITNESS:  No. |
| | 14 | BY MR. LUBELEY: |
| 12:15 | 15 | Q.    And why not? |
| 12:15 | 16 | A.    Just wasn't on my mind at that time. |
| 12:15 | 17 | Q.    Okay.  Did your doctor ask you if you |
| 12:15 | 18 | needed a note for work at that time in your April 19 |
| 12:15 | 19 | meeting with the doctor? |
| 12:15 | 20 | A.    He didn't ask me.  I told -- we talked |
| 12:15 | 21 | and I said if he's extending it, then I'm going to |
| 12:15 | 22 | need paperwork -- |
| 12:15 | 23 | Q.    Okay. |
| 12:15 | 24 | A.    -- to give to my employer. |
| 12:15 | 25 | Q.    Okay.  And did he give you that |

**Kusar** ® Keeping Your Word Is Our Business℠

Jayme Tipton (v.I)                Jayme Tipton v. Airport Terminal Services, Inc.                1147705

| | | |
|---|---|---|
| 12:15 | 1 | paperwork that day? |
| 12:15 | 2 | A.    April 19. |
| 12:15 | 3 | Q.    Yes. |
| 12:15 | 4 | A.    Yes. |
| 12:15 | 5 | MR. LUBELEY:  Okay.  I'd like to have marked |
| 12:15 | 6 | exhibit 12. |
| 12:16 | 7 | (Deposition Exhibit 12 was marked for |
| | 8 | identification by the reporter and is |
| 12:16 | 9 | attached herewith.) |
| 12:16 | 10 | BY MR. LUBELEY: |
| 12:16 | 11 | Q.    This a document from Tarzana Treatment |
| 12:16 | 12 | Centers.  It appears to be a certificate to return to |
| 12:16 | 13 | work.  It said that -- well, Jayme Tipton -- it has |
| 12:16 | 14 | your name and a stamp there -- will be able to return |
| 12:16 | 15 | to work on -- it says May 1st, 2017.  It's signed by |
| 12:16 | 16 | the doctor. |
| 12:16 | 17 | Do you recognize this note? |
| 12:16 | 18 | A.    Yes. |
| 12:16 | 19 | Q.    All right.  Is this the note that you |
| 12:16 | 20 | believe you received on April 19? |
| 12:16 | 21 | A.    Yes. |
| 12:16 | 22 | Q.    Okay.  And what did you do with this -- |
| 12:16 | 23 | once you received this note, what did you do? |
| 12:16 | 24 | A.    I sent it with my -- at that time, it |
| 12:16 | 25 | was my fiance to the job, and he gave it to the |

89

Jayme Tipton (v.I)                     Jayme Tipton v. Kmart Terminal Services, Inc.                      1147705

| 12:16 | 1 | manager. |
| 12:16 | 2 | Q. How do you know he gave it to the |
| 12:16 | 3 | manager? |
| 12:16 | 4 | A. Because I asked him. |
| 12:17 | 5 | Q. Did he tell you he gave it to the |
| 12:17 | 6 | manager? |
| 12:17 | 7 | A. Yes. |
| 12:17 | 8 | Q. Okay. Did you reach out to call anyone |
| 12:17 | 9 | at work, your manager or anyone about being out for |
| 12:17 | 10 | -- having your time out extended? |
| 12:17 | 11 | A. No. |
| 12:17 | 12 | Q. Why not? |
| 12:17 | 13 | A. I just didn't. |
| 12:17 | 14 | Q. Okay. I mean -- |
| 12:17 | 15 | A. I was -- I just didn't. |
| 12:17 | 16 | Q. You didn't call anyone? |
| 12:17 | 17 | A. No. |
| 12:17 | 18 | Q. Okay. When -- what was your -- what |
| 12:17 | 19 | was your fiance's work schedule during that time? |
| 12:17 | 20 | MR. GBEWONYO: Objection, calls for |
| 12:17 | 21 | speculation. If you know. |
| 12:17 | 22 | THE WITNESS: Can't remember the exact time |
| 12:17 | 23 | that he started. Between 6:00 and 6:30 A.M. |
| 12:17 | 24 | BY MR. LUBELEY: |
| 12:17 | 25 | Q. What days of the week did he work? |

Kusar ® Keeping Your Word Is Our Business℠

Jayme Tipton (v.I)                Jayme Tipton v. Port Terminal Services, Inc.                        1147705

| Time | Line | |
|---|---|---|
| 12:17 | 1 | A.    The same days. |
| 12:18 | 2 | Q.    What's his full name? |
| 12:18 | 3 | A.    Deon Brown. |
| 12:18 | 4 | Q.    And who did -- who did you ask him to |
| 12:18 | 5 | give the note to? |
| 12:18 | 6 | A.    Edgar. |
| 12:18 | 7 | Q.    Edgar.  And did Deon tell you he'd |
| 12:18 | 8 | given the note to Edgar? |
| 12:18 | 9 | A.    Yes. |
| 12:18 | 10 | Q.    Did he tell you -- was there anything |
| 12:18 | 11 | said or any more information that he gave you? |
| 12:18 | 12 | A.    No.  They just said thank you. |
| 12:18 | 13 | Q.    Did you hear from anyone at HR or |
| 12:18 | 14 | anything about the extension? |
| 12:18 | 15 | A.    No. |
| 12:18 | 16 | Q.    Did you come back to work on May 1st? |
| 12:18 | 17 | A.    No. |
| 12:18 | 18 | Q.    And why not? |
| 12:18 | 19 | A.    Because my leave got extended. |
| 12:19 | 20 | Q.    Tell me what happened with that. |
| 12:19 | 21 | A.    Well, I went back to the doctor, and we |
| 12:19 | 22 | were still waiting on some -- some -- what is it |
| 12:19 | 23 | called -- the approval from my health care to approve |
| 12:19 | 24 | some more tests that I needed. |
| 12:19 | 25 | Q.    Do you recall what these tests were? |

Kusar® Keeping Your Word Is Our Business℠

Case 2:18-cv-09503-AB-JEM   Document 55-1   Filed 01/17/20   Page 187 of 265   Page
ID #:1822
Jayme Tipton (v.I)          Jayme Tipton v. West Terminal Services, Inc.          1147705

| 12:26 | 1 | break to use the rest room. |
|---|---|---|
| 12:26 | 2 | MR. LUBELEY:  Yeah.  Let me just get through |
| 12:26 | 3 | the doctor notes and then we can.  We've been going I |
| 12:26 | 4 | think about, what, 30 minutes since -- |
| 12:26 | 5 | MR. GBEWONYO:  That's it.  Wow. |
| 12:26 | 6 | MR. LUBELEY:  If we can power through till |
| 12:26 | 7 | 1:00, we can do a lunch break if that makes sense. |
| 12:26 | 8 | MR. GBEWONYO:  Okay.  All right. |
|  | 9 | BY MR. LUBELEY: |
| 12:26 | 10 | Q.      Do you recognize this document that |
| 12:26 | 11 | we've had marked as exhibit 13? |
| 12:26 | 12 | A.      Yes. |
| 12:26 | 13 | Q.      And what do you recognize this as? |
| 12:26 | 14 | A.      This is my -- my doctor's note for my |
| 12:26 | 15 | employer. |
| 12:26 | 16 | Q.      Okay.  This is a note from Tarzana |
| 12:26 | 17 | Treatment Centers.  It appears to provide a return to |
| 12:26 | 18 | work date of May 15, 2017.  Is that correct? |
| 12:26 | 19 | A.      Yes. |
| 12:26 | 20 | Q.      But you don't recall when the doctor |
| 12:26 | 21 | gave you this note? |
| 12:26 | 22 | A.      I do not. |
| 12:26 | 23 | Q.      Okay.  What I'd like to understand is |
| 12:26 | 24 | -- so did your doctor know that you were having the |
| 12:26 | 25 | health insurance issues at this time? |

Kusar® Keeping Your Word Is Our Business℠

Case 2:18-cv-09503-AB-JEM    Document 55-1    Filed 01/17/20    Page 188 of 265    Page
ID #:1823
Jayme Tipton (v.I)                Jayme Tipton v. Airport Terminal Services, Inc.                1147705

| | | |
|---|---|---|
| 12:27 | 1 | A.    My doctor just kept saying we're |
| 12:27 | 2 | waiting for the approval. |
| 12:27 | 3 | Q.    Okay.  When you went in -- you know, |
| 12:27 | 4 | you went in sometime before May 1st to see the |
| 12:27 | 5 | doctor; correct? |
| 12:27 | 6 | A.    Yes. |
| 12:27 | 7 | Q.    Okay.  And when you went in to see the |
| 12:27 | 8 | doctor, the doctor told you we're waiting for |
| 12:27 | 9 | approval.  Did you ask the doctor for another note? |
| 12:27 | 10 | A.    I told him that if he's taking me off |
| 12:27 | 11 | -- if he's extending it, then I would need a note for |
| 12:27 | 12 | my employer. |
| 12:27 | 13 | Q.    Do you know why he only extended it to |
| 12:27 | 14 | May 15? |
| 12:27 | 15 | A.    No. |
| 12:27 | 16 | Q.    Because if you didn't have the testing, |
| 12:27 | 17 | you weren't ready to return to work on May 15; |
| 12:27 | 18 | correct? |
| 12:27 | 19 | MR. GBEWONYO:  Calls for speculation.  If you |
| 12:27 | 20 | understand the question, you can answer. |
| 12:27 | 21 | THE WITNESS:  Can you explain. |
| 12:27 | 22 | MR. LUBELEY:  Yeah. |
| 12:27 | 23 | Q.    I mean, you know, August you needed to |
| 12:27 | 24 | go in to make sure you had a note to cover your |
| 12:28 | 25 | absence so it wasn't an unauthorized absence from |

| | | |
|---|---|---|
| 12:37 | 1 | You're referring to this note? |
| 12:37 | 2 | THE WITNESS:  Can you repeat -- |
| 12:37 | 3 | MR. LUBELEY:  The May -- the note that had the |
| 12:37 | 4 | May 15 return date. |
| 12:37 | 5 | MR. GBEWONYO:  Okay. |
| 12:37 | 6 | THE WITNESS:  Can you repeat the question, |
| 12:37 | 7 | please? |
| 12:37 | 8 | MR. LUBELEY:  Sure. |
| 12:37 | 9 | Q.    There's -- I'm just trying to clarify |
| 12:37 | 10 | because I have a note myself -- |
| 12:37 | 11 | A.    Yes. |
| 12:37 | 12 | Q.    -- that comes from someone named Moses. |
| 12:37 | 13 | Now Moses was a manager who replaced Edgar.  Is that |
| 12:37 | 14 | your understanding? |
| 12:37 | 15 | A.    Yes. |
| 12:37 | 16 | Q.    And how do you know this? |
| 12:37 | 17 | A.    Moses called me. |
| 12:37 | 18 | Q.    And when did Moses call you? |
| 12:37 | 19 | A.    I do not recall the exact date, but it |
| 12:37 | 20 | was before Shonta called me. |
| 12:37 | 21 | Q.    Okay.  So sometime in May before the |
| 12:37 | 22 | call with Shonta that occurred on May 8th, I believe, |
| 12:38 | 23 | right?  The day before the May 9th letter? |
| 12:38 | 24 | A.    Yes. |
| 12:38 | 25 | Q.    Okay.  Talk to me about the call from |

Kusar® Keeping Your Word Is Our Business℠

Case 2:18-cv-09503-AB-JEM   Document 55-1   Filed 01/17/20   Page 190 of 265   Page
ID #:1825
Jayme Tipton (v.I)                Jayme Tipton v. Pact Terminal Services, Inc.                1147705

| | | |
|---|---|---|
| 12:38 | 1 | Moses. |
| 12:38 | 2 | A.      Moses called me to introduce his self |
| 12:38 | 3 | as the new manager, and he asked what's going on. |
| 12:38 | 4 | Why -- you know why was I off.  Even though he got |
| 12:38 | 5 | the doctor's note, he was trying to clarify. |
| 12:38 | 6 | Q.      How do you know that he got the |
| 12:38 | 7 | doctor's note? |
| 12:38 | 8 | A.      Well, he told me that he seen all the |
| 12:38 | 9 | doctor notes. |
| 12:38 | 10 | Q.      Okay. |
| 12:38 | 11 | A.      Yeah. |
| 12:38 | 12 | Q.      Do you know when this call occurred? |
| 12:38 | 13 | A.      I do not remember, but it was between |
| 12:38 | 14 | May 1st and May 8th. |
| 12:39 | 15 | Q.      And did your -- back to -- so back to |
| 12:39 | 16 | the -- you now recall that he had reached out, when |
| 12:39 | 17 | Moses reached out to you to introduce himself, what |
| 12:39 | 18 | do you recall about that interaction?  So you said |
| 12:39 | 19 | that he asked you -- well, strike that. |
| 12:39 | 20 | What do you recall occurring in that |
| 12:39 | 21 | conversation? |
| 12:39 | 22 | MR. GBEWONYO:  Objection, calls for a |
| 12:39 | 23 | narrative.  If you can recall, go ahead. |
| 12:39 | 24 | THE WITNESS:  I do not recall word for word. |
| 12:39 | 25 | MR. LUBELEY:  That's fine. |

**Kusar** ® *Keeping Your Word Is Our Business℠*

Jayme Tipton (v.I)          Jayme Tipton v. Airport Terminal Services, Inc.          1147705

```
02:20    1    that time stopped her and said, hey, are you guys
02:20    2    hiring for -- for Airport Terminal Services, and she
02:20    3    said, yeah, just go on and put your résumé.  Go on
02:20    4    and apply and put your résumé and then that's how I
02:20    5    got ATS.
02:20    6         Q.    And who hired you at ATS?
02:20    7         MR. GBEWONYO:  Objection.  Calls for
02:20    8    speculation.
02:20    9         THE WITNESS:  I can't recall her name.
        10    BY MR. LUBELEY:
02:20   11         Q.    Do you remember who you interviewed
02:20   12    with?
02:20   13         A.    Shonta.
02:20   14         Q.    Okay.  You interviewed with Shonta.
02:20   15    Shonta hired you in the position.  She's also the one
02:20   16    who notified you about being fired?
02:20   17         A.    Yes.
02:20   18         MR. GBEWONYO:  Objection, compound.
        19    BY MR. LUBELEY:
02:21   20         Q.    Did you quit at -- did you quit
02:21   21    Menzies?
02:21   22         A.    I put in my two week notice Menzies,
02:21   23    yes.
02:21   24         Q.    Why did you want to leave Menzies so
02:21   25    quickly after you started?
```

| 02:42 | 1 | "workplace." |
|---|---|---|
| 02:42 | 2 | THE WITNESS:  I'm sorry.  Can you repeat that? |
| | 3 | BY MR. LUBELEY: |
| 02:42 | 4 | Q.    So we had -- when you worked at ATS, |
| 02:42 | 5 | right, we've gone through that you were written up |
| 02:42 | 6 | and you said that you didn't think the write-up was |
| 02:42 | 7 | fair; right? |
| 02:42 | 8 | A.    Yes. |
| 02:42 | 9 | Q.    And you said the reason why you believe |
| 02:42 | 10 | -- well, you mentioned something about Melissa |
| 02:42 | 11 | possibly being jealous about your work ethic; right? |
| 02:42 | 12 | A.    Yes. |
| 02:42 | 13 | Q.    Did Melissa do anything to you that you |
| 02:42 | 14 | believed was discriminatory? |
| 02:42 | 15 | A.    I just felt that she wasn't being fair |
| 02:42 | 16 | at times with positioning the employees to their job |
| 02:42 | 17 | the day of, and that's what I was voicing to her. |
| 02:43 | 18 | Not in a mean or anything, you know, any kind of |
| 02:43 | 19 | disrespectful way.  I was just voicing it to her and |
| 02:43 | 20 | that's what caused the write-up.  Because she thought |
| 02:43 | 21 | that I was not trying to do my job that she gave me. |
| 02:43 | 22 | Q.    And you're proud of your work ethic, |
| 02:43 | 23 | right? |
| 02:43 | 24 | A.    Yes. |
| 02:43 | 25 | Q.    And explain to me what this frustration |

Kusar ® Keeping Your Word Is Our Business℠

| | | |
|---|---|---|
| 02:43 | 1 | is so that I understand what you mean when you said |
| 02:43 | 2 | that you were voicing to her about it not being fair |
| 02:43 | 3 | at times with positioning of employees to their job |
| 02:43 | 4 | on the day of. |
| 02:43 | 5 | A.    Okay.  Like I said, we have just a good |
| 02:43 | 6 | day eight workers.  Two people are in -- sometimes |
| 02:43 | 7 | it's three people.  If we have an extra person, |
| 02:43 | 8 | they're doing first class.  Two people doing |
| 02:44 | 9 | bathrooms, two people vacuuming, picking up trash and |
| 02:44 | 10 | so forth.  So we're supposed to rotate on a daily. |
| 02:44 | 11 | Q.    Okay. |
| 02:44 | 12 | A.    Supposed to rotate.  Now, some people |
| 02:44 | 13 | got to keep the same job the whole -- like every day. |
| 02:44 | 14 | Q.    Okay. |
| 02:44 | 15 | A.    As far as bathrooms, two people will |
| 02:44 | 16 | stay on bathrooms every day, or they will stay in the |
| 02:44 | 17 | first class section every day, and the least favorite |
| 02:44 | 18 | duty was to vacuum. |
| 02:44 | 19 | Q.    Okay. |
| 02:44 | 20 | A.    Because the vacuum was heavy, No one |
| 02:44 | 21 | liked to vacuum, and because we have to do it in a |
| 02:44 | 22 | timely manner, like nobody liked to do that.  So it |
| 02:44 | 23 | was an issue.  So I believe -- I'm not exactly sure |
| 02:45 | 24 | who, but they said that we have to start rotating. |
| 02:45 | 25 | So she would rotate certain positions but leave the |

Kusar® Keeping Your Word Is Our Business℠

Case 2:18-cv-09503-AB-JEM    Document 55-1    Filed 01/17/20    Page 194 of 265    Page
ID #:1820
Jayme Tipton (v.I)                Jayme Tipton v. Sunport Terminal Services, Inc.                1147705

| 02:45 | 1 | other people with that same position every day, and I |
| 02:45 | 2 | just didn't think that that was fair.  If you're |
| 02:45 | 3 | going to rotate, you need to rotate everybody. |
| 02:45 | 4 | Q.    Okay.  And you were doing vacuuming |
| 02:45 | 5 | then? |
| 02:45 | 6 | A.    At that time, maybe. |
| 02:45 | 7 | Q.    What position were you doing? |
| 02:45 | 8 | A.    I do not recall -- |
| 02:45 | 9 | Q.    Okay. |
| 02:45 | 10 | -- what position. |
| 02:45 | 11 | Q.    So if I understand it right, you had |
| 02:45 | 12 | raised some concerns to her which you felt were valid |
| 02:45 | 13 | about the rotation.  She then got upset that you |
| 02:45 | 14 | raised that and had you written up for |
| 02:45 | 15 | insubordination. |
| 02:45 | 16 | Am I understanding it right? |
| 02:45 | 17 | A.    Yes. |
| 02:45 | 18 | Q.    Okay.  And you didn't think that was |
| 02:45 | 19 | fair? |
| 02:45 | 20 | A.    Yes. |
| 02:45 | 21 | Q.    What is her -- what's her racial |
| 02:45 | 22 | background? |
| 02:45 | 23 | MR. GBEWONYO:  Objection.  Calls for |
| 02:45 | 24 | speculation. |
| | 25 | BY MR. LUBELEY: |

Kusar®  Keeping Your Word Is Our Business℠

Case 2:18-cv-09503-AB-JEM    Document 55-1    Filed 01/17/20    Page 195 of 265    Page
ID #:1830
Jayme Tipton (v.I)                    Jayme Tipton v. Trinity Terminal Services, Inc.                    1147705

| | | |
|---|---|---|
| 02:45 | 1 | Q.    Do you know? |
| 02:45 | 2 | A.    No. |
| 02:45 | 3 | Q.    Is she white, black, Hispanic? |
| 02:45 | 4 | A.    Do not recall.  Do not recall. |
| 02:45 | 5 | Q.    But did she do -- so Melissa had |
| 02:46 | 6 | written you up or had you written up for that.  Then |
| 02:46 | 7 | you went -- you went out on leave the next -- or you |
| 02:46 | 8 | injured yourself the next day and then went on leave, |
| 02:46 | 9 | right?  Right? |
| 02:46 | 10 | It happened on the 9th of April I think |
| 02:46 | 11 | we established.  Let me look at the calendar.  I'll |
| 02:46 | 12 | show you this calendar there.  I think the write-up |
| 02:46 | 13 | discussion occurred on the 8th.  You injured yourself |
| 02:46 | 14 | on the 9th I think we determined, and then you came |
| 02:46 | 15 | back to work on the 10th and tried to work through |
| 02:46 | 16 | and then went out on the 11th, right? |
| 02:46 | 17 | A.    Yes. |
| 02:46 | 18 | Q.    Did anything -- anything else -- other |
| 02:46 | 19 | than this one write-up, had you had any other |
| 02:46 | 20 | employment interactions that you didn't think were |
| 02:46 | 21 | fair with Melissa? |
| 02:47 | 22 | A.    No.  After that, I just closed my mouth |
| 02:47 | 23 | and continued doing my job. |
| 02:47 | 24 | Q.    But did you feel that -- I mean did |
| 02:47 | 25 | anything happen that you thought was discriminatory |

162

Jayme Tipton (v.I)                Jayme Tipton v. Marine Terminal Services, Inc.                    1147705

| | | |
|---|---|---|
| 03:05 | 1 | Q.    Could you clean? |
| 03:05 | 2 | A.    It was difficult, but I could do it.  I |
| 03:05 | 3 | just could not move or lift my right arm. |
| 03:05 | 4 | Q.    Could you drive? |
| 03:05 | 5 | A.    It was difficult. |
| 03:06 | 6 | Q.    But could you drive? |
| 03:06 | 7 | A.    Yes. |
| 03:06 | 8 | Q.    Were you aware that in the complaint, |
| 03:06 | 9 | and I refer you to paragraph 6 on page 2, over to |
| 03:06 | 10 | paragraph -- over to page 3, it said that due to your |
| 03:06 | 11 | work injury, you suffered severe pain that prevented |
| 03:06 | 12 | you from being able to care for young children, cook, |
| 03:06 | 13 | clean, drive and caused her to experience sleep |
| 03:06 | 14 | deprivation. |
| 03:06 | 15 | MR. GBEWONYO:  Objection, compound.  Again, |
| 03:06 | 16 | the complaint is not verified. |
| 03:06 | 17 | THE WITNESS:  Meaning I cannot do things with |
| 03:06 | 18 | my right arm. |
| 03:06 | 19 | MR. LUBELEY:  Okay. |
| 03:06 | 20 | Q.    But it doesn't say that there.  It says |
| 03:06 | 21 | you couldn't do those things at all, but that's not |
| 03:06 | 22 | accurate, right? |
| 03:06 | 23 | MR. GBEWONYO:  Objection, argumentative.  You |
| 03:06 | 24 | can answer if you understand the question. |
| 03:06 | 25 | THE WITNESS:  Repeat it, please. |

**Kusar** ® Keeping Your Word Is Our Business℠

| 03:08 | 1 | because we talked about it being on -- the discussion |
| 03:08 | 2 | being on the 11th of April, right? |
| 03:08 | 3 | MR. GBEWONYO:  Same objection. |
| 03:08 | 4 | THE WITNESS:  Not the 11th.  It was -- |
| 03:08 | 5 | MR. GBEWONYO:  Vague as to discussion. |
| 03:08 | 6 | THE WITNESS:  Do I still answer? |
| 03:08 | 7 | MR. GBEWONYO:  Yeah, you can answer. |
| 03:09 | 8 | THE WITNESS:  We said that it happened on |
| 03:09 | 9 | April 9th. |
|  | 10 | BY MR. LUBELEY: |
| 03:09 | 11 | Q.    And April 9 is when you told your |
| 03:09 | 12 | manager that you had injured yourself? |
| 03:09 | 13 | A.    Yes. |
| 03:09 | 14 | Q.    Okay.  Have you ever told anyone that |
| 03:09 | 15 | these dates are -- do you think these are just typos |
| 03:09 | 16 | or something in the document? |
| 03:09 | 17 | MR. GBEWONYO:  Objection.  Calls for |
| 03:09 | 18 | speculation. |
| 03:09 | 19 | THE WITNESS:  It's been -- |
| 03:09 | 20 | MR. GBEWONYO:  Hold on.  Instruct not to |
| 03:09 | 21 | answer.  Privileged.  Attorney-client privileged. |
| 03:09 | 22 | MR. LUBELEY:  Okay.  That's fine. |
| 03:09 | 23 | Q.    There's something described in here |
| 03:09 | 24 | that I wanted to ask you whether this is consistent |
| 03:09 | 25 | with your understanding of what occurred. |

Kusar ® Keeping Your Word Is Our Business℠

```
03:09    1              Were you diagnosed with a tear in your
03:09    2    rotator cuff?
03:09    3         A.    I was not diagnosed with that, but it
03:09    4    was topic --
03:09    5         Q.    That's --
03:09    6         A.    -- between my physician.  They were
03:09    7    trying to see.
03:09    8         Q.    That's what you were waiting for the
03:10    9    MRI for, right?
03:10   10         A.    Correct.
03:10   11         Q.    Okay.  Had you previously torn your
03:10   12    rotator cuff back in 2015 when you first saw a doctor
03:10   13    about an injury to your shoulder?
03:10   14         A.    No.
03:10   15         Q.    How did you originally injure your
03:10   16    shoulder?
03:10   17         A.    I don't recall, but I just know it was
03:10   18    just sore.
03:10   19         Q.    Did you play sports?
03:10   20         A.    And I went to the doctor.  I do.
03:10   21         Q.    Was it like a sports related injury
03:10   22    maybe?
03:10   23         MR. GBEWONYO:  Objection, asked and answered.
03:10   24         MR. LUBELEY:  You can answer.
03:10   25         THE WITNESS:  I don't know.
```

Kusar ® Keeping Your Word Is Our Business℠

Case 2:18-cv-09503-AB-JEM    Document 55-1    Filed 01/17/20    Page 199 of 265    Page
ID #:1884
Jayme Tipton (v.I)          Jayme Tipton v. American Terminal Services, Inc.          1147705

03:34    1       Q.      Did anyone take any actions against you

03:34    2   while you were employed at ATS that you believed

03:34    3   harmed you emotionally?

03:34    4       A.      I believe Shonta when I spoke to her,

03:35    5   the way that she was communicating with me when she

03:35    6   was term -- telling me to resign or she'll terminate

03:35    7   me.

03:35    8       Q.      What was her tone in that conversation?

03:35    9       A.      Firm.

03:35   10       Q.      Okay.  When she called you, what did

03:35   11   she first say?

03:35   12       A.      She introduced herself as Shonta

03:35   13   Henderson from HR, and word for word, I can't

03:35   14   remember exactly.

03:35   15       Q.      Shonta is the one who interviewed and

03:35   16   hired you; correct?

03:35   17       A.      Yes.

03:35   18       Q.      And did you have a good working

03:35   19   relationship with Shonta?

03:35   20       A.      I didn't work with Shonta.

03:35   21       Q.      But did you feel that you could reach

03:35   22   out to Shonta if you needed to?

03:36   23       A.      You could never get in contact with

03:36   24   Shonta.

03:36   25       Q.      What do you mean?



Case 2:18-cv-09503-AB-JEM    Document 55-1    Filed 01/17/20    Page 200 of 265    Page
ID #:1835
Jayme Tipton (v.I)                    Jayme Tipton v. West Terminal Services, Inc.                    1147705

| 03:36 | 1  | A.    She never answered her phone if we |
|---|---|---|
| 03:36 | 2  | needed to speak to her, and she'll probably -- if we |
| 03:36 | 3  | left a message, she'll get back to us weeks later. |
| 03:36 | 4  | Q.    Okay.  Did you ever try to reach out to |
| 03:36 | 5  | her? |
| 03:36 | 6  | A.    I do not recall, but -- I do not recall |
| 03:36 | 7  | me trying to reach out to her, but I just know from |
| 03:36 | 8  | other -- excuse me -- from other coworkers that it's |
| 03:36 | 9  | hard to get in contact with her. |
| 03:36 | 10 | Q.    Okay.  Shonta -- if Shonta was -- |
| 03:36 | 11 | strike that. |
| 03:36 | 12 | Did Shonta tell you when she first |
| 03:36 | 13 | reached out to you that you had no protected time and |
| 03:36 | 14 | they couldn't accommodate personal leaves for you? |
| 03:36 | 15 | A.    I do not recall. |
| 03:36 | 16 | Q.    Okay.  Did she mention anything to you |
| 03:37 | 17 | about confusion as to whether this was a personal or |
| 03:37 | 18 | work-related injury? |
| 03:37 | 19 | A.    No.  I just feel that honestly like |
| 03:37 | 20 | they terminated me because of my disability. |
| 03:37 | 21 | Q.    And why do you feel they terminated you |
| 03:37 | 22 | because of your disability?  Let me back up. |
| 03:37 | 23 | What -- when you say "disability," what |
| 03:37 | 24 | do you mean? |
| 03:37 | 25 | A.    My arm injury. |



199

| | | |
|---|---|---|
| 03:37 | 1 | Q.    Your arm injury. |
| 03:37 | 2 | A.    Okay. |
| 03:37 | 3 | Q.    And why do you feel they terminated you |
| 03:37 | 4 | because of your arm injury? |
| 03:37 | 5 | A.    Because maybe I was a liability to the |
| 03:37 | 6 | company. |
| 03:37 | 7 | Q.    In terms of what? |
| 03:37 | 8 | A.    I mean I'm not quite sure why.  I don't |
| 03:38 | 9 | understand why they did it, but that's just what I |
| 03:38 | 10 | think that they did.  I was -- I was fine.  I was |
| 03:38 | 11 | just under a doctor's care and then they terminated |
| 03:38 | 12 | me.  Why would they do that. |
| 03:38 | 13 | Q.    Now, there is -- one of the issues is |
| 03:38 | 14 | whether or not you could be -- you know, reapply once |
| 03:38 | 15 | you were released.  You know, there is a -- you know, |
| 03:38 | 16 | if you can't perform your work, you know, employers |
| 03:38 | 17 | need to find someone else, you know, to do the job; |
| 03:38 | 18 | right? |
| 03:38 | 19 | So one of the issues is do you think |
| 03:38 | 20 | you were terminated because you were unable to |
| 03:38 | 21 | perform your job at that time versus just because you |
| 03:38 | 22 | had an injury to your arm? |
| 03:38 | 23 | A.    Well, I felt that they wasn't -- they |
| 03:38 | 24 | didn't need -- there was no need to replace me at |
| 03:38 | 25 | that time.  They had enough employees there.  So it's |

**Kusar** ® Keeping Your Word Is Our Business℠

Case 2:18-cv-09503-AB-JEM    Document 55-1    Filed 01/17/20    Page 202 of 265    Page
Jayme Tipton (v.I)                    Jayme Tipton v. Airport Terminal Services, Inc.              1147705
ID #:1887

| 03:39 | 1 | not like they couldn't perform their work because I |
| 03:39 | 2 | was gone.  They could perform their work. |
| 03:39 | 3 | Q.     And what do you base that on?  Is that |
| 03:39 | 4 | your -- are you speculating or do you have -- did you |
| 03:39 | 5 | have access to information on schedules and their |
| 03:39 | 6 | hiring needs at that time? |
| 03:39 | 7 | A.     I just know from me working there how |
| 03:39 | 8 | many people is there.  Now I'm not sure who came |
| 03:39 | 9 | certain days, who was off, I don't know, but as far |
| 03:39 | 10 | as terminating me because I was -- I couldn't perform |
| 03:39 | 11 | the job at that time, they didn't need to replace me |
| 03:39 | 12 | is what I'm saying, and they didn't -- I believe that |
| 03:39 | 13 | they didn't start hiring or they didn't hire people |
| 03:39 | 14 | till like four months later. |
| 03:39 | 15 | Q.     Were you aware that during this time |
| 03:39 | 16 | they actually were actively looking to hire people? |
| 03:39 | 17 | A.     No. |
| 03:40 | 18 | Q.     Did you -- you weren't looking for |
| 03:40 | 19 | positions at other companies at this time, right? |
| 03:40 | 20 | A.     Oh, no. |
| 03:40 | 21 | Q.     Okay.  But they did hire -- did they |
| 03:40 | 22 | hire your friend from Menzies as well? |
| 03:40 | 23 | A.     Later, yes.  After me. |
| 03:40 | 24 | Q.     So you knew they had been hiring just a |
| 03:40 | 25 | few months before you went out on leave, right? |

Kusar ® Keeping Your Word Is Our Business℠

Case 2:18-cv-09503-AB-JEM   Document 55-1   Filed 01/17/20   Page 203 of 265   Page
ID #:1888
Jayme Tipton (v.I)                Jayme Tipton v. Airport Terminal Services, Inc.          1147705

| | | |
|---|---|---|
| 03:41 | 1 | Q. Isn't it difficult for them to meet the |
| 03:41 | 2 | customer needs if employees aren't coming to work? |
| 03:41 | 3 | A. Yes. |
| 03:41 | 4 | MR. GBEWONYO: Same objection. |
| 03:41 | 5 | MR. LUBELEY: And I think we can end for |
| 03:42 | 6 | today. What time is it? |
| 03:42 | 7 | MR. GBEWONYO: 3:41. |
| 03:42 | 8 | MR. LUBELEY: Okay. Does that work okay for |
| 03:42 | 9 | you? |
| 03:42 | 10 | MR. GBEWONYO: That's fine with me. |
| 03:42 | 11 | THE WITNESS: Yes. |
| 03:42 | 12 | MR. LUBELEY: Okay. All right. Why don't we |
| 03:42 | 13 | -- we're going to end this session of the -- this |
| 03:42 | 14 | session of the deposition. Her deposition will |
| 03:42 | 15 | remain open, but we can have the court reporter |
| 03:42 | 16 | prepare the transcript for review, and then we'll |
| 03:42 | 17 | continue -- we'll continue on a short time frame. |
| 03:42 | 18 | MR. GBEWONYO: We'll meet and confer. |
| 03:42 | 19 | MR. LUBELEY: We'll meet and confer. We |
| 03:42 | 20 | should probably talk anyway based on some of the |
| 03:42 | 21 | other housekeeping matters -- |
| 03:42 | 22 | MR. GBEWONYO: Okay. |
| 03:42 | 23 | MR. LUBELEY: -- housekeeping stuff. |
| 03:42 | 24 | And then what do we want to do on the |
| 03:42 | 25 | stipulation? Do it by Code. |

**Kusar** ® Keeping Your Word Is Our Business℠

| 03:42 | 1 | MR. GBEWONYO:  Have the original transcript |
| 03:42 | 2 | sent to my office so that she can review it and then |
| 03:42 | 3 | we'll send it back in 30 days. |
| 03:42 | 4 | MR. LUBELEY:  Let's go off the record real |
| 03:42 | 5 | quickly. |
| 03:42 | 6 | THE VIDEOGRAPHER:  The time is 3:42 P.M.  We |
| 03:43 | 7 | are off the record. |
| 03:44 | 8 | (Off-the-record discussion.) |
| 03:44 | 9 | THE VIDEOGRAPHER:  We're back on the record. |
| 03:44 | 10 | The time is 3:42 P.M. |
| 03:45 | 11 | MR. LUBELEY:  All right.  The parties are |
| 03:45 | 12 | willing to have the transcript handled pursuant to |
| 03:45 | 13 | Code with the following exceptions and conditions. |
| 03:45 | 14 | One, that plaintiff and her counsel |
| 03:45 | 15 | would be able to readily access and review the |
| 03:45 | 16 | transcript electronically, or otherwise, without the |
| 03:45 | 17 | need to go to the court reporter's office. |
| 03:45 | 18 | That the parties can use a certified |
| 03:45 | 19 | copy of the transcript as the original at all times |
| 03:45 | 20 | during the litigation for any purpose during the |
| 03:45 | 21 | litigation should the original not be available, and |
| 03:45 | 22 | if the -- once the period of time to review per the |
| 03:45 | 23 | Code has expired, the deposition transcript will be |
| 03:45 | 24 | deemed to have been signed under penalty of perjury. |
| 03:46 | 25 | MR. GBEWONYO:  So stipulated. |

Kusar ®  Keeping Your Word Is Our Business℠

Jayme Tipton (v.I)                    Jayme Tipton v. Airport Terminal Services, Inc.                    1147705

```
03:46    1              THE VIDEOGRAPHER:  Okay.  This concludes the

03:46    2      video deposition of Jayme Tipton.  The original media

03:46    3      of today's proceeding will remain in the custody of

03:46    4      Kusar Legal Services.

03:46    5                      We are going off the record at 3:45.

         6          (Declaration under penalty of perjury on the

         7      following page hereof.)

         8

         9

        10

        11

        12

        13

        14

        15

        16

        17

        18

        19

        20

        21

        22

        23

        24

        25
```

**Kusar**® Keeping Your Word Is Our Business℠

1                            DECLARATION

2                                 OF

3                         PENALTY OF PERJURY

4

5        I declare under penalty of perjury, under the

6    laws of the State of California, that I have read the

7    foregoing transcript, I have made any corrections,

8    additions or deletions that I was desirous of making

9    in order to render the within transcript true and

10   correct, and

11       IN WITNESS WHEREOF, I have hereunto subscribed

12   my name this _____ day of _____, 20____, at

13   _____, California.

14

15

16

17       _____

         JAYME TIPTON

18

19

20

21

22

23

24

25

**Kusar**® *Keeping Your Word Is Our Business℠*

Jayme Tipton (v.I)                Jayme Tipton v. Foxx Terminal Services, Inc.                1147705

```
 1                CERTIFICATION OF COURT REPORTER

 2                        FEDERAL JURAT

 3
                    I, the undersigned, a Certified
 4   Shorthand Reporter of the State of California do
     hereby certify:
 5

 6                    That the foregoing proceedings were
     taken before me at the time and place herein set
 7   forth; that any witnesses in the foregoing
     proceedings, prior to testifying, were placed under
 8   oath; that a verbatim record of the proceedings was
     made by me using machine shorthand which was
 9   thereafter transcribed under my direction; further,
     that the foregoing is an accurate transcription
10   thereof.

11
                    That before completion of the
12   deposition, a review of the transcript [X] was
     [ ] was not requested.
13

14                   I further certify that I am neither
     financially interested in the action nor a relative
15   or employee of any attorney of any of the parties.

16
                    IN WITNESS WHEREOF, I have this date
17   subscribed my name.

18
                   Dated: October 30, 2019
19

20

21

22

23
                   _____
24                 NORMA L. GADDISON, CSR
                   Certificate No. 4214
25
```



Case 2:18-cv-09503-AB-JEM    Document 55-1    Filed 01/17/20    Page 208 of 265    Page
ID #:1843
Jayme Tipton (v.II)                    Jayme Tipton v. Airport Terminal Services, Inc.                    1149998

```
 1                    UNITED STATES DISTRICT COURT

 2                   CENTRAL DISTRICT OF CALIFORNIA

 3

 4

 5    JAYME TIPTON,                    )
                                      )
 6           Plaintiff,               )
                                      )
 7    vs.                             ) Case No.
                                      ) 2:18-cv-09503
 8    AIRPORT TERMINAL SERVICES, INC., ) AB-JEM
      et al.,                         )
 9                                    )
             Defendants.              )
10                                    )
      _____)
11

12

13

14                        VOLUME II

15          VIDEOTAPED DEPOSITION OF JAYME TIPTON

16                 Los Angeles, California

17                Monday, December 2, 2019

18

19

20    Reported by:

21    Norma L. Gaddison, CSR No. 4214,
      Certified Realtime Professional
22

23

24

25
```

Kusar®  Keeping Your Word Is Our Business℠

1                    UNITED STATES DISTRICT COURT

2                    CENTRAL DISTRICT OF CALIFORNIA

3

4

5    JAYME TIPTON,                    )
                                      )
6            Plaintiff,               )
                                      )
7    vs.                              ) Case No.
                                      ) 2:18-cv-09503
8    AIRPORT TERMINAL SERVICES, INC., ) AB-JEM
     et al.,                          )
9                                     )
             Defendants.              )
10                                    )
     _____)

11

12

13

14           Videotaped deposition of JAYME TIPTON,

15    Volume Two, taken on behalf of Defendants, at 601 S.

16    Figueroa Street, Suite 3300, Los Angeles, California,

17    beginning at 10:11 A.M. and ending at 1:46 P.M., on

18    December 2, 2019, before NORMA L. GADDISON, Certified

19    Shorthand Reporter No. 4214.

20

21

22

23

24

25

Kusar® Keeping Your Word Is Our Business℠

```
 1    APPEARANCES:

 2    For Plaintiff:

 3                    SHEGERIAN & ASSOCIATES
                      BY:  AARON GBEWONYO, Esq.
 4                    225 Santa Monica Boulevard, Suite 700
                      Santa Monica, California 90401
 5                    (310) 860-0770
                      agbewonyo@shergerianlaw.com
 6


 7
      For Defendants:
 8
                      SEYFARTH SHAW
 9                    BY:  AARON LUBELEY, Esq.
                      601 S. Figueroa Street, Suite 3300
10                    Los Angeles, California 90017
                      (213) 270-9600
11                    alubeley@seyfarth.com


12


13    Also Present:

14                    TOM McCARTHY, Videographer

15

16

17

18

19

20

21

22

23

24

25
```

Kusar® Keeping Your Word Is Our Business℠

Jayme Tipton (v.II)                Jayme Tipton v. Project Terminal Services, Inc.                1149998

```
 1                    I N D E X

 2    WITNESS                        EXAMINATION

 3    JAYME TIPTON

 4                                          PAGE

 5              BY MR. LUBELEY      213, 339
              BY MR. GBEWONYO          314
 6

 7

 8

 9                      EXHIBITS

10    NUMBER         DESCRIPTION              PAGE

11    Exhibit 20    Second Amended Notice of   214
12                   Deposition

13    Exhibit 21    May 9, 2017 letter from Shonta  217
                   to Jayme Tipton re
14                 Separation of Employment

15    Exhibit 22    Collection of text messages and  278
                   emails
16

17

18

19          APPENDED DOCUMENT, UNMARKED, REFERRED TO

20                 Workers Compensation Request
                   for Authorization, DWC Form RFA
21

22

23

24

25
```

**Kusar**® *Keeping Your Word Is Our Business℠*

Case 2:18-cv-09503-AB-JEM    Document 55-1    Filed 01/17/20    Page 212 of 265    Page
                                        ID #:1847
Jayme Tipton (v.II)                Jayme Tipton v. Airport Terminal Services, Inc.                    1149998

| 09:21 | 1 | LOS ANGELES, CALIFORNIA; MONDAY, DECEMBER 2, 2019 |
| 09:25 | 2 | 10:11 A.M. - 1:46 P.M. |
| 10:08 | 3 | |
| 10:10 | 4 | THE VIDEOGRAPHER:  We are going on the record |
| 10:11 | 5 | at 10:11 A.M.  This is media unit one of the video |
| 10:11 | 6 | deposition of Jayme Tipton, Volume 2, taken by the |
| 10:11 | 7 | defendant, in the matter of Jayme Tipton versus |
| 10:11 | 8 | Airport Terminal Services, Incorporated, et al., |
| 10:11 | 9 | filed in the United States District Court, Central |
| 10:11 | 10 | District of California.  The case number is |
| 10:11 | 11 | 2:18-CV-09503-AB-JEM. |
| 10:11 | 12 | This deposition is being held at 601 |
| 10:11 | 13 | South Figueroa Street, Suite 3300, in Los Angeles, |
| 10:11 | 14 | California, on December 2nd, 2019. |
| 10:11 | 15 | My name is Tom McCarthy, and I'm a |
| 10:11 | 16 | Notary Public and legal video specialist.  The court |
| 10:11 | 17 | reporter is Norma Gaddison, and we are both here |
| 10:11 | 18 | representing Kusar Legal Services, located in Long |
| 10:11 | 19 | Beach, California. |
| 10:12 | 20 | Please note that audio and video |
| 10:12 | 21 | recording will take place unless all parties agree to |
| 10:12 | 22 | go off the record.  The microphones are very powerful |
| 10:12 | 23 | and may pick up whispers, private conversations and |
| 10:12 | 24 | cell conversations. |
| 10:12 | 25 | Counsel and all present will now state |

Kusar ® Keeping Your Word Is Our Business℠

Case 2:18-cv-09503-AB-JEM    Document 55-1    Filed 01/17/20    Page 213 of 265    Page
ID #:1848
Jayme Tipton (v.II)                Jayme Tipton v. Bengal Terminal Services, Inc.                    1149998

```
11:01   1        Q.    Are you interested in applying for any

11:01   2    of those positions?

11:01   3        A.    I'm not interested in going back to the

11:01   4    airport at this point.

11:01   5        MR. LUBELEY:  Why don't we take a quick break

11:01   6    and I can get the transcript for you.

11:01   7        MR. GBEWONYO:  Okay.  Great.

11:01   8        THE VIDEOGRAPHER:  The time is 11:01 A.M., and

11:01   9    we are off the record.

11:01   10       (Short break.)

11:15   11       THE VIDEOGRAPHER:  The time is 11:16 A.M., and

11:16   12   we're back on the record.

        13   BY MR. LUBELEY:

11:16   14       Q.    Ms. Tipton, do you recall having a

11:16   15   conversation with a supervisor named Moses?

11:16   16       A.    Yes.

11:16   17       Q.    Do you recall testifying to that

11:16   18   conversation?  He reached out to speak with you --

11:16   19       A.    Yes.

11:16   20       Q.    -- while you were out on leave?

11:16   21       A.    Yes.

11:16   22       Q.    Have you told me everything you can

11:16   23   recall about that conversation?

11:16   24       A.    He called me to introduce his self as a

11:16   25   new manager and that's all I really remember.
```

253

Jayme Tipton (v.II)                    Jayme Tipton v. Marriott Terminal Services, Inc.            1149998

| 11:48 | 1 | text messages that I -- |
| 11:48 | 2 | MR. LUBELEY:  Let's take a little break and |
| 11:48 | 3 | let's get those documents for you. |
| 11:48 | 4 | THE VIDEOGRAPHER:  The time is 11:48 A.M., and |
| 11:48 | 5 | we are off the record. |
| 11:48 | 6 | (Short break.) |
| 11:54 | 7 | THE VIDEOGRAPHER:  The time is 11:55 A.M., and |
| 11:54 | 8 | we're back on the record. |
| 11:54 | 9 | MR. LUBELEY:  I'd like to have marked as the |
| 11:54 | 10 | next exhibit in order a collection of documents that |
| 11:55 | 11 | your counsel recently produced to us.  It's 1, 2, 3 |
| 11:55 | 12 | -- they're Bates numbered JT 86 through JT 106. |
| 11:55 | 13 | (Deposition Exhibit 21 was marked for |
|  | 14 | identification by the reporter and is |
| 11:56 | 15 | attached herewith.) |
| 11:56 | 16 | BY MR. LUBELEY: |
| 11:56 | 17 | Q.    Do you recognize those documents? |
| 11:56 | 18 | A.    Yes. |
| 11:56 | 19 | Q.    Are these documents you provided to |
| 11:56 | 20 | your attorney? |
| 11:56 | 21 | A.    Yes. |
| 11:56 | 22 | Q.    I want you to look at the first page. |
| 11:57 | 23 | It appears to be a printout of a text message |
| 11:57 | 24 | exchange; is that correct? |
| 11:57 | 25 | A.    Yes. |

Kusar ® Keeping Your Word Is Our Business℠

Case 2:18-cv-09503-AB-JEM    Document 55-1    Filed 01/17/20    Page 215 of 265    Page
ID #:1850
Jayme Tipton (v.II)          Jayme Tipton v. American Terminal Services, Inc.          1149998

| 11:57 | 1 | Q. | All right. And where did you obtain |
| 11:57 | 2 | this document? | |
| 11:57 | 3 | A. | From my phone. |
| 11:57 | 4 | Q. | And it says at the top, "Moses" with a |
| 11:57 | 5 | phone number? | |
| 11:57 | 6 | A. | Yes. |
| 11:57 | 7 | Q. | Okay. And is that the Moses we've been |
| 11:57 | 8 | talking about from ATS? | |
| 11:57 | 9 | A. | Yes. |
| 11:57 | 10 | Q. | There's -- it starts off by saying |
| 11:57 | 11 | "Jayme, right?" with a question? | |
| 11:57 | 12 | A. | Yes. |
| 11:57 | 13 | Q. | Okay. Was there any text message that |
| 11:57 | 14 | pre -- that was sent before this? | |
| 11:57 | 15 | A. | No. |
| 11:57 | 16 | Q. | On May 8th, it says here, "Need to call |
| 11:57 | 17 | me ASAP, please." That was a text message from | |
| 11:57 | 18 | Moses. Do you see that? | |
| 11:57 | 19 | A. | Yes. |
| 11:57 | 20 | Q. | Did you respond to that text message? |
| 11:57 | 21 | A. | No. |
| 11:57 | 22 | Q. | Why not? |
| 11:57 | 23 | A. | Most likely I called. I'm not sure. |
| 11:58 | 24 | Q. | And did you call Moses? |
| 11:58 | 25 | A. | I'm not sure. |

Kusar® Keeping Your Word Is Our Business℠

Jayme Tipton (v.II)                    Jayme Tipton v. Airport Terminal Services, Inc.                    1149998

| | | |
|---|---|---|
| 12:28 | 1 | always going to be in MINT, and I guess every day it |
| 12:28 | 2 | rotates.  Well, she wanted to rotate it.  Maybe she |
| 12:28 | 3 | didn't want me in there all the time with her.  Who |
| 12:28 | 4 | knows. |
| 12:29 | 5 | Q.    Okay.  Do you know the names of the |
| 12:29 | 6 | doctors that you saw? |
| 12:29 | 7 | A.    No. |
| 12:29 | 8 | Q.    Have you provided those at all to your |
| 12:29 | 9 | attorney? |
| 12:29 | 10 | A.    Doctor names, no.  Are we done with |
| 12:29 | 11 | this? |
| 12:29 | 12 | Q.    Yeah, we're done with that.  Do you |
| 12:29 | 13 | have any other text messages relating to any of the |
| 12:30 | 14 | issues -- strike that. |
| 12:30 | 15 | Do you have any other text messages |
| 12:30 | 16 | between anyone related to your employment at ATS? |
| 12:30 | 17 | MR. GBEWONYO:  Objection.  Asked and answered. |
| 12:30 | 18 | You can answer. |
| 12:30 | 19 | THE WITNESS:  No. |
| 12:30 | 20 | BY MR. LUBELEY: |
| 12:30 | 21 | Q.    Other than Jet Blue, were there any |
| 12:30 | 22 | other airlines at that terminal that ATS supported? |
| 12:30 | 23 | A.    Yes. |
| 12:30 | 24 | MR. GBEWONYO:  Objection.  Calls for |
| 12:30 | 25 | speculation, vague as to time |

Kusar ®  Keeping Your Word Is Our Business℠

| | | |
|---|---|---|
| 12:30 | 1 | BY MR. LUBELEY: |
| 12:30 | 2 | Q.    At Terminal 3, what were the other |
| 12:30 | 3 | airlines that ATS supported? |
| 12:30 | 4 | A.    At Terminal 3, it was just Jet Blue. |
| 12:30 | 5 | Q.    And Terminal 3 is where they -- is -- |
| 12:30 | 6 | strike that. |
| 12:30 | 7 | At Terminal 3, the work at Jet Blue was |
| 12:30 | 8 | the airplane grooming positions; correct? |
| 12:30 | 9 | A.    Yes. |
| 12:30 | 10 | Q.    Did they -- did ATS do any other |
| 12:31 | 11 | support work for Jet Blue? |
| 12:31 | 12 | MR. GBEWONYO:  Objection.  Calls for |
| 12:31 | 13 | speculation.  Vague as to time. |
| | 14 | BY MR. LUBELEY: |
| 12:31 | 15 | Q.    Do you know? |
| 12:31 | 16 | A.    Ramp agent, but as far as us groomers, |
| 12:31 | 17 | we just cabin cleaning. |
| 12:31 | 18 | Q.    And was there -- was there work at |
| 12:31 | 19 | other terminals that ATS did? |
| 12:31 | 20 | A.    Yes. |
| 12:31 | 21 | Q.    And what was that? |
| 12:31 | 22 | A.    We did cabin cleaning for -- I cannot |
| 12:31 | 23 | remember the airlines. |
| 12:31 | 24 | Q.    Do you -- |
| 12:31 | 25 | A.    West Jet. |

Kusar ® Keeping Your Word Is Our Business℠

Case 2:18-cv-09503-AB-JEM    Document 55-1    Filed 01/17/20    Page 218 of 265    Page
ID #:1853
Jayme Tipton (v.II)          Jayme Tipton v. West Terminal Services, Inc.              1149998

| | | |
|---|---|---|
| 12:31 | 1 | Q.    You recall there being a contract to do |
| 12:31 | 2 | work at West Jet? |
| 12:31 | 3 | A.    Yes. |
| 12:31 | 4 | Q.    Were you aware that the contract at |
| 12:31 | 5 | West Jet did not include cabin cleaning? |
| 12:31 | 6 | A.    No. |
| 12:31 | 7 | Q.    You believe it did include cabin |
| 12:31 | 8 | cleaning? |
| 12:31 | 9 | A.    I'm not sure.  I just know we was |
| 12:31 | 10 | instructed to clean the airplanes.  It was certain |
| 12:31 | 11 | airlines that came during the day that we had to go |
| 12:31 | 12 | clean. |
| 12:31 | 13 | Q.    And you cleaned planes for West Jet? |
| 12:32 | 14 | A.    Yes. |
| 12:32 | 15 | Q.    And what terminal.  Was that Terminal 3 |
| 12:32 | 16 | as well? |
| 12:32 | 17 | A.    I believe Terminal 2. |
| 12:32 | 18 | Q.    Terminal 2.  How many times did you |
| 12:32 | 19 | clean planes for West Jet? |
| 12:32 | 20 | A.    We clean at least one or two a day. |
| 12:32 | 21 | Q.    That was part of your normal crew |
| 12:32 | 22 | schedule? |
| 12:32 | 23 | A.    Yes.  At first, it was every so often, |
| 12:32 | 24 | but then we -- we had to do it every day. |
| 12:32 | 25 | Q.    Any other grooming positions that you |

**Kusar** ® Keeping Your Word Is Our Business℠

Case 2:18-cv-09503-AB-JEM    Document 55-1    Filed 01/17/20    Page 219 of 265    Page
Jayme Tipton (v.II)                         Jayme Tipton v. ____ t Terminal Services, Inc.                      1149998
ID #:1854

12:54    1          Q.    And when you spoke with Mr. Guillen,

12:54    2    did you inform him that you were off of work due to

12:54    3    an injury that you had experienced while at work?

12:54    4          MR. LUBELEY:   I'm going to object to that.

12:54    5    It's improperly leading and asked and answered.

12:54    6          THE WITNESS:   I did speak to him about the

12:54    7    injury, yes.

12:54    8          MR. GBEWONYO:   Okay.

12:54    9          Q.    And what did you tell him about the

12:54    10   injury?

12:54    11         A.    I told him -- I had explained to him

12:54    12   what happened and I was off work.   He was talking to

12:54    13   me about the doctor notes.

12:54    14         Q.    Okay.   And what did he tell you about

12:54    15   the doctor notes?

12:54    16         A.    He didn't tell me anything.   He was

12:54    17   just asking questions about the doctor notes, and it

12:54    18   says that I would be back at this date.   Can't

12:54    19   remember which doctor's note it was, but when it said

12:55    20   I was supposed to return back to work.   I believe it

12:55    21   was May -- May 1st.

12:55    22         Q.    Did he tell you that he had seen some

12:55    23   doctor notes or a doctor's note for you?

12:55    24         A.    Yes.   Yes.

12:55    25         Q.    And when he told you that he had

Kusar® Keeping Your Word Is Our Business℠

Jayme Tipton (v.II)                Jayme Tipton v. Abbott Terminal Services, Inc.                1149998

| | | |
|---|---|---|
| 12:55 | 1 | received the doctor notes, you said something about a |
| 12:55 | 2 | return date? |
| 12:55 | 3 | A.    Yes. |
| 12:55 | 4 | Q.    Okay.  And did he say that he was aware |
| 12:55 | 5 | of what that return date was? |
| 12:55 | 6 | A.    Yes. |
| 12:55 | 7 | Q.    Okay. |
| 12:55 | 8 | A.    I told him, but he was aware of |
| 12:55 | 9 | everything.  He was just verifying. |
| 12:55 | 10 | Q.    And during that phone call with |
| 12:55 | 11 | Mr. Guillen, did he ask you about when you could |
| 12:55 | 12 | return to work? |
| 12:55 | 13 | A.    Did he ask me when could I return back |
| 12:55 | 14 | to work? |
| 12:55 | 15 | Q.    Correct. |
| 12:55 | 16 | A.    I said when -- when my doctor's note |
| 12:55 | 17 | said I was supposed to return back to work. |
| 12:55 | 18 | Q.    Okay.  Did he ask you if you could |
| 12:55 | 19 | return to work sooner with any type of accommodation? |
| 12:55 | 20 | A.    No.  He did not say that. |
| 12:56 | 21 | Q.    Okay.  Did he ask you if you could |
| 12:56 | 22 | return to work sooner without some type of |
| 12:56 | 23 | accommodation? |
| 12:56 | 24 | MR. LUBELEY:  Object to the extent these are |
| 12:56 | 25 | leading. |

Case 2:18-cv-09503-AB-JEM    Document 55-1    Filed 01/17/20    Page 221 of 265    Page
Jayme Tipton (v.II)                     Jayme Tipton v. ... et Terminal Services, Inc.                    1149998
                                        ID #:1850

12:56   1          THE WITNESS:   I don't understand the question.

12:56   2          MR. GBEWONYO:   Okay.

12:56   3          Q.       Did he ask you whether you could return

12:56   4   to work with any type of light duty?

12:56   5          A.      No.   He did not.

12:56   6          Q.       Did he speak with you about any type of

12:56   7   light duty at all?

12:56   8          A.      No.   Not at all.   We didn't even get

12:56   9   into that.

12:56   10         Q.      And I believe you said -- you testified

12:56   11  earlier that potentially a day after you spoke with

12:56   12  Mr. Guillen that you received a call from

12:56   13  Ms. Henderson; is that correct?

12:56   14         A.      Yes.

12:56   15         Q.      Okay.  And when Ms. Henderson called to

12:56   16  speak with you, did she inform you whether she had

12:56   17  received any doctor's note from you?

12:56   18         A.      No.

12:56   19         Q.      Okay.  Did she inform you that

12:56   20  Mr. Guillen had provided her with a doctor's note?

12:56   21         A.       No.  She didn't say anything about the

12:56   22  doctor's note.

12:56   23         Q.      Did she inform you as to how she knew

12:57   24  that you were off of work?

12:57   25         MR. LUBELEY:  I'm going to object to the

Kusar® Keeping Your Word Is Our Business℠

Jayme Tipton (v.II)                  Jayme Tipton v. Abbott Terminal Services, Inc.                  1149998

|       |    |                                                               |
|-------|----|---------------------------------------------------------------|
|       | 1  | Q.      "And how do you know that she wasn't                   |
| 12:58 | 2  | surprised to hear that?")                                      |
| 12:58 | 3  | THE WITNESS:  Oh.  'Cuz she -- when she                        |
| 12:58 | 4  | called, it sounds like she just wanted -- just like           |
| 12:58 | 5  | she said, she wanted me to resign or she wanted to            |
| 12:58 | 6  | terminate me.  She wasn't even trying to find out             |
| 12:58 | 7  | what -- what was really going on, or if I can come            |
| 12:58 | 8  | back, you know, like be on light duty or anything             |
| 12:58 | 9  | like that.                                                    |
| 12:58 | 10 | She -- she didn't sound -- she didn't                         |
| 12:58 | 11 | sound like she was worried or trying to help me.  She         |
| 12:58 | 12 | just called me I believe with the intent of                   |
| 12:58 | 13 | termination.                                                  |
|       | 14 | BY MR. GBEWONYO:                                              |
| 12:58 | 15 | Q.      Did you expect her to be worried about                |
| 12:58 | 16 | you?                                                           |
| 12:58 | 17 | A.      Yes.  Because she's -- I believe her                  |
| 12:58 | 18 | title was head of HR or something.  You're supposed           |
| 12:58 | 19 | to I thought be concerned about your employees.               |
| 12:58 | 20 | Q.      Did Ms. Henderson speak with you about                |
| 12:58 | 21 | when you could return to work?                                |
| 12:58 | 22 | MR. LUBELEY:  Objection.  Asked and answered.                 |
| 12:59 | 23 | THE WITNESS:  Not that I can recall.                          |
| 12:59 | 24 | MR. GBEWONYO:  Okay.                                          |
| 12:59 | 25 | Q.      Did you inform Ms. Henderson about what               |

320

12:18:10
Case 2:18-cv-09503-AB-JEM    Document 55-1    Filed 01/17/20    Page 223 of 265    Page
Jayme Tipton (v.II)                     Jayme Tipton v. Target Terminal Services, Inc.              1149998
ID #:1858

| | | |
|---|---|---|
| 12:59 | 1 | your doctor's note said? |
| 12:59 | 2 | A.       Yes. |
| 12:59 | 3 | Q.       Okay. |
| 12:59 | 4 | A.       Yes, I did.  I -- I told her, you know, |
| 12:59 | 5 | my doctor had me off work.  I'm supposed to return to |
| 12:59 | 6 | work on this day, which was May 15th, I believe, and |
| 12:59 | 7 | she was -- and she was just, no, you need to resign |
| 12:59 | 8 | now or we're going to terminate you. |
| 12:59 | 9 | Q.       And you had been injured at work |
| 12:59 | 10 | previously; correct? |
| 12:59 | 11 | A.       Yes. |
| 12:59 | 12 | Q.       Okay.  And were you allowed to continue |
| 12:59 | 13 | to work on that day? |
| 12:59 | 14 | A.       Yes. |
| 12:59 | 15 | Q.       And you had informed somebody in |
| 12:59 | 16 | management that you had been injured at work; |
| 12:59 | 17 | correct? |
| 12:59 | 18 | MR. LUBELEY:  Objection, misstates her |
| 12:59 | 19 | testimony. |
| 12:59 | 20 | THE WITNESS:  Yes.  The supervisor. |
| | 21 | BY MR. GBEWONYO: |
| 12:59 | 22 | Q.       Who was the supervisor at that time? |
| 12:59 | 23 | A.       Damian. |
| 12:59 | 24 | Q.       Okay. |
| 12:59 | 25 | A.       And of course my crew chief Ora was |

Kusar® Keeping Your Word Is Our Business℠

Case 2:18-cv-09503-AB-JEM   Document 55-1   Filed 01/17/20   Page 224 of 265   Page
Jayme Tipton (v.II)                    Jayme Tipton v. Sunset Terminal Services, Inc.                 (D v. 1050)
                                                                                                    1149998

```
01:01   1    perform your duties without any type of light duty?

01:01   2         MR. LUBELEY:  Objection, assumes facts, asked

01:01   3    and answered.

01:01   4         THE WITNESS:  Without light duty, no.

        5    BY MR. GBEWONYO:

01:01   6         Q.    And did she ask you if you could

01:01   7    perform your duties with light duties?

01:01   8         MR. LUBELEY:  Same objection.

01:01   9         THE WITNESS:  No.

01:01   10        MR. LUBELEY:  Asked and answered.

01:02   11        THE WITNESS:  Sorry.

        12   BY MR. GBEWONYO:

01:02   13        Q.    And when Shonta Henderson asked you or

01:02   14   told you that you had to resign or be terminated,

01:02   15   what did you say to her?

01:02   16        MR. LUBELEY:  Same objection.  This has been

01:02   17   asked and answered.

01:02   18        THE WITNESS:  I told her that I don't want to

01:02   19   resign.  That I want to keep working.  I like my job.

01:02   20   I wanted to keep my job.  I want to stay with the

01:02   21   company.

01:02   22   BY MR. GBEWONYO:

01:02   23        Q.    And when you told her that, were you

01:02   24   upset?

01:02   25        A.    Yes.  I was very upset.  I was hurt.
```

Kusar ® Keeping Your Word Is Our Business℠

01:02  1          MR. LUBELEY:  Objection, leading.

       2  BY MR. GBEWONYO:

01:02  3          Q.      What was the tone of your voice when

01:02  4  you said that?

01:02  5          A.      I was angry.  I was surprised.  I was

01:02  6  all kind of emotions, you know.  I even cried on the

01:02  7  phone with her.  I was crying, telling her that I

01:02  8  don't want to lose my job because -- because -- you

01:03  9  know, because I was hurt.  I don't want to lose my

01:03  10  job.  I'm trying to get better so I can come back to

01:03  11  work.

01:03  12          Q.      And when you cried on the phone with

01:03  13  Shonta, did you believe yourself to be disabled?

01:03  14          A.      I believe that I -- I could have

01:03  15  worked, at least light duty with my -- with my

01:03  16  injury.

01:03  17          Q.      Okay.  And did you believe that it was

01:03  18  illegal for Shonta to terminate you because you were

01:03  19  out due to your injury?

01:03  20          A.      Yes.  I do believe that, yes.

01:03  21          Q.      Did you ever communicate that to

01:03  22  Shonta?

01:03  23          A.      I believe I did.  I'm not quite sure,

01:03  24  but I know for sure that I was thinking it.  I was

01:03  25  like you can't do this.  I'm on a doctor's leave.  My

Jayme Tipton (v.II)                Jayme Tipton v. Marriott Terminal Services, Inc.                1149998

```
01:03    1    doctor have me out.

01:03    2         Q.      Did you tell Shonta that you were out

01:03    3    on a doctor's leave and that your doctor had you out?

01:03    4         A.      Yes.

01:04    5         Q.      And after -- and what did Shonta say in

01:04    6    response to that, you telling her that you were out

01:04    7    on a doctor's leave and your doctor had you out?

01:04    8         MR. LUBELEY:  Same objection, asked and

01:04    9    answered.

01:04   10         THE WITNESS:  She just kept saying that I need

01:04   11    to resign or they're going to terminate me.  That's

01:04   12    what she just kept repeating.

01:04   13         MR. GBEWONYO:  Okay.

01:04   14         Q.      And did she ultimately tell you they

01:04   15    were going to terminate you?

01:04   16         MR. LUBELEY:  Same objection.

01:04   17         THE WITNESS:  I -- I told her that I wasn't

01:04   18    going to resign.  So therefore I don't recall if she

01:04   19    stated then we're going to terminate you or not but

01:04   20    that was the only other option that she gave me.

        21    BY MR. GBEWONYO:

01:04   22         Q.      And after you were informed by Shonta

01:04   23    that either you had to resign or you were going to be

01:04   24    terminated, how did you feel?

01:04   25         A.      Please repeat, please.
```

326

Case 2:18-cv-09503-AB-JEM    Document 55-1    Filed 01/17/20    Page 227 of 265    Page
ID #:1802
Jayme Tipton (v.II)    Jayme Tipton v. Airport Terminal Services, Inc.    1149998

| | | |
|---|---|---|
| 01:15 | 1 | did he call you on the phone number that was -- that |
| 01:15 | 2 | you were texting from? |
| 01:15 | 3 | A.    Yes. |
| 01:15 | 4 | Q.    Okay.  Do you recall whether he |
| 01:15 | 5 | mentioned the text messages that were sent to you on |
| 01:15 | 6 | that date? |
| 01:15 | 7 | A.    No. |
| 01:15 | 8 | Q.    Okay.  Did you ever ask him about those |
| 01:15 | 9 | text messages? |
| 01:15 | 10 | A.    No. |
| 01:16 | 11 | Q.    Were there any duties specifically that |
| 01:16 | 12 | you felt that you absolutely could not perform |
| 01:16 | 13 | without -- without any light duties after your injury |
| 01:16 | 14 | to your shoulder? |
| 01:16 | 15 | A.    Please repeat. |
| 01:16 | 16 | Q.    Of course.  After your shoulder injury, |
| 01:16 | 17 | were there any of your duties as a groomer that you |
| 01:16 | 18 | know for certain that you could not perform without |
| 01:16 | 19 | light duties? |
| 01:16 | 20 | A.    No.  There's nothing that comes to |
| 01:16 | 21 | mind.  Because to me, the whole job is light duty. |
| 01:16 | 22 | Q.    What do you mean by that? |
| 01:16 | 23 | A.    It's very simple.  It's pick up trash |
| 01:16 | 24 | and wiping down the bathrooms.  I could do all of |
| 01:16 | 25 | that with one hand. |



Jayme Tipton (v.II)                    Jayme Tipton v. West Terminal Services, Inc.                    1149998

| | | |
|---|---|---|
| 01:16 | 1 | Q.        When you picked up trash before, did |
| 01:16 | 2 | you pick up trash with both hands? |
| 01:16 | 3 | A.        No. |
| 01:16 | 4 | Q.        Okay.   When you wiped down the |
| 01:16 | 5 | bathroom, did you wipe down the bathroom with both |
| 01:16 | 6 | hands? |
| 01:17 | 7 | A.        No. |
| 01:17 | 8 | Q.        Did you ever have to vacuum? |
| 01:17 | 9 | A.        Yes. |
| 01:17 | 10 | Q.        Okay.   Did you vacuum with both hands? |
| 01:17 | 11 | A.        You vacuum with one hand. |
| 01:17 | 12 | Q.        Is okay.   And what's your dominant |
| 01:17 | 13 | hand? |
| 01:17 | 14 | A.        Right. |
| 01:17 | 15 | Q.        Okay.   And it was your right shoulder |
| 01:17 | 16 | that was injured; correct? |
| 01:17 | 17 | A.        Yes. |
| 01:17 | 18 | Q.        Could have you vacuumed with your left |
| 01:17 | 19 | hand? |
| 01:17 | 20 | A.        Yes. |
| 01:17 | 21 | Q.        Okay.   What about -- you mentioned |
| 01:17 | 22 | folding blankets; is that correct? |
| 01:17 | 23 | A.        No.   We didn't fold blankets.   The |
| 01:17 | 24 | blankets already come in a packet that is already |
| 01:17 | 25 | folded.   So we just -- they already in bags and we've |

Kusar®  Keeping Your Word Is Our Business℠

Case 2:18-cv-09503-AB-JEM    Document 55-1    Filed 01/17/20    Page 229 of 265    Page
ID #:1804
Jayme Tipton (v.II)                Jayme Tipton v. Airport Terminal Services, Inc.                1149998

| 01:17 | 1  | got to bring the bag upstairs to the plane and we |
| 01:17 | 2  | just open it and we put the blankets on the seats. |
| 01:17 | 3  | Q.      Okay. |
| 01:17 | 4  | A.      So they're already done, but the |
| 01:17 | 5  | blankets that's already there, yeah, they -- we bag |
| 01:17 | 6  | them up and take them down. |
| 01:17 | 7  | Q.      Okay.  And when you say you bag them |
| 01:17 | 8  | up, what does that mean? |
| 01:17 | 9  | A.      The old blankets, we bag -- we put the |
| 01:17 | 10 | old blankets in the bag and we take them off the |
| 01:17 | 11 | airplane. |
| 01:17 | 12 | Q.      Okay.  Is it like a plastic bag that |
| 01:18 | 13 | you had to carry or was it like on some type of dolly |
| 01:18 | 14 | that you pushed?  Can you describe that to me? |
| 01:18 | 15 | A.      It's in a bag that you carry. |
| 01:18 | 16 | Q.      And were you responsible for carrying |
| 01:18 | 17 | the bag of old blankets? |
| 01:18 | 18 | A.      You -- everybody's responsible. |
| 01:18 | 19 | Everybody help each other.  So if somebody is -- is |
| 01:18 | 20 | in MINT, they'll put the blankets in the front. |
| 01:18 | 21 | Somebody else can bag them up, throw them outside the |
| 01:18 | 22 | aircraft, and then when we all leave the aircraft, we |
| 01:18 | 23 | just take it out the door and it's a slide down the |
| 01:18 | 24 | jet bridge, and we throw them on the slide and it |
| 01:18 | 25 | slides the blankets down. |

338



| | | |
|---|---|---|
| 01:18 | 1 | Q. So after it gets out of the plane on to |
| 01:18 | 2 | the slide, do you have to carry them thereafter? How |
| 01:18 | 3 | do they get to wherever they're going? If you know. |
| 01:18 | 4 | A. I can't -- I can't remember now, but I |
| 01:18 | 5 | know we slid them down and I think we put them in a |
| 01:19 | 6 | cart, but most of the time, ramp agents will help us |
| 01:19 | 7 | downstairs. They'll help us with the blankets after |
| 01:19 | 8 | that. Because they -- they can be really heavy. |
| 01:19 | 9 | Q. Okay. Was there anything else that you |
| 01:19 | 10 | can think of that you could not have done without |
| 01:19 | 11 | accommodations or without light duties, I should say? |
| 01:19 | 12 | A. No. To me everything was light duty on |
| 01:19 | 13 | there. It was very simple. |
| 01:19 | 14 | MR. GBEWONYO: I think that's all for me. |
| 01:19 | 15 | MR. LUBELEY: Okay. Just a couple follow-up |
| 01:19 | 16 | questions. |
| | 17 | |
| 01:19 | 18 | FURTHER EXAMINATION |
| 01:19 | 19 | BY MR. LUBELEY: |
| 01:19 | 20 | Q. Did you perjure yourself in your prior |
| 01:19 | 21 | testimony? Did you lie under oath when you described |
| 01:19 | 22 | previously your discussions with Shonta? |
| 01:19 | 23 | A. Did I lie, no. |
| 01:19 | 24 | Q. Yes. So to the extent that you are now |
| 01:19 | 25 | providing different testimony to what you testified |

Kusar® Keeping Your Word Is Our Business℠

Jayme Tipton (v.II)                 Jayme Tipton v. Prime Flight Terminal Services, Inc.                 1149998

| | | |
|---|---|---|
| 01:21 | 1 | Q.      You reviewed your first deposition |
| 01:22 | 2 | transcript -- |
| 01:22 | 3 | A.      Yes. |
| 01:22 | 4 | Q.      -- to ensure it was accurate; correct? |
| 01:22 | 5 | A.      Yes. |
| 01:22 | 6 | Q.      Was there anything in there that was |
| 01:22 | 7 | inaccurate that you had testified to? |
| 01:22 | 8 | A.      No. |
| 01:22 | 9 | Q.      You just testified that you were able |
| 01:22 | 10 | to perform all of your job duties without any |
| 01:22 | 11 | accommodation; correct? |
| 01:22 | 12 | A.      If ATS felt that I could not -- |
| 01:22 | 13 | basically, I'm saying everything is light duty for |
| 01:22 | 14 | me.  Everything that -- the job duties is light duty. |
| 01:22 | 15 | I asked to be on light duty.  They said, no, there is |
| 01:22 | 16 | no light duty for you.  I felt that there is light |
| 01:22 | 17 | duty, but if they feel that it's not, that I need |
| 01:22 | 18 | help with certain things as far as bringing up the |
| 01:22 | 19 | blankets on the airplanes, I don't have to do that. |
| 01:22 | 20 | Somebody else could helped me with that if I'm in the |
| 01:23 | 21 | MINT section or everybody will help bring up bags.  I |
| 01:23 | 22 | don't have to bring up bags. |
| 01:23 | 23 | Now as far as the bag of tissues and |
| 01:23 | 24 | stuff like that, I can hold that with my left hand, |
| 01:23 | 25 | but if the job thinks that I need help holding that |

342

Kusar ® Keeping Your Word Is Our Business℠

Jayme Tipton (v.II)                Jayme Tipton v. Abbott Terminal Services, Inc.                1149998

```
01:23   1   being on light duty, then that's fine, but I could

01:23   2   clean with my left hand.  I could vacuum.  I can do

01:23   3   everything.  That's what I'm saying.

01:23   4        Q.    Okay.  So you believed, it's your

01:23   5   belief --

01:23   6        A.    I believe.

01:23   7        Q.    -- that you could perform your job

01:23   8   without any time off, without any need to rest to let

01:23   9   your shoulder to recover?

01:23   10       MR. GBEWONYO:  Objection, misstates witness

01:23   11  testimony.

01:23   12       THE WITNESS:  Asked and answered.

01:23   13       MR. LUBELEY:  I'm asking what you believe.

01:23   14       THE WITNESS:  I believe that I could have been

01:23   15  working.

        16  BY MR. LUBELEY:

01:23   17       Q.    Without any accommodation whatsoever;

01:23   18  correct?

01:23   19       A.    With my left hand.

01:23   20       Q.    You could do your full job with your

01:23   21  left hand?

01:23   22       A.    Yes.  I could have, yes.

01:23   23       Q.    Then why did you tell your employer --

01:23   24  why did you provide a doctor's note telling your

01:23   25  employer that you couldn't do work?
```

Kusar ®  Keeping Your Word Is Our Business℠

| | | |
|---|---|---|
| 01:26 | 1 | THE WITNESS:  It says a doctor's note that my |
| 01:26 | 2 | doctor took me off work for them days.  It did not |
| 01:26 | 3 | say that I cannot perform work. |
| | 4 | BY MR. LUBELEY: |
| 01:26 | 5 | Q.    So you're suggesting maybe your doctor |
| 01:26 | 6 | was not telling the truth in those documents? |
| 01:26 | 7 | MR. GBEWONYO:  Objection, misstates witness |
| 01:26 | 8 | testimony.  Argumentative. |
| 01:26 | 9 | BY MR. LUBELEY: |
| 01:26 | 10 | Q.    He took you off work even though you |
| 01:26 | 11 | were able to work? |
| 01:26 | 12 | A.    No.  My doctor felt that I was not able |
| 01:27 | 13 | to work. |
| 01:27 | 14 | Q.    Your doctor believed you couldn't. |
| 01:27 | 15 | A.    I felt that I could have worked light |
| 01:27 | 16 | duty. |
| 01:27 | 17 | Q.    Okay.  But you never told your doctor |
| 01:27 | 18 | you thought you could work light duty? |
| 01:27 | 19 | A.    No.  I did not go over that as -- we |
| 01:27 | 20 | talked about things, but I did not say, hey, can you |
| 01:27 | 21 | write me a note so I can work light duty.  Because |
| 01:27 | 22 | when I talked to the job, they said there is no light |
| 01:27 | 23 | duty available.  No, you cannot work.  That's what |
| 01:27 | 24 | Damian and Ora said. |
| 01:27 | 25 | Q.    There was not light duty position? |

**Kusar**® Keeping Your Word Is Our Business℠

Jayme Tipton (v.II)                    Jayme Tipton v. Pact Terminal Services, Inc.                    1149998

| | | |
|---|---|---|
| 01:27 | 1 | A.    There was not a light duty position is |
| 01:27 | 2 | what they said. |
| 01:27 | 3 | Q.    And did they also tell you that your |
| 01:27 | 4 | doctor restrictions just showed you couldn't work? |
| 01:27 | 5 | MR. GBEWONYO:  Objection, misstates witness |
| 01:27 | 6 | testimony.  The document speaks for itself. |
| 01:27 | 7 | THE WITNESS:  It said my -- my doctor took me |
| 01:27 | 8 | off for those days.  That's what it said. |
| 01:27 | 9 | MR. LUBELEY:  Okay. |
| 01:27 | 10 | Q.    And it didn't say that you could |
| 01:27 | 11 | perform light duty work; correct? |
| 01:27 | 12 | A.    It didn't say anything. |
| 01:27 | 13 | MR. GBEWONYO:  Objection, asked and answered. |
| | 14 | The document speaks for itself. |
| | 15 | BY MR. LUBELEY: |
| 01:27 | 16 | Q.    Did it say you could perform any kind |
| 01:27 | 17 | of work? |
| 01:27 | 18 | A.    It didn't say anything. |
| 01:27 | 19 | Q.    Okay.  You're familiar with the |
| 01:28 | 20 | company's policies related to employees with work |
| 01:28 | 21 | restrictions; correct? |
| 01:28 | 22 | MR. GBEWONYO:  Objection, vague as to time, |
| 01:28 | 23 | vague as to familiarity. |
| 01:28 | 24 | THE WITNESS:  No. |
| | 25 | BY MR. LUBELEY: |

**Kusar**® Keeping Your Word Is Our Business℠

| | | |
|---|---|---|
| 01:40 | 1 | A.    Yes.  He did -- when he first got |
| 01:40 | 2 | hired, he was graveyard. |
| 01:40 | 3 | Q.    So when you testified under oath |
| 01:40 | 4 | earlier today that you couldn't drive due to your |
| 01:41 | 5 | doctor's restrictions, that was false testimony; |
| | 6 | correct? |
| 01:41 | 7 | A.    No.  He drove. |
| 01:41 | 8 | Q.    No.  I understand.  But I'm asking when |
| 01:41 | 9 | you testified that you couldn't drive because of your |
| 01:41 | 10 | medical restrictions, was that truthful or was that |
| 01:41 | 11 | false? |
| 01:41 | 12 | A.    I couldn't drive. |
| 01:41 | 13 | MR. GBEWONYO:  Objection, argumentative. |
| | 14 | BY MR. LUBELEY: |
| 01:41 | 15 | Q.    What's that? |
| 01:41 | 16 | A.    I couldn't drive.  I could drive but my |
| 01:41 | 17 | doctor's restriction said don't drive. |
| 01:41 | 18 | Q.    Okay.  So when your attorney asked you |
| 01:41 | 19 | if you would have driven in to work, you would have |
| 01:41 | 20 | done that against your doctor's orders; correct? |
| 01:41 | 21 | A.    Physically, yes, I can.  I can drive. |
| 01:41 | 22 | My doctor's restriction was don't drive.  Don't pick |
| 01:41 | 23 | up your kids.  Don't pick up heavy things.  That's my |
| 01:41 | 24 | doctor's restriction.  Physically, I could do it. |
| 01:41 | 25 | Q.    I understand that. |

Kusar ® Keeping Your Word Is Our Business℠

Case 2:18-cv-09503-AB-JEM    Document 55-1    Filed 01/17/20    Page 236 of 265    Page
ID #:1871
Jayme Tipton (v.II)                Jayme Tipton v. Port Terminal Services, Inc.                1149998

| | | |
|---|---|---|
| 01:42 | 1 | starts his shift after 9:00.  That's when I'm at home |
| 01:43 | 2 | with my kids.  He's back at home by 3:00 in the |
| 01:43 | 3 | morning.  So I could work during the daytime. |
| 01:43 | 4 | Q.    But you can only work if you are on a |
| 01:43 | 5 | staggered shift? |
| 01:43 | 6 | A.    Yes. |
| 01:43 | 7 | Q.    You couldn't work the same shift? |
| 01:43 | 8 | A.    No. |
| 01:43 | 9 | Q.    Okay.  So that -- that situation with |
| 01:43 | 10 | the transportation limits the jobs that you can apply |
| 01:43 | 11 | for? |
| 01:43 | 12 | A.    That is what we came to agreements now. |
| 01:43 | 13 | Before we was working the same shift, it was -- we |
| 01:43 | 14 | was getting child care for our kids but now all of |
| 01:43 | 15 | that is not going great.  So we agreed to work |
| 01:43 | 16 | different shifts so one of us could care for our |
| 01:43 | 17 | children. |
| 01:44 | 18 | Q.    Did you ever ask Moses if you could |
| 01:44 | 19 | perform light duty? |
| 01:44 | 20 | MR. GBEWONYO:  Objection.  Asked and answered. |
| 01:44 | 21 | THE WITNESS:  No. |
| | 22 | BY MR. LUBELEY: |
| 01:44 | 23 | Q.    Did you ever ask Shonta if you could |
| 01:44 | 24 | perform light duty? |
| 01:44 | 25 | A.    No. |

Kusar ® Keeping Your Word Is Our Business℠

Case 2:18-cv-09503-AB-JEM    Document 55-1    Filed 01/17/20    Page 237 of 265    Page
ID #:1872
Jayme Tipton (v.II)                Jayme Tipton v. Airport Terminal Services, Inc.                1149998

01:44  1          MR. GBEWONYO:  Objection.  Asked and answered.

01:44  2    BY MR. LUBELEY:

01:44  3          Q.    Did you ever have a conversation

01:44  4    directly with Damian in which you asked if you could

01:44  5    perform light duty?

01:44  6          A.    Directly, no.

01:44  7          Q.    Yes.

01:44  8          MR. LUBELEY:  Okay.  I have no further

01:44  9    questions.  You want to do the same stipulation,

01:45  10   counsel?

01:45  11         MR. GBEWONYO:  I'm agreeable to the same

01:45  12   stipulation.  However, I'm assuming that we're not

01:45  13   keeping this deposition open given that we've now --

01:45  14   to the extent that -- same stipulation, but we're

01:45  15   concluding the deposition at this time.

01:45  16         MR. LUBELEY:  Well, I say I'm leaving it open

01:45  17   until we get the supplemental discovery responses.

01:45  18         MR. GBEWONYO:  We've produced those documents.

01:45  19         MR. LUBELEY:  I know.  I'm just leaving it

01:45  20   open.  I don't know that we'll ever continue it.  You

01:45  21   know we have some, I think, outstanding discovery

01:45  22   issues is the only thing that I think is outstanding.

01:45  23         MR. GBEWONYO:  Okay.  I also think that we've

01:45  24   exhausted the time period, but I'm happy to meet and

01:45  25   confer with you about that.

Kusar ® Keeping Your Word Is Our Business℠

```
01:45    1        MR. LUBELEY:  That's fine, if necessary.

01:45    2        MR. GBEWONYO:  Okay.

01:45    3        MR. LUBELEY:  All right.  Thanks.

01:45    4        MR. GBEWONYO:  All right.  So stipulated.

01:45    5        THE VIDEOGRAPHER:  This concludes the video

01:45    6   deposition of Jayme Tipton, Volume 2, consisting of

01:45    7   two media units.

01:45    8              The original media of today's

01:46    9   proceedings will remain in the custody of Kusar Legal

01:46   10   Services.  We are going off the record at 1:46 P.M.

        11         (Declaration under penalty of perjury on the

        12   following page hereof.)

        13

        14

        15

        16

        17

        18

        19

        20

        21

        22

        23

        24

        25
```

**Kusar** Keeping Your Word Is Our Business℠

1          DECLARATION

2               OF

3          PENALTY OF PERJURY

4

5      I declare under penalty of perjury, under the

6   laws of the State of California, that I have read the

7   foregoing transcript, I have made any corrections,

8   additions or deletions that I was desirous of making

9   in order to render the within transcript true and

10   correct, and

11       IN WITNESS WHEREOF, I have hereunto subscribed

12   my name this _____ day of _____, _____.

13

14

15

16

17   _____

18   JAYME TIPTON

19

20

21

22

23

24

25

367

Jayme Tipton (v.II)                Jayme Tipton v. Everport Terminal Services, Inc.                1149998

```
 1              CERTIFICATION OF COURT REPORTER

 2                        FEDERAL JURAT

 3
            I, the undersigned, a Certified
 4  Shorthand Reporter of the State of California do
    hereby certify:
 5

 6              That the foregoing proceedings were
    taken before me at the time and place herein set
 7  forth; that any witnesses in the foregoing
    proceedings, prior to testifying, were placed under
 8  oath; that a verbatim record of the proceedings was
    made by me using machine shorthand which was
 9  thereafter transcribed under my direction; further,
    that the foregoing is an accurate transcription
10  thereof.

11

12              That before completion of the
    deposition, a review of the transcript [X] was
13  [ ] was not requested.

14              I further certify that I am neither
    financially interested in the action nor a relative
15  or employee of any attorney of any of the parties.

16

17              IN WITNESS WHEREOF, I have this date
    subscribed my name.

18

19              Dated: December 9, 2019

20

21

22              Norma L. Gaddison

23              _____

24              NORMA L. GADDISON, CSR
                Certificate No. 4214
25
```

368


Kusar® Keeping Your Word Is Our Business℠

# EXHIBIT 14

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA


IN RE MATTER OF:                )
                                )
JAYME TIPTON,                   )
                                )
          Plaintiff,            )
                                )
     vs.                        )  CASE NO.
                                )  2:18-cv-09503-AB-JEM
                                )
AIRPORT TERMINAL SERVICES,      )
INC., and DOES 1 to 100,        )
inclusive,                      )
                                )
          Defendants.           )
_____ )



DEPOSITION OF DEON KEITH BROWN

LOS ANGELES, CALIFORNIA

Wednesday, December 18, 2019




Stenographically Reported by:

HEATHER J. BAUTISTA, CSR, CRR, RPR

```
 1              DEPOSITION of DEON KEITH BROWN, taken before

 2    Heather J. Bautista, CSR No. 11600, a Certified

 3    Shorthand Reporter for the State of California, with

 4    principal office in the County of Santa Clara,

 5    commencing on Wednesday, December 18, 2019, 10:01 a.m.,

 6    at 601 South Figueroa Street, Suite 3300, Los Angeles,

 7    California 90017-5793.

 8

 9

10

11    APPEARANCES OF COUNSEL:

12

13         For the Plaintiff:

14              Shegerian & Associates, Inc.
                BY:  AARON GBEWONYO, ESQ.
15              225 Santa Monica Boulevard
                Suite 700
16              Santa Monica, California 90401
                Phone:  (310) 860-0770 / Fax:  (310) 860-0771
17              agbewonyo@shegerianlaw.com

18

           For the Defendant:
19
                Seyfarth Shaw LLP
20              BY:  MEAGAN SUE O'DELL, ESQ.
                601 South Figueroa Street
21              Suite 3300
                Los Angeles, California 90017-5793
22              Phone:  (213) 270-9600 / Fax:  (213) 270-9601
                modell@seyfarth.com
23

24

25
```

2

**Kusar** ® Keeping Your Word Is Our Business℠

Deon Keith Brown                Jayme Tipton vs. Abbott Terminal Services, Inc.                1150037

```
 1                        INDEX OF EXAMINATION

 2                                                         PAGE

 3    DEON KEITH BROWN

 4        EXAMINATION BY MS. O'DELL                        4

 5

 6

 7                           --o0o--

 8

 9

10                        INDEX OF EXHIBITS
```

| Exhibit No. | Description | Page |
|---|---|---|
| Exhibit 1 | Notice of Deposition and Subpoena | 7 |
| Exhibit 2 | Medical note from Tarzana Treatment Centers | 29 |
| Exhibit 3 | Doctor's note | 33 |
| Exhibit 4 | Doctor's note | 35 |
| Exhibit 5 | Second Amended Complaint | 52 |

**Kusar** Keeping Your Word Is Our Business℠

```
 1                  Wednesday, December 18, 2019

 2                          10:01 a.m.

 3                           --oOo--

 4                       DEON KEITH BROWN,

 5   having been first duly sworn, was examined and testified

 6                        as follows:

 7                     DIRECT EXAMINATION

 8   BY MS. O'DELL:

 9       Q.   Can you please state and spell your name for

10   the record.

11       A.   Deon Keith Brown; D-e-o-n, B-r-o-w-n.

12       Q.   And middle name was Keith, you said?

13       A.   Yes.

14       Q.   Have you ever gone by any other names?

15       A.   No.

16       Q.   And, Mr. Brown, I introduced myself off the

17   record, but my name is Meagan O'Dell, and I'm an

18   attorney for Airport Terminal Services in a claim that

19   was filed by your wife, Ms. Tipton, against them.

20       A.   Okay.

21       Q.   Have you ever given testimony under oath

22   before?

23       A.   No.

24       Q.   All right.

25            Then I'm going to go over just a few deposition
```

4

rules with you today. Okay?

A. Yes.

Q. You are not represented by counsel; correct?

A. No.

Q. That's correct, that you're not represented?

A. No.

Q. Okay.

It's my fault. I asked the question in a confusing way, so I just wanted to make sure. Okay.

So the court reporter that's sitting here to your left is taking down everything that we're saying. At the end of the deposition, she's going to put it into a transcript, and you'll have the opportunity to review it and make any changes if anything is inaccurate.

I would just caution you that if you do make any significant changes, such as a "yes" to a "no," that is something we could comment on at the time of trial. Okay?

A. Okay.

Q. You're already doing it, but we have to have audible responses today so that she can take down what you're saying. So nods of the head, things like that, she can't transcribe. So if you do nod your head or shake your head, I may ask you for clarification of whether it's a yes or no. I'm not trying to be

Kusar Keeping Your Word Is Our Business SM

```
 1    "issues."

 2              THE WITNESS:  No.

 3        Q.   (By Ms. O'Dell)  She'd never had pain in her

 4    shoulder before, to your knowledge?

 5              MR. GBEWONYO:  Calls for speculation.

 6              THE WITNESS:  To my knowledge, no.

 7        Q.   (By Ms. O'Dell)  Did Ms. Tipton ever tell you

 8    that she hurt herself outside of work?

 9              MR. GBEWONYO:  Objection.  Vague.

10              THE WITNESS:  No.

11        Q.   (By Ms. O'Dell)  Do you have an understanding

12    of what the exact injury was?  For example, a doctor's

13    diagnosis of Ms. Tipton's injury?

14        A.   Can you repeat that.

15        Q.   Sure.

16              Are you aware of any doctor's diagnosis of what

17    Ms. Tipton's injury was?

18        A.   No.  I'm not -- I'm not sure.

19        Q.   Did you witness Ms. Tipton informing anyone at

20    ATS that she was injured?

21        A.   I think she told Damian.

22        Q.   What makes you think --

23        A.   Damian, the supervisor.

24        Q.   What makes you think that Ms. Tipton told

25    Damian?
```



Deon Keith Brown                Jayme Tipton vs. Airport Terminal Services, Inc.                    1150037

```
 1        A.    Because I was basically -- like, I'm an agent;

 2   so, basically, we all talk and everything, and he came

 3   up to me and said, "Oh.  Wife hurt herself," or, you

 4   know.  I said, "She hurt herself."

 5             That's when she was telling me, like, her arm

 6   is hurting real bad.  So that's all I knew about that.

 7             But I know for sure that she told Damian,

 8   because Damian came and told me.

 9        Q.    Did Damian tell you about her injury before

10   Ms. Tipton told you?

11        A.    Yes, he did.  He did.

12        Q.    What exactly did Damian say to you?

13        A.    Well, Damian just said, "Oh.  Your wife hurt

14   her arm."  That's about it.

15        Q.    What did you say in response?

16        A.    I just basically went to the plane, and -- and

17   I seen her hurting, and I grabbed -- trying to rub her

18   arm, whatever, and that's about it.  I mean, that's all.

19   I couldn't do nothing about it.

20             I'm sorry.  I'm under the weather.

21        Q.    So -- no, you're fine.  If you need a break,

22   just let me know.

23             So after Damian came up to you and said, "Wife

24   hurt her arm," did he give you any detail?

25        A.    No.
```

Kusar ® Keeping Your Word Is Our Business℠

1    Q.   He just said it and walked away, or --

2    A.   As me being a ramp agent, and all of us -- you

3    know, we're always messing around with each other.  He's

4    like, "Oh.  Your wife hurt her arm," you know, and

5    that's all he said.

6    Q.   And you were able to actually go on to the

7    plane where Ms. Tipton was?

8    A.   Actually, no.  I seen her coming down, and I

9    met her at the stairs.

10   Q.   When you say "saw her coming down," you mean,

11   like, the jetway?

12   A.   No.  It's basically stairs going up to the --

13   to the gate bridge.  It's a bridge, and it's a gate

14   going up there to the plane.  So she was coming off, and

15   I was going up.

16   Q.   What did Ms. Tipton say to you at that point?

17   A.   She said she hurt her arm.  It's hurting real

18   bad.

19   Q.   Is that when she told you how she hurt it?

20   A.   Yeah.

21   Q.   What did you tell her in response?

22   A.   I said -- I just said, basically, "You'll be

23   okay," and just was rubbing her arm.

24   Q.   Did she say anything in response?

25   A.   No.

**Kusar** ® _Keeping Your Word Is Our Business℠_

Deon Keith Brown                  Jayme Tipton v. Airport Terminal Services, Inc.                    1150037

1       Q.   Was this at the end of your shifts, or do you

2   remember approximately when during the day?

3       A.   Well, I think she's off -- she was off before

4   me, so it's towards like -- I guess towards the end of

5   her shift, I believe, to my knowledge.

6       Q.   So if her shift normally ended before yours,

7   did she just wait for you, like, in the break room or

8   something until you finished?

9       A.   Yes.

10      Q.   Do you remember approximately how long it was

11  between the end of her shift and the end of yours?

12      A.   Maybe about an hour.

13      Q.   Okay.

14      So you just went straight back to work after

15  that?

16      A.   After?

17      Q.   After speaking with Ms. Tipton.

18      A.   Yes.

19      Q.   Did you actually see Ms. Tipton inform anyone

20  at ATS that she was injured?

21      A.   No.

22      Q.   Did she tell you that she told anyone other

23  than Damian about the injury?

24      MR. GBEWONYO:  Objection.  Vague as to time.

25      THE WITNESS:  Not to my knowledge.  I'm not

**Kusar** ® Keeping Your Word Is Our Business℠

1    sure.

2        Q.    (By Ms. O'Dell)  As you sit here today, you

3    can't think of anyone else that was informed at ATS

4    about her injury?

5        A.    I mean, only person she would have to inform is

6    maybe her leads.

7        Q.    Do you know if she did that?

8        A.    I believe she did.  But, I mean, like I said, I

9    wasn't there to see it, so I don't really know.

10       Q.    What makes you believe that Ms. Tipton told her

11   leads?

12       A.    Because those are the people she has to inform.

13   When anything goes wrong, you tell your lead.  And if

14   your lead's not there, you tell your supervisor, and --

15   you know.  So I believe she had to have told her lead

16   that she hurt herself.  And then a lead is on the plane

17   with her, so I believe she told her lead.

18       Q.    Am I understanding correctly that you're just

19   assuming she told her lead because that was the policy?

20       A.    Yes, I'm assuming.  I'm not sure.  I wasn't

21   there so --

22       Q.    Did Ms. Tipton ever tell you that she told her

23   lead about the injury?

24       A.    Yeah.  She told me that she told her, but I

25   wasn't there, so --

Kusar ® Keeping Your Word Is Our Business℠

1      Q.    Which lead did Ms. Tipton tell you she informed

2    about her injury?

3      A.    I'm not sure who was the lead that day, so --

4      Q.    So it would have been whoever was the lead the

5    day she was injured?

6      A.    Yes.

7      Q.    Did Ms. Tipton tell you that she informed

8    anyone else about the injury?

9            MR. GBEWONYO:   Objection.   Vague.

10           THE WITNESS:   I'm not sure.

11     Q.    (By Ms. O'Dell)   Okay.

12           Did Ms. Tipton give you any details about the

13    information that she provided to her lead, the

14    conversations she had with her lead about the injury?

15     A.    No.

16     Q.    On your drive home that day, did you guys

17    discuss the injury anymore?

18     A.    No.   Basically, we just said -- I just told

19    her, you know, "You got to go to the doctor," you know,

20    "if it's hurting that bad," and that was about it.   I

21    didn't really, like, go into detail on, like, "Why you

22    did this," "Why you did that."   I just told her, you

23    know, "You got to go to the doctor."

24     Q.    Did she agree?

25     A.    Yes.

1    indicated she could return to work on April 20th.  Do

2    you remember if she went to the doctor again after that,

3    if she went back to work?

4         A.   She went back to the doctor again after that.

5    I drove to the doctor, and this time, I just basically

6    took the paper -- I got the paperwork, because there was

7    no point of me -- of her going all the way to the

8    airport when I'm going there anyway.  So I basically got

9    the paperwork, and I turned in the paper to Edgar.

10   That's who I gave the paperwork to.

11        Q.   When you say "paperwork," are you referring to

12   a doctor's note?

13        A.   Yes, a doctor's note.

14        Q.   Did that doctor's note also place Ms. Tipton

15   off work?

16        A.   Yes.

17             MS. O'DELL:  Mark as Exhibit 3.

18             (Exhibit 3 was marked for identification.)

19        Q.   (By Ms. O'Dell)  Please take a second and look

20   at Exhibit 3, and let me know, is this one of the notes

21   that you believe you turned in to ATS?

22        A.   Yes.

23        Q.   Do you remember who you gave Exhibit 3 to?

24        A.   I gave this paper right here to Edgar.

25        Q.   When did you give it to Edgar?

```
 1        A.    April 20th.

 2        Q.    What makes you think April 20th?

 3        A.    Because she went to the doctor the 19th?   Was

 4   it the 19th?   I'm not sure, but I know when I took her

 5   to the doctor, I got the paperwork, and I took it

 6   straight to work.   So I just know I turned this paper in

 7   to Edgar.

 8        Q.    But you're thinking maybe April 20 because it

 9   would have been the day after she went to the doctor?

10        A.    Yeah.   I'm not sure.   It's around that time,

11   that time frame, so --

12        Q.    Did you personally hand it to Edgar?

13        A.    Yes, I did.

14        Q.    What did Edgar say?

15        A.    He just said, "Thank you," and I went back to

16   work.

17        Q.    Did he ask you any questions about the note?

18        A.    No.

19        Q.    Did you ask him any questions?

20        A.    No.   Basically, because he already knew the

21   situation.   So I gave it to him, and he said, "All

22   right.   Thank you," and I left and went back to doing my

23   job.

24        Q.    Did you talk to anybody else about Exhibit 3 at

25   ATS?
```

**Kusar**® Keeping Your Word Is Our Business℠

1    refreshes your recollection at all as to when you would

2    have turned Exhibit 4 in to Damian.

3         A.    I'm not sure.    I just know -- I mean, once I

4    get the paper, I gave it to him, and that was about it.

5         Q.    Did Ms. Tipton ask you to provide Exhibit 3 and

6    Exhibit 4 to ATS?

7         A.    Well, actually, no.    Like I said, I didn't --

8    ain't no point in her to come all the way down to LAX,

9    so I took her paperwork to the managers for her.

10        Q.    Did you just offer to do that?

11        A.    Yes.

12        Q.    Did you and Ms. Tipton have a conversation at

13   all about what you'd say to ATS when you provided the

14   paperwork?

15        A.    No.

16        Q.    Do you remember if Ms. Tipton's doctor changed

17   her restrictions at any point over the course of her

18   appointments?

19             MR. GBEWONYO:    Objection.    Calls for

20   speculation.

21             THE WITNESS:    I'm not sure.

22        Q.    (By Ms. O'Dell)  Is it your understanding that

23   she still had the same limitations in May of 2017 that

24   she had in April of 2017?

25             MR. GBEWONYO:  Vague as to "limitations."



1    Q.    (By Ms. O'Dell)   She didn't tell you?

2    A.    No.

3    Q.    Did Ms. Tipton provide you any other details

4    about that conversation with Moses?

5    A.    No.

6    Q.    Do you remember when the conversation occurred

7    between Ms. Tipton and Moses?

8    A.    No.

9    Q.    Was it by phone?

10   A.    Yes.

11   Q.    Did Ms. Tipton ever tell you about a

12   conversation that she had with Shonta Henderson?

13        MR. GBEWONYO:  Objection.  Vague as to time.

14        THE WITNESS:  Yes.

15   Q.    (By Ms. O'Dell)   What did Ms. Tipton tell you

16   about her conversation with Ms. Henderson?

17   A.    That Shonta called her and basically said, "We

18   need you to come in and turn in your badge," or "You

19   might have to resign or quit or resign" or something

20   like that, maybe.  And she told her that she didn't want

21   to quit, she wanted her job; and that was basically it.

22        They was going back and forth, and she didn't

23   really go into detail, but I know it was something

24   really upsetting, because I came home, and she was

25   basically, like -- like, tearing up, really crying over

Kusar ®  Keeping Your Word Is Our Business℠

```
 1    the situation and, you know, kind of -- kind of was

 2    weird me coming home, seeing her like that.

 3            And, I mean, that's -- that's it.  I mean, she

 4    told her "Either you're going to have to resign or --"

 5    you know, I don't really know every little bits and

 6    pieces about it, but I know it was around that

 7    situation, about her resigning or quitting.

 8        Q.    You mentioned that Shonta and Ms. Tipton were

 9    going back and forth.  What were they going back and

10    forth regarding?

11        A.    I'm not sure.

12        Q.    Did you have an understanding that it was not

13    only ATS but LAX policy that the badges had to be turned

14    in due to security reasons?

15        A.    No.

16        Q.    You understand that the badges give security

17    clearance throughout LAX airport; correct?

18        A.    Yes.

19        Q.    Did Ms. Tipton ever turn in her badge?

20        A.    Yes, she did.

21        Q.    Do you remember when?

22        A.    No.

23        Q.    Is that something you brought to ATS, or did

24    she bring it?

25        A.    No.  She brought it.
```



Kusar ® Keeping Your Word Is Our Business℠

1    return to work of May 15, 2017."

2            Do you see where I just read that?

3    A.    Um-hum.

4    Q.    Is that a "yes"?

5    A.    Yes.

6    Q.    You previously testified that the second note

7    that you brought in to ATS was given to Damian.  Is that

8    still your testimony, or do you now believe that note

9    went to Edgar Trujillo?

10    A.    No.  The first note I gave to Edgar.  The

11    second note, I gave to Damian.

12    Q.    So Paragraph 8(e) here would be incorrect.  It

13    should read the note went to Damian, as opposed to

14    Edgar -- as opposed to Edgar Trujillo?  It just has his

15    last name.

16    A.    Yes.

17    Q.    Okay.

18            Is there a reason that you didn't give that

19    note to either Edgar or Moses?

20    A.    Basically, Moses wasn't there yet, because he

21    came later.  And Edgar wasn't there that day, so Damian

22    was -- I guess was the head person there that day, so I

23    turned it in to Damian.

24    Q.    When you say Moses wasn't there yet, do you

25    mean he had not taken over the manager role with



Deon Keith Brown                    Jayme Tipton v. Airport Terminal Services, Inc.                    1150037

```
 1    JetBlue, or do you mean he just hadn't arrived?
 2        A.    He hadn't arrived yet.
 3        Q.    Just hadn't arrived at work for the day?
 4        A.    I don't -- I don't remember when Moses came.
 5    He came in, I guess, later; like, a couple months,
 6    maybe.  Because I don't remember -- I don't remember
 7    Moses being around when I was -- when I had turned in
 8    these papers.
 9        Q.    Meaning, you don't remember Moses being in the
10    role of manager or supervisor?
11        A.    Yes.  So, I mean, I knew Damian was our
12    supervisor.  I turned it in to Damian.
13        Q.    Did you ever witness Ms. Tipton requesting
14    light duty from any individual at ATS?
15            MR. GBEWONYO:  Objection.  Vague as to time.
16            THE WITNESS:  No.
17        Q.    (By Ms. O'Dell)  Did Ms. Tipton ever tell you
18    that she requested light duty from any individual at
19    ATS?
20        A.    No.
21        Q.    Did Ms. Tipton complain that her job duties
22    were causing her pain when she was performing them?
23        A.    No.
24        Q.    So after she injured her shoulder, she didn't
25    say that it was hurting to continue to perform her work?
```

54


Kusar · Keeping Your Word Is Our Business℠

1    right now.  But -- oh, yeah.  Moses terminated me

2    because Moses told me that I had a certain amount of

3    points.  He said, "Oh.  Try not to miss no more -- no

4    more days," or whatever.  So I was always there two

5    hours early.  I even sleep in the break room, you know,

6    until the time for me to clock in.

7            And then maybe a month later, I go back to his

8    office and he say, "Oh.  You know why you're here?"

9            "No."

10           "You got 22 points."

11           I'm like, "Man, where 22 points come from?  You

12   just told me I had 16."

13           And, you know, he's said, well -- he said,

14   "You're all right.  You know, we're going to have to

15   suspend you, but you can come right back.  We're going

16   to bring you back."

17           And he suspended me, and few days later, I get

18   a termination paper telling me I can't come back, but --

19   so that was, you know --

20       Q.   Did you call Moses after you got that letter

21   and ask him what happened?

22       A.   I did, but he never -- he never answered my

23   calls after that.

24       Q.   Did you speak to anybody at ATS about that?

25       A.   No, because after I got terminated, I was just

Kusar ® Keeping Your Word Is Our Business℠

12/18/2019
Deon Keith Brown                    Jayme Tipton vs. Airport Terminal Services, Inc.                    1150037

1    done.

2         Q.    But you remember specifically trying to call

3    Moses?

4         A.    Um-hum, yes.

5         Q.    More than once?

6         A.    Yes.

7         Q.    Do you know how many times?

8         A.    Maybe three times.

9         Q.    Any other specific examples of Moses saying one

10   thing and then saying another when other people are

11   around?

12        A.    I'm not sure after that.  I mean, I can't think

13   of nothing else right now.

14        Q.    Okay.

15             MS. O'DELL:  I don't think I have anything else

16   unless you do.

17             MR. GBEWONYO:  No questions.

18             MS. O'DELL:  Okay.

19             So then why don't we have the transcript

20   handled per the code with the following exceptions and

21   conditions:

22             The transcript will be sent directly to you,

23   Mr. Brown, for you to be able to review, make any

24   changes as you see fit.  Is 30 days sufficient time for

25   you to do so?

Kusar ® Keeping Your Word Is Our Business℠

1     THE WITNESS:  That's fine.

2     MS. O'DELL:  So within 30 days, you'll need to

3  let us know whether or not there have been any changes

4  to it.  If we don't hear from you regarding changes and

5  don't receive the signed transcript, we'll assume that's

6  signed for all intents and purposes.

7     The parties can use a certified copy of the

8  transcript as the original at all times during the

9  litigation for any purpose should the original not be

10  available.

11     (Discussion held off the record.)

12     MS. O'DELL:  And so as the court reporter

13  mentioned, Mr. Brown, you'll receive the read-only copy

14  of the deposition transcript with instructions of how to

15  complete the errata sheet.  You'll return that errata

16  sheet with any changes and your signature to the company

17  within 30 days of receipt.  If they don't receive any

18  changes or your signature, the transcript will be deemed

19  signed as-is.

20     Once that all transpires, the original will be

21  sent over to my office and we'll maintain it.

22     So stipulated?

23     MR. GBEWONYO:  So stipulated.

24     (Whereupon, the deposition of DEON KEITH BROWN

25  concluded at 11:38 a.m.)



1                    DECLARATION OF WITNESS

2

3          I hereby declare I am the deponent in the
within matter; that I have read the foregoing deposition
4   and know the contents thereof, and I declare that the
same is true of my knowledge except as to the matters
5   which are therein stated upon my information or belief,
and as to those matters, I believe them to be true.
6          I declare under the penalties of perjury of the
State of California that the foregoing is true and
7   correct.

8

         Executed this _____ day of _____,
9
20_____, at _____, _____.
10              (City)                          (State)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Kusar®  Keeping Your Word Is Our Business℠

1      I, HEATHER J. BAUTISTA, CSR No. 11600, Certified

2    Shorthand Reporter, certify:

3      That the foregoing  proceedings were taken before

4    me at the time and place therein set forth, at which

5    time the witness declared under penalty of perjury; that

6    the testimony of the witness and all objections made at

7    the time of the examination were recorded

8    stenographically by me and were thereafter transcribed

9    under my direction and supervision;

10      That the foregoing is a full, true, and correct

11    transcript of my shorthand notes so taken and of the

12    testimony so given;

13      (XX) Reading and signing was requested.

14      (  ) Reading and signing was waived.

15      (  ) Reading and signing was not requested.

16      I further certify that I am not financially

17    interested in the action, and I am not a relative or

18    employee of any attorney of the parties, nor of any of

19    the parties.

20      I declare under penalty of perjury under the laws

21    of California that the foregoing is true and correct.

22      Dated:  December 23, 2019

23

24

25     _____
       Heather J. Bautista, CSR, CRR, RPR, CLR


Kusar® Keeping Your Word Is Our Business℠

**TIPTON v. ATS**                                    **USDC Case No. 2:18-cv-09503-AB-JEM**

## PROOF OF SERVICE

### STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

I am an employee in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action; my business address is 145 South Spring Street, Suite 400, Los Angeles, California 90012.

On January 17, 2020, I served the foregoing document, described as **"PLAINTIFF JAYME TIPTON'S EVIDENCE IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, SUMMARY ADJUDICATION"** on all interested parties in this action by placing a true copy thereof in a sealed envelope, addressed as follows:

**Aaron R. Lubeley, Esq.**
**Simon L. Yang, Esq.**
**Meagan Sue O'Dell, Esq.**
**SEYFARTH SHAW LLP**
**601 South Figueroa Street, Suite 3300**
**Los Angeles, California 90017-5793**

☒     **BY CM/ECF NOTICE OF ELECTRONIC FILING:** I electronically filed the document(s) with the Clerk of the Court by using the CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the CM/ECF system. Participants in the case who are not registered CM/ECF users will be served by mail or by other means permitted by the court rules.

☒     **(FEDERAL)** I declare that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

Executed on January 17, 2020, at Los Angeles, California.

_____
Jose Castro